**OLSHAN GRUNDMAN FROME**
**ROSENZWEIG & WOLOSKY LLP**
Park Avenue Tower
65 East 55th Street
New York, New York 10022
Michael S. Fox, Esq.
Jordanna L. Nadritch, Esq.
212.451.2300

*Proposed Counsel to the Debtors*

**UNITED STATES BANKRUPTCY COURT**
**THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| JENNIFER CONVERTIBLES, INC.,[1] | Case No. 10-13779 (ALG) |
| Debtors. | (Motion for Joint Administration Pending) |

**MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER: (I) AUTHORIZING THE DEBTORS TO (A) PAY WAGES, SALARIES, AND OTHER COMPENSATION, (B) MAINTAIN INSURANCE, EMPLOYEE MEDICAL AND SIMILAR BENEFITS, AND (C) PAY REIMBURSABLE EMPLOYEE EXPENSES; AND (II) AUTHORIZING AND DIRECTING BANKS AND OTHER FINANCIAL INSTITUTIONS TO PAY ALL CHECKS AND ELECTRONIC PAYMENT REQUESTS MADE BY THE DEBTORS RELATING TO THE FOREGOING**

Jennifer Convertibles, Inc. ("Jennifer Convertibles") and its affiliated chapter 11

debtors and debtors in possession (collectively, the "Debtors"), move the Court for entry of an

order: (i) authorizing, but not requiring the Debtors to (a) pay and/or honor prepetition wages,

commissions, salaries, and other compensation, (b) maintain employee medical and similar

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are: (i) Jennifer Convertibles, Inc. (4646); (ii) Jennifer Convertibles Boylston MA, Inc. (7904); (iii) Jennifer Chicago Ltd. (0505); (iv) Elegant Living Management, Ltd. (5049); (v) Hartsdale Convertibles, Inc. (1681); (vi) Jennifer Management III Corp. (3552); (vii) Jennifer Purchasing Corp. (7319); (viii) Jennifer Management II Corp. (9177); (ix) Jennifer Management V Ltd. (9876); (x) Jennifer Convertibles Natick, Inc. (2227); (xi) Nicole Convertibles, Inc. (5985); (xii) Washington Heights Convertibles, Inc. (0783).

benefits and (c) pay reimbursable employee expenses; and (ii) authorizing banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing (the "Motion"). In support of this Motion, the Debtors respectfully state as follows:

## Background

1. On July 18, 2010 (the "Petition Date"), each of the Debtors commenced with the Bankruptcy Court a voluntary case pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or statutory creditors' committee has been appointed in these chapter 11 cases.

2. Jennifer Convertibles, Inc. was organized as a Delaware corporation in 1986, and is currently the owner of (i) the largest group of sofabed specialty retail stores and leather specialty retail stores in the United States, with stores located throughout the Eastern seaboard, Midwest, West Coast and Southwest, and (ii) seven big box, full-line furniture stores operated under the Ashley Furniture HomeStore brand (the "Ashley Stores") under a license from Ashley Furniture Industries, Inc.

3. In order to generate sales, the Debtors rely on aggressive pricing, the attractive image of its stores, extensive advertising and prompt delivery. Operations are classified into two operating segments organized by retail concept: Jennifer and Ashley. The Jennifer segment operates the sofabed specialty retail store concept. The Ashley segment is the big box, full line home furniture retail store concept. There are no inter-company sales between segments. The Ashley segment is highly profitable due to its unique sourcing model, whereby once most sales

962386-7

are executed, Ashley's supplier manages the supply chain process. Under the Ashley sourcing model, the Debtors need for warehouse inventory is reduced, thereby limiting working capital needs and infrastructure requirements. The Debtors' two operating segments enable the Debtors to more effectively offer diverse home furnishings and accessories and expand to a broader consumer base.

4.      As of the Petition Date, the Debtors' stores include 130 stores operated by the Jennifer segment. During fiscal 2007, the Debtors opened their first Ashley Store. As of the Petition Date, the Debtors operate seven Ashley Stores.

5.      As of the Petition Date, the Debtors employ 497 people. There are 336 employees in the Jennifer segment, 114 employees in the Ashley segment and 47 corporate employees. None of the employees are represented by a collective bargaining unit.

6.      For the fiscal year ended August 29, 2009, the Debtors' consolidated financial statements showed revenues from continuing operations of approximately $94,177,000, compared with $120,131,000 for the fiscal year ended August 30, 2008, and $132,683,000 for the fiscal year ended August 25, 2007. For the thirty-nine weeks ended May 29, 2010, revenues from continuing operations were approximately $70,036,000, with $56,144,000 coming from the Jennifer segment stores, and $13,892,000 from the Ashley segment stores.

7.      Net sales from continuing operations were $88,845,000 and $113,073,000 for the fiscal years ended August 29, 2009 and August 30, 2008, respectively. Net sales from continuing operations decreased by 21.4%, or $24,228,000 for the fiscal year ended August 29, 2009 compared to the fiscal year ended August 30, 2008. The decrease in net sales is attributable to a decline in overall demand within the furniture industry sector due to a poor housing market and an overall weak U.S. economy. Consolidated same store sales from

continuing operations (sales at those stores open for the entire current and prior comparable periods) decreased 19.6% for the thirteen weeks ended May 29, 2010, compared to the same period ended May 30, 2009.

8.     Specifically, in the Ashley segment, net sales from continuing operations were $5,106,000 and $3,363,000 for the thirteen-week periods ended May 29, 2010 and May 30, 2009, respectively.  Net sales from continuing operations increased by 51.8%, or $1,743,000 for the thirteen-week period ended May 29, 2010 compared to the thirteen-week period ended May 30, 2009.  The increase is largely attributable to four new Ashley locations open during the thirteen-week period ended May 29, 2010 that were not open during the same thirteen week period last year.

9.     In the Jennifer segment, net sales from continuing operations were $16,375,000 and $16,987,000 for the thirteen-week periods ended May 29, 2010 and May 30, 2009, respectively.  Net sales from continuing operations decreased by 3.6%, or $612,000 for the thirteen-week period ended May 29, 2010 compared to the thirteen-week period ended May 30, 2009.  The decrease is attributable to the decline in overall demand within the furniture industry sector due to the prevailing conditions of the U.S. economy, the current housing market, store closings, and delays in receipt of merchandise from the Debtors' Chinese supplier, all as discussed in greater detail in the other first day motions, filed concurrently herewith.

10.     The factual background relating to the Debtors' commencement of these chapter 11 cases is set forth in additional detail in the Declaration of Rami Abada in Support of First Day Motions (the "Abada Declaration") filed contemporaneously with this Motion and incorporated herein by reference.

**Jurisdiction**

11.     This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of these proceedings and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

12.     The statutory bases for the relief requested herein are sections 105(a), 363(b), 507(a)(4) and 507(a)(5) of title 11 of the United States Code (as amended, the "Bankruptcy Code") and rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules").

## **Relief Requested**[2]

13.     The Debtors employ approximately 497 employees (the "Employees") as of the Petition Date.  To minimize the personal hardships that the Employees will suffer if their prepetition employee-related obligations are not paid, to maintain the morale of the Employees during this critical time, and to minimize disruptions to the Debtors' ongoing business operations, the Debtors, by this Motion, seek authority, in their sole discretion, to:  (i) pay unpaid prepetition claims for wages, commissions and salaries to the Employees (the "Unpaid Wages"); (ii) remit applicable withholding obligations to the proper third parties; (iii) honor and maintain certain benefits (as more fully set forth below) offered by the Debtors (the "Benefits"); (iv) reimburse certain unpaid business expenses incurred prepetition by the Employees; and (v) pay all costs incident to the foregoing as set forth in detail below.

14.     Pursuant to sections 105(a), and 363(b)(1) and (c)(1) of the Bankruptcy Code and the "necessity of payment" doctrine, the Debtors seek authority to pay or honor, in their sole discretion:[3]

---

[2]  Nothing in this Motion is intended to or shall convert any prepetition claim into an administrative claim.
 [3]  All capitalized terms not defined here will be defined below.

- the Unpaid Wages, including any associated payroll processing obligations;

- any Employer Tax Obligations attributable to the period prior to the Petition Date and to remit the same to applicable taxing authorities or other appropriate third-parties;

- the General Reimbursement Obligations;

- all prepetition obligations under the Medical Plans;

- all prepetition obligations under the Disability Insurance, AD&D Insurance, and Life Insurance Programs;

- the Bonuses

- all prepetition obligations under the Workers' Compensation Policy, including those obligations incurred prepetition and liquidated post-petition;

- honor vacation time earned prepetition by Employees; and

- any other prepetition claims or obligations described in this Motion for which such authority is specifically requested herein

(with each of the foregoing referred to collectively as the "Prepetition Employee Obligations.").

15.     The Debtors also seek authority to continue, in their sole discretion, on a postpetition basis:

- the Health Plans, including the Medical Plans and the Disability Insurance, AD&D Insurance, and Life Insurance Programs;

- the Workers' Compensation Policy;

- vacation policies pursuant to the terms of the Debtors' applicable policies and this Motion;

- the Bonuses;

- payment of the Employer Tax Obligations; and

- any other benefit program described in this Motion for which authority is specifically requested herein

(with each of the foregoing referred to collectively as the "Employee Programs.").

16.     With the exception of the Officers (as defined below), the Debtors represent that

(i) they will not distribute any amounts over the § 507(a)(4) priority cap of $11,725 directly to

any individual employee on account of Unpaid Wages, and (ii) they will not pay any amounts in

6

excess of the estimated outstanding amounts for each category of prepetition claim identified herein without further order from this Court.

17. To enable the Debtors to accomplish the foregoing, the Debtors request that the Court authorize and direct the Debtors' banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing.

18. Notwithstanding the authority requested in this Motion, the Debtors, in the ordinary course of business sometimes modify, change and discontinue employee programs and implement new employee programs and will continue to do so during these chapter 11 cases, and will provide notice thereof as required by applicable rules and law.

## The Debtors' Compensation and Benefits Programs

The Debtors' Compensation Procedures

19. As of the Petition Date, Employees paid by the hour (the "Hourly Employees") are owed total Unpaid Wages earned between July 4, 2010 and July 18, 2010, and salaried Employees (the "Salaried Employees") are owed Unpaid Wages earned between July 4, 2010 and July 18, 2010.[4] Salaried Employees and Hourly Employees are collectively referred to herein as "Employees".

20. *Wages and Salaries*. The Debtors' aggregate monthly payroll including wages, salaries and commissions, is approximately $1,440,000 per month. Hourly Employees are paid $938,000. Salaried Employees are paid $502,000.

---

[4] While the pay period ends July 18, 2010, the payments are not processed until July 22, 2010.

21.     As of the Petition Date, the Debtors owe an estimated $745,000 for the gross amount of earned but Unpaid Wages.  No single Employee is owed more than $11,725 in Unpaid Wages, with the exception of Harley J. Greenfield, the chairman of the board and chief executive officer, who is owed $21,670, Rami Abada, the president, chief financial officer, and chief operating officer, who is owed $26,689 and Edward B. Seidner, executive vice president, who is owed $12,363.  Messrs. Greenfield, Abada and Seidner are hereinafter referred to as the Officers. The Debtors therefore seek authority to pay the Unpaid Wages in the approximate amount of $745,000.

22.     The Officers are each owed prepetition wages beyond the $11,725 limit of Bankruptcy Code §507(a)(4). The Officers are all integral to the continued operation of the Debtors' businesses and the Debtors are concerned that they will cease working to keep the Debtors' businesses operating unless they are paid the full amount of the prepetition wages owed to them. While the Officers' prepetition wages exceeding the $11,725 limit of §507(a)(4) are general unsecured claims, where an unsecured claim exists the non-payment of which could impair a debtor's ability to operate, courts may, order payment of unsecured prepetition claims. *See In re Coserv., Inc.*, 273 B.R. 487, 493-94 (Bankr. N.D. Tex. 2002).  The Debtors therefore request that the Officers be paid the amounts owed them over the statutory cap.

23.     In addition to the Unpaid Wages, the Debtors estimate that as of the Petition Date, approximately $53,000 of the Debtors' contributions to tax and insurance withholdings were incurred and unpaid in connection with the Unpaid Wages (the "Employer Tax Obligations"). The Debtors request authority to pay the Employer Tax Obligations, in the approximate amount of $53,000, in connection with the payment of the Unpaid Wages, plus any amounts

subsequently deemed to be due and owing pursuant to any audit of the Employer Tax Obligations which occurs after the Petition Date.

24.     *PEO.*  The Debtors' employees are leased from a professional employer organization, Prestige Employee Administrators (the "PEO").  A PEO is a single source provider of integrated services which enable business owners to cost-effectively outsource the management of human resources, employee benefits, payroll and workers' compensation and other strategic services, such as, recruiting, risk/safety management, and training and development.  It does this by hiring a client company's employees, thus becoming their employer of record for tax purposes and insurance purposes.  This practice is known as co-employment.

25.     In the ordinary course of business, the Debtors provide applicable schedules to the PEO in advance of the payroll payment period, and the PEO issues payroll checks.  The Debtors pay approximately $12,000 per month to the PEO on account of payroll processing services.  The Debtors estimate that they owe the PEO approximately $6,500 on account of prepetition services.  By this Motion, the Debtors request authority to continue to use the PEO's payroll processing services to pay any prepetition amounts that may be due to PEO, in the approximate amount of $6,000 per bi-weekly payroll processing.

26.     *Bonuses.*  In order to attract and retain qualified and motivated employees at the operating properties, the Debtors have implemented incentive and discretionary bonus arrangements with certain individual employees (the "Bonuses").  Bonuses are either task related, based on performance goals and/or discretion of the management.  The task related Bonuses are generally paid to Jennifer and Ashley segment Employees bi-weekly, except for those related to store banking which are paid monthly.  Corporate Employees receive Bonuses quarterly upon completion of the filings required by the Securities and Exchange Commission.

962386-7

Certain other corporate Employees receive monthly Bonuses that are linked to their managerial responsibilities. The performance-based Bonuses are earned by sales personnel for attaining set sales goals for which they are compensated monthly. Each of these Bonuses play a key role in maintaining Employee morale and preserving the value of the Debtors' businesses.

27.     As of the Petition Date, the Debtors pay an average of $616,000 annually on account of the Bonuses. By this Motion, the Debtors request the authority to continue to pay the Bonuses in the ordinary course of business.

Business Expense Reimbursements

28.     The Debtors customarily reimburse Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtors. Such expenses typically include, but are not limited to, business-related travel expenses, including air travel, auto travel and car rental, lodging, meal charges, business lunches, telephone charges, and miscellaneous other allowed travel expenses (the "General Reimbursement Obligations"). Such General Reimbursement Obligations also include amounts billed by Employees to corporate charge cards for the purchase supplies, inventory, and equipment on behalf of the Debtors and in support of the Debtors' businesses.

29.     It is difficult for the Debtors to determine the exact amounts of General Reimbursement Obligations that are due and owing for any particular time period since the expenses incurred by Employees on behalf of the Debtors throughout the year vary on a monthly basis and because there may be some delay between when an Employee incurs an expense and submits the corresponding expense report for processing. Based on historical experience, the average monthly amount of General Reimbursement Obligations for all Employees was approximately $16,000.

30.    By this Motion, the Debtors seek authority to pay any prepetition General Reimbursement Obligations (including any such amounts due to former employees) in the approximate amount of $16,000, and to continue to honor General Reimbursement Obligations incurred postpetition in the ordinary course of the Debtors' businesses.

<u>The Health Plans</u>

31.    The Debtors provide several health and related benefit plans to their Employees, including medical insurance, life insurance, accidental death and disability insurance, and short and long-term disability insurance (collectively, the "Health Plans"), as described in more detail below.  The Debtors seek authority to pay such invoices in the ordinary course of their businesses, as more specifically set forth below.  .

32.    *Medical Plans*.  The Debtors, through the PEO, offer all full-time employees medical insurance through various medical plans (the "Medical Plans").  Full-time Employees are eligible on the first of the month following a ninety day waiting period that begins on the date of employment.  Approximately 70 of the Debtors' Employees currently participate in the Medical Plans.

33.    At the beginning of each month, the Debtors pay the PEO approximately $40,000 on account of the Medical Plans.  The PEO then withholds the appropriate amount from the Employees participating in the Medical Plans, and reimburses the Debtors each pay period.  On average, after the PEO has withheld the appropriate medical payments from Employee Wages, the Debtors' cost is approximately $8,500 per month on account of their Medical Plan.

34.    The Debtors seek authority to pay the PEO on account of the Medical Plan on account of the prepetition invoices and for any other Medical Plan contributions that came due prepetition for which the Debtors are not yet aware.  The Debtors seek authority to continue to

offer their Medical Plans postpetition, and make payments to the PEO, in the ordinary course of business and in their discretion.

35.     Also, as required by law, the Debtors offer coverage under certain of the Health Plans to their former employees who have elected COBRA coverage. In the case of the former employees who have elected COBRA coverage, the Debtors do not pay any premiums on behalf of the Employees. Instead, such former employees pay the full amount of the premiums due to the PEO. Although the Debtors advance the premium amounts for these former employees when the Debtors pay their monthly invoices to the PEO for the Health Plans, these amounts are reimbursed to the Debtors by the PEO, who collects the premium amounts owing directly from the former employees and remits them to the Debtors. As part of the relief requested hereunder, the Debtors request authority to pay prepetition premium payments relating to COBRA coverage (which are fully paid by the former employees) for their Health Plans and to continue to make such payments in the ordinary course of business.

36.     *Life, AD&D and Disability Insurance*. The Debtors provide their Employees with life insurance ("Life Insurance") and accidental death and dismemberment insurance ("AD&D Insurance") and make additional life insurance, short-term disability insurance and long-term disability insurance ("Disability Insurance", and collectively, the "Insurance Policies") available to Employees though their insurance carriers and the PEO. The Debtors' premium contributions to the Insurance Policies total, in the aggregate, approximately $2,920 per month. As of the Petition Date, the Debtors owe $1,460 on account of the prepetition period for these programs. However, in an abundance of caution, the Debtors seek authority to pay approximately $1,500 for all of these programs on account of any prepetition amounts that may be owing for which

962386-7

they are not yet aware, and to continue to offer the Insurance Policies postpetition in the ordinary course of business in their discretion.

Workers Compensation.

37.     Under the laws of the states where the Debtors conduct their business, the Debtors are required to maintain workers' compensation insurance to provide their Employees with coverage for claims arising from or related to their employment with the Debtors.  The Debtors currently maintain an annual workers' compensation policy (the "Workers' Compensation Policy") with PMA Insurance Company ("PMA"), pursuant to which PMA provides workers' compensation insurance coverage up to the statutory limits and up to $500,000 per occurrence for employer liability.  The current term of the Workers' Compensation Policy runs through February 3, 1011, and costs $360,000 on an annual basis, subject to final audit.  The Debtors make quarterly payments on the 3rd day of February, May, August and November under their existing Workers' Compensation Policy.

38.     The Debtors submit that the continuance of their Workers' Compensation Policy is appropriate in the ordinary course of business, but out of an abundance of caution, seek authority to maintain their workers' compensation insurance in accordance with applicable law postpetition and to pay all premium installments to PMA as they come due in the ordinary course of business for going forward coverage.

Vacation Benefits

39.     The Debtors provide all full-time Employees vacation time.  Vacation benefits vary based on the Employee's location and position, and begin to accrue one year from the employment date.  Employees in the Jennifer segment accrue vacation time at a rate of 0.83 days per month, and personal days at a rate of 4 days per year.  Employees in the Ashley segment

accrue vacation time at a rate of 0.83 days per month, and personal days at a rate of 6 days per year. Employees in the Debtors' warehouses accrue vacation time at a rate of 0.83 days per month, and personal days at a rate of 5 days per year. Employees in the Debtors' corporate offices accrue vacation time at a rate of 0.83 days per month, which increases to 1.25 days per month after five years of employment, and 4 personal days per year.

40.    Vacation is paid by the Debtors at the employee's base rate at the time the vacation is taken. Vacation pay does not include overtime or any special forms of compensation such as incentives, commissions, Bonuses, or shift differentials. If a holiday falls during the Employee's vacation, the day will be charged to holiday pay rather than vacation pay. The Debtors encourage their Employees to use the available vacation time in the year it is earned, as Employees lose any unused vacation days.[5]

41.    The Debtors request authority in their discretion to honor existing vacation obligations accrued prior to the Petition Date by their Employees and develop any similar policies regarding time away from work and holidays on a post-petition basis and in the ordinary course of the Debtors' business.

## Basis for Relief

42.    As a result of this Chapter 11 filing, the Debtors are prohibited from paying claims that arose before the Petition Date unless the Debtors receive specific authorization from the Court. Statutory support for the requested relief exists pursuant to sections 105(a), 363(b)(1) and (c)(1), and 507(a) of the Bankruptcy Code and the "necessity of payment" doctrine (as discussed below). Bankruptcy Code section 363(b)(1) authorizes a debtor in possession to use property of the estate other than in the ordinary course of business after notice and a hearing.

---

[5] Employees in the Debtors' San Francisco locations do not lose their unearned vacation days.

14

Bankruptcy Code section 363(c) authorizes a debtor in possession to enter into transactions in the ordinary course of business without notice and a hearing. Bankruptcy Code section 105(a) further provides, in pertinent part, that this Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code. Accordingly, because most, if not all, such priority claims may be paid in full under a plan of reorganization, unless the holders otherwise agree, accelerated payment of such claims at this time is appropriate and this Court is authorized to grant the relief requested.

43. The relief requested in this Motion is supported by the well-established "necessity of payment" doctrine.[6] Courts have recognized the applicability of the "necessity of payment" doctrine with respect to the payment of prepetition employee expense reimbursements. *See, e.g.*, *In re Chateaugay Corp.*, 80 B.R. 279, 281 (Bankr. S.D.N.Y. 1987) (under the "necessity of payment" doctrine, bankruptcy court should defer to the debtor's business judgment in permitting payment of certain workers' compensation claims). Similarly, the court in *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989), stated that the "necessity of payment" doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor." In that case, the court permitted Eastern Air Lines, Inc., to pay its current employees' prepetition wages, salaries, medical benefits, and business expense claims. Judge Lifland relied on his equitable powers under Bankruptcy Code section 105(a) and, in particular, the "necessity of payment" doctrine to authorize such payments, recognizing that the debtor had to make the payments in order to retain its current employees and maintain positive

---

[6] The doctrine was first articulated by the Supreme Court in railroad reorganization cases, *see Miltenberger v. Logansport Ry.*, 106 U.S. 286 (1882), and it has been held to be equally applicable to non-railroad debtor cases. *See, e.g., Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (hotel); *In re Gulf Air, Inc.*, 112 B.R. 152, 153 (Bankr. W.D. La. 1989) (airline).

employee moral--two factors that he deemed critical to the rehabilitation of an operating debtor. *Id.* at 176-77 (citing H.R. Rep. No. 595 95th Cong. 1st Sess. 16 (1977)).

44. Courts in this district have approved payment of prepetition claims for compensation and benefits similar to those described herein in other chapter 11 cases. *See, e.g., In re Saint Vincents Catholic Medical Centers of New York*, Case No. 10-11963 (CGM) (Bankr. S.D.N.Y. May 7, 2010); *In re Journal Register Company, et al.*, Case No. 09-10769 (ALG) (Bankr. S.D.N.Y. Feb. 21, 2009); *In re Fortunoff Holdings, LLC and Fortunoff Card Company, LLC*, Case No. 09-10497 (RDD) (Bankr. S.D.N.Y. Feb. 5, 2009); *In re Steve & Barry's Manhattan LLC, et al.*, Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. July 10, 2008); *In re Lexington Precision Corp.*, Case No. 08-11153 (MG) (Bankr. S.D.N.Y. Apr. 22, 2008); *Quebecor World (USA) Inc.*, Case No. 08-10152 (IMP) (Bankr. S.D.N.Y. Jan. 23, 2008).

45. Therefore, the "necessity of payment" doctrine authorizes the Debtors to pay the amounts it seeks authority to pay pursuant to this Motion because the Debtors' Employees are critical assets necessary both to the Debtors' operations and the successful prosecution of these chapter 11 cases.

46. Moreover, pursuant to sections 507(a)(4) of the Bankruptcy Code, claims of Employees of the Debtors for "wages, salaries, or commissions, including vacation, severance, and sick leave pay" earned within 180 days before the Petition Date are afforded priority unsecured status to the extent of $11,725 per Employee. The Debtors believe that all of the Unpaid Wages relating to the period prior to the Petition Date constitute priority claims under sections 507(a)(4) of the Bankruptcy Code. As priority claims, the Unpaid Wages must be paid in full before any general unsecured obligations of the Debtors may be satisfied. Accordingly,

962386-7

the relief requested may affect only the timing of the payment of these priority obligations, and will not prejudice the rights of general unsecured creditors or other parties in interest.

47. Upon information and belief, with the exception of the Officers, none of the Employees are currently owed Employee Obligations in excess of $11,725. Pursuant to the relief requested herein, the Debtors request authority to pay up to the $11,725 statutory cap under Bankruptcy Code section 507(a)(4) to each Employee on account of all Unpaid Wages collectively owing to such Employee.[7], and the amounts over the statutory cap owed the Officers, as set forth above.

48. Many Employees rely exclusively on receiving their full compensation or reimbursement of their expenses in order to continue to pay their daily living expenses. These Employees may be exposed to significant financial and healthcare related problems if the Debtors are not permitted to pay and/or honor the Unpaid Wages and Benefits, and the expenses associated therewith, in the ordinary course of the Debtors' business. Moreover, the Debtors believe that if they are unable to honor accrued Unpaid Wages and the Benefits described above, including honoring earned vacation time, Employee morale and loyalty will be jeopardized at a time when Employee support is critical.

49. If the Debtors are not authorized to pay for medical benefits, then many of the Debtors' Employees may not be reimbursed or otherwise have their medical benefits claims paid. In addition, certain Employees may become primarily obligated for the payment of these claims in cases where health care providers have not been reimbursed. The Debtors believe that potentially enormous hardship could be visited upon these employees if the Debtors are not

---

[7] With the exception of the Officers, in the event any unpaid amounts owing to any Employee on account of Unpaid Wages exceed the $11,725 statutory cap, the Debtors reserve the right to petition the Court for authority to pay such amounts.

authorized to honor the resultant Medical Plan and Dental Plan Obligations. The Debtors believe the uncertainty regarding the payment of Medical Plan and Dental Plan Obligations will cause significant anxiety at precisely the time the Debtors needs their Employees to perform their jobs at peak efficiency. Furthermore, the Debtors believe that the Medical Plan and Dental Plan Obligations are entitled to priority status under sections 507(a)(5)(A) and (B) of the Bankruptcy Code.

50.     The Employer Tax Obligations and other amounts either voluntarily or involuntarily withheld from Employee paychecks by the PEO (collectively, the "Withholding Obligations") do not constitute property of the Debtors' estate and principally represent employee earnings that governments (in the case of taxes), Employees (in the case of voluntary Withholding Obligations), and judicial authorities (in the case of involuntary Withholding Obligations), have designated for deduction from Employee paychecks. The failure to transfer these withheld funds could result in hardship to certain Employees. The Debtors expect inquiries from garnishers regarding any failure to submit, among other things, child support and alimony payments, which are not the Debtors' property but, rather, have been withheld from Employee paychecks by the PEO. Moreover, if the Debtors cannot remit these amounts, the Debtors' Employees may face legal action due to the Debtors' failure to submit these payments.

51.     Finally, the Debtors submit that with respect to the wage-related taxes that constitute "trust fund" taxes, the payment of such taxes will not prejudice other creditors of the Debtors' estate given that the relevant taxing authorities would have a priority claim under section 507(a)(8) of the Bankruptcy Code in respect of such obligations. Moreover, the monies payable for trust fund taxes, as well as the other funds that are held in trust for the benefit of third parties are not property of the Debtors' estate. *See, e.g.*, *Begier v. IRS*, 496 U.S. 53 (1990)

(withholding taxes are property held by a debtor in trust for another and, as such, are not property of the debtor's estates).

52.     The Employees have an intimate knowledge of the operation of the Debtors' business and are critical components to the success of these chapter 11 cases. Deterioration in the morale and welfare of the Employees at this critical time undoubtedly would adversely impact the Debtors and their ability to maximize the value of their assets. Satisfaction of the Unpaid Wages and Benefits, as described herein, is necessary to maintain the Employees' morale during the case and to insure continued, efficient operation in order to maximize value for all creditors.

## No Assumption or Assignment of Employee Benefits

53.     To the extent any Employee Benefits or related agreement is deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, the Debtors do not, at this time, seek to assume any such contract. Accordingly, if the Court authorizes the payments described above, such payments should not be deemed to constitute a postpetition assumption or adoption of the programs, policies, or agreements as executory contracts pursuant to section 365 of the Bankruptcy Code. Moreover, authorization to pay all amounts on account of Unpaid Wages and Benefits shall not affect the Debtors' right to contest the amount or validity of these obligations.

**Request for Authority for Banks and Other Financial Institutions
to Honor Checks Issued to Pay Wages and Benefits, to Honor All
Fund Transfer Requests Relating to the Foregoing, and to Pay All
Processing Fees Associated with Payment of Employee Wages and Benefits**

54.     The Debtors request that all applicable banks and other financial institutions be authorized to receive, process, honor, and pay all checks presented for payment and to honor all

fund transfer requests made by the Debtors to Employees, whether such checks were presented or fund transfer requests were submitted prior to, on, or after the Petition Date. The Debtors represent that they have (or will have) sufficient postpetition funding to pay promptly all Unpaid Wages and Benefits, to the extent described herein, on an ongoing basis and in the ordinary course of business. Nothing contained in this Motion, however, shall constitute a request for authority to assume any agreements, policies, or procedures relating to Unpaid Wages and Benefits. Further, the Debtors seek to retain the discretion to decide which Unpaid Wages and Benefits it will pay and honor, and nothing in this Motion shall be deemed an admission by the Debtor that any Unpaid Wages and Benefits will in fact be paid or honored.

55. Finally, the Debtors request authority to pay all of the processing fees associated with payment of the Unpaid Wages and Benefits including, but not limited to, any fees owed to any third party administrators of Benefits as described in the Motion.

## The Debtors Satisfy Bankruptcy Rules 6003 and 6004

56. Pursuant to Rule 6003(b) of the Federal Rules of Bankruptcy Procedure, which became effective December 1, 2007, "a motion to pay all or part of a claim that arose before the filing of the petition" shall not be granted by the Court within 20 days of the Petition Date "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm . . . ." Fed. R. Bankr. P. 6003(b). For the reasons described more fully above, the Debtors submit that the requirements of Rule 6003 have been met and that the relief requested in this Motion is necessary to avoid immediate and irreparable harm. To implement the foregoing successfully and insure the wages and benefits owed to Employees are not interrupted, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an

order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), to the extent these rules are applicable.

## Notice

57.     No trustee, examiner or statutory creditors' committee has been appointed in these chapter 11 cases. Notice of this Motion has been provided to: (i) Office of the United States Trustee for the Southern District of New York; (ii) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estate (on a consolidated basis); (iii) counsel to Haining Mengnu Group Co. Ltd.; (iv) the SEC; (v) the IRS; (vi) all taxing authorities in relevant jurisdictions; (vii) all attorneys general in relevant jurisdictions; and (viii) any other party directly affected by this Motion.  The Debtors submit that such notice is sufficient under the circumstances.

## No Prior Request

58.     No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE the Court should authorize, but not require, the Debtors to pay all of the above listed in this Motion, including: prepetition wages, salaries, and other compensation, employee medical and similar benefits, and reimbursable employee expenses, and authorize banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing, and grant such other and further relief as is just and proper.

Dated: New York, New York
July 19, 2010

OLSHAN GRUNDMAN FROME
ROSENZWEIG & WOLOSKY LLP

By:     /s Michael S. Fox
        Michael S. Fox
        Jordanna L. Nadritch
        Park Avenue Tower
        65 East 55th Street
        New York, New York 10022
        (212) 451-2300

        *Proposed Attorneys for the Debtors and
        Debtors in Possession*

22

**Exhibit A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| JENNIFER CONVERTIBLES, INC.,[1] | Case No. 10-13779 (ALG) |
| Debtors. | (Motion for Joint Administration Pending) |

### ORDER (I) AUTHORIZING THE DEBTORS TO PAY PREPETITION (A) WAGES, SALARIES, AND OTHER COMPENSATION, (B) EMPLOYEE MEDICAL AND SIMILAR BENEFITS, AND (C) REIMBURSABLE EMPLOYEE EXPENSES; AND (II) AUTHORIZING AND DIRECTING BANKS AND OTHER FINANCIAL INSTITUTIONS TO PAY ALL CHECKS AND ELECTRONIC PAYMENT REQUESTS MADE BY THE DEBTORS RELATING TO THE FOREGOING

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (the "Debtors") for entry of an order (i) authorizing, but not requiring, the Debtors to all the relief requested in the Motion, including to pay prepetition (a) wages, salaries, and other compensation, (b) employee benefits and arrangements and (c) reimbursable employee expenses; and (ii) authorizing and directing banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing; and upon consideration of the Declaration of Rami Abada in Support of the Debtors' Chapter 11 Petitions and Request for First Day Relief; and the Court having found that

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are: (i) Jennifer Convertibles, Inc. (4646); (ii) Jennifer Convertibles Boylston MA, Inc. (7904); (iii) Jennifer Chicago Ltd. (0505); (iv) Elegant Living Management, Ltd. (5049); (v) Hartsdale Convertibles, Inc. (1681); (vi) Jennifer Management III Corp. (3552); (vii) Jennifer Purchasing Corp. (7319); (viii) Jennifer Management II Corp. (9177); (ix) Jennifer Management V Ltd. (9876); (x) Jennifer Convertibles Natick, Inc. (2227); (xi) Nicole Convertibles, Inc. (5985); (xii) Washington Heights Convertibles, Inc. (0783).

[2] Capitalized terms used but not defined herein shall have the same meanings ascribed to them in the Motion.

jurisdiction is proper pursuant to 28 U.S.C. §§ 157 and 1334 as is venue pursuant to 28 U.S.C. §§ 1408 and 1409; this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); the relief requested is proper under 11 U.S.C. §§ 105(a), 507(a)(4) and (5), and 541(d); the relief requested is in the best interests of the Debtors' estates, their creditors, and other parties-in-interest; such relief is necessary to avoid immediate and irreparable harm meaning that the requirements of Rule 6003 of the Federal Rules of Bankruptcy Procedure have been satisfied; proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and after due deliberation thereon; and good and sufficient cause appearing therefor,

### IT IS HEREBY ORDERED THAT:

1.     The Motion is GRANTED.

2.     Pursuant to sections 507(a), 363(b) and 105(a) of the Bankruptcy Code, the Debtors are authorized, but not directed, to pay and/or honor the Prepetition Employee Obligations, the Employee Programs, all costs and/or expenses related thereto as set forth in the Motion, in accordance with the Debtors' policies in the ordinary course of business.

3.     With the exception of the Officers, no payments to any Employee on account of that Employee's Unpaid Wages and prepetition vacation and sick pay shall exceed the $11,725 cap per Employee provided under section 507 of the Bankruptcy Code.

4.     The Debtors are authorize, but not directed to pay the Officers as follows: Harley J. Greenfield: $21,670; Rami Abada: $26,689; and Edward B. Seidner: $12,363.

5.     The Debtors and any other third parties administering withholding obligations on behalf of the Debtors, are authorized, but not directed, to make payments to applicable third parties with respect to the Withholding Obligations, and the Employer Tax Obligation, as set

2

forth in the Motion, and the costs associated therewith, in accordance with the Debtors' ordinary course of business and stated policies, as set forth in the Motion.

6.     In accordance with this Order and any other order of this Court, the banks and financial institutions at which the Debtors maintain their accounts are authorized to honor all fund transfer requests made by the Debtors related hereto, to the extent that sufficient funds are on deposit in such accounts.

7.     The Debtors are authorized to pay all processing and administrative fees associated with the Prepetition Employee Obligations, Employee Programs, and other benefits as set forth in the Motion.

8.     Nothing in the Motion or this Order shall be deemed to be an assumption or adoption of any policy, procedure, or executor contract that may be described or referenced herein or in the Motion.   The Debtors retain the discretion to not make the payments contemplated by this Order and nothing in this Order will, in and of itself, constitute a promise or guarantee of any payment.

9.     Bankruptcy Rule 6003(b) has been satisfied.

10.    The requirements of Bankruptcy Rule 6004(a) are waived.

11.    Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon entry of this Order.

12.    Nothing in the Motion shall be deemed a request by the Debtors for authority to assume, and nothing in this Order shall be deemed authorization to assume, any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code or create an administrative obligation for any prepetition wages or benefits.

13.    This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

Dated: July __, 2010
      New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

4