OLSHAN GRUNDMAN FROME
ROSENZWEIG & WOLOSKY LLP
Park Avenue Tower
65 East 55th Street
New York, New York 10022
Michael S. Fox, Esq.
Jordanna L. Nadritch, Esq.
212.451.2300

*Proposed Counsel to the Debtors*

**UNITED STATES BANKRUPTCY COURT**
**THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| JENNIFER CONVERTIBLES, INC.,[1] | Case No. 10-13779 (ALG) |
| Debtors. | |
| | (Motion for Joint Administration Pending) |

**MOTION OF THE DEBTORS TO APPROVE SALE PROCESS INCLUDING SALE
TO THE HIGHEST BIDDERS AND TO (A) APPROVE BID PROCEDURES
AND PROTECTIONS; (B) SCHEDULE A SALE HEARING; (C) APPROVE THE FORM
AND MANNER OF NOTICE RELATED THERETO; (D) AUTHORIZE SALE FREE
AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND
INTERESTS; AND (E) GRANT RELATED RELIEF**

Jennifer Convertibles, Inc. ("Jennifer Convertibles") and its affiliated debtors, as debtors

in possession (together, the "Debtors"), hereby move this Court (the "Motion") for entry of an

order that will (a) approve bid procedures and protections; (b) schedule a sale hearing; (c)

approve the form and manner of notice related thereto; (d) authorize sale free and clear of all

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are: (i) Jennifer Convertibles, Inc. (4646); (ii) Jennifer Convertibles Boylston MA, Inc. (7904); (iii) Jennifer Chicago Ltd. (0505); (iv) Elegant Living Management, Ltd. (5049); (v) Hartsdale Convertibles, Inc. (1681); (vi) Jennifer Management III Corp. (3552); (vii) Jennifer Purchasing Corp. (7319); (viii) Jennifer Management II Corp. (9177); (ix) Jennifer Management V Ltd. (9876); (x) Jennifer Convertibles Natick, Inc. (2227); (xi) Nicole Convertibles, Inc. (5985); (xii) Washington Heights Convertibles, Inc. (0783).

1015286-6

liens, claims, encumbrances and interests; and (e) grant related relief (the "Sale Motion"). In support of this Sale Motion, the Debtors respectfully state as follows:

**Background**

1. On July 18, 2010 (the "Petition Date"), each of the Debtors commenced with the Bankruptcy Court a voluntary case pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or statutory creditors' committee has been appointed in these chapter 11 cases.

2. Jennifer Convertibles, Inc. was organized as a Delaware corporation in 1986, and is currently the owner of (i) the largest group of sofabed specialty retail stores and leather specialty retail stores in the United States, with stores located throughout the Eastern seaboard, Midwest, West Coast and Southwest, and (ii) seven big box, full-line furniture stores operated under the Ashley Furniture HomeStore brand (the "Ashley Stores") under a license from Ashley Furniture Industries, Inc.

3. In order to generate sales, the Debtors rely on aggressive pricing, the attractive image of its stores, extensive advertising and prompt delivery. Operations are classified into two operating segments organized by retail concept: Jennifer and Ashley. The Jennifer segment operates the sofabed specialty retail store concept. The Ashley segment is the big box, full line home furniture retail store concept. There are no inter-company sales between segments. The Ashley segment is highly profitable due to its unique sourcing model, whereby once most sales are executed, Ashley's supplier manages the supply chain process. Under the Ashley sourcing model, the Debtors need for warehouse inventory is reduced, thereby limiting working capital needs and infrastructure requirements. The Debtors' two operating segments enable the Debtors

2

to more effectively offer diverse home furnishings and accessories and expand to a broader consumer base.

4.     As of the Petition Date, the Debtors' stores include 130 stores operated by the Jennifer segment.  During fiscal 2007, the Debtors opened their first Ashley Store.  As of the Petition Date, the Debtors operate seven Ashley Stores.

5.     As of the Petition Date, the Debtors employ 497 people.   There are 336 employees in the Jennifer segment, 114 employees in the Ashley segment and 47 corporate employees.   None of the employees are represented by a collective bargaining unit.

6.     For the fiscal year ended August 29, 2009, the Debtors' consolidated financial statements showed revenues from continuing operations of approximately $94,177,000, compared with $120,131,000 for the fiscal year ended August 30, 2008, and $132,683,000 for the fiscal year ended August 25, 2007.  For the thirty-nine weeks ended May 29, 2010, revenues from continuing operations were approximately $70,036,000, with $56,144,000 coming from the Jennifer segment stores, and $13,892,000 from the Ashley segment stores.

7.     Net sales from continuing operations were $88,845,000 and $113,073,000 for the fiscal years ended August 29, 2009 and August 30, 2008, respectively.   Net sales from continuing operations decreased by 21.4%, or $24,228,000 for the fiscal year ended August 29, 2009 compared to the fiscal year ended August 30, 2008.   The decrease in net sales is attributable to a decline in overall demand within the furniture industry sector due to a poor housing market and an overall weak U.S. economy.   Consolidated same store sales from continuing operations (sales at those stores open for the entire current and prior comparable periods) decreased 19.6% for the thirteen weeks ended May 29, 2010, compared to the same period ended May 30, 2009.

1015286-6

8.     Specifically, in the Ashley segment, net sales from continuing operations were $5,106,000 and $3,363,000 for the thirteen-week periods ended May 29, 2010 and May 30, 2009, respectively.  Net sales from continuing operations increased by 51.8%, or $1,743,000 for the thirteen-week period ended May 29, 2010 compared to the thirteen-week period ended May 30, 2009.  The increase is largely attributable to four new Ashley locations open during the thirteen-week period ended May 29, 2010, that were not open during the same thirteen week period last year.

9.     In the Jennifer segment, net sales from continuing operations were $16,375,000 and $16,987,000 for the thirteen-week periods ended May 29, 2010 and May 30, 2009, respectively.  Net sales from continuing operations decreased by 3.6%, or $612,000 for the thirteen-week period ended May 29, 2010 compared to the thirteen-week period ended May 30, 2009.  The decrease is attributable to the decline in overall demand within the furniture industry sector due to the prevailing conditions of the U.S. economy, the current housing market, store closings, and delays in receipt of merchandise from the Debtors' Chinese supplier, all as discussed in greater detail in the other first day motions, filed concurrently herewith.

10.    The factual background relating to the Debtors' commencement of these chapter 11 cases is set forth in additional detail in the Declaration of Rami Abada in Support of First Day Motions (the "Abada Declaration") filed contemporaneously with this Motion and incorporated herein by reference.

**<u>Jurisdiction</u>**

11.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

12.     The statutory predicates for the relief requested herein are sections 105(a), and 363 of the United States Code (the "Bankruptcy Code").

**Relief Requested**

13.     By this Sale Motion, the Debtors request the entry of an order on an expedited basis, substantially in the form attached hereto as Exhibit C,[2] (a) approving the bid procedures (the "Bid Procedures") (attached hereto as Exhibit B) to be employed in connection with the proposed sale (the "Sale Transaction", or the "Sale") of the Debtors' retail business operations and related properties and assets (collectively, the "Subject Assets") with respect to specific stores (the "Closing Stores") and store locations (the "Exiting Territories"), including authorizing and scheduling an auction (the "Auction") to be held on a date that the Debtors select; (b) scheduling a hearing (the "Sale Hearing"), or such other date and time as the Court's calendar may permit, to authorize and approve the proposed Sale Transaction; and (c) approving the form and manner of the notice of the Sale Motion (defined below) (as it relates to the relief to be requested at the Sale Hearing).

14.     In addition, the Debtors request that, at the Sale Hearing the Court approve the sale by entry of an order substantially in the form attached hereto as Exhibit D, authorizing and approving the Sale Transaction free and clear of all liens, claims, encumbrances and interests.

**Basis For Relief**

15.     Over the course of the last year, the Debtors have been experiencing liquidity constraints.  With the help of its financial advisors, the Debtors began to consider reducing its operations and reducing the footprint of the Jennifer segment by closing unprofitable stores and disposing of inventory located in the showrooms of such unprofitable stores.  The Debtors have

---

[2] On July 19, 2010, the Debtors filed a motion seeking to shorten notice with respect to approval of the proposed bid procedures and Sale.

determined that the best way to maximize cash available for operations and act in the best interest of their estates and creditors is for the Debtors to sell the inventory in the Closing Stores and further reduce its costs and expenses.

16. In light of the importance of preserving the Jennifer brand and avoiding any loss of goodwill or customer patronage, prior to the Petition Date the Debtors began engaging in discussions with potential liquidators regarding the closing of stores in the Exiting Territories. To minimize the risk to the Debtors' estates and to expeditiously move the sale process forward, the Debtors solicited a bid for the disposition of the entire merchandise inventory of stores located in the Exiting Territories from Great American Furniture Services, LLC ("GAFS"). The Debtors and GFAS negotiated the terms of the bid which resulted in an agency agreement with GAFS in substantially final form, annexed hereto as Exhibit A, and subject to higher or better bids (the "GAFS Agency Agreement"). The GAFS Agency Agreement will serve as the "stalking horse bid" and will be the baseline against which all other bids will be measured. The Debtors propose to solicit bids for the Subject Assets and to conduct the Auction for the Subject Assets under the following timeline: (A) the deadline to submit a bid will be on or before July 23, 2010; (B) to the extent the Debtors receive one or more proposals for the Sale Transaction, the Debtors would select one or more of such proposals and negotiate the terms of an agency agreement, substantially in the form of the GAFS Agency Agreement; and (C) the Debtors will conduct an Auction beginning on July 26, 2010 and more fully described herein at the offices of the Debtors' counsel.

17. By this Motion, the Debtors seek approval of a process that is designed to generate the greatest value for the Debtors' store locations in the Exiting Territories.

<u>Store Closing Sale Process</u>

18.    The terms of the GAFS Agency Agreement, plus requisite overbid as determined by the Debtors, shall serve as a minimum opening bid for any persons proposing to make bids for a Sale Transaction.  Any person desiring to make a bid to act as the Debtors' agent in connection with the Sale Transaction shall submit such bid by July 23, 2010 at 12:00 noon (Eastern time). Attached hereto as Exhibit B are the Bidding Procedures.

19.    To the extent the Debtors' receive competing bids, the Debtors will assemble, compare and evaluate all bids and determine whether any of the bids are qualifying bids and whether an Auction is necessary.

20.    If it is determined that an Auction is necessary, the Auction will be held beginning on July 26, 2010 at the offices of Olshan Grundman Frome Rosenzweig & Wolosky LLP, 65 East 55th Street, New York, New York 10022, commencing at 10:00 a.m. (Eastern Time).  At the conclusion of the Auction and after a sufficient opportunity for the Debtors and their consultants to review the results of the Auction, the Debtors shall inform each of the qualified bidders of the decision regarding who is a successful bidder (the "Successful Bidder"). If for any reason a Successful Bidder fails to consummate the Sale Transaction, on or before July 27, 2010, the Debtors should be authorized to immediately consummate the Sale Transaction with the offeror of the second highest and/or otherwise best bid.

<u>The GAFS Agency Agreement</u>

21.    GAFS is unrelated to the Debtors and the GAFS Agency Agreement represents an arms-length transaction between GAFS and the Debtors.  The break-up fee of $50,000 (the "Break-Up Fee") provided for the GAFS Agency Agreement, represents a very small percentage of the guaranteed amount of 75% of the cost value of the Debtor's inventory in the Exiting Stores (the "Guaranteed Amount") that the Debtors will receive from GAFS.  The Break-Up Fee

is designed to foster bidding while at the same time reward GAFS for the risk they took in entering into the agreement with the Debtors subject to higher and better offers and having a commitment of cash without any assurances at the end of the day that the transaction will be theirs. The Break-Up Fee will enable the Debtors to procure a far more favorable agreement that it would have absent the Break-Up Fee.

The GAFS Agency Agreement contains the following material terms:

- GAFS will[3]:

  (a) advance one month's occupancy costs for all Closing Locations in the amount of $331,687.00;

  (b) provide an Inventory Guarantee Amount of 75% (seventy-five percent) of the cost value of the Merchandise (as defined in section 5 of the GFAS Agency Agreement) located in the Closing Stores (as discussed in section 3 of the GFAS Agency Agreement).

  (c) provide Merchant with a weekly fee for the right to add Additional Inventory ( as discussed in the GAFS Agency Agreement) during the Sale;

  (d) provide Merchant with a commission of 4% (four percent), to be paid weekly for all written sales of all Additional Merchandise sold, as well as 4% (four percent) of all delivery charges collected during the Sale.

  (e) provide sales personnel as it deems appropriate to assist in conducting the Sale;

  (f) use reasonable commercial efforts to oversee the liquidation and disposal of the Merchandise;

  (g) recommend and implement the appropriate price and discounting of the Merchandise; and

  (h) pay all direct expenses of the Sale for the Closing Locations.

  (i) have a Commencement Date no later than Monday, July 26, 2010. The Sale Term shall be no longer than 60 days.

---

[3] To the extent that any of the terms differ or are inconsistent from the terms in the GFAS Agency Agreement, the terms of the GFAS Agency Agreement will govern. Capitalized terms have the meaning ascribed to them in GFAS Agency Agreement.

1015286-6

(j)     Agent shall not be permitted to use the current delivery service of Merchant. Agent will be required to set up and process deliveries and inventory movement during for sale.

22.     The break-up fee of $50,000 (the "Break-Up Fee") provided for in the GAFS Agency Agreement, represents a very small percentage of the guaranteed amount of 75% of the cost value of the Debtors' inventory in the Exiting Stores (the "Guaranteed Amount") that the Debtors will receive from GAFS. The Break-Up Fee is designed to foster bidding while at the same time reward GAFS for the risk they took in entering into the agreement with the Debtors subject to higher and better offers and having a commitment of cash without any assurances at the end of the day that the transaction will be theirs. The Break-Up Fee will enable the Debtors to procure a far more favorable agreement that it would have absent the Break-Up Fee.

## **Applicable Authority**

23.     In the exercise of the Debtors' sound business judgment, the Debtors have determined that it is in the best interest of the Debtors' estates, their creditors and all parties in interest for the Debtors to conduct an Auction for the sale of the Subject Assets pursuant to the Bid Procedures.

### A. The Proposed Sale and Process is Within the Debtors' Sound Business Judgment and Should Therefore Be Approved.

24.     The relief requested by this Motion is appropriate under the Court's equitable powers under section 105(a) of the Bankruptcy Code and authority to approve non-ordinary course transactions under section 363(b) of the Bankruptcy Code. To obtain court approval to use property under section 363(b) of the Bankruptcy Code for a sale or lease of property outside of the ordinary course of business, the Debtors need only show "some articulated business justification." *See, e.g.*, *In re Lionel Corp.*, 722 F.2d 1063, 1070-71 (2d Cir. 1983); *Stephens Indust., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Martin*, 91 F.3d 389, 395 (3d

Cir. 1996).  In addition, section 105(a) provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  See 11 U.S.C. § 105(a).  The purpose of section 105(a) is to ensure a bankruptcy court's power to take whatever action "is appropriate or necessary in aid of the exercise of [its] jurisdiction."  *In re Casse*, 198 F.3d 327, 336 (2d Cir. 1999).  Here, the relief requested should be granted for the reasons discussed below.

(i) <u>Sound Business Reasons Exist for the Sale Transaction.</u>

25.  Adequate business reasons exist to justify the Sale Transaction.  As discussed above, the Debtors have determined that the sale process will maximize the return to their estate and creditors.  Furthermore, the administrative and economic costs of maintaining such assets for an uncertain period of time would not be in the best interest of the estates.  The Sale Transaction represents the highest and best use for the Debtors' assets.

26.  Under these circumstances, sound business reasons exist that justify the sale of the Subject Assets outside of the ordinary course of business.

(ii) <u>The Proposed Consideration Offered is Fair and Reasonable.</u>

27.  To dispel any doubt, the Debtors are subjecting their assets to competing bids from buyers interested in all of the inventory at the Auction, thereby ensuring that the Debtors will receive the highest and/or otherwise best value for its assets.  Consequently, the fairness and reasonableness of the consideration to be received by the Debtors will ultimately be demonstrated by a "market check" through an auction process, which is the best means for establishing whether a fair and reasonable price is being paid for the Subject Assets.

(iii) <u>The Sale Process Has Been Undertaken in Good Faith.</u>

28.     Section 363(m) of the Bankruptcy Code provides that "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith . . . ." 11 U.S.C. § 363(m) (emphasis added).

29.     While the Bankruptcy Code does not define "good faith," the court in *In re Sullivan Central Plaza I, Ltd.*, 106 B.R. 934 (Bankr. N.D. Tex. 1998) stated that "[t]he type of conduct of a Buyer which would destroy its good faith status under § 363(m) involves fraud, collusion between the Buyer and other bidders of the trustee, or an attempt to take grossly unfair advantages of other bidders." 106 B.R. at 938 (*citing Matter of Bleaufontaine, Inc.*, 634 F.2d 1383, 1388 (5th Cir. 1981)).

30.     The Sale Transaction will be the product of extensive bidding processes among the bidders. The Debtors do not anticipate that the Successful Bidder or any of its affiliates would be "insiders" of the Debtors within the meaning of section 101(31) of the Bankruptcy Code and are not controlled by, or acting on behalf of, any insider of the Debtors. Accordingly, the Debtors request the Court to find that the Successful Bidder is a "good faith" Buyer under section 363(m) of the Bankruptcy Code.

**B.  Sale of the Subject Assets Should be Granted Free and Clear of Certain Liens, Claims, Interests and Encumbrances.**

31.     Under section 363(f) of the Bankruptcy Code, a debtor may sell property "under subsection (b) and (c) free and clear of any interest in such property of an entity other than the estate." In particular, section 363(f) authorizes a debtor to sell property free and clear if (i) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (ii)

such entity consents; (iii) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (iv) such interest is in bona fide dispute; or (v) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f); *see also In re Gen. Bearing Corp.*, 136 B.R. 361, 366 (Bankr. S.D.N.Y. 1992) (listing requirements).

32. The Debtors are unaware of any (i) liens, encumbrances or interests (collectively "Interests") or (ii) "claims" as defined in section 101(5) of the Bankruptcy Code ("Claims") that have been asserted against the Subject Assets. The proposed Sale Order provides that all Interests and Claims attach to the net cash proceeds derived from the Sale Transaction in the same validity, force and effect that such Interests or Claims now have against the Subject Assets, subject to the rights and defenses, if any, of the Seller with respect thereto.

**C. Compliance With Any State And Local Laws, Statutes, Rules and Ordinances On Store Closing Going-Out-Of-Business Sales Should Be Waived**

33. Certain states in which the Exiting Territories might be located may have, licensing and similar requirements with respect to the conduct of liquidation and store closing sales. In certain circumstances, however, these requirements do not apply where such sales are conducted pursuant to an order of, and under the supervision of a court. Accordingly, the Debtors request that this Court authorize the Debtors (and/or the Agent) to conduct the Sales without the necessity of, and the delay associated with, obtaining various state licenses and/or satisfying any additional requirements in connection therewith.

34. Because the Debtors regularly conduct "sales" at the store locations, the Debtors do not believe that the Sales should interfere with lease provisions that are intended to protect the image of a shopping center, mall or other location or avoid disruption of normal commerce. Nonetheless, certain of the leases governing the premises of the stores (collectively, the

"Leases") may contain provisions purporting to restrict or prohibit the Debtors from conducting store closing, liquidation, or similar sales. Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its case and maximize the value of its assets under section 363 of the Bankruptcy Code. *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 136 B.R. at 359 (holding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets…"); *In re R. H. Macy and Co., Inc.*, 170 B.R. 69, 73-74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to stay open because the debtor had a duty to maximize the value of the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467-68 (Bankr. N.D. Ga. 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); *In re Lisbon Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in Chapter 11 case where debtor sought to conduct going-out-of-business sale).

35. As such, to the extent that such provisions or restrictions exist in any of the leases for the closing stores, such landlords may not interfere with or otherwise seek to restrict the Debtors from conducting the Sales. Accordingly, the Debtors request that the Court authorize the Debtors to conduct the Sales without interference by any landlords or other persons affected, directly or indirectly, by the Sales.

36. Bankruptcy courts have previously held restrictive lease provisions affecting store closing sales in chapter 11 cases unenforceable. See, e.g., *In re Ames Dept. Stores, Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y., 1992) ("This Court believes that to enforce the anti-GOB sale clause

of the Lease would contravene overriding federal policy requiring Debtor to maximize estate assets by imposing additional constraints never envisioned by Congress."); *In re Three A's Holdings, L.L.C.*, Case No. 06-10886 (BLS) (Bankr. D. Del. Sept. 25, 2006) (order authorizing, among other things, agent to conduct store closing sales).

### D. Good Faith under Section 363(m)

37.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith", the Third Circuit in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986) has held that:

> [t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted).

38.     The Debtors submits, and will adduce evidence (either through direct testimony or by proffer) that sale of the transactions contemplated hereby will be conducted in an arm's-length transaction, in which the Debtors and the purchasers at the Auction will have at all times acted in good faith under applicable legal standards. The Debtors shall therefore request that the Court make a finding that the Successful Bidder at the Auction has/have entered into the subject Agency Agreement, as the case may be, in good faith within the meaning of § 363(m) of the Bankruptcy Code.

39.     The GAFS Break-Up Fee represents a fair compensation and reimbursement of the expenses incurred in conducting due diligence and negotiating the GAFS Agency Agreement.  Absent such provisions, GAFS would likely not have agreed to act as a "stalking horse" in connection with a transaction for which they may ultimately not be the successful bidder, and in connection with assets, which by the very nature change as the Debtors continue to operate their day to day business between the date the agreement was signed and the Auction. The Debtors thus believe that in this instance with was necessary and appropriate for the Debtors to agree to the Break-Up Fee, which represents a very small percentage of the consideration being paid by GAFS under the GAFS Agency Agreement.  Because of the above, the Debtors hereby request that the Court approve the payment of the GAFS Break-Up Fee.

40.     Break-up and other termination fees are a normal, and in some cases necessary, component of sales outside the ordinary course of business under § 363 of the Bankruptcy Code. *See, e.g.*, *In re Integrated Resources, Inc.*, 147 B.R. 650, 660 (S.D.N.Y. 1992) (noting that break-up fees may be legitimately necessary to convince a single "white knight" to enter the bidding by providing some form of compensation for the risk it is undertaking); *In re Financial News Network, Inc.*, 126 B.R. 152 (S.D.N.Y. 1991), *appeal dismissed*, 931 F.2d 217 (2d Cir. 1991); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 879 (Bankr. S.D.N.Y. 1990) (break-up fees in merger agreement approved); *In re 995 Fifth Ave. Assoc., L.P.*, 96 B.R. 24, 28-9 (Bankr. S.D.N.Y. 1989) (payment of $500,000 break-up fee to outbid contract vendee following sale of debtor's property was not unreasonable absent evidence that fee chilled bidding).

41.     In considering whether to approve a break-up fee, courts generally consider the following three factors: (1) the relationship between the initial bidder and the seller; (2) whether

the fee is designed to encourage bidding; and (3) the size of the fee in relation to the purchase price. *See In re Integrated Resources*, 147 B.R. at 657-63.

42. In the present case, GAFS has and will continue to expend substantial resources in negotiating "stalking horse" bids and performing its due diligence -- especially given the relatively short due diligence period being provided. Obtaining approval and authority to pay the GAFS Break-Up Fee, will facilitate the Debtors' efforts to assure a sale to a contractually-committed bidder at a price(s) the Debtors believe is fair, while at the same time providing the Debtors with the potentials of even greater benefit to the estates.

43. A break-up fee which constitutes a fair and reasonable percentage of the proposed purchase price and which is reasonably related to the risk, effort, and expenses of the prospective purchaser is generally permissible. *See, e.g.*, *In re 995 Fifth Ave. Assoc.*, 96 B.R. at 28.

44. The GAFS Break-Up Fee is beneficial to the Debtors' estates and their creditors, as the GAFS Agency Agreement establishes a floor for further bidding on the subject assets. If the GAFS Break-Up Fee is payable -- by definition, it is because the Debtors have received a higher or otherwise better offer -- the terms set forth in the GAFS Agency Agreement, and thus the states will have benefited, particularly in the context of the total consideration received.

**E. Disclosures regarding GAFS**

45. The Debtors are not aware of any prior connection with GAFS, and the Debtors do not anticipate any future relationship with GAFS after the Sale has been completed. The Debtors selected GAFS to act as the Debtors' agent for the purposes of liquidating its merchandise, based on their extensive experience in the industry. The selection was based on evaluating GFAS's abilities as well as the cost of the services they proposed to provide. The quotation by GAFS was then negotiated to embody its current terms.

16

**F.  The Debtors' Request for Relief from Transfer Taxes Under Bankruptcy Code Section 1146(c) Should Be Granted.**

46.     The Sale Transaction should not be subject to a stamp tax or similar tax under applicable law.  However, to the extent that a taxing authority seeks to impose such taxes in connection with the Sale Transaction, the Sale Transaction should be exempt pursuant to section 1146(c) of the Bankruptcy Code.

47.     Bankruptcy Code section 1146(c) provides that "the making or delivery of an instrument of transfer under a Plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax."  This language has been construed to include transfers pursuant to a sale outside of, but in furtherance of, effectuating a reorganization plan. *See In re Beulah Church of God in Christ Jesus, Inc.*, 316 B.R. 41 (Bankr. S.D.N.Y. 2004) (holding that the 1146(c) exemption from transfer tax, for transfers "under a plan confirmed," is broad enough to apply to transfers completed prior to confirmation of plan); *see also In re Jacoby-Bender, Inc.*, 758 F.2d 840, 842 (2d Cir. 1985) (holding that Bankruptcy Code section 1146(c) applies when the "transfer is necessary to the consummation of a plan").

## Notice

48.     No trustee, examiner or statutory creditors' committee has been appointed in these chapter 11 cases. Notice of this Motion has been provided to: (i) Office of the United States Trustee for the Southern District of New York; (ii) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estate (on a consolidated basis); (iii) counsel to Haining Mengnu Group Co. Ltd.; (iv) the SEC; (v) the IRS; (vi) all taxing authorities in the relevant jurisdictions; (vii) all attorneys general in the relevant jurisdictions; and (viii) any other party directly affected by this Motion.  The Debtors submit that such notice is sufficient under the circumstances.

1015286-6

**No Previous Request**

49.     No previous request for the relief sought herein has been made to this or any other

Court.

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the

relief requested herein and such other and further relief as the Court may deem just and

appropriate.


Dated: New York, New York
       July 20, 2010

                                        OLSHAN GRUNDMAN FROME
                                        ROSENZWEIG & WOLOSKY LLP


                                        By:     /s Michael S. Fox
                                                Michael S. Fox
                                                Jordanna L. Nadritch
                                                Park Avenue Tower
                                                65 East 55th Street
                                                New York, New York 10022
                                                (212) 451-2300

                                                *Proposed Attorneys for the Debtors and
                                                Debtors in Possession*

**Exhibit A**

**GAFS Agency Agreement**

# AGENCY AGREEMENT

This Agency Agreement (the "Agreement") is made as of this 16th day of July, 2010, by Great American Furniture Services, LLC, a Delaware limited liability company, (the "Agent") and Jennifer Convertibles, a Delaware corporation (the "Merchant").

# RECITALS

WHEREAS, Merchant filed a voluntary petition for relief under Title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and Merchant is managing its affairs as a debtor and debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code ("Chapter 11 Case");

WHEREAS, Merchant desires that Agent act as Merchant's exclusive agent for the limited purpose of: (a) selling all of the Merchandise (defined below) located or to be located in Merchant's stores (collectively, the "Stores") as each are identified in Exhibit A (collectively, the "Closing Locations"), by conducting "store closing" sales at the Stores, subject in all respects to the terms and conditions contained herein (the "Sale"); and (b) at Merchant's election, in accordance with Section 15 hereof, disposing of Merchant's owned FF&E (defined below) located at the Closing Locations, subject to the terms and conditions set forth herein;

WHEREAS, except as expressly provided for herein, this Agreement shall govern the conduct of the Sale at the Closing Locations, together with the parties' respective rights and obligations with respect thereto;

WHEREAS, Agent is willing to serve as Merchant's exclusive agent to conduct the Sale at the Closing Locations and dispose of the FF&E in the Closing Locations in accordance with the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent and Merchant hereby agree as follows:

Section 1.    Defined Terms; Exhibits

1.1    Defined Terms.  The terms set forth below are defined in the Sections referenced of this Agreement:

| Defined Term | Section |
|---|---|
| Additional Merchandise | Section 3.5(a) |

| | |
|---|---|
| Additional Merchandise And Delivery Sales | Section 3.1(b) |
| Additional Return | Section 3.1(b) |
| Additional Stores | Section 2.3(n) |
| Agency Accounts | Section 3.3(c) |
| Agency Documents | Section 11.1(b) |
| Agent | Preamble |
| Agent Claim | Section 12.5 |
| Agent Indemnified Parties | Section 13.1 |
| Agreement | Preamble |
| Approval Order | Section 2.3 |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Central Services Expenses | Section 4.1 |
| Closing Locations | Recitals |
| Cost Value | Section 5.3 |
| Customer Returned Goods | Section 8.5 |
| Defective Merchandise | Section 5.2(b) |
| Event of Default | Section 14 |
| Excluded Benefits | Section 4.1 |
| Expenses | Section 4.1 |
| | |
| Final Inventory Report | Section 3.3(a) |
| Final Reconciliation | Section 3.4(a) |
| FF&E | Section 15 |
| FF&E Election | Section 15 |
| Store Closing Sale Laws | Section 2.3(e) |
| Guaranty Percentage | Section 3.1(a) |
| Guaranteed Amount | Section 3.1(a) |
| | |
| Guaranty Payment | Section 3.1(a) |
| Initial Occupancy Payment | Section 3.3 (a) |
| Inventory Guaranteed Amount | Section 3.3(a) |
| Inventory Completion Date | Section 5.1 |
| Inventory Date | Section 5.1 |
| Inventory Taking | Section 5.1 |
| Inventory Taking Instructions | Section 5.1 |
| | |
| Inventory Restrictions | Section 3.5 (a) |
| Lenders | Section 5.1 |
| Merchandise | Section 5.2(a) |
| Merchant | Preamble |
| Additional Return | Section 3.1(b) |
| Occupancy Expenses | Section 4.1 |
| Proceeds | Section 7.1 |
| Remaining Merchandise | Section 3.2 |
| Retained Personnel | Section 9.1 |
| Sale | Recitals |
| Sale Commencement Date | Section 6.1 |

| Sale Guidelines | Section 8.1 |
| Sale Term | Section 6.1 |
| Sale Termination Date | Section 6.1 |
| Sales Taxes | Section 8.3 |
| Third Party | Section 4.1 |

1.2　　Exhibits.  The Exhibits and Schedules annexed to this Agreement, as listed below, are an integral part of this Agreement:

| Exhibit | Section | Description |
|---------|---------|-------------|
| Exhibit A | Recitals | Closing Locations |
| Exhibit 4.1(a) | Section 4.1(a) | Occupancy Expense Schedule |
| Exhibit 5.1(a) | Section 5.1 | Inventory Taking Instructions |
| Exhibit 8.1 | Section 8.1 | Sale Guidelines |
| Exhibit 10 | Section 10 | Form of Approval Order |
| Exhibit 11.1(c) | Section 11.1(c) | Pre-Existing Liens |

1.3　　Currency.  Unless otherwise specified, all references to monetary amounts refer to United States dollars.

Section 2.　　Appointment of Agent

2.1　　Merchant hereby appoints Agent, and Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale in accordance with the terms and conditions of this Agreement.  Merchant's and Agent's obligations hereunder are subject to the approval of this Agreement by the Bankruptcy Court, and this Agreement (other than Section 16.11, which shall be binding once it is approved by the Bankruptcy Court) shall be of no force or effect in the event that the Approval Order is not obtained.

2.2　　Except for incurring Expenses in connection with the Sale and as otherwise specifically provided in this Agreement, Agent shall have no authority to enter into any contract, agreement or other arrangement or to take any other action, by or on behalf of Merchant, that would have the effect of creating any obligation or liability, present or contingent, on behalf of or for the account of Merchant without Merchant's prior written consent.

2.3　　Not later than two (2) business days after the execution of this Agreement, Merchant shall file an expedited motion with the Bankruptcy Court for entry of an order approving this Agreement and authorizing Merchant and Agent to conduct the Sale at the Closing Locations, in accordance with the terms hereof (the "Approval Order"). The Approval Order shall provide, in a form reasonably satisfactory to the Merchant and Agent, among other things, that:

(a)　　the terms of this Agreement (and each of the transactions contemplated hereby) are approved;

(b)     Merchant and Agent shall be authorized to continue to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby;

(c)     Agent shall be entitled to sell all Merchandise hereunder free and clear of all liens, claims and encumbrances thereon (collectively, "Liens"), with any presently existing Liens encumbering all or any portion of the Merchandise or the Proceeds attaching only to the Guaranteed Amount and other amounts to be received by Merchant under this Agreement;

(d)     Subject to Agent's obligations to pay Expenses pursuant to Section 4.1 and Section 5.4 hereof, Agent shall have the right to use the Closing Locations and all related store services, furniture, fixtures, equipment and other assets of Merchant as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person;

(e)     Agent, as agent for Merchant, is authorized to conduct, advertise, post signs and otherwise promote the Sale without further consent of any person (other than Merchant as provided for herein), in accordance with the terms and conditions of this Agreement and the Sale Guidelines (as the same may be modified and approved by the Bankruptcy Court), and without further compliance with applicable federal, state or local laws governing, *inter alia*, the conduct of store closing sales (the" Store Closing Laws"), other than those designed to protect public health and safety and tax, labor, employment, environmental and consumer protection laws (including consumer laws relating to deceptive practices and false advertising);

(f)     Agent shall be granted a limited license and right to use until the Sale Termination Date the trade names, logos and customer lists relating to and used in connection with the operation of the Closing Locations, solely for the purpose of advertising the Sale in accordance with the terms of the Agreement;

(g)     all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Approval Order as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including, without limitation, the conducting and advertising of the Sale in the manner contemplated by this Agreement;

(h)     all utilities, landlords, creditors and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, institute any action in any court (other than in the Bankruptcy Court) or before any administrative body which in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale;

(i)     the Court shall retain jurisdiction over the parties to enforce this Agreement;

(j)     Agent shall not be liable for any claims against the Merchant other than as expressly provided for in this Agreement, and Agent shall have no successorship liabilities whatsoever;

(k)     Agent shall have, subject to Agent's obligations to pay the Guaranteed Amount, the Additional Return and Expenses, a valid, duly perfected first priority lien and security interest in the Merchandise and any Proceeds to which Agent is entitled in accordance with the terms of this Agreement;

(l)     Agent shall not permitted to use the current delivery services of the Merchant. Agent will be required to setup and process deliveries and inventory movement, during the Sale, without the assistance of the current delivery service.

(l)     Agent shall be permitted to supplement the Merchandise and include in the Sale Additional Merchandise consistent with the terms of Section 3.5 hereof; and

(m)     Merchant and Agent shall be permitted, if needed, to close the Stores to the public for a period commencing after the Sale Commencement Date for the purposes of preparing the Stores for the Sale.

(n)     Merchant shall have the right to add additional stores to this Agency Agreement after the Sale Commencement Date, without further order of the Bankruptcy Court ("Additional Stores").

Section 3.     Guaranteed Amount and Other Payments

3.1     Payments to Merchant and Agent

(a)     As a guaranty of Agent's performance hereunder, in addition to the payment of Expenses as provided for in Section 4.1 hereof, Agent guarantees that Merchant shall receive the sum of seventy- five percent (75%) (the "Guaranty Percentage") of the aggregate Cost Value of Merchandise located in the Closing Locations on the Sale Commencement Date and based on the Final Inventory Report (the "Guaranteed Amount").

(b)     In addition to the Guaranteed Amount, Agent hereby guarantees that the Merchant shall receive four percent (4.0%) of the written sales from the sale of Additional Merchandise (e.g., written sales less sales tax) and delivery charges collected (collectively, the "Additional Return").  Agent shall tender payment of the Additional Return as part of the weekly reconciliation conducted pursuant to Section 8.7 hereof

(c)     Agent shall pay to Merchant the Guaranteed Amount in the manner and at the times specified in Section 3.3 below, which Guaranteed Amount will be calculated based upon the aggregate Cost Value of the Merchandise as determined by the Final Inventory Report (as defined in Section 3.3(a)).

3.2     Payments to Agent.  After payment in full of the Guaranteed Amount and the Additional Return, and payment of all Expenses, Agent shall be entitled to retain any remaining Proceeds of the Sale.  Provided that no Event of Default has occurred and continues to exist on the part of the Agent, all Merchandise remaining at the conclusion of the Sale shall become the property of Agent, free and clear of all Liens ("Remaining Merchandise").

3.3     Time of Payments and Control of Proceeds

(a)     Payment of Guaranteed Amount and First Month Occupancy.  On the first business day following entry of the Approval Order, Agent shall pay Merchant the entire first month's total Occupancy Expense set forth in Exhibit  4.1(a) (the "Initial Occupancy Payment"). The calculation based upon the estimated aggregate Cost Value of the Merchandise to be included in the Sale, as reflected on Merchant's books and records on the last business day immediately preceding the Sale Commencement Date (the "Inventory Guaranteed Amount"), shall be paid in full no later than twelve calendar days from the Sale Commencement Date by wire transfer to such account(s) as are designated on Exhibit 3.3(a) (the "Guaranty Payment"). The Guarantee Amount shall be calculated after the issuance of the final audited report of the aggregate Cost Value of the Merchandise, after verification and reconciliation thereof by Agent and Merchant (the "Final Inventory Report"). In the event there is any dispute with respect to the reconciliation of the aggregate Cost Value of the Merchandise following the Inventory Taking, then any such dispute shall be resolved in the manner and at the times set forth in Section 3.4(b) hereof.

(b)     Control of Proceeds.  Within one (1) business days after the Sale Commencement Date, Agent shall establish its own Sale account for the deposit of the Proceeds (the "Agency Accounts"). Agent shall exercise sole signatory authority and control with respect to the Agency Accounts; provided, however, upon request, Agent shall deliver to Merchant copies of all bank statements and other information relating to such accounts, if requested. Merchant shall not be responsible for and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the Agency Accounts, whether received during or after the Sale Term.  Upon Agent's establishing of the Agency Accounts, all Proceeds of the Sale (including credit card proceeds) shall be deposited into the Agency Accounts. Agent shall setup credit card processing and will not be required or permitted to the use of the Merchant's current credit card processing during the Sale Term.

3.4     Final Reconciliation.  (a) Within thirty (30) days after the Sale Termination Date, Agent and Merchant shall jointly prepare a final reconciliation of the Sale including, without limitation, a summary of Additional Return, taxes and any other accountings required hereunder (the "Final Reconciliation"). Within five (5) days of completion of the Final Reconciliation, any undisputed and unpaid Expenses shall be paid by Agent.  In the absence of an order of the Bankruptcy Court, no such disputed amount(s) shall be paid until the dispute has been resolved by agreement of the parties. or as determined in the manner prescribed in Section 3.4(b) hereof.

3.5     Additional Merchandise

(a)     Agent shall be entitled to include in the Sale at the Stores additional merchandise which is of like kind, quality and similar price points as the Merchandise located in the Stores as well as rugs and wall coverings ("Additional Merchandise"); provided, however, Agent shall not deliver any Additional Merchandise to the Closing Locations until after the completion of the Inventory Taking at such location(s). Additional Merchandise shall only be permitted to be supplemented for the first 30 days of the Sale Term (the "Inventory Restrictions").

(b)     At all times and for all purposes, the Additional Merchandise and its proceeds shall be the exclusive property of Agent.  The transactions relating to the Additional Merchandise are, and shall be construed as, a true consignment from Agent to Merchant.  The Additional Merchandise shall be at all times subject to the control of Agent.  If requested by Agent, Merchant shall, at Agent's expense, insure the Additional Merchandise and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers.

(c)     In order to distinguish the Additional Merchandise from the Merchandise located in the Closing Locations, Agent shall describe a "dummy" SKU to such Additional Merchandise, which shall enable Merchant and Agent to distinguish the sales of the Additional Merchandise from the sale of the Merchandise presently include in the Sale.

Section 4.     Expenses of the Sale

4.1     Expenses.  Agent shall be responsible for all Expenses incurred in conducting the Sale during the Sale Term, which expenses shall be paid by Agent in accordance with Section 4.2 below.  As used herein, "Expenses" shall mean all Store-level operating expenses of the Sale which arise during the Sale Term at the Closing Locations, limited to the following:

(a)     Actual Occupancy Expenses for the Store Locations set forth on Exhibit 4.1(a) hereto and starting the fifth week of the Sale, on a weekly basis;

(b)     payroll and commissions for all Store-level Retained Personnel used in conducting the Sale. All Retained Personnel shall be converted to independent contractors during the Sale;

(c)     actual costs of Agent's on-site supervision, supervisor travel and supervisor bonuses;

(d)     banners and in-store signs which are produced for the Sale;

(e)     promotional costs including, without limitation, advertising and direct mail;

(f)     the costs and expenses of obtaining additional supplies as may be required by Agent in the conduct of the Sale;

(g)     long distance telephone, postage/overnight delivery/courier charges;

(h)     credit card and bank card fees, chargebacks and discounts;

(i)     costs of moving, transferring, or consolidating Merchandise between the Stores;

(j)     Merchant's casualty insurance premiums attributable to the Merchandise for the Sale Term;

(k)     armored car service, security personnel and monthly alarm services;

(l)     trash removal and ordinary course third party cleanings;

(m)     Store security and building alarm service;

(n)     costs and expenses of delivery and assembly services; and

(o)     routine repair and maintenance costs.

"Expenses" shall not include: (i) Central Service Expenses; ii) Excluded Benefits; (iii) any rent or other occupancy expenses other than Occupancy Expenses in accordance with Section 4.1(a) hereof; and (iv) any costs, expenses or liabilities arising during the Sale Term in connection with the Sale of Merchandise, other than the Expenses listed above, all of which shall be paid by Merchant promptly when due during the Sale Term. Notwithstanding anything herein to the contrary, to the extent that any Expense listed in Section 4.1 is also included on Exhibit 4.1(a), then Exhibit 4.1(a) shall control and such Expense shall not be double counted.

As used herein, the following terms have the following respective meanings:

"Central Services Expenses" means costs and expenses for Merchant's central administrative and distribution services but not limited to (a) Merchant's inventory control system; (b) payroll system; and (c) accounting system.

"Excluded Benefits" means vacation days or vacation pay, sick days or sick leave, maternity leave or other leaves of absence, termination or severance pay, ERISA coverage and similar contributions (other then pension and 401(k) contributions).

"Occupancy Expenses" means rent, CAM, real estate and use taxes, HVAC, utilities, base telephone charges and all other categories of expenses at the Closing Locations as set forth on Exhibit 4.1(a) attached hereto, up to the specific amounts set forth on Exhibit 4.1(a) attached hereto.

"Third party" means, with reference to any Expenses to be paid to a "third party", a party that is not affiliated with or related to Merchant.

4.2    "Payment of Expenses"

All Expenses incurred during each week of the Sale (*i.e.,* Sunday through Sa*turda*y) shall be paid by Agent to or on behalf of Merchant immediately following the weekly Sale reconciliation by Merchant and Agent pursuant to Section 8.7 below, based upon invoices and other documentation reasonably satisfactory to Agent.

Section 5.    Inventory Valuation; Merchandise

5.1    Inventory Taking.    Commencing on the Sale Commencement Date, Merchant and Agent shall cause to be taken a physical inventory of the Merchandise located in the Closing Locations (collectively, the "Inventory Taking"), which Inventory Taking shall be completed in each of the Closing Locations no later than one  (1) day after the Sale Commencement Date notwithstanding the fact that the Inventory Taking shall not be required to occur on Saturdays and Sundays (the "Inventory Completion Date").  Merchant and Agent shall jointly conduct the Inventory Taking without utilizing a third party inventory taking service. The Inventory Taking shall be conducted in accordance with the procedures and instructions to be mutually agreed by Merchant and Agent and made a part of this Agreement as Exhibit 5.1(a) (the "Inventory Taking Instructions"). Merchant and Agent shall bear their respective costs and expenses incurred in the Inventory Taking.  Merchant, Agent and Merchant's senior secured post-petition lenders (the "Lenders") shall each have the right to have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking.  Merchant agrees that during the conduct of the Inventory Taking in each of the Closing Locations, the applicable location shall be closed to the public and no sales or other transactions shall be conducted until the Inventory Taking at such location has been completed, as agreed by Merchant and Agent.

5.2    Merchandise Subject to this Agreement.

(a)    For purposes of this Agreement, including, without limitation, the calculation of the Guaranteed Amount, "Merchandise" shall mean all finished goods inventory that is owned by Merchant and located in the Closing Locations on the Sale Commencement Date.  Notwithstanding the foregoing, "Merchandise" shall not include: (1) goods which belong to sublessees, licensees or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) Customer Ordered Merchandise; (4) merchandise that is so damaged as to be unsaleable; and (5) furnishings, trade fixtures, furniture and equipment and improvements to real property which are located in the Closing Locations.

(b)    As used herein, the following terms shall have the respective meanings set forth below:

(i)    "Customer Ordered Merchandise" means those items of Merchandise located in the Closing Locations that have previously been earmarked

and/or reserved by Merchant from available merchandise and designated by Merchant for satisfaction of customer orders (whether in respect of a fully sold order or a partially reserved order) that were received prior to the Sale Commencement Date.

(ii)     "Defective Merchandise" means such items of inventory that are used or previously owned, damaged, shopworn or soiled inventory and are rendered unsaleable because of such defeats.

(iii)     "Returned Merchandise" means (a) Customer Returned Goods (subject to Section 8.5 hereof); and (b) Customer Ordered Merchandise, for which the order has been cancelled by either the customer or Merchant, prior to the Sale Commencement Date.

5.3     Valuation.

5.4     For purposes of this Agreement, "Cost Value" shall mean with respect to each item of Merchandise the actual landed cost (determined by applicable Merchant accounting unit) for such item of Merchandise as reflected in Merchant's master cost file as of the Sale Commencement Date (the "Cost File"), which average cost is inclusive of freight and shipping charges, and as verified by the Agent in its review of actual invoices.

5.45     Delivery of Customer Ordered Goods. Agent shall have no involvement with the Merchant to facilitate the delivery of Customer Ordered Merchandise for sales made prior to the Sale Commencement Date. Merchant shall retain responsibility for the processing and delivery of such merchandise to customers, including retaining responsibility for the costs and expenses of processing, handling and delivery of such goods and will not involve the Stores in any manner whatsoever.

5.56     Excluded Goods. Merchant shall retain all rights and responsibility for any goods not included as "Merchandise" hereunder and shall remove such goods from the Closing Locations prior to the Sale Commencement Date, or as soon thereafter as reasonably practicable. If Merchant elects at the beginning of the Sale Term, Agent shall accept those goods not included as "Merchandise" hereunder and as identified by Merchant for sale as "Merchant Consignment Goods". Agent shall retain 20% of the sale price (less Sales Taxes) for all sales of Merchant Consignment Goods, and Merchant shall receive 80% of the sale price (less Sales Taxes) in respect of such sales. Merchant shall receive its share of the receipts of sales of Merchant Consignment Goods on a weekly basis, immediately following the weekly Sale reconciliation by Merchant and Agent pursuant to Section 8.7 below. If Merchant does not elect to have Agent sell such goods not included as Merchandise, then all such items will be removed by Merchant from the Closing Locations at its expense. Except as expressly provided in this Section 5.6, Agent shall have no cost, expense or responsibility in connection with any goods not included in Merchandise.

Section 6.     Sale Term.

6.1     Term.  Subject to the terms of the Approval Order, the Sale shall commence at the Closing Locations on the first calendar day after entry of the Approval Order by the Court (the "Sale Commencement Date"), which Approval Order shall be entered no later than July 26, 2010. The Agent shall complete the Sale, and shall vacate each Closing Location's premises in favor of Merchant or its representative or assignee on or before 60 days from the Sale Commencement Date (the "Sale Termination Date"). The period from the Sale Commencement Date to the Sale Termination Date shall be referred to herein as the "Sale Term."  The Sale Term shall be no longer than 60 calendar days, with no extension permitted.

6.2     Vacating the Closing Locations.  (a)  Agent shall (i) vacate each of the Closing Locations no later than ninety days from Sale Commencement date and (ii) provide Merchant with not less than seven (7) days' advance written notice of its intention to vacate any Closing Location (as to each, the "Vacate Date").  On the Vacate Date, Agent shall vacate the applicable Closing Location in favor of Merchant or its representatives or assignee, remove all Remaining Merchandise and leave the Closing Location in "broom clean" condition (ordinary wear and tear excepted), subject to the right to abandon, neatly in place, the FF&E.  Agent's obligations to pay all Expenses, including Occupancy Expenses, for each Closing Location subject to vacate notice shall continue until the applicable Vacate Date for such Closing Location.  All assets of Merchant used by Agent in the conduct of the Sale (e.g., FF&E, supplies, etc.) shall be returned by Agent to Merchant or left at the Closing Locations to the extent same have not been used in the conduct of the Sale or have not been otherwise disposed of through no fault of the Agent.  Where reference is made in this Section 6 to vacating the Closing Locations, such shall mean vacating the Closing Locations, in favor of Merchant, its representatives or assignee and shall not mean vacating possession or disclaimer of lease in favor of the landlord or owner of the Closing Location premises.  Agent agrees that it shall be obligated to repair any damage caused by Agent (or any representative, agent or licensee thereof) to any Closing Location during the Sale Term, ordinary wear and tear expected.

Section 7.     Sale Proceeds.

7.1     Proceeds.  For purposes of this Agreement, "Proceeds" shall mean the total amount (in dollars) of all sales of Merchandise and Additional Merchandise made under this Agreement, including the proceeds of any fabric protection sales, exclusive of (i) Sales Taxes, (ii) charges to customers for delivery services and assembly services; and (iii) returns, allowances and customer credits.  All proceeds of Merchant's insurance (net of any deductible) directly attributable to loss or damage to Merchandise or loss of cash arising from events occurring during the Sale Term shall constitute Proceeds under this Agreement.

7.2     Credit Card Proceeds.  Agent shall not be allowed to use Merchant's current credit card systems and servicing arrangements during the course of the Sale. Agent shall be required to establish outside credit card processing systems and machines

at Agent's sole expense and will utilize its own merchant identification numbers during the entire Sale Term. Merchant shall not be responsible for paying and Agent shall pay as an Expense hereunder, all credit card fees, charges and chargebacks related to the Sale, whether received during or after the Sale Term.

Section 8.    Conduct of the Sale

8.1    Rights of Agent.  Subject to entry of the Approval Order, Agent shall be permitted to conduct a "store closing" or similar theme sale at the Stores throughout the Sale Term in a manner consistent with the "Sale Guidelines" annexed hereto as Exhibit 8.1, whether by in-store or media advertising or promotional materials.  In addition to any other rights granted to Agent hereunder, in conducting the Sale, Agent, in the exercise of its sole discretion, shall have the right:

(a)    to establish Stores' hours, which are consistent with the terms of applicable leases, mortgages or other occupancy agreements and local laws or regulations, including, without limitation, Sunday closing laws;

(b)    to use without charge (except where designated as an Expense pursuant to Section 4.1 hereof) during the Sale Term all FF&E, Store-level (and to the extent available, corporate) customer lists and mailing lists and existing supplies located at the Closing Locations, intangible assets (including Merchant's names, logos and tax identification numbers), keys, case keys, security codes, and safe and lock combinations required to gain access to and operate the Closing Locations, and any other assets, excluding point of sale equipment, of Merchant located at the Closing Locations (whether owned, leased, or licensed) consistent with applicable terms of leases or licenses.  Agent shall exercise due care and return to the Merchant immediately at the end of the Sale all materials and supplies except materials or supplies expended;

(c)    to establish sales prices and implement advertising, signage (including exterior banners and signs), and promotion programs consistent with the sale theme described herein, and as otherwise provided in the Approval Order and the Sale Guidelines, as and where applicable (including, without limitation, by means of media advertising, A-frame, and similar signage, and use of sign walkers, in Agent's discretion);

(d)    to transfer Merchandise between the Closing Locations only after the Inventory Taking is completed at both the transferring and the receiving location;

(e)    to supplement the Merchandise at the Closing Locations with Additional Merchandise in accordance with Section 3.5 hereof; and

(f)    to close the Stores to the public for a period commencing on the Sale Commencement Date for the purposes of preparing the Stores for the Sale. All refunds or credits for cancelled Customer Ordered Merchandise and Customer Returned Goods, to the extent applicable, shall be issued by Merchant's home office and shall not be issued at the Closing Locations.

8.2    Terms of Sales to Customers.  Subject to Agent's compliance with applicable law, all sales of Merchandise will be "final sales" and "as is, where is" and all advertisements and sales receipts (including credit card receipts) will reflect the same. Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash, nationally recognized bank credit cards, and, in Agent's discretion, personal checks, provided, however, if Agent determines to accept personal checks, Agent shall bear the risk of loss therefor.

8.3    Sales Taxes.  During the Sale Term, all sales, excise and other taxes attributable to sales of Merchandise as indicated on Agent's point of sale equipment (other than taxes on income, but specifically including, without limitation, gross receipts taxes payable to the State of New York) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise and collected on Merchant's behalf, and provided to Merchant on no less than a bi-weekly basis for deposit in Merchant's existing accounts, trust accounts or other accounts, as designated by Merchant.  Provided that Agent has collected all Sales Taxes during the Sale and remitted the proceeds thereof to Merchant, Merchant shall promptly pay or cause to be paid all Sales Taxes and file all applicable reports and documents required by the applicable taxing authorities. Agent shall reimburse Merchant for any additional Sales Taxes, interest, fines, penalties, and the like payable to any taxing authority as the result of a Sales Tax audit conducted by or on behalf of such authority which discloses that the Sales Taxes collected by Agent and paid over to Merchant for any period during the Sale were less than those mandated by applicable law (any such additional Sales Taxes and other amounts are collectively referred to herein as "Additional Taxes and Penalties").  Merchant will be given access to the computation of gross receipts for verification of all such Sales Tax collections.  Provided Agent performs its responsibilities in strict compliance with this Section 8.3, Merchant shall indemnify and hold harmless Agent from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Agent sustains or incurs as a result or consequence of the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required, by applicable law, to be filed with or delivered to such taxing authorities.  Agent shall add Sales Tax to the sales price of Additional Merchandise and Agent shall collect Sales Taxes attributable to the sales of Additional Merchandise and deposit such amounts into existing accounts, trust accounts or other accounts designated by Agent, for remittance by Merchant, on behalf of Agent, to the appropriate taxing authority.  If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with its obligations in accordance with this Section 8.3, Agent shall indemnify and hold harmless Merchant from and against any and all costs including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes, remit Sales Taxes to Merchant, and/or, to the extent Agent is required hereunder to prepare reports and other documents, the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.

8.4    Supplies.  Agent shall have the right to use all existing supplies necessary to conduct the Sale (e.g., boxes, bags, twine, but not gift certificates, rain checks, merchandise credits or the like) located at the Closing Locations at no charge to Agent. In the event that additional supplies are required in any of the Closing Locations during the Sale, the acquisition of such additional supplies shall be the responsibility of Agent as an Expense.

8.5    Customer Refunds for prior Sales. All customer requests for cash refunds or merchandise credits with regard to the cancellation of Customer Ordered Merchandise shall be processed exclusively through Merchant's home office, and Agent shall not issue any cash refunds or credits to customers in respect of any sale written prior to the Sale Commencement Date.

8.6    Gift Certificates.  During the Sale Term, Agent shall not accept Merchant's gift certificates and gift cards issued by Merchant prior to the Sale Commencement Date.

8.7    Sale Reconciliation.  On each Thursday during the Sale Term, commencing on the second Thursday after the Sale Commencement Date, Agent and Merchant shall cooperate to reconcile Expenses, and such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e., Sunday through Saturday), all pursuant to procedures agreed upon by Merchant and Agent.  On a weekly basis, Agent shall provide Merchant with a true and correct summary of sales of Merchandise and Additional Merchandise at each Closing Location (in each case for the prior week).  On a bi-monthly basis, if requested, Agent shall provide to Merchant (at Agent's sole cost and expense) true and correct copies of all records and source documents evidencing sales of Merchandise or Additional Merchandise (in each case for the prior two-week period).  Within thirty (30) days after the end of the Sale Term, Agent and Merchant shall complete a final reconciliation of the Sale, the written results of which shall be certified by representatives of each of Merchant and Agent as a final settlement of accounts between Merchant and Agent.

8.8    Force Majeure.  If any casualty or act of God prevents the conduct of business in the ordinary course at any Closing Location for a period in excess of three (3) consecutive days, such Closing Location and the Merchandise located at such Closing Location shall be eliminated from the Sale and considered to be deleted from this Agreement as of the last date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Sale which is not the subject of insurance proceeds or consolidated by Agent (as an Expense) into another Closing Location(s), and Merchant to the extent actually received shall reimburse Agent for the amount the Guaranteed Amount is so reduced prior to the end of the Sale Term.  As noted in the proceeding sentence, Agent will use its best efforts to consolidate and transfer all Merchandise which is not the subject of insurance proceeds and include said Merchandise in the Sale in other Stores.

Section 9.    Employee Matters

9.1    Merchant's Personnel.  Subject to the applicable provisions of the Approval Order and any other provisions in this Agreement relating to employees, Agent may use Merchant's personnel in the conduct of the Sale to the extent Agent in its sole discretion deems expedient, and Agent may select and, with Merchant, schedule the number and type of Merchant's personnel required for the Sale.  Agent shall identify any such personnel to be used in connection with the Sale (each such personnel, a "Retained Personnel") prior to the Sale Commencement Date.  On or before the Sale Commencement Date, Retained Personnel shall be converted to independent contractors hired by Agent during the Sale, but shall not be considered or deemed to be employees of Agent.

9.2    Termination of Personnel.  Agent may in its discretion stop using any Retained Personnel at any time during the Sale.

9.3    Payroll Matters.  During the Sale Term, Agent shall process and pay the payroll utilizing its own payroll processing and will issue all independent contactors with 1099 forms at the end of the tax year.

Section 10.    Conditions Precedent.

The willingness of Agent and Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by the applicable party:

(a)    All representations and warranties of Merchant and Agent hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and as of the Sale Commencement Date;

(b)    Agent hereby acknowledges that prior to the execution of this Agreement, Merchant has provided Agent reasonable access to all pricing and cost files, computer hardware, software and data files, inter-Stores transfer logs, markdown schedules, invoices, style runs and all other documents relative to the price, mix and quantities of inventory located at the Closing Locations;

(c)    Agent hereby acknowledges that prior to the execution of the Agreement, and on the date immediately preceding the Inventory Date, Agent has had and shall have had the opportunity to inspect the Closing Locations and the Merchandise;

(d)    On or before July 26, 2010, the Bankruptcy Court shall have entered an order approving the bidding procedures set forth in Section 16.11 hereof; and

(e)    On or before July 26, 2010, the Bankruptcy Court shall have entered the Approval Order substantially in the form of Exhibit 10 attached hereto and otherwise in a form reasonably acceptable to Merchant and Agent.

Section 11.     Representations, Warranties and Covenants

11.1     Merchant's Representations, Warranties and Covenants.  Merchant hereby represents, warrants and covenants in favor of Agent as follows:

(a)     Merchant (i) is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation; (ii) has all requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Closing Locations are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)     Subject to the entry of the Approval Order in the Chapter 11 Case, Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "Agency Documents") and to perform fully its obligations thereunder. Subject to the entry of the Approval Order in the Chapter 11 Case, Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval on the part of Merchant is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale.  Subject to the entry of the Approval Order in the Chapter 11 Case, each of the Agency Documents has been duly executed and delivered by Merchant and constitutes the legal, valid and binding obligation of Merchant enforceable in accordance with its terms.  Subject to the entry of the Approval Order in the Chapter 11 Case, no court order or decree of any federal, state, local, or provincial governmental authority or regulatory body is in effect that would prevent or materially impair, or is required for the Merchant's consummation of, the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefore, other than as shall be obtained prior to the Sale Commencement Date, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.  Other than for any consent as shall be obtained prior to the Sale Commencement Date, and those contracts or agreements identified by Merchant to Agent on or prior to the Sale Commencement Date, if any, no contract or other agreement to which the Merchant is a party or by which the Merchant is otherwise bound will prevent or materially impair the consummation of the Sale and the other transactions contemplated by this Agreement.

(c)     Merchant (i) owns and will own at all times during the Sale Term, good and marketable title to all of the Merchandise free and clear of all liens, claims and encumbrances of any nature, and (ii) shall not create, incur, assume or suffer to exist any security interest, lien or other charge or encumbrance upon or with respect to any of the Merchandise or the Proceeds, in each case, except for such pre-existing liens and security

interests as shall have been disclosed by Merchant to Agent and identified in Exhibit 11.1(c) hereof.

(d)     Merchant has maintained its pricing files (including, but not limited to, the Cost File) in the ordinary course of business, and prices charged to the public for goods (whether in-store, by advertisement or otherwise) are the same in all material respects as set forth in such pricing files for the periods indicated therein (without consideration of any point of sale markdowns).  All pricing files and records relative to the Merchandise have been made available to Agent.

(e)     Merchant shall ticket or mark all items of inventory received at the Closing Locations prior to the Sale Commencement Date in a manner consistent with similar Merchandise located at the Closing Locations and in accordance with Merchant's past practices and policies relative to pricing and marking inventory.

(f)     To the best of Merchant's knowledge, all Merchandise is in material compliance with all applicable federal, state or local product safety laws, rules and standards.  Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls prior to the Sale Commencement Date.

(g)     Subject to the terms of this Agreement, Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, each of the Closing Locations, the assets currently located at the Closing Locations to the extent Merchant is entitled to use the same, and the services provided at the Closing Locations to the extent Merchant is entitled to such services.  Merchant shall throughout the Sale Term maintain in a manner consistent with its customary and historic practices, all cash registers, heating systems, air conditioning systems, elevators, escalators, alarm systems, and all other mechanical devices used in the ordinary course of operation of the Closing Locations or, if applicable, use reasonable efforts to cause any applicable landlord to comply with its obligations under applicable lease and occupancy agreements with respect to any such matter.

(h)     Merchant has not transferred and shall not transfer merchandise, FF&E or supplies to or from the Closing Locations outside the ordinary course of business, and shall not transfer Merchandise from the Distribution Centers to the Closing Locations other than in the ordinary course of business.

(il)     From and after the date of this Agreement, Merchant will not fill customer orders from "floor inventory" except in the ordinary course of business.

11.2    Agent's Representations, Warranties and Covenants.  Agent hereby represents, warrants and covenants in favor of Merchant as follows:

(a)     Agent: (i) is a corporation, partnership, or limited liability company, as the case may be, duly and validly existing and in good standing under the laws of the State of its organization; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated

hereby; and (iii) is and during the Sale Term will continue to be duly authorized and qualified as a foreign company to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b)     Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Agent has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale.  Each of the Agency Documents has been duly executed and delivered by the Agent and constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms.  No court order or decree of any federal, provincial, state or local governmental authority or regulatory body is in effect that would prevent or impair or is required for Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor other than as provided herein.  No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)     No action, arbitration, suit, notice, or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved, or to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement, or which if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

Section 12.     Insurance

12.1     Merchant's Liability Insurance.  Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies including, but not limited to, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with Merchant's operation of the Closing Locations, and shall cause Agent to be named an additional named insured with respect to all such policies.  Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent. In the event of a claim under any such policies Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts to the extent said claim arises from or relates to the alleged acts or omissions of Merchant or its employees, agents (other than Agent's employees), or independent contractors (other than Agent and independent contractors hired by Agent in conjunction with the Sale).

12.2     Merchant's Casualty Insurance.  Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, fire, flood, theft and

extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the Cost Value thereof, which coverage shall be reduced from time to time to take into account the sale of Merchandise. In the event of a loss to the Merchandise on or after the date of this Agreement, the proceeds of such insurance attributable to the Merchandise (net of any deductible) shall constitute Proceeds. Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof, in form and substance reasonably satisfactory to Agent. All such policies shall require at least thirty (30) days prior notice to Agent of cancellation, non-renewal or material change. Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date, without Agent's prior written consent.

      12.3   <u>Agent's Insurance</u>. Agent shall maintain at Agent's cost and expense throughout the Sale Term, in such amounts as it currently has in effect, comprehensive public liability and automobile liability insurance policies covering injuries to persons and property in or in connection with Agent's agency at the Closing Locations, and shall cause Merchant to be named an additional insured with respect to such policies. In the event of a claim under such policies Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, to the extent said claim arises from or relates to the alleged acts or omissions of Agent or Agent's employees, agents or independent contractors.

      12.4   <u>Risk of Loss</u>. Without limiting any other provision of this Agreement, Merchant acknowledges that Agent is conducting the Sale on behalf of Merchant solely in the capacity of an agent, and that in such capacity (i) Agent shall not be deemed to be in possession or control of the Closing Locations or the assets located therein or associated therewith, or of Merchant's personnel located at the Closing Locations, and (ii) except as expressly provided in this Agreement, Agent does not assume any of Merchant's obligations or liabilities with respect to any of the foregoing. Agent shall not be deemed to be a successor employer. Merchant and Agent agree that, subject to the terms of this Agreement, Merchant shall bear all responsibility for liability claims of customers, employees and other persons arising from events occurring at the Closing Locations during and after the Sale Term, except to the extent any such claim arises directly from the acts or omissions of Agent, or its supervisors, agents, independent contractors, or employees located at the Closing Locations (an "<u>Agent Claim</u>"). In the event of any liability claim other than an Agent Claim, Merchant shall administer such claim and shall present such claim to Merchant's liability insurance carrier in accordance with Merchant's policies and procedures existing immediately prior to the Sale Commencement Date, and shall provide a copy of the initial documentation relating to such claim to Agent at the address listed in this Agreement. To the extent that Merchant and Agent agree that a claim constitutes an Agent Claim, Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide copies of the initial documentation relating to such claim to Merchant. In the event that Merchant and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party to the foregoing address.

Section 13.    Indemnification

13.1    Merchant Indemnification.  Merchant shall indemnify and hold Agent and its officers, directors, employees, agents and independent contractors (collectively, "Agent Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against Agent resulting from, or related to:

(a)    Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document (provided, however, Agent shall not be entitled to any indemnity hereunder in the event of a breach of any representation contained in Section 11.1(k) hereof, in which case Agent's sole remedy shall be such adjustment to the Guaranteed Amount in accordance with Exhibit 11.1(k));

(b)    subject to Agent's performance and compliance with its obligations pursuant to Sections 4.1(b) and 4.1(c) and Section 9 hereof, any failure of Merchant to pay to its personnel any wages, salaries or benefits due to such personnel during the Sale Term;

(c)    subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof;

(d)    any consumer warranty or products liability claims except to the extent such claims arise from representations made by the Agent relating to the Merchandise;

(e)    the gross negligence or willful misconduct of Merchant or any of its officers, directors, employees, agents (other than Agent) or representatives.

13.2    Agent Indemnification.  Agent shall jointly and severally indemnify and hold Merchant and its officers, directors, employees, agents and representatives harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against, Merchant resulting from, or related to (including acts or omissions of persons or entities affiliated with or acting on behalf of the Agent):

(a)    Agent's material breach of or failure to comply with any local, state, or federal laws or regulations, or any of its agreements, covenants, representations or warranties contained in any Agency Document;

(b)    any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of Merchant by Agent or any of its employees, agents, independent contractors or other officers, directors or representatives of Agent;

(c)     any claims by any party engaged by Agent as an employee or independent contractor arising out of such engagement;

(d)     any Agent Claims;

(e)     Agent's use of point of sale system to compute Sales Taxes relating to the Sale, any Additional Taxes and Penalties; and

(f)     the negligence or willful misconduct of Agent or any of its officers, directors, employees, agents or representatives.

Section 14.     <u>Defaults</u>.  The following shall constitute "<u>Events of Default</u>" hereunder:

(a)     Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting party; or

(b)     Any representation or warranty made by Merchant or Agent proves untrue in any material respect as of the date made or at any time and throughout the Sale Term; or

(c)     Subject to Section 8.8 hereof, the Sale is terminated or materially interrupted or impaired at any Closing Location for any reason other than (i) an Event of Default by Agent, or (ii) any other material breach or action by Agent not authorized hereunder.

In the event of an Event of Default, the non-defaulting party may, in its discretion, elect to terminate this Agreement upon seven (7) business days' written notice to the other party and pursue any and all rights and remedies and damages resulting from such default hereunder in the event such cure is not affected by the defaulting party.

Section 15.     <u>Fixtures</u>

With respect to furniture, fixtures and equipment owned by Merchant and located at the Closing Locations (collectively, the "<u>FF&E</u>"), Agent shall sell the FF&E in any such Closing Locations.  Merchant shall bear the expenses incurred in connection with the disposition of the FF&E and Agent shall be entitled to receive a commission equal to twenty five percent (25%) of the gross receipts (net only of taxes, if any) from the sale of such FF&E; <u>provided</u> <u>further</u> <u>however</u>, Merchant may elect to receive, in lieu of proceeds net of expenses and Agent's commission, a lump sum payment, on a per Closing Location basis, in an amount to be agreed upon between Merchant and Agent, in which case all costs and expenses associated with the disposition thereof shall be borne by Agent.   In either event, as of the Sale Termination Date, Agent may abandon in place in a neat and orderly manner any unsold FF&E at the Closing Locations.

Section 16.    Miscellaneous

16.1    Notices.  All notices and communications provided for pursuant to this Agreement shall be in writing, and sent by hand, by email or a recognized overnight delivery service, as follows:

If to Agent:        Great American Furniture Services
                    13950 Ballantyne Corporate Place
                    Richardson Building, Suite 175
                    Charlotte, NC 28277
                    Attn:  Laura Gee
                    Email: lgee@greatamerican-furniture.com
                    Fax: 888 – 940 - 4237

If to the Merchant:    _____
                       _____
                       _____
                       _____
                       Attn:  _____
                       Fax:   _____

With a copy to:        _____
                       _____
                       _____
                       Attn:  _____
                       Fax:   _____

16.2    Governing Law; Consent to Jurisdiction.  This Agreement shall be governed and construed in accordance with the laws of the State of New York, without regard to conflicts of laws principles thereof.  The parties hereto agree that the Bankruptcy Court shall retain exclusive jurisdiction to hear and finally determine any disputes arising from or under this Agreement, and by execution of this Agreement each party hereby irrevocably accepts and submits to the jurisdiction of such court with respect to any such action or proceeding and to service of process by certified mail, return receipt requested to the address listed above for each party.

16.3    Entire Agreement.  This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

16.4    Amendments.  This Agreement may not be modified except in a written instrument executed by each of the parties hereto.

16.5    No Waiver.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in

the performance by such other party of the same or any other obligation of such party. Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

16.6    Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon Agent and Merchant, including, but not limited to, any chapter 11 or chapter 7 trustee.  Agent shall not be permitted to assign its obligations under this Agreement.

16.7    Execution in Counterparts.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one agreement.  This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original signature hereunder.

16.8    Section Headings.  The headings of Sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

16.9    Survival.  All representations, warranties, covenants and agreements made herein, by the parties hereto, shall be continuing, shall be considered to have been relied upon by the parties and shall survive the execution, delivery and performance of this Agreement.

16.10    Termination.  This Agreement shall remain in full force and effect until the first to occur of: (i) receipt by Merchant of written notice from Agent that any of the conditions specified in Section 10 hereof have not been satisfied within five (5) days of the anticipated Sale Commencement Date set forth in Section 6.1; or (ii) the expiration of the Sale Term and completion and certification by Merchant and Agent of the final Sale reconciliation pursuant to Section 8.7 above.  Notwithstanding the foregoing, (a) the representations, warranties and indemnities of Merchant and Agent contained herein and the provisions of Section 11 above, and (b) any claim arising from a breach of this Agreement prior to its termination, shall survive the termination of this Agreement pursuant to this Section 16.10.

16.11    Bidding Procedures / /Bankruptcy Matters.  In consideration of Agent conducting its due diligence and entering into this Agreement, which serves as a base by which other offers may be measured and is subject to higher or better offers by way of a bidding process, all subject to the approval of the Bankruptcy Court, Merchant agrees to pay Agent from the proceeds of the offer received from the party that submits the highest or best bid (to the extent Agent is not the party that submits the highest or best bid) a break-up fee in the amount of $ 50,000.00 (the "Break-up Fee").  The Agent will have the ability to "credit bid" using the Break up Fee. Each bid from another party will be no less than three percent (3%) of the Cost Value higher in addition to the Break up Fee.

16.12    Security Interest.  Subject to payment of the Guaranty Payment, Additional Return, and Expenses, and the provision of services hereunder to Merchant,

Merchant hereby grants to Agent a first priority security interest in and lien upon the Merchandise and the Proceeds to secure all obligations of Merchant to Agent hereunder. Until the payment of the Guaranteed Amount, the Additional Return, and Expenses, in full, the security interest granted to Agent hereunder shall remain junior to the security interest of Merchant's Lenders. After entry of the Approval Order, but subject to payment of the Guaranty Payment, the security interest granted to Agent hereunder shall be deemed properly perfected without the need for further filings or documentation.

16.13   <u>Obligations Joint and Several</u>. All obligations of Agent to Merchant hereunder shall be joint and several. Agent may utilize the services of subcontractors and or licensees in connection with the performance of its obligations hereunder.

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agency Agreement as of the day and year first written above.

<u>**AGENT**</u>**:**

**GREAT AMERICAN FURNITURE SERVICES, LLC**

By: _____
Name: _____
Title: _____

<u>**MERCHANT**</u>**:**

_____

By: _____
Name: _____
Title: _____

**Exhibit B**

**Bidding Procedures**

# BIDDING PROCEDURES

A.    Bid Deadline

1.    The Debtors[1] seek to solicit bids for the sale of its or its inventory (the "Subject Assets") in certain of its stores (the "Closing Stores") identified in Exhibit A to the GAFS Agency Agreemetn.

2.    In order to receive bids for the sale of the Subject Assets, an auction (the "Auction") shall be conducted as set forth below.  In order to bid at the Auction, a bidder (the "Bidder" and collectively, the "Bidders") must submit a written bid in the form of the Required Bid Documents (as defined below) for the Subject Assets in the Closing Stores no later than July 23, 2010 at 3:00 PM (ET) (the "Bid Deadline").  The original Required Bid Documents must be submitted to: counsel for the Debtors, Olshan Grundman Frome Rosenzweig & Wolosky LLP ("Olshan"), Park Avenue Tower, 65 East 55th Street, New York NY 10021 (Attn: Michael S. Fox, Esq. and Jordanna L. Nadritch, Esq.), with copies to (i) Jennifer Convertibles, Inc., 417 Crossways Park Drive, Woodbury, New York 11797, (Attn: Rami Abada); and (ii) Office of the United States Trustee for the Southern District of New York.

3.    Each Bidder shall be deemed to acknowledge: (a) that it had an opportunity to inspect and examine the Subject Assets prior to making its offer and that each such Bidder relied solely on that review and upon its own investigation and inspection of the Subject Assets in making its offer, (b) that Bidder is not relying upon any written or oral statements, representations, or warranties of the Debtors, their agents or representatives; and (c) that the occupancy of the Closing Stores may not be available until the completion of the store closing at the premises. Other pertinent documents will be available for inspection prior to the

---

[1] All capitalized terms not defined herein shall have the meanings ascribed to them in the Sale Motion.

Auction during regular business hours at the offices of Olshan or arrangements can be made with Olshan prior to the Auction for copies to be delivered to Bidder for inspection.

B.  Reservation of Rights

4.  "Stalking Horse" Agreement(s): In order to maximize the value of the Subject Assets to the estates, the Debtors have entered into an Agency Agreement with Great American Furniture Services LLC ("GAFS"), subject to Bankruptcy Court approval, for the Subject Assets.  As consideration for the value of such "stalking horse" bid(s), in the event that the Bankruptcy Court should determine any third party's competitive bid as a higher and better offer and the Debtors thereafter close an Agency Agreement with such third party, then, subject to the Bankruptcy Court's approval, the Debtors propose to pay to GAFS a break-up fee up of $50,000.

5.  In order to maximize the value of the Subject Assets to the estates, the Debtors may, after consultation with their advisors, withdraw from sale any of the Subject Assets prior to or during the Auction.  The Debtors reserve the right to reject any and all bids for the Subject Assets.

C.  Required Bid Documents

6.  All bids must include the following documents (the "Required Bid Documents"):

a.  a written offer, on Bidder's corporate letterhead, or, if on behalf of Bidder by Bidder's legal counsel, then on Bidder's legal counsel's letterhead, for the purchase of the Subject Assets that must include the full name and identity of the proposed purchaser, the amount being offered in the form of an allocation schedule and the intended use of each premises. Such written offer must expressly state that the Bidder's offer is irrevocable until the earlier to occur of (i) the Closing (as defined herein) or (ii) fifteen days following the Auction (unless such bid is sooner expressly rejected in writing by the Debtors) and that if it is the successful Bidder, Bidder is ready, willing and able to execute the individual Agency Agreement;

2

b.      a certified check for the Deposit (as defined herein);

c.      written evidence of Bidder's ability to consummate the transaction and evidence of adequate assurance of future performance: (i) including, but not limited to, federal tax returns for two years and/or a current audited or review financial statement and/or bank account statements; and (ii) any information that the Debtors may reasonably request.

7.      All bids shall remain open and irrevocable until the earlier to occur of: (i) the Closing (as defined herein) or (ii) fifteen days following the completion of the Auction.

D.    <u>Qualified Bids</u>

8.      Unless such requirement is waived by the Debtors, only Bidders that have submitted qualified bids ("Qualified Bids") shall be eligible to participate in the Auction. In order to be a Qualified Bid, a bid shall:

a.      include each of the Required Bid Documents;

b.      not be contingent on obtaining financing; and

c.      be received by the Bid Deadline.

9.      In addition, to be a Qualified Bid, each Bidder must be prepared to demonstrate to the Debtors its ability to consummate the purchase of the Subject Assets, demonstrate adequate assurance of future performance, and otherwise fulfill its obligations.

E.    <u>Deposit Requirement</u>

10.      Each Bidder shall tender a deposit equal to ten percent (10%) of the bid amount (the "Deposit").

11.      In the event the Debtors do not consummate a sale for any reason (other than the Bidder's failure to consummate a sale), the Debtors' sole obligation and liability shall be to refund the Deposit to the Bidder.

12.     No sale shall be deemed to have been consummated by the Debtors pursuant to the procedures described herein unless (a) the Bankruptcy Court has approved such sale (the "Sale Hearing"), and (b) such proposed transaction is in fact consummated.

F.     The Auction

13.     The Auction shall occur on July 26, 2010 at 10:00 AM (ET), at the offices Olshan, on the terms and conditions set forth in these Bidding Procedures. Only Qualified Bids will be considered at the Auction. THE SALE SHALL BE SUBJECT TO APPROVAL OF THE BANKRUPTCY COURT.

14.     The terms and procedures governing the Auction are as follows:

a.     The GAFS Bid is deemed to be a Qualified Bid. GAFS is authorized to credit bid at the Auction, pursuant to section 363 of the Bankruptcy Code, using the Break-Up Fee.

b.     In the event the Debtors receive only a single Qualified Bid, the Subject Assets will not be subject to bidding at the Auction, and the Debtors may seek to sell the Subject Assets at the Sale Hearing, if such Qualified Bid is otherwise acceptable to the Debtors. In the event the Debtors receive multiple Qualified Bids, the Subject Assets will be offered for sale at the Auction.

c.     Bidders are subject to a Qualified Bid minimum of no less than three percent (3%) of the Cost Value higher in addition to the Break-Up Fee.

d.     The Debtors intend to sell their interest to the Bidder making the highest or best Qualified Bid at the Auction. Formal acceptance of a bid will not occur unless and until the Court enters an order approving and authorizing the Debtors to consummate the sale to such Bidder or its designated assignee.

e.     At the conclusion of the Auction, the Debtors will announce which bid is the highest and best bid (the "Successful Bidder") and which bid is the second highest and/or best bid. The Successful Bidder shall supplement its Deposit within one business day so that, to the extent necessary, such Deposit equals ten percent (10%) of the highest and best bid.

f.    The Debtors reserve the right to (i) determine which Bid is the highest or best Bid and (ii) reject at any time prior to entry of an order of the Bankruptcy Court approving a Bid, any offer which the Debtors, at their sole discretion, deem to be (x) inadequate or insufficient, (y) not in conformity with the requirements of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Bankruptcy Local Rules or the terms and conditions of sale set forth herein, or (z) contrary to the best interests of the Debtors, their estate and creditors. The Debtors will have no obligation to accept or submit for Court approval any offer presented at the Auction except such written offers as may have been accepted by the Debtors.

G.    The Closing

15.    Except as otherwise provided in a written offer that has been accepted by the Debtors, the closing of the sale shall take place within one business day following the entry of an order by the Bankruptcy Court approving the sale of the Subject Assets to the Successful Bidder (the "Closing"). The Sale Hearing before the Bankruptcy Court is scheduled for July 26, 2010 at 10:00 a.m. (EDT). With respect to the Closing, time of performance by the Successful Bidder is of the essence. Upon failure to consummate a sale because of a breach or failure on the part of the Successful Bidder(s), the Debtors shall retain the Deposit as liquidated damages, and the next highest or otherwise best Qualified Bidder, as disclosed at the Sale Hearing shall be deemed the Successful Bidder and shall consummate the sale of the Subject Assets without further order of the Court.

16.    The balance of the purchase price shall be paid by the Successful Bidder by wire transfer or an endorsed bank or certified check at the Closing.

17.    All adjustments to be made in connection with the Closing shall be made as of midnight of the date immediately prior to the date of Closing (the "Adjustment Date"). Any adjustments attributable to escalation or pass-through charges which would be billed after the Adjustment Date shall be made based upon the most recent billing received by the Debtors for such charges. The Successful Bidder shall be liable for all obligations with respect to the

5

Subject Assets from the Adjustment Date forward including, but not limited to, any year-end adjustments, and shall indemnify the Debtors with respect thereto and unless otherwise agreed the Debtors shall be liable for all obligations accrued prior to the Adjustment Date.

H.    Miscellaneous Terms of Sale

18.    Any sale, assignment or other disposition of the Subject Assets shall be without representations or warranties of any kind, nature or description by the Debtors, their agents or representatives.  The Subject Assets shall be transferred "as is" and "where is."

19.    All of the Debtors' rights, title and interest in and to the Subject Assets shall be assigned and sold pursuant to section 365(f) of the Bankruptcy Code free and clear of all liens, claims, encumbrances and security interests, which shall attach to the net proceeds received by the Debtors as a result of the sale with the same force and effect that they now have, subject to further order of the Bankruptcy Court.

20.    All sales, transfer and recording taxes, stamp taxes or similar taxes, if any, relating to the sale of the Subject Assets of the Debtors in connection therewith shall be the sole responsibility of the Successful Bidder and shall be paid to the Debtors at the Closing of each transaction.

21.    The Debtors, at or before the Auction, may impose or modify the terms and conditions herein as they determine to be in the best interests of the Debtors, their estates, creditors and other parties in interest.  The Debtors may revise the procedures herein without Court approval.

**Exhibit C**

**Proposed Bidding Procedures Order**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| JENNIFER CONVERTIBLES, INC.,[1] | Case No. 10-13779 (ALG) |
| Debtors. | (Motion for Joint Administration Pending) |

**ORDER APPROVING PROCESS INCLUDING SALE TO THE HIGHEST BIDDERS AND TO (A) APPROVE BID PROCEDURES AND PROTECTIONS; (B) SCHEDULE A SALE HEARING; (C) APPROVE THE FORM AND MANNER OF NOTICE RELATED THERETO; AND (D)**
**GRANTING RELATED RELIEF**

Upon the motion, dated July 20, 2010 (the "Sale Motion")[2] of Jennifer Convertibles, Inc. and its affiliated debtors, as debtors in possession (collectively, the "Debtors"), for entry of an order that will (a) approve bid procedures and protections; (b) schedule a sale hearing; (c) approve the form and manner of notice related thereto; (d) authorize sale free and clear of all liens, claims, encumbrances and interests; and (e) grant related relief; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the parties listed therein, and it appearing that no other or further notice need be provided; and the Court

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are: (i) Jennifer Convertibles, Inc. (4646); (ii) Jennifer Convertibles Boylston MA, Inc. (7904); (iii) Jennifer Chicago Ltd. (0505); (iv) Elegant Living Management, Ltd. (5049); (v) Hartsdale Convertibles, Inc. (1681); (vi) Jennifer Management III Corp. (3552); (vii) Jennifer Purchasing Corp. (7319); (viii) Jennifer Management II Corp. (9177); (ix) Jennifer Management V Ltd. (9876); (x) Jennifer Convertibles Natick, Inc. (2227); (xi) Nicole Convertibles, Inc. (5985); (xii) Washington Heights Convertibles, Inc. (0783).
[2] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, and creditors; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED.

2.      The Bid Procedures are hereby approved in all respects, including granting the Debtors the discretion to adjust the Bid Procedures as may be appropriate to maximize the value the Debtors receive.

3.      An auction will be held beginning on July 26, 2010 at the offices of Olshan Grundman Frome Rosenzweig & Wolosky LLP, 65 East 55th Street, New York, New York 10022, commencing at 10:00 a.m. (Eastern Time).  At the auction, the Debtors are hereby authorized to conduct the auction in the manner that the Debtors and their advisors believe will provide the greatest return

4.      The GAFS Break-Up Fee in the amount of $50,000 is approved, and the Debtors are authorized to pay such amounts.

5.      The Sale Hearing shall be on July ____, 2010 at __:__ _.m. (Eastern Time), or as soon thereafter as counsel may be heard, before the Honorable Allan L. Gropper.

6.      Responses or objections, if any, to the entry of the Sale shall be filed with this Court and served, so as to be actually received no later than July __, 2010, at 4:00 p.m. (Eastern Time) on: (a) Olshan Grundman Frome Rosenzweig & Wolosky LLP, Attn: Michael S. Fox, Esq., Counsel for the Debtors; (b) Office of the U.S. Trustee; (c) Lawrence A. Darby, III, Esq., Counsel to Mengnu; and (d) Neiger LLP, Attn: Edward E. Neiger, Esq., Counsel to Mengnu.

7.     The Debtors are authorized and empowered to take such steps, incur and pay such costs and expenses, and take all such actions as may be reasonably necessary to fulfill the notice requirements established by this Order.

8.     The Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.

Dated: July __, 2010
       New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

**Exhibit D**

**Proposed Sale Order**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| JENNIFER CONVERTIBLES, INC.,[1] | Case No. 10-13779 (ALG) |
| Debtors. | (Motion for Joint Administration Pending) |

**ORDER (A) AUTHORIZING SALE FREE AND CLEAR OF ALL LIENS, CLAIMS,**
**ENCUMBRANCES AND INTERESTS; AND (B) GRANTING RELATED RELIEF**

Upon the motion, dated July 20, 2010 (the "Sale Motion")[2] of Jennifer Convertibles, Inc.

and its affiliated debtors, as debtors in possession (collectively, the "Debtors"), for entry of an

order that will (a) approve bid procedures and protections; (b) schedule a sale hearing; (c)

approve the form and manner of notice related thereto; (d) authorize sale free and clear of all

liens, claims, encumbrances and interests; and (e) grant related relief; and the Court having

jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157

and 1334; and consideration of the Motion and the requested relief being a core proceeding

pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C.

§§ 1408 and 1409; and due and proper notice of the Motion having been provided to the parties

listed therein, and it appearing that no other or further notice need be provided; and the Court

having determined that the legal and factual bases set forth in the Motion establish just cause for

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are: (i) Jennifer Convertibles, Inc. (4646); (ii) Jennifer Convertibles Boylston MA, Inc. (7904); (iii) Jennifer Chicago Ltd. (0505); (iv) Elegant Living Management, Ltd. (5049); (v) Hartsdale Convertibles, Inc. (1681); (vi) Jennifer Acquisition Corp. (9587); (vii) Jennifer Management III Corp. (3552); (viii) Jennifer Media Corp. (3593); (ix) Jennifer Purchasing Corp. (7319); (x) Jennifer Convertibles Licensing Corp. (8920); (xi) Jennifer Management II Corp. (9177); (xii) Jennifer Management V Ltd. (9876); (xiii) Jennifer Convertibles Natick, Inc. (2227); (xiv) Nicole Convertibles, Inc. (5985); (xv) Washington Heights Convertibles, Inc. (0783).

[2] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

1

the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, and creditors; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1. The Motion is GRANTED.

2. The _____ Agency Agreement and the transactions contemplated thereby are approved.

3. Pursuant to Bankruptcy Code section 363(b), the Debtors are authorized to consummate the Sale Transaction upon the terms and conditions set forth in the _____ Agency Agreement and to commence and conduct the Sales in accordance with such agreements and the terms of this Order.

4. The Debtors are authorized to take all actions and execute all documents necessary or appropriate to effectuate the terms of the _____ Agency Agreement and to conduct the Sales.

5. Pursuant to Bankruptcy Code section 363(f), the sale of the Subject Assets to Purchaser, and Purchaser's subsequent sale of the Subject Assets in accordance with the _____ Agency Agreement, shall be free and clear of all liens, claims, all mortgages, security interests, conditional sales or title retention agreements, pledges, hypothecations, liens, judgments, encumbrances or claims of any kind or nature (including, without limitation, any and all "claims" as defined in Bankruptcy Code section 101(5)), arising before, on or after the date on which these chapter 11 cases were commenced (collectively, the "Liens"), with such Liens to attach to the Purchase Price and other amounts payable to the Debtors under the _____ Agency Agreement, in the same order, amount and priority as existed immediately prior to the

2

filing of the petitions commencing these cases (and the rights of any party and the Committee to object to any alleged liens in such assets is also fully preserved).

6.      All payments required to be made under the _____ Agency Agreement (either to the Debtors, to Purchaser or to any third parties) are hereby approved and may be made without any further motion or order of this Court.

7.      The Debtors' stores may "go dark" during the Sales and may remain "dark" despite any lease restriction, REA, local law, or ordinance to the contrary, and any "continuous operation" or similar clause in any of the leases (or any lease provision that purports to increase the rent or impose any penalty for going dark) may not be enforced to hinder or interrupt the Closing Store Sales (and the going dark under such leases shall not be an event of default nor a basis to cancel or terminate the leases).

8.      Any person or entity in possession of any of the Subject Assets shall surrender such assets to the Debtors upon the closing of the transactions approved by this Order.

9.      Neither the Debtors nor Purchaser (nor their respective officers, agents, employees or directors) shall be required to obtain the approval of any landlord, managing agent or other third party to conduct the Sales and the transactions authorized herein.

10.      At the conclusion of the Sales, Purchaser is authorized to abandon any remaining furniture, fixtures or equipment.  In the event of such abandonment, the landlord may dispose of such property without any liability to any individual or entity that may have an interest in such abandoned property and such abandonment is without prejudice to any landlord to assert any claims based on such abandonment and without prejudice to the Debtors or other party in interest to object thereto.

1015286-6

11.     The Debtors are authorized and empowered to take such steps, incur and pay such costs and expenses, and take all such actions as may be reasonably necessary to fulfill the notice requirements established by this Order.

12.     The Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.


Dated: July __, 2010
       New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE