**UNITED STATES BANKRUPTCY COURT**
**THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| JENNIFER CONVERTIBLES, INC.,[1] | Case No. 10-13779 (ALG) |
| Debtors. | (Jointly Administered) |

**MEMORANDUM DECISION ALLOWING ASSUMPTION OF**
**TRADEMARK USAGE AGREEMENTS AND PROVISIONALLY**
**CONFIRMING JOINT PLAN OF REORGANIZATION**

A P P E A R A N C E S:

OLSHAN GRUNDMAN FROME ROSENZWEIG & WOLOSKY, LLP
*Attorney for Debtors*
  By:  Michael S. Fox
        Jordanna L. Nadritch
        Jayme Bethel
Park Avenue Tower
65 East 55th Street
New York, NY 10022

GREENBERG TRAURIG, LLP
*Attorney for Ashley HomeStores, Ltd. and Ashley Furniture Industries, Inc.*
  By:  Michael H. Goldstein
        Nathan A. Schultz
2450 Colorado Avenue, Suite 400 East
Santa Monica, CA 90404

KELLY DRYE & WARREN LLP
*Attorney for the Official Committee of Unsecured Creditors*
  By:  James S. Carr
        Jason R. Adams
101 Park Avenue
New York, NY 10178

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: (i) Jennifer Convertibles, Inc. (4646); (ii) Jennifer Convertibles Boylston MA, Inc. (7904); (iii) Jennifer Chicago Ltd. (0505); (iv) Elegant Living Management, Ltd. (5049); (v) Hartsdale Convertibles, Inc. (1681); (vi) Jennifer Management III Corp. (3552); (vii) Jennifer Purchasing Corp. (7319); (viii) Jennifer Management II Corp. (9177); (ix) Jennifer Management V Ltd. (9876); (x) Jennifer Convertibles Natick, Inc. (2227); (xi) Nicole Convertibles, Inc. (5985); (xii) Washington Heights Convertibles, Inc. (0783).

NEIGER LLP
*Attorney for Haining Mengnu Group Co. Ltd.*
 By:   Edward Neiger
317 Madison Avenue, 21st Floor
New York, NY 10017

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

## BACKGROUND

On July 18, 2010 (the "Petition Date"), each of the twelve Debtors commenced voluntary cases pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors operate through two business segments: (i) a group of sofabed and leather specialty retail stores (the "Jennifer Stores"), which are operated by certain of the Debtors other than Hartsdale (hereafter called the "Jennifer Debtors") and (ii) six full-line furniture stores operated under the Ashley Furniture HomeStore brand (the "Ashley Stores"), by one of the Debtors, Hartsdale Convertibles, Inc. ("Hartsdale"). The primary supplier of furniture to the Jennifer Stores is Haining Mengnu Group Co. Ltd. ("Mengnu"), which is located in the People's Republic of China, and is the Debtors' largest creditor and plan sponsor. Ashley HomeStores, Ltd. ("AHS") is the primary supplier to the Ashley Stores.

On November 19, 2010, the Debtors filed their disclosure statement and a joint chapter 11 plan of reorganization (as amended and modified, the "Plan"). Under the Plan, Mengnu is separately classified and has agreed in the Plan (i) to convert most of its unsecured debt into equity; (ii) to allow its substantial § 503(b)(9) priority claims to be treated *pari passu* with allowed general unsecured claims; (iii) to accept notes with a longer maturity date and less collateral protection than the notes payable to general unsecured creditors; and (iv) to provide financing essential for the Debtors' reorganization that no other entity is willing to provide. The

2

disclosure statement estimates Mengnu will recover 87.7% and that other general unsecured creditors will recover 22.7%. No party has objected or questioned Mengnu's separate classification, its recovery or that it is supplying essential support for the Plan. There was also no dispute that there is no value for the equity, and the Plan provides no recovery for either the preferred or common stockholders.

The Plan contemplated the "deemed" substantive consolidation of the Debtors' estates, solely for purposes of voting, confirmation and making distributions under the Plan. The disclosure statement represents that no creditor was expected to receive a recovery inferior to that which it would have received if a separate plan for each entity had been proposed, that the Debtors have not been managed operationally on an individual entity basis and that it would be difficult if not impossible to allocate value and operational costs and benefits on an individual entity basis.

On January 24, 2011, AHS and its affiliate, Ashley Furniture Industries, Inc. ("AFI", and together with AHS, "Ashley"), filed the sole opposition to confirmation (the "Confirmation Objection") (Dkt. No. 470). Ashley also opposed the Debtors' motion to assume certain Trademark Usage Agreements ("TUAs") between AHS and Hartsdale. Ashley is the sole furniture supplier to Hartsdale and has entered into TUAs with that debtor.

Pursuant to an order of this Court, a deadline for voting on the Plan was established and, as of that deadline, 90.91% in number and 92.86% in amount of the Class 3 general unsecured claims voted to approve the Plan. *See Certification of Ballots* (Dkt. No. 450). It was represented without dispute that no creditor of Hartsdale other than Ashley voted against the Plan. Mengnu, the sole creditor in Class 2, also voted in favor of the plan. *See id.* The official committee of

3

unsecured creditors (the "Creditors' Committee") was closely involved in negotiations over the Plan and strongly supported its confirmation.

### The TUAs

The Ashley Stores are operated pursuant to six licenses (TUAs) between AHS and Hartsdale. The Debtors' parent entity, Jennifer Convertibles, Inc. ("JCI"), is a guarantor under the TUAs. On December 3, 2010, the Debtors filed a motion (the "Motion") for entry of an order pursuant to § 365 of the Bankruptcy Code approving the Debtors' assumption of the TUAs (Dkt. No. 362). The Motion asserts that assumption of the TUAs is "vital to the Debtors' ability to reorganize" and a "key component of the Debtors [sic] go forward businesses." *Motion* at ¶ 10. Absent the assumption of the TUAs and the continued profitable operation of the Ashley Stores, "a successful reorganization simply would not be possible, and distributions to the Debtors' creditors could be adversely affected." *Motion* at ¶ 19. The Debtors acknowledged the need to cure defaults under the TUAs and to provide adequate assurance of future performance. *Id.* at ¶¶ 35-36.[1]

### Ashley's Objections to Assumption and Confirmation

In addition to the Confirmation Objection, Ashley filed an objection to assumption of the TUAs that, in particular, expressed concern that Hartsdale would have post-petition liabilities to Mengnu, the plan sponsor and funder. Mengnu is not only the primary furniture supplier to the Jennifer Debtors and the prospective holder of 90.1% of the Debtors' new common stock, but it is also one of Ashley's competitors. In an attempt to address Ashley's objections, the Debtors amended the Plan in their second amended joint plan of reorganization, filed on January 24, 2011

---

[1] The Debtors have acknowledged that the cure amount owed to Ashley is at least $980,366.96. Ashley contends that the Debtors must pay a cure amount of not less than $1,397,895.96 (plus post-petition product purchases). The Debtors have committed to reconcile the exact sum with Ashley and, if future court proceedings are necessary, to escrow any disputed balance.

(Dkt. No. 466). The Debtors eliminated Hartsdale's liability with respect to most of the notes by which Mengnu is providing post-confirmation credit and funding to the Debtors, including the Tranche A, B, C and D notes and the letter of credit portion of the secured exit financing facility. Under the Plan, Hartsdale's only liability to Mengnu as plan funder will be under the Tranche E note, which is a working capital facility to be used, in part, to pay for inventory purchased from Ashley. Hartsdale's only asset that will be encumbered under the Tranche E note is its inventory. Further, in order to protect Ashley in the future, Hartsdale has committed to purchase inventory from Ashley on a C.O.D. basis and thus to have little or no outstanding debt to Ashley at any time.

Nevertheless, Ashley continued to press its objection to the assumption of the TUAs and to confirmation. As of the confirmation hearing, its remaining objections to assumption of the TUAs were that the Debtors (i) cannot cure one outstanding default, the alleged obligation to pay in cash, in full, all third parties with which Hartsdale does business, *see TUA* at ¶ 4;[2] and (ii) have not provided adequate assurance of future performance, including concern that Hartsdale will continue to be beholden to Mengnu, that Hartsdale has failed to commit to provide "the full range of reporting requirements imposed under the TUAs" and that the Debtors have failed "to confirm that AFI's confidential information will be protected from disclosure and use by the Plan Sponsor—AFI's competitor." *See Confirmation Objection* at ¶ 18.[3]

Ashley also argued that the Plan failed to satisfy the requirements of § 1129(a) of the Bankruptcy Code. First, Ashley asserted that § 1129(a)(2) is violated because of an alleged lack

---

[2] The TUAs are essentially identical; the fourth paragraph of ¶ 4 of each TUA contains language regarding the need to "pay, on or before the date they become due, all sums due" to third parties.

[3] Ashley's counsel repeatedly and explicitly stated that it did not rely on and waived any contention, based on cases such as *Perlman v. Catapult Entm't, Inc. (In re Catapult Entm't, Inc.)*, 165 F.3d 74 (9th Cir. 1999), that the Debtors could not assume the TUAs because § 365 of the Bankruptcy Code prevents the assumption of an executory contract without the consent of a counterparty where such contract is not assignable under applicable law. *In re Catapult* and similar cases have been rejected in this district. *See Adelphia Commc'ns Corp.*, 285 B.R. 127 (Bankr. S.D.N.Y. 2002).

of disclosure as to Hartsdale's separate assets and liabilities. *See Confirmation Objection* at ¶ 19-21. Second, Ashley asserted that the Plan does not satisfy § 1129(a)(3)'s good faith requirement, including an assertion that the Debtors are substantively consolidating their estates with the primary purpose of disadvantaging the Hartsdale creditors. *See Id.* at ¶ 22-24. Third, Ashley contends that the Plan does not satisfy the best interests test of § 1129(a)(7)[4] with respect to the Hartsdale creditors because the consolidated liquidation analysis provided by the Debtors "does not establish that the creditors of each of the Debtors [*i.e.*, Hartsdale] are receiving a [sic] least what they would receive in a hypothetical liquidation under chapter 7." *Id.* at ¶ 25-28. Finally, Ashley asserts that § 1129(a)(11)'s "feasibility" requirement has not been established because the projections, which are the Debtors' primary evidence of feasibility, are too "speculative, conjectural, or unrealistic." *Id.* at ¶ 29-38.

The Debtors, the Creditors' Committee and Mengnu contest Ashley's objections, arguing that the record supports assumption of the TUAs and that the Debtors have met their burden with respect to confirmation. At the confirmation hearing, the Debtors introduced into evidence the declarations of Rami Abada, the Debtors' president, CEO and COO, and Robert Grien, the Debtors' financial advisor (Dkt. Nos. 458 and 469, respectively). Grien was called and qualified as an expert witness. An experienced financial consultant for Mengnu, Thomas Sperry, also testified. Ashley cross-examined Abada, Grien and Sperry, but did not call any witnesses or introduce any documents of its own.

### DISCUSSION

1. **Ashley's TUA Arguments Against Assumption of the TUAs**

    A. <u>Adequate Protection of Future Performance</u>

---

[4] Reference is made in Ashley's papers to 11 U.S.C. § 1129(a)(8), but this appears intended to be a reference to (a)(7).

Ashley argues that the TUAs cannot be assumed because the Debtors have not provided adequate assurance of future performance. An executory contract may not be assumed if, in addition to curing certain defaults, a debtor cannot provide "adequate assurance of future performance under such contract." 11 U.S.C. § 365(b)(1)(C). To determine whether a debtor has provided adequate assurance, a court must look at the facts and circumstances of each case. *In re M. Fine Lumber Co., Inc.*, 383 B.R. 565, 572 (Bankr. E.D.N.Y. 2008). A debtor need not prove that it "will thrive and make a profit" but only that it appears that it will meet its obligations. *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985). Adequate assurance is "appropriate and necessary where the counter-party has reasonable grounds for insecurity with respect to the debtor's ability to fully perform its obligations under the contract." *In re Metromedia Fiber Network, Inc.*, 335 B.R. 41, 50 (Bankr. S.D.N.Y. 2005), *aff'd, Abovnet, Inc. v. SBC Telecom, Inc.*, 2007 WL 636602 (S.D.N.Y. Feb. 27, 2007) (06-8269-CLB).

The Debtors' contend that they are able to provide the necessary adequate assurance because: (i) they always made timely pre-petition payments to Ashley, have been on C.O.D. terms since the Petition Date and will remain on such terms unless Ashley agrees otherwise; (ii) JCI has guaranteed and will continue to guarantee Hartsdale's obligations under the TUAs; (iii) the financial projections show continued operations, increased sales and profitability of Hartsdale and the enterprise as a whole; and (iv) they are willing and able to cure all appropriate pre-petition defaults. Ashley contends that the Debtors have not met their burden, that Hartsdale will be adversely affected by its association with the Jennifer companies and that certain provisions in the TUAs cannot or will not be cured. For the following reasons, the record is sufficient to demonstrate that the Debtors can provide Ashley with adequate assurance of future performance and have every reason to do so.

First, Ashley's concerns that Hartsdale would be burdened during the post-petition period by its liability for debt generated by the Jennifer Debtors was substantially met by changes to the Plan, as reflected in the second amended Plan filed on January 24, 2011. Under the revised Plan, Hartsdale has no liability under the Tranche A, B, C and D notes or under the letter of credit portion of the secured exit financing facility. Hartsdale's sole liability is under a working capital facility that is intended to be used, in part, to pay for inventory received from Ashley. Hartsdale's sole asset encumbered by that facility is its inventory, but the Debtors also established that Ashley's future credit exposure to Hartsdale would be limited by the agreement to pay for inventory on C.O.D. terms. The TUAs contain no covenants that impose restrictions on the financial condition of Hartsdale or purport to regulate its relationship to the Jennifer Debtors, and Ashley failed to demonstrate that any basis exists for the Court to impose such requirements where the parties did not provide for them in their contracts.

Second, although the Ashley Stores are projected to be more profitable than the Jennifer Stores, the Debtors' CEO, Abada, testified credibly that the Jennifer Stores will not adversely impact the Ashley business and that the Debtors have the ability and the intention to comply with all of their obligations under the TUAs, including the provision of all appropriate financial reporting for the Ashley Stores and the protection of confidential information. Although the Jennifer Stores have not been profitable in the recent past, the Debtors have provided reasonable projections that they will succeed in the future, as further discussed below. The Court does not accept Ashley's implicit argument that affiliated debtors cannot, as a matter of law, reorganize if one of the debtors' business lines is stronger than the others. Earlier in these cases the Court rejected Ashley's contention that the Debtors could not use equity in Hartsdale to support financing for the business as a whole. Even where there are efforts to make certain subsidiaries

8

of an entity "bankruptcy remote," the entity can, with appropriate protections for the subsidiary, use its equity in the subsidiary to support the parent.[5] Ashley is not entitled to demand isolation especially where it has not protected its position through covenants and conditions in its agreements. Ashley is only entitled to adequate assurance of future performance. While the financial obligations of each of the reorganized Debtors bear on such assurance, the Debtors are able to show feasibility for the enterprise as a whole, as further discussed below, and thus have satisfied the feasibility requirement.

B. Assumption of the TUAs is Not Barred by the Cross-Default Provisions

Ashley also contends that the Debtors cannot assume the TUAs unless they cure a default resulting arising from the language contained in the fourth sub-paragraph of ¶ 4 of the TUAs, which provides, in relevant part, that "Licensee [Hartsdale], in operating the Licensed Business and Warehouse, will pay, on or before the date they become due, all sums due Licensor, Owner, Ashley Distribution Services, Ltd., and all other parties with which Licensee does business." Under the Plan the Debtors will cure any default in payment to the "Licensor, Owner and Ashley Distribution Services, Ltd.," all of which are Ashley entities. At the confirmation hearing, Ashley asserted Hartsdale should be required to deposit, in a separate interest bearing account, sufficient funds to cure all defaults to third party vendors in order to assume the TUAs. Although it could not identify the universe of vendors at issue or the total amounts due to those vendors, Ashley asserted that its trademarks, brand, goodwill and good name could be negatively affected by a licensee's failure to timely pay all third party vendors in full, in cash.

---

[5] *See* decision of Judge Koeltl affirming the order of this Court in *A&K Endowment, Inc. v. General Growth Properties, Inc. (In re General Growth Properties, Inc.)*, 423 B.R. 716, 725-26 (S.D.N.Y. 2010); *see also In re General Growth Properties, Inc.*, 412 B.R. 122 (Bankr. S.D.N.Y. 2009); *cf. In re Babcock and Wilcox Co.*, 250 F.3d 955 (5th Cir. 2001).

9

None of the third party vendors that Ashley asserts are required to be paid in full, in cash, has objected to their treatment under the Plan. Indeed, the Creditors' Committee, representing the interest of all creditors, including creditors of Hartsdale, specifically rejected Ashley's reading of paragraph four.[6] The Debtors also represented that every vote submitted by the Hartsdale creditors was a vote in favor of the Plan. In any event, despite Ashley's contentions, paragraph four of the TUAs can only be read to require legal satisfaction of all claims of third party vendors as of the effective date. As the Second Circuit held in *Northwestern Mutual Life Ins. Co. v. Delta Air Lines, Inc. (In re Delta Air lines, Inc.)*, 608 F.3d 139, 148 (2d Cir. 2010), the appropriate interpretation of the word "pay" in a contract requires consideration of the relevant language "[i]n context and in light of the purpose of the agreement." In that case, construction of the contract as a whole demonstrated that the parties intended the meaning to be payment in full, in cash. Here, construction of the contract as a whole demonstrates that Ashley could only be concerned with satisfaction of vendors' claims and that construction is supported by the fact that, as Ashley emphasized in court, the vendors are not third party beneficiaries under the TUAs. In order to fulfill their obligations under paragraph four, the Debtors need only to provide satisfaction in accordance with the provisions of the law and, thus, the Debtors can cure the alleged defaults by allowing the claims of the relevant third party vendors under the Plan.[7]

Moreover, the TUAs must be construed to allow satisfaction of third party vendors under the Plan in order to avoid a conflict with the provisions of the Bankruptcy Code that limit the validity of cross-default clauses. Section 365(e) provides, in relevant part, that an executory contract "may not be terminated or modified, and any right or obligation under such contract . . . may not be terminated or modified, at any time after the commencement of the case solely

---

[6] It was also represented that a Hartsdale creditor is a member of the Creditors' Committee.
[7] As this Court pointed out in *In re Northwest Airlines Corp.*, 393 B.R. 337, 346 (Bankr. S.D.N.Y. 2008), the word "pay" may mean "pay in full, in cash" or it may simply mean "satisfied."

because of a provision in such contract . . . that is conditioned on the insolvency or financial condition of the debtor." 11 U.S.C. § 365(e)(1)(A). Section 1124(2)(A) similarly relieves a debtor of any requirement to cure "a default of a kind specified in section 365(b)(2) . . . or of a kind that section 365(b)(2) expressly does not require to be cured." 11 U.S.C. § 1124(2)(A). In turn, § 365(b)(2) specifies that defaults of the type covered by § 365(e)—defaults relating to "the insolvency or financial condition of the debtor"—need not be cured. 11 U.S.C. § 365(b)(2). Cross-default provisions, like those in paragraph four of the TUAs, are "inherently suspect" because they impede a debtor's right to assume a contract by conditioning assumption on the cure of defaults under entirely separate agreements. *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Op., LLC (In re Charter Commc'ns, et al.)*, 419 B.R. 221, 250-51 (Bankr. S.D.N.Y. 2009) (*internal citations omitted*). As the Court said there, "[b]efore enforcing [cross-default provisions], a court should carefully scrutinize the facts and circumstances surrounding the particular transaction to determine whether enforcement of the provision would contravene an overriding federal bankruptcy policy and thus impermissibly hamper the debtor's reorganization." *Id*.

Reading the clause in the manner proffered by Ashley—that the Debtors cannot cure defaults under the TUAs because of a requirement to pay third parties under entirely separate contracts—would contravene the federal bankruptcy policy against the enforcement of *ipso facto* clauses and impermissibly hamper the Debtors' reorganization. *Id.* at 251. It will not be so construed. Ashley failed to offer any support for its argument that the phrase "pay all sums due" did not encompass satisfaction pursuant to law where the requirement of full payment did not come due. Under the circumstances, the Debtors satisfaction of the claims of all other Hartsdale

11

creditors through the Plan and adequate assurance of future performance to Ashley is sufficient under §§ 365 and 1124 of the Bankruptcy Code.

2. **Ashley's § 1129(a) Arguments Against Plan Confirmation**

A. <u>Section 1129(a)(2) – the Debtors Provided Adequate Disclosure</u>

Ashley asserts that the Plan violates § 1129(a)(2) of the Bankruptcy Code, which provides that "[t]he court shall confirm a plan only if . . . the proponent of the plan complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(2). Ashley specifically claims that the Debtors were required to provide more detailed disclosure with respect to Hartsdale's financial condition, such as disclosure of cash and an account receivable owed by JCI to Hartsdale as of the Petition Date, and that failure to provide this information was intended to achieve an "obfuscation of Hartsdale's financial condition." *Confirmation Objection* at ¶ 21.

Ashley neither objected to the Debtors' motion to approve the disclosure statement, nor appeared at the hearing, held on December 21, 2010, regarding the adequacy of the disclosure statement. In any event, the disclosure statement made it perfectly clear that the Plan was premised on substantive consolidation. The real question is whether the Debtors properly consolidated Hartsdale with the other Debtors for purposes of voting and distributions under the Plan, and this is discussed in the next section. Also discussed below is Ashley's contention regarding the Debtors' failure to provide a separate liquidation analysis for Hartsdale. As for the claim on intentional "obfuscation," the Court is convinced of the Debtors' good faith and has no occasion to revisit its earlier order finding that the disclosure statement contains adequate information regarding the Debtors, including Hartsdale.

B.  Section 1129(a)(3) – Good Faith and Substantive Consolidation

Ashley asserts that the Plan does not satisfy § 1129(a)(3)'s good faith requirement, principally on the ground that the Debtors are substantively consolidating their estates with the primary purpose of disadvantaging the Hartsdale creditors.  *See Confirmation Objection* at ¶ 22-24.  However, there is absolutely no evidence to suggest that the Plan was proposed "with the primary purpose to disadvantage tactically a group of creditors," such as the Hartsdale creditors. *See In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005).  Section 1129(a)(3) of the Bankruptcy Code requires only that the plan be proposed "in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  Ashley adduced no evidence to rebut the showing made by the Debtors that the Debtors "honestly believe that [they were] in need of reorganization and that the Plan was negotiated and proposed with the intention of accomplishing a successful reorganization."  *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988).

Whether the Debtors have established that substantive consolidation is appropriate is a separate inquiry.  No question has been raised as to the consolidation of the Debtors other than Hartsdale.  The only issue is whether it is appropriate to consolidate Hartsdale with the other Debtors.  In this circuit, substantive consolidation is appropriate when:  (i) "creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit;" or (ii) "the affairs of the debtors are so entangled that consolidation will benefit all creditors."  *In re Augie/Restivo Baking Co.*, 860 F.2d 515, 518 (2d Cir. 1988) (*internal citations omitted*).  The Debtors never introduced any evidence with respect to the first prong of the *Augie/Restivo* test, whether the trade creditors that were listed on Hartsdale's schedules relied on Hartsdale's separate identity in extending credit.  Instead, the Debtors' primary justification for

13

substantive consolidation is that there has been a "commingling" of assets and business functions. *Id.* at 519. The record established that the Debtors historically managed their businesses as a single economic unit, that it would be difficult for the Debtors to unscramble their finances without substantial expense and that the recoveries of all creditors would be adversely affected by the exercise. However, the burden of proving the appropriateness of substantive consolidation is on the Debtors and there was no showing that the necessary accounting would be impossible to perform or an estimate as to the cost involved. The Debtors also never explained how they prepared schedules and a statement of financial affairs for Hartsdale, setting forth its separate creditors, assets and liabilities.[8]

       Thus, there is a deficiency in the record on the issue of substantive consolidation. The record is clear, however, that such deficiency affects only a small number of creditors, and that Hartsdale's principal creditors have a position in these cases that renders substantive consolidation irrelevant. Ashley is not affected by the Debtors' proposed substantive consolidation of Hartsdale with the other Debtors because the TUAs will be assumed once all appropriate defaults have been cured and Ashley will be protected in the future by the survival of Hartsdale as a separate entity. Ashley is, therefore, getting the benefit of its bargain. Hartsdale's next largest creditors are the landlords of its store locations, one of whom, TMCC, Inc., attended the confirmation hearing. It was represented that the landlords had reached separate agreements with the Debtors regarding the leases that will be assumed as of the effective date, that the lease modifications generally provide for a waiver of arrears owed by the Debtors and thus, in effect, the landlords have agreed to the treatment they are receiving in the Plan.

---

[8] Separate schedules and a separate statement of financial affairs were prepared only for Hartsdale. The Debtors filed consolidated schedules and a consolidated statement of financial affairs for all of the other Debtors.

Thus, the only creditors arguably adversely affected by the proposed consolidation are a relatively small number of suppliers that might have extended credit to Hartsdale. The amount of this debt was not quantified, but Ashley relied on the Debtors' schedules, and the Hartsdale schedules set forth on a provisional basis $1,602,718.75 in trade debt, including $940,012.32 in debt to Ashley, $568,357.04 in debt to the landlords and $94,349.39 to all others. The deficiency in the record is with respect to the creditors who hold this $94,349.39 in debt—a relatively small amount in these cases—that could possibly be adversely affected by substantive consolidation. Despite the deficiency in the record, it is well accepted that substantive consolidation is a flexible concept and that a principal question is whether creditors are adversely affected by consolidation and, if so, whether the adverse effects can be eliminated. For example, in *James Talcott, Inc. v. Wharton (In re Continental Vending Machine Corp.)*, 517 F.2d 997, 1001 (2d Cir. 1975) *cert. denied,* 424 U.S. 913 (1976), the Court approved an amended plan of reorganization that substantively consolidated the debtors' estates but provided that the secured creditors' claims would not be elevated or improved as a result.[9] The Court found it appropriate to consolidate assets and liabilities for purposes of dealing with unsecured claims but not with respect to secured claims, because the secured creditor would "obtain under the amended plan exactly what it bargained for." *Id.*; s*ee also First National Bank v. Giller*, 962 F.2d 796, 799 (8th Cir. 1992) ("the Bankruptcy Court retains the power to order less than complete consolidation"). In this case, Ashley and most of the other large Hartsdale creditors are provided for individually under the Plan, have received exactly what they bargained for and are unaffected by substantive consolidation. The Debtors have failed to adequately demonstrate only that the relatively few

---

[9] *In re Continental Vending Machine Corp.* was decided under the prior Bankruptcy Act, but Act cases remain relevant as the equitable power to order substantive consolidation of debtors' assets and liabilities "undoubtedly survived enactment of the Bankruptcy Code." *See In re Bonham*, 229 F.3d 750, 765 (9th Cir. 2000); *see also In re Owens Corning*, 419 F.3d at 209 n.14 (citing *Bonham*).

15

trade creditors of Ashley are being treated appropriately as a consequent of consolidation. With regard to these creditors, whose reliance on the separate identity of Hartsdale is also uncertain, the appropriate remedy is discussed below.

    C.   <u>Section 1129(a)(7) – The Best Interests Test</u>

Ashley also objects to the Plan on the basis that it allegedly does not satisfy the "best interests" test of § 1129(a)(7) because the consolidated liquidation analysis provided by the Debtors "does not establish that the creditors of each of the Debtors are receiving a [sic] least what they would receive in a hypothetical liquidation under chapter 7." *Confirmation Objection* at ¶ 25-28. The "best interests" test requires that each creditor receive "not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7." 11 U.S.C. § 1129(a)(7)(A)(ii). Ashley does not dispute the best interests test is satisfied for all Debtors other than Hartsdale. The record is also clear that Ashley and the landlords are being paid in full or in accordance with their separate agreements, and no serious contention has been made that they are not receiving more than they would receive in a liquidation. Nevertheless, the question remains whether failure to provide a separate liquidation analysis prevents confirmation of the Plan as to Hartsdale's small trade creditors.

The Court gives little credit to the back-of-the-envelope calculations contained in Ashley's Confirmation Objection. Ashley called no witnesses and, on cross-examination, adduced no testimony from the Debtors' witnesses in support of its contention that the Hartsdale creditors would receive more in a liquidation than under the Plan. Ashley's arguments are speculative, and its calculations as to the total liquidation value for Hartsdale creditors are based on questionable assumptions regarding potential recovery rates in a liquidation. However, it is the Debtors' burden to satisfy § 1129(a)(7) and on this record, they have not done so with respect

16

to the Hartsdale creditors. In a case where the propriety of substantive consolidation has been established, a separate liquidation analysis would not be required or even appropriate, as the cost of the effort to create it would defeat one of the purposes of consolidation. In the absence of proof that substantive consolidation is proper, a separate liquidation analysis would normally be required to establish that none of the trade creditors of Hartsdale would receive less under the Plan than in a Hartsdale liquidation, and the Debtors would have to provide one. The remedies available to the Debtor are discussed below.

### D. Section 1129(a)(11) – The Plan is Feasible

Ashley's final objection to the Plan is that the Debtors have failed to meet § 1129(a)(11)'s "feasibility" requirement. Ashley contends that the Debtors' projections are the primary evidence of feasibility and those projections are too "speculative, conjectural, or unrealistic" to support a finding of feasibility. *Confirmation Objection* at ¶ 30. Section 1129(a)(11) provides that a plan of reorganization can be confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . ." 11 U.S.C. § 1129(a)(11).

Ashley contends that the Debtors' projections do not support a finding that the Plan is feasible because they are premised upon unrealistic compounded growth projections and only modest expense increases. The Debtors' witnesses, Abada and Grien, testified credibly at the confirmation hearing regarding the Debtors' projections. The projections forecast reasonable same store sales growth of five percent in Jennifer Stores and eight percent in Ashley stores. Ashley makes much of the prevailing economic and credit conditions in the U.S. economy as of July 19, 2010 and in the subsequent six months, but it provided no support for its contention that the U.S. economy will remain stagnant or that credit will be largely unavailable for home

furnishing purchases. The Debtors' financial advisor, Grien, was qualified as an expert and, in his declaration, introduced as his direct testimony, Grien stated that the projections "appear reasonable based on historic data, the operations of the Debtors and the overall market and economic conditions." *Declaration of Robert C. Grien* at ¶ 6 (Dkt. No. 69). Based on the entirety of the record, it appears likely that the Debtors will be able to return to profitability and that a future liquidation or reorganization is not likely to occur. All that is required is "a reasonable assurance of success." *See In re Kane v. Johns-Mansville Corp.*, 843 F.2d at 649. Based on the entirety of the record, this Court finds that the Debtors' Plan has a reasonable assurance of success.

## CONCLUSION

For the reasons set forth above, this Court finds that the assumption of the TUAs is appropriate and that the Debtors do not need to pay all Hartsdale creditors in full, in cash, on the effective date in order to effect such assumption. The Debtors must, however, comply with all of the other ongoing obligations under the TUAs, including compliance with its (i) reporting requirements and (ii) confidentiality provisions.

With respect of the Plan, the Court finds that the Debtors have met their burden of proof under § 1129 and that the Plan may be confirmed as to each Debtor other than Hartsdale. As to Hartsdale, for the reasons stated above, the record is inadequate to establish that substantive consolidation is appropriate with respect to the treatment of the small number of creditors who can be identified as having extended credit to Hartsdale.

The Debtors may cure this omission in the record in one of two ways. They may provide for payment in full of the debt of these small creditors and immediately confirm the Plan as to Hartsdale as well as the other Debtors. Alternatively, they may supplement the record on the

issue of substantive consolidation and submit a separate liquidation analysis for Hartsdale. The Court recognizes the need for speed; if further filings are made, a hearing will be scheduled on shortened notice to deal with any remaining issues. An appropriate form of confirmation order will then be entered as soon as feasible.

Dated: February 4, 2011
      New York, New York

                                     */s/ Allan L. Gropper*_____
                                     UNITED STATES BANKRUPTCY JUDGE