1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 10-13779-alg

5   - - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   JENNIFER CONVERTIBLES, INC., et al.,

9

10                  Debtors.

11   - - - - - - - - - - - - - - - - - - - - - -x

12

13                  U.S. Bankruptcy Court

14                  One Bowling Green

15                  New York, New York

16

17                  January 25, 2011

18                  11:03 a.m.

19

20

21   B E F O R E:

22   HON. ALLAN L. GROPPER

23   U.S. BANKRUPTCY JUDGE

24

25

1

2    Initial Case Conference.

3

4    Motion Filed by Debtors for Authority to Enter Into Amended

5    Nonresidential Real Property Leases and to Assume Amended

6    Nonresidential Real Property Leases Effective as of the

7    Effective Date of a Chapter 11 Plan of Reorganization.

8

9    Objection Filed by Federal Realty Investment Trust to Debtors'

10   Cure Schedule for Assumed Executory Contracts and Unexpired

11   Leases Relating to the Amended Joint Plan of Reorganization of

12   Jennifer Convertibles, Inc.

13

14   Debtors' Omnibus Objection to Claims(s) Number: 63, 142, 314,

15   315, 35, 56, 139, 185, 331, 333, 68, 94, 294, 350, 3, 30, 10,

16   156, 256, 292, 318, 324, 325, 165, 194, 166, 195, 49, 178, 275,

17   276, 2, 6, 313, 337, 48, 107, 167, 184, 7, 4, 57, 171, 340, 75,

18   69, 135, 192 to Certain Duplicate Claims.

19

20   Response of 376 Boylston Street Realty Trust's in Opposition to

21   Debtors' Omnibus Objection to Certain Duplicate Claims.

22

23

24

25

1

2 Motion Filed by Debtors for Approval to Assume Leases or

3 Executory Contracts With Licensor, Effective as of the

4 Effective Date of a Plan of Reorganization.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24 Transcribed by:  Esther Accardi

25

1

2    A P P E A R A N C E S :

3    OLSHAN GRUNDMAN FROME ROSENZWEIG & WOLOSKY, LLP

4           Attorneys for the Debtors

5           65 East 55th Street

6           New York, New York 10022

7

8    BY:   MICHAEL S. FOX, ESQ.

9           THOMAS J. FLEMING, ESQ.

10          JORDANNA L. NADRITCH, ESQ.

11          JAYME M. BETHEL, ESQ.

12

13

14   KELLEY DRYE & WARREN LLP

15          Attorneys for Creditors' Committee

16          101 Park Avenue

17          New York, New York 10178

18

19   BY:   JAMES S. CARR, ESQ.

20          JASON R. ADAMS, ESQ.

21

22

23

24

25

1

2    A P P E A R A N C E S : (continued)

3    GREENBERG TRAURIG, LLP

4         Attorneys for Ashley HomeStores Ltd.

5         2450 Colorado Avenue, Suite 400 East

6         Santa Monica, California 90404

7

8    BY:   MICHAEL H. GOLDSTEIN, ESQ.

9

10

11   GREENBERG TRAURIG, LLP

12        Attorneys for Ashley HomeStores Ltd.

13        200 Park Avenue

14        New York, New York 10166

15

16   BY:   RACHEL EHRLICH ALBANESE, ESQ.

17

18

19   CULLEN AND DYKMAN LLP

20        Attorneys for TMCC

21        100 Quentin Roosevelt Blvd.

22        Garden City, New York 11530

23

24   BY:   BONNIE L. POLLACK, ESQ.

25

1

2    A P P E A R A N C E S : (continued)

3    NEIGER LLP

4         Attorney for Haining Mengnu Group Co. Ltd.

5         317 Madison Avenue, 21st Floor

6         New York, New York 10017

7

8    BY:   EDWARD E. NEIGER, ESQ.

9

10

11   HINSHAW & CULBERTSON LLP

12         Attorneys for 376 Boylston Street Realty Trust

13         780 Third Avenue, 4th Floor

14         New York, New York 10017

15

16   BY:   PHILIP TOUITOU, ESQ.

17

18

19   APPEARING TELEPHONICALLY:

20   JULIA OSBORNE, BMC GROUP

21   ALAN HARRIS, ESQ., HARRIS & RUBLE

22

23

24

25

1          P R O C E E D I N G S

2          THE COURT:  Please be seated.  All right, Jennifer

3    Convertibles.

4          Do we have somebody on the phone?  Is the phone line

5    open?

6          MR. HARRIS:  Yes, Your Honor.

7          THE COURT:  All right.

8          MR. HARRIS:  This is Alan Harris.  I represent the

9    claimant; Combs, in the class action.

10         THE COURT:  All right.  Let me take appearances from

11   those in the courtroom.

12         MR. FOX:  Good morning, Judge.  Michael Fox, Jordanna

13   Nadritch and Jayme Bethel, representing Jennifer Convertibles,

14   et al.

15         MR. CARR:  Good morning, Your Honor.  Jim Carr of

16   Kelley Drye & Warren, and with me is Jason Adams of Kelley Drye

17   & Warren on behalf of the unsecured creditors' committee.

18         MR. NEIGER:  Good morning, Your Honor.  Edward Neiger

19   of Neiger LLP on behalf of Haining Mengnu Group Co. Ltd.  Good

20   morning, Your Honor.

21         MR. GOLDSTEIN:  Good morning, Your Honor.  Michael

22   Goldstein, Rachel Ehrlich Albanese, Greenberg Traurig, here on

23   behalf of Ashley HomeStores and Ashley Furniture.

24         MS. POLLACK:  Good morning, Your Honor.  Bonnie

25   Pollack, Cullen and Dykman for TMCC.

1        MR. TOUITOU:  Your Honor, Phil Touitou, Hinshaw

2    Culbertson for creditor; 376 Boylston Street.

3        THE COURT:  Anyone else wish to appear or expect to

4    speak?

5        All right, I have one person on the phone.  Anyone

6    else on the telephone?

7        MS. OSBORNE:  Yes, Your Honor.  This is Julia Osborne

8    from BMC Group.  I'm with the claims and balloting agent for

9    the debtors.

10        THE COURT:  All right, anyone else?

11        All right, Mr. Fox, please go ahead.  Where should we

12    start?

13        MR. FOX:  I always like to say, Your Honor, good

14    morning and it's a pleasure to be here.  I hope that today is a

15    start and a finish.  But I think for ease of the record, what I

16    prefer to do as I have in the past, I think we should probably

17    go through the uncontested matters, then perhaps one of the

18    people on the phone would be able to excuse themselves and then

19    we can deal with, you know, the two motions that are probably

20    more complicated.  One being confirmation and the other being

21    the assumption of the Ashley TUA.

22        So having said that what I think on the calendar are

23    the motion to assume the modified leases, the Comb settlement,

24    and the claims objection.

25        THE COURT:  All right.

1       MR. FOX:  I think those are the three that are either

2   uncontested or there's just been one response, which I think is

3   very easy to address.

4       THE COURT:  All right, please go ahead.

5       MR. FOX:  Just so we can go, I would take them in the

6   order of the Combs settlement.  This way Mr. Harris, who's on

7   the phone, to the extent that is approved, it would be up to

8   him, he could excuse himself.

9       THE COURT:  All right.

10      MR. FOX:  Well, Your Honor, the Combs -- I'm calling

11  it the Combs' motion because Ms. Combs was -- Ayesha (ph.)

12  Combs was a lead class action claimant in a law suit that was

13  commenced against the debtor and against the debtors'

14  officer -- certain of the debtors' officers pre-petition.

15      And as we have seen fit to do in just about everything

16  that's happened in this case, once people actually sit and have

17  an open dialogue we try to see if there's a resolution.

18      They had filed a few proof of claims in this estate

19  totaling in excess of eight million dollars.  Through

20  negotiations between and amongst the debtor, Mengnu, and the

21  creditors' committee, and Mr. Harris on behalf of his client,

22  we've come up with a resolution that we think addresses some of

23  the needs that is in the best interest of the estate to enter

24  into.  So we noticed a 9019, there's been no objections.

25      What the sum and substance of the settlement we

1  propose is a payment of 50,000 dollars upon confirmation of the

2  case.  An allowed claim -- a general unsecured class 3 claim of

3  450,000 dollars which is much, much, much, much lower than the

4  7.6 or 8 million dollar claim that Mr. Harris and his client

5  would have.  And there are certain --

6          THE COURT:  Are claiming.  Are claiming --

7          MR. FOX:  Are claiming to have, you're right.

8          And there's always the idea of settlement, Your Honor.

9  And this in our -- the debtors' opinion meets the lowest level

10  of reasonableness under 9019.  And we have nego -- this has

11  been a hotly contested, hotly negotiated settlement between and

12  amongst the parties I've done, and including Mr. Harris on

13  behalf of his clients.

14          So this is something that is not a big payment up

15  front to him and he will -- his client will share pari passu as

16  a class 3 creditor.  There are some other mechanisms that we

17  have to go through this court, some procedures just to make

18  sure that the class is certified, but I don't think that for

19  purposes of the settlement today and the 9019 that we need to

20  argue that.

21          THE COURT:  Does anyone wish to be heard?

22          All right, I've reviewed the settlement papers, I have

23  a couple of questions.

24          One is this is set up as a what we call a class action

25  settlement, as I understand it.  I suppose in the California

1    form, is that right, Mr. Harris?

2            MR. HARRIS:  Correct, Your Honor.  The California form

3    is no really different than it is in New York or anywhere else.

4            THE COURT:  All right.  Well, it's a little different

5    in bankruptcy court because you have a claim and you're giving

6    parties the right to exclude themselves from the class.  But

7    the only party who's filed a proof of claim is the class

8    plaintiff.  So I'm not at all sure that anybody else is going

9    to have a claim.  But I don't need to decide that.

10           I think you ought to put a sentence in your settlement

11   papers, though, or perhaps more than -- just blackline it and

12   underline it and say "Nothing herein determines whether or not

13   someone who excludes himself or herself from the class has a

14   claim, because the deadline for filing claims is past."

15           Now, I don't know what the effect of this would be,

16   but I would think that that's an issue that we ought to

17   reserve.  I don't know that anybody's going to exclude

18   themselves from the class, I think they'd have to be out of

19   their minds.  But that, perhaps -- I should withdraw that

20   comment.  And I should play the role of a class action judge.

21   And I do, and I make no comment at this point on the merits of

22   the settlement.

23           Is that reasonable?

24           MR. HARRIS:  Yes, Your Honor.  We will include that in

25   the notice.

1      THE COURT:  I would think that's got to be noticed.

2      The other part of this that hit my attention was the

3  immediate payment of 50,000 dollars to the individual named

4  plaintiff.

5      Now, Mr. Harris, is that standard operating procedure

6  in class actions in California today?

7      MR. HARRIS:  No, it happens in certain cases where --

8  as in this one, where the plaintiff has the claims, not only

9  against the company but also against the corporate officers,

10  and has incurred substantial out-of-pocket expenses that she

11  has already indicated.  So I think under the circumstances of

12  this case this is a normal and acceptable procedure.  Which we

13  have negotiated to prevent the merits to be closed.

14      THE COURT:  And these types of payments, if are deemed

15  appropriate, in class action settlements in California?

16      MR. HARRIS:  Yes, Your Honor.  When they're disclosed

17  as they are in this case.  The disclosure of the case stature.

18      THE COURT:  Now, they are disclosed but I don't know

19  what happens to the 50,000 dollars in the event the class

20  action settlement is not approved.  Because I gather that

21  payment is made up front, is that right?

22      MR. HARRIS:  Yes, Your Honor.  This is on account of

23  separate claims against the company and against the corporate

24  officers.  And in the event they do not have final approval

25  this payment will have been made but that her claim will be

1    effectively approved and resolved as of today, and she will

2    have no further claims.  So if the class action is not

3    approved, she will not have any further claims against the

4    company or the officers, but she will retain the benefit of the

5    initial payment.

6            THE COURT:  And you're representing that the amount

7    bears a reasonable relationship to her actual personal damages?

8            MR. HARRIS:  Yes, Your Honor.

9            THE COURT:  All right.  Well, I'm taking each of what

10   you have said as a representation by an attorney with knowledge

11   of the facts.  And if no one wishes to be heard I'll approve

12   the settlement, but on that basis.

13           Because while this is a bankruptcy court and we,

14   certainly, make determinations with regard to state law

15   frequently I do not purport to be an expert on class action

16   settlements either in California or in New York.  My direct

17   experience being, perhaps, twenty plus years old, which is

18   ancient history to most of the people in this room.

19           All right, then I'll approve -- does anyone wish to be

20   heard?

21           All right, I'll approve the settlement subject to the

22   additional notice that there's no certainty that anyone who

23   excludes himself or herself from the class, in fact, will have

24   a claim because of the claims bar date.

25           MR. HARRIS:  Yes, Your Honor.

1      MR. FOX:  Your Honor, I'd like to thank Your Honor for

2  this.

3      THE COURT:  All right.

4      MR. FOX:  I did a lot of learning as best I could on

5  the class actions, to try to at least understand some of the

6  issues, and --

7      THE COURT:  I hope you're not going to change your

8  specialty, though.

9      MR. FOX:  No, I don't intend to, Your Honor.

10      THE COURT:  All right.

11      MR. FOX:  I hope that there will be no more class

12  actions in my life, to tell you the truth.

13      MR. HARRIS:  Thank you, Your Honor.  And if I may

14  excuse myself?

15      THE COURT:  All right.  I wish I could, but you

16  certainly may.

17      MR. HARRIS:  Thank you, Your Honor.

18      MR. FOX:  Thank you, Mr. Harris.

19      The other matter that's -- I guess it's slightly

20  contested, I don't think it was material, was a duplicate

21  claims motion that was filed.  I think we got one response from

22  one of the creditors that's here today.  But for the most part,

23  what it did, Your Honor, was seek to expunge the duplicate

24  claims that were filed.  That's all it sought to do.

25      THE COURT:  Does the order -- is the party who did

1    file a response here?

2           MR. TOUITOU:  I am, Your Honor.

3           THE COURT:  Does the order make it clear that you

4    retain whatever claim you wish to retain?

5           MR. TOUITOU:  Yeah, I believe it does make that clear.

6           THE COURT:  All right.  So does anyone wish to be

7    heard, then, with regard to the order as revised?

8           All right, then, the claims will be expunged and

9    adjusted as requested subject to a clarification with regard to

10   the claim of 376 Boylston Street Realty.

11          All right.

12          MR. FOX:  And for the last uncontested motion; which

13   is the motion to assume some modified leases, I will cede the

14   podium to Ms. Jordanna Nadritch.

15          THE COURT:  All right.

16          MS. NADRITCH:  Good morning, Your Honor.  The motion

17   that I have before me is a motion to assume modified leases

18   seeking authority to enter into the amended real property

19   leases, as well as to assume the leases upon an effective date

20   of a plan of reorganization.

21          The terms of the amended leases have not been shared

22   with the Court due to confidentiality issues, but they have

23   been provided, both to counsel for the committee and counsel to

24   Mengnu, and neither have had any objections.

25          This motion is uncontested.  While there was a limited

1  objection initially filed by one of the landlords there was

2  some confusion.  And after subsequent discussions with that

3  counsel they have withdrawn that objection.

4       We've also filed a revised amended exhibit, and have

5  further amended that exhibit as of this morning, even to

6  account for further lease modifications that have been agreed

7  to, specifically with TMCC, who's in court today.

8       As you know, Your Honor, throughout the Chapter 11

9  cases, the debtors have been diligently crafting a

10 comprehensive reorganization strategy and plan.  And a

11 significant part of that has been their ability to negotiate

12 more favorable terms -- lease terms, rather, with their

13 landlords.

14      In furtherance of this effort the debtors, in

15 conjunction with KPMG and on their own, as well, have engaged

16 in arm's length negotiations with many of the counterparties to

17 various leases, and are to modify the terms for the go-forward

18 store locations.

19      The modification agreements, or the list of leases to

20 be modified on Exhibit A, are the product of these

21 negotiations.  And assumption of these modifications will

22 significantly benefit the debtors, their creditors and their

23 estates going forward.

24      More specifically, Your Honor, KPMG has negotiated

25 fifty-five lease modifications that are fully executed, another

1    four that landlord is countersigning today, I believe.  Out of

2    those lease modifications that benefits to the estate on a go-

3    forward basis, there's a present value savings go-forward of

4    rent of 7.1 million dollars.  There are landlords that have

5    waived approximately 1.8 of pre-petition arrearages.

6            In addition, the debtors, themselves, had negotiated

7    approximately fifteen additional leases that have an aggregate

8    saving of 2.7 million.  Broken down I believe to be 2.9 on a

9    go-forward savings -- a present value savings, that is.  And

10   about 900 of pre-petition waivers.

11           So as you can see, Your Honor, there's been a

12   significant benefit to the estate, both on a pre-petition

13   unsecured basis and on a go-forward ability to operate their

14   business successfully through their leases.

15           Your Honor, the lease obligations agreement are

16   conditioned upon approval of this Court's motion.  So if we

17   seek approval of them today, as well as we also seek contingent

18   upon confirmation of plan that they be approved so we may get a

19   confirmed plan today.

20           THE COURT:  Or that you have a confirmed plan in the

21   near future.

22           MS. NADRITCH:  And in the near future, correct.

23           THE COURT:  All right.  Does anyone wish to be heard?

24           MS. POLLACK:  Briefly, Your Honor, thank you.

25           Bonnie Pollack, Cullen and Dykman for TMCC.

1          The modification with TMCC was on an earlier exhibit

2     that was filed with the Court.  But the name of the landlord

3     was incorrect on that exhibit, so it was previously submitted

4     to the Court.

5          I would like to say that the agenda shows TMCC's

6     motion seeking payments under 365(d)(3) as being resolved and

7     marked off as a result of this motion.  And that is correct.

8     Except, Your Honor, to the extent that the plan is not

9     confirmed --

10          THE COURT:  Obviously.

11          MS. POLLACK:  -- then I would keep the motion on the

12     calendar for further hearing.  Thank you, Your Honor.

13          MR. CARR:  Good morning, Your Honor.  Jim Carr of

14     Kelley Drye & Warren on behalf of the official committee of

15     unsecured creditors.

16          Your Honor, we received from the debtors' financial

17     advisors the financial effect of the modifications of the

18     leases.  And as indicated to Your Honor they are substantial.

19     And in connection with the retail case, Your Honor, there's two

20     ways to make the company more successful as it emerges from

21     bankruptcy.

22          One is to increase revenue, or the other is to

23     decrease the expenses.  And Mr. Bordwin (ph.) has done a

24     tremendous job in connection with decreasing the expenses at

25     all these locations, and the committee fully supports this

1    motion.

2         THE COURT:  Does anyone wish to be heard?

3         All right, I will approve the motion without

4    objection.

5         Mr. Fox, do you wish to add something?

6         MR. FOX:  No.  The only thing I wanted to point out

7    was that Harold Bordwin and Robert Tremonicon (ph.), doing

8    terrible justice to his name, who were the real estate

9    consultants, are in court to the extent that Your Honor had any

10   questions as to any of the numbers.  But once you approved it,

11   I almost didn't even want to stand up and tell you that they

12   were here if you had any questions, but they were if you did.

13        THE COURT:  No, I have no ques -- I have one question.

14   Are any landlord leases not either rejected or assumed as

15   modified?  Are any of them being simply assumed under the plan?

16        MS. NADRITCH:  Yes, Your Honor.  Including this one

17   landlord that had originally objected, JW Mays (ph.), their

18   lease is not for the modification agreement.  We are similarly

19   securing it as is.  So there are a few like this.

20        THE COURT:  A few are, all right.

21        MS. NADRITCH:  Yes.

22        THE COURT:  Are any of the release -- you have

23   rejected some leases?

24        MS. NADRITCH:  Yes, we've rejected leases and done

25   that pursuant throughout the case, as Your Honor's aware, as

1  well as of January 13th, pursuant to our notice of rejected

2  leases as well.

3          THE COURT:  All right.

4          MS. NADRITCH:  The debtors have made that

5  determination as to what are the go-forward ones and what are

6  the assumed leases as of January 14th -- January 13th.

7          THE COURT:  All right.  And those parties then have an

8  opportunity -- they've gotten notice of the rejection, they'll

9  have an opportunity, they'll get notice of the need to put in a

10  proof of claim.

11          MS. NADRITCH:  Yes, Your Honor.  And there's already

12  been discussions with them as regarding cure amounts and what

13  not.  So they also are aware.

14          THE COURT:  All right.  Does anyone wish to be heard?

15          All right, then I'll approve the motion.

16          MS. NADRITCH:  Thank you, Your Honor.

17          THE COURT:  And, perhaps, we'll give Mr. Bordwin and

18  his colleague a prize by allowing them to leave.  But they can

19  stay if they wish.

20          MR. FOX:  I think the prize they want to have in mind

21  is they have not been paid yet, and all their lease

22  modifications were subject to being approved.  So I think that

23  they will feel comforted that that did happen today.  But I'm

24  not speaking for them, but that's probably the prize they would

25  prefer to have.

1      Well, now, Your Honor, we're up to one of the two

2   motions.  One is confirmation, two is the TUA.

3      THE COURT:  All right.  And they're closely related,

4   as I understand it.

5      MR. FOX:  Well, I think they're -- they are closely

6   related.  I think that the only issue that really is

7   outstanding would be vis-a-vis the TUAs, the adequate assurance

8   of future performance argument under 363(b).  And that, to the

9   extent there's a lesser standard, there might be feasibility

10  standards, which would be a higher standard to confirm the

11  case.

12      When we were here July 14th we heard you loud and

13  clear, although I was perfectly prepared to argue that motion

14  and proceed, I think that everybody listened to trying to

15  develop as Your Honor suggested to us, a clear path.  I think

16  those were your specific words directed to me.  "Mr. Fox, I

17  have a clear path for you."  "I have a clear path for you that

18  will hopefully enable you to timely exit."

19      And what was the confusion seemed to be the

20  substantive consolidation issue.  So what happened in that

21  week, in that at least ten days that we've tried to show

22  everybody here, including Ashley, that we were listening and

23  trying to limit the argument so that we could have a successful

24  and timely exit today.

25      What did we do?  We went, we spoke with Mengnu; the

1    plan sponsor, we spoke with the committee, there have been some

2    dialogues with Ashley.  And they have changed; made it clear

3    that the tranche A notes, the tranche B notes, the tranche C

4    notes and the tranche D notes, are without recourse to

5    Hartsdale.

6         Mr. Abada was deposed by Ashley, we gave them,

7    certainly, an opportunity to speak and understand how he treats

8    Hartsdale, why he treated Hartsdale, the genesis of how the

9    Hartsdale licenses became with -- it's hard, Your Honor.

10        THE COURT:  Don't -- don't -- don't -- emotion is bad

11   for the health.  And --

12        MR. FOX:  You're right, Your Honor.

13        THE COURT:  -- we'll proceed through the agenda in a

14   deliberate fashion.

15        I see the changes that have been made, and they

16   certainly appear to be significant.  But Ashley continues to

17   raise certain issues.  I received their objection late last

18   night, did not give me too much of a chance, but I have read

19   it.  And I've read most of the other papers that have been

20   filed.

21        So we'll go through the agenda and I'll hear the

22   objections, and I don't know -- I didn't see, if I recall

23   correctly, too much recognition in their papers of your plan

24   modifications.  On the other hand, I assume that some of the

25   papers were drafted before the negotiations over the last few

1  days.

2      In any event, please go ahead.

3      MR. FOX:  Okay, right.  Well, I think for --

4      THE COURT:  And, also, give me an idea about what you

5  propose to do today in terms of a record and testimony on the

6  issues that Ashley has raised.

7      I gather, as far as I can tell, there are no other

8  objections to confirmation?

9      MR. FOX:  This has been the lone objection to

10 confirmation.  It's the lone objection that's outstanding.

11     THE COURT:  All right.

12     MR. FOX:  So I would propose to proceed today is I

13 have filed, and there have been filed, declarations that could

14 be used as our direct testimony for Mr. Abada, Mr. Grien, Mr.

15 Sperry, and also Ms. Osborne.  But I think her declaration

16 really goes to the voting balloting procedures.

17     THE COURT:  All right.  Ms. Osborne is your balloting

18 agent.  We have a ballot certification on file.  She's on the

19 phone.  Does anyone wish to be heard with regard to the issue

20 of the ballot certification of votes?

21     MR. GOLDSTEIN:  Your Honor, Michael Goldstein,

22 Greenberg Traurig for Ashley.

23     Your Honor, all the witnesses that we would

24 potentially cross-examine, we would not be cross-examining the

25 ballot certification declarant.

1           So for our purposes, Your Honor, that witness can be

2   excused.

3           We have issues with respect to classification.  But

4   with respect to the certification, what with the ballots that

5   came in and her report, we really have no issue with that, Your

6   Honor.

7           THE COURT:  No issue, all right.

8           MR. GOLDSTEIN:  So she can be excused as far as we're

9   concerned.

10           THE COURT:  So we'll admit the certification and the

11   agent can either remain on the line and listen in or can be

12   excused.

13           MS. OSBORNE:  Thank you, Your Honor.  This is Ms.

14   Osborne.  I'll be excused.

15           THE COURT:  All right.

16           MS. OSBORNE:  Thank you.

17           THE COURT:  Then I guess everybody is off the line and

18   we can close the line.  Is that right?  Anybody else on the

19   line?

20           All right, we'll close the line then.

21           All right.  Please go ahead, Mr. Fox.

22           MR. FOX:  Your Honor, Ms. Osborne -- what the ballots

23   did show is that the creditors were solicited and spoke very

24   clearly and directly that ninety-three percent of them, of the

25   class 3 creditors, voted in support of the case -- of the plan.

1  Four of those creditors, by the way, if I were able to review

2  them, are strictly Hartsdale creditors, and they also voted in

3  favor of the plan.

4       The class 2 Mengnu, seems even though there's a class

5  of 1 was Mengnu, they voted twice.  I just think that there may

6  have been an overlap between China and the local rep here.  But

7  it's not that their claims are twice the amount, they're

8  not -- they're one time but they voted in support of the plan.

9  But there were two of those ballots.

10       So I think that's -- it's entirely favorable that the

11  information that was deemed necessary to go out there, gave

12  people a chance to be heard.  They were heard and they spoke.

13  Ashley has objected.

14       THE COURT:  Right.  Now, Ashley is a Hartsdale

15  creditor and has voted against the plan.  But you would propose

16  to make them an unimpaired creditor, I gather.

17       MR. FOX:  Well, I think reading his -- the ballot that

18  they filed, Your Honor, they filed their ballot for 147,000

19  dollars.  And they filed that as a negative vote.  And I

20  don't -- the plan impairs them in the Hartsdale.

21       Why -- how I think they calculated that number is that

22  Ashley has sold goods directly to Jennifer Convertibles outside

23  of the TUA, and they've been doing that even prior to the

24  opening of the Ashley HomeStores.  There was a relationship

25  that they had.  And of that claim that they filed for 280

1    something thousand dollars, the 147 is I think the deficiency

2    claim as to what that 503(b) claim would allow -- would be paid

3    and then that -- this would be the remainder claim.

4         In total, in the Hartsdale entity, we believe, and as

5    Mr. Abada's affidavit reconciles to the response filed by

6    Ashley, their claim in the -- from the Hartsdale to Ashley is

7    980,000 dollars, which we propose to cure and pay no later than

8    the effective date, we have the money available.  And that

9    could be addressed later.

10        So they're unimpaired in the Hartsdale, so I think

11   their only claim, I'm just working backwards to it, is 282

12   minus their 503(b)(9) claim gives them a general unsecured

13   claim, which is a class 3 claim, which they were one of the no

14   voters.  I think there were nine of them, or eight of them --

15   people who voted against the plan.

16        THE COURT:  Did any Hartsdale creditors vote against

17   the plan --

18        MR. FOX:  No.

19        THE COURT:  -- as far as you know.

20        MR. FOX:  No.

21        THE COURT:  None.

22        MR. FOX:  Well, as far as I know.  I only had Ms.

23   Osborne send to me her spreadsheet and her certification.  And

24   we were able to go through and note who voted for the plan.  I

25   could point out which of the four creditors voted for the plan

1   of the Hartsdale, I do have that.  But of the no votes that we

2   have none of them related to the Hartsdale entity.  And I think

3   that speaks loud and clear about how that -- how those

4   creditors expect to be treated.

5           As to the Jennifer side, again, in terms of proceeding

6   I would offer these declarations as my direct testimony.  I

7   think in terms of expediency I would then --

8           THE COURT:  Sit down.

9           MR. FOX:  -- as well as the exhibits allowing Ashley's

10  counsel to cross them, subject to some redirect.  And I think

11  that in consideration, hopefully after and in consideration of

12  the direct testimony and any cross-examination Your Honor would

13  find that we would otherwise have met all aspects of

14  confirmation.

15          And, again, assuming that we've met all aspects of

16  confirmation with feasibility being one of them, I think the

17  issue of adequate assurance of future performance is subsumed

18  in the feasibility issue.

19          That's how I would intend to proceed today and subject

20  to other people's input.  I think that's probably the most

21  streamlined way.  We have filed these affidavits well in

22  advance of today.

23          THE COURT:  Are the affidavits you're speaking of the

24  declaration of Robert Grien, which I received, I think,

25  yesterday.  And there's another -- there's a declaration of Mr.

1    Sperry.  And there's a declaration of your president, right?

2           MR. FOX:  President and COO and CFO; Rami Abada.

3           THE COURT:  Mr. Abada.

4           MR. FOX:  Together with the exhibits.

5           THE COURT:  All right.  Okay, does anyone wish to

6    speak in support of confirmation of the plan, or as to the

7    order of proceedings today; how we should proceed.

8           MR. CARR:  Your Honor, Jim Carr on behalf of the

9    creditors' committee.

10          We would like to speak in support of the confirmation

11   of the plan, but we reserve -- we'd like to reserve our right

12   to do so at the conclusion of any testimony that's being

13   presented.  In terms of the order of proceeding, we have no

14   comment in that regard.

15          MR. NEIGER:  Edward Neiger on behalf of Mengnu.

16          I would echo the sentiments of Mr. Carr.  We would

17   like to speak in support of the plan, but, perhaps, it would be

18   better to do it after everything gets brought out to light and

19   the record is made clear.

20          With respect to the order of going forward, we're okay

21   with what Mr. Fox proposed.

22          THE COURT:  All right.  Anyone else?  Ashley?

23          MR. GOLDSTEIN:  Yes, Your Honor.  Michael Goldstein,

24   Greenberg Traurig.

25          Your Honor, in terms of procedure if Mr. Fox wants to

1    submit on the direct testimony with the declarations, which

2    we've seen yesterday, we're prepared to deal with those on

3    cross-examination.  Mr. Abada, we deposed, I'm prepared to deal

4    with his.

5          I have two oral motions to address with respect to the

6    other two declarations, which I'd like to have the opportunity

7    to do that at the appropriate time, before the cross-

8    examination.  I think both of them have substantial issues that

9    we need to deal with as to whether they come in --

10         THE COURT:  The other two declarations being Mr.

11   Sperry?

12         MR. GOLDSTEIN:  Mr. Sperry's declaration and Mr.

13   Hynes' (sic) declaration, yes, Your Honor.

14         And then in terms, Your Honor, of speaking in terms of

15   support -- opposition, if Your Honor wants to hear kind of an

16   opening argument preview, prepared to do that.  If Your Honor

17   thinks its best to just deal with the evidence, and proceed

18   with argument at closing, summation, I'm prepared to do that as

19   well.  I don't have -- I think for efficiency purposes if the

20   Court had the opportunity to review our objection of the --

21   briefly I think you know where we're coming from --

22         THE COURT:  I've read your objection -- I think I know

23   where you're coming from, or sometimes I do.  But this is a

24   moving target.  Things have changed, things changed yesterday I

25   assume.

1          MR. GOLDSTEIN:  And perhaps, Your --

2          THE COURT:  So perhaps it would be useful --

3          MR. GOLDSTEIN:  Okay.

4          THE COURT:  -- if you gave me an opening statement

5     that made it as clear as you can --

6          MR. GOLDSTEIN:  sure.

7          THE COURT:  -- exactly what your objections are to

8     confirmation of this plan.  What's been resolved, if anything.

9     What hasn't been resolved.  And what relief you want me to

10    enter today, both with regard to the plan and the motion to

11    assume the TUAs.

12         MR. GOLDSTEIN:  I'm prepared to do that, Your Honor.

13         THE COURT:  All right.

14         MR. GOLDSTEIN:  And if I do that now --

15         THE COURT:  That's fine.

16         MR. GOLDSTEIN:  -- I would go to the podium.

17         THE COURT:  That's fine.

18         MR. GOLDSTEIN:  Thank you, Your Honor.  Michael

19    Goldstein, Greenberg Traurig, appearing on behalf of Ashley

20    HomeStores and Ashley Furniture.

21         Your Honor, I will try to direct my comments really to

22    some of the changes in the specific issues and will reserve the

23    right to deal with more broad-scope issues at the appropriate

24    time.

25         Your Honor, as the Court noted, there were changes

1    made.  We received amendments to the plan yesterday, the day

2    before.  And so we do now know there are changes to the A, B, C

3    and D note, which no longer make, as we understand it,

4    Hartsdale an obligor, nor is there any security interest

5    granted to secure those obligations.

6         I would note that the form of the document submitted

7    before Your Honor in the signature blocks are still a little

8    bit confusing, since there's reference to signatures by

9    Jennifer Convertibles and its subsidiaries.  It's not entirely

10   clear the actual subsidiaries will be joined.

11        Some of the documents specifically reference Jennifer

12   Convertibles and its affiliates, and one of them, I think with

13   the B security note maybe says "other than Hartsdale."  Other,

14   the documents don't have that language.  So the documentation

15   is still a little unclear to us.  Presumably, that can be

16   cleared up at the appropriate time and the documents can be

17   modified to follow what the representations, at least, have

18   been made.  But as you can imagine in reading the documents and

19   the words the two don't necessarily completely coincide.  I'll

20   attribute that not to any intention to be confusing, but

21   probably documentations moving quickly and not, necessarily,

22   perhaps, following the intention.

23        There is, however, Your Honor, very significant issues

24   with respect to what I'll call the secured exit facility, and

25   the documents that follow that.  And those documents, Your

1    Honor, as I currently read them, and where we have an

2    objection, is as follows:

3            As we understand it the secured exit facility

4    encompasses two components.  A letter of credit facility and a

5    cash facility.  The letter of creditor facility will be an

6    amount up to five million dollars.  It will be secured.  But we

7    don't have a security agreement that deals with that letter of

8    credit.  I assume that we don't have a document, that the

9    security agreement that deals with the letter of credit will be

10   identical to security agreement proposed for the security note.

11   But I don't know that.  But we'll give them the benefit of the

12   doubt.

13           The security note, Your Honor, as I understand it,

14   really accomplishes two things.  It provides for a rollup of

15   the DIP financing, and it provides for an ongoing working

16   capital commitment of an unspecified amount, an unspecified

17   commitment, and so we really don't know what it is.  In fact,

18   I'm note even sure how the debtor deals with feasibility when

19   it has a working capital provider who doesn't really tell you

20   what it's going to provide, how it's going to provide it, when

21   it's going to provide it, how much it's going to provide it,

22   and when it's going to decide to shut it down.

23           Our complication with that working capital facility,

24   of course, is that it has an excess cash flow provision which,

25   essentially, means that -- as we'll get into testimony, all of

1    the cash flow of this company that comes out of the Hartsdale

2    segment, the Ashley segment, if you will, gets swept up to the

3    parent and that will be used to pay back the working capital

4    facility of this plan sponsor, the owner, Ashley's competitor.

5    But we will come back to those issues.

6         The issue with respect to the transaction, itself,

7    however, Your Honor, from the documentation, is that that

8    letter of credit facility, up to five million dollars, which we

9    assume is secured by the same security interest as the tranche

10   E note.  And the tranche E note, an amount which we're not

11   really sure what it is, will be secured as we now read the

12   documents by Hartsdale's inventory.

13        If I'm reading the documents correctly, Your Honor,

14   that inventory is limited to that amount.  The inventory lien,

15   the lien is limited to the inventory amount.  But make no

16   mistake about it, contrary to some of the documents the

17   obligation that Hartsdale is being imposed upon is the entire

18   obligation under the LC and the entire obligation under the

19   cash facility.  The rollup DIP and some other additional

20   working capital.

21        THE COURT:  All right.  Tell me how this in the future

22   will damage or put your client at risk.

23        MR. GOLDSTEIN:  Your Honor, the issue under the TUAs

24   with respect to Ashley going forward is three-fold.  One, is

25   payment for goods.

1          THE COURT:  All right.  They proposed to pay you cash

2     on delivery, is that right.

3          MR. GOLDSTEIN:  And if they pay cash on delivery or if

4     Ashley extends credits on terms that they're acceptable to,

5     then I would submit, Your Honor, that's not the issue.

6          THE COURT:  All right.

7          MR. GOLDSTEIN:  And that's -- and that's never been

8     the issue.

9          THE COURT:  So payment isn't the issue.

10          MR. GOLDSTEIN:  Payment to Ashley is not the issue.

11          THE COURT:  Okay.  All right.

12          MR. GOLDSTEIN:  Number 2 --

13          THE COURT:  So let's be very clear --

14          MR. GOLDSTEIN:  No, no, that's I --

15          THE COURT:  All right.

16          MR. GOLDSTEIN:  That's not the issue.  I said there's

17     three issues but that one is not the issue.

18          THE COURT:  Well, you said there were three issues and

19     then you said we're taking one away.

20          MR. GOLDSTEIN:  We're taking one away.  I'm sorry.

21          THE COURT:  So there are two issues.

22          MR. GOLDSTEIN:  There's two remaining issues.

23          THE COURT:  All right.

24          MR. GOLDSTEIN:  I was trying to define the universe

25     and be complete, Your Honor, I didn't mean to be distracting.

1            THE COURT:  We're a very simple folk here in New York.

2    We try to narrow issues.

3            MR. GOLDSTEIN:  That's what I'm trying to --

4            THE COURT:  We try to hone in on what the real

5    problems are.

6            MR. GOLDSTEIN:  That's -- I'm trying to address

7    there's --

8            THE COURT:  All right.

9            MR. GOLDSTEIN:  We try to be simple -- even simpler in

10   California.

11           In any event, Your Honor, the second issue is that

12   trade bar usage agreements, the TUAs --

13           THE COURT:  Yes.

14           MR. GOLDSTEIN:  -- impose a number of obligations upon

15   the licensee; Hartsdale.

16           THE COURT:  All right, we're going to look at the

17   TUAs --

18           MR. GOLDSTEIN:  Yeah.

19           THE COURT:  -- and you're going to tell me exactly

20   what obligations are impacted by the assumption motion, and the

21   plan.  There's lot of vague argument in your papers, but I've

22   got a TUA open right here, and you're going to have a chance to

23   tell me what section of the TUA is implicated by any of this.

24   Okay.

25           MR. GOLDSTEIN:  Okay.

1        THE COURT:  That's issue number one.

2        MR. GOLDSTEIN:  That's issue --

3        THE COURT:  Of two.

4        MR. GOLDSTEIN:  That -- exactly, Your Honor.  And my

5   point about those issues is those go to the issue of protecting

6   the brand, protecting the mark.

7        THE COURT:  Right.  Right.

8        MR. GOLDSTEIN:  And so the --

9        THE COURT:  Let's -- we'll come back to that.

10        MR. GOLDSTEIN:  No, no, I just wanted to --

11        THE COURT:  And you're going to tell me what section I

12   should look at --

13        MR. GOLDSTEIN:  Absolutely.

14        THE COURT:  -- of the TUA.  Okay, we'll come back to

15   that.  In fact, we'll come back to that in a moment.  But I

16   want you to tell me what your issue number two is.

17        MR. GOLDSTEIN:  The second issue, we're now down to

18   two issues, Your Honor.

19        The second issue, Your Honor, is that under the TUAs

20   the licensor; Hartsdale, is obligated to maintain and pay its

21   vendors.  It's vendors, okay.

22        So Hartsdale's financial condition and, therefore,

23   it's condition vis-a-vis and a relationship with its parent is

24   an integral part of the TUAs.  Not vis-a-vis --

25        THE COURT:  So that's really a subset of your issue

1     number one.

2           MR. GOLDSTEIN:  It's a subset, Your Honor, but it's a

3     different focus.

4           THE COURT:  It's a different focus.  And you're going

5     to show me where that obligation resides in the --

6           MR. GOLDSTEIN:  In the TUA.

7           THE COURT:  -- in the TUA.

8           MR. GOLDSTEIN:  Correct.

9           THE COURT:  Okay, why don't we look at the TUA right

10    now.

11          MR. GOLDSTEIN:  Okay.  Your Honor, if I may, I want to

12    get one in front of me.

13          THE COURT:  Yep.  Are they all the same -- they're all

14    essentially the same, I gather.

15          MR. GOLDSTEIN:  They're generally all the same except

16    for term and location, Mr. Abada agreed with that in his

17    deposition.

18          Your Honor, which one do you have in front of you?

19          THE COURT:  I have --

20          MR. GOLDSTEIN:  And I'll just make sure I have the

21    same one.

22          THE COURT:  Ashley HomeStores --

23          MR. GOLDSTEIN:  What -- which --

24          THE COURT:  -- business at 419 Crossways Park Drive,

25    Woodbury, New York.

1          MR. GOLDSTEIN:  That's the one I have.

2          THE COURT:  Okay.

3          MR. FOX:  No, no, they're all --

4          MR. GOLDSTEIN:  I'm sorry.

5          MR. FOX:  They're all addressed that way because

6   that's the corporate office.

7          THE COURT:  All right.

8          MR. FOX:  You've got to look for the store access to

9   it.

10         THE COURT:  Where is --

11         MR. FOX:  But they're all identical agreements.

12         THE COURT:  Where do we look for that?

13         MS. NADRITCH:  Your Honor, recital E in the first page

14  of the --

15         THE COURT:  This is Carle -- oh, thank you, this is

16  Carle Place, New York.  It's the one in the black binder, or,

17  at least, one of them.

18         MR. FOX:  Is it 168 Glenn Cove Road in Carle Place,

19  Your Honor?

20         THE COURT:  That's right.

21         MR. FOX:  Right.  It is Exhibit C to our -- to Mr.

22  Abada's affidavit, if that will make it easier for you.

23         MR. GOLDSTEIN:  Okay, Your Honor.  So we're looking at

24  the TUA for the Glen Cove Road, Carle Place location.

25         THE COURT:  Okay.

1        MR. GOLDSTEIN:  So our focus now is going to be --

2    you're asking me where in this TUA do we have specific

3    obligations where we're concerned and impose non -- what we'll

4    call payment obligations, but they're important to Ashley that

5    relate to both the assumption and the plan.  Issue number one.

6        Okay.  Your Honor, there's a number of provisions.

7    We'll do this.  The first one starts with Section 4, it's on

8    page 2.

9        THE COURT:  Okay.

10       MR. GOLDSTEIN:  And if we look at the third paragraph

11   it starts "Licensee will operate the license business and

12   warehouse in accordance with the terms and conditions of this

13   agreement, and all rules, guidelines, policies, procedures,

14   trademark usage standards, and other requirements contained in

15   the HomeStore manual, including all customer service

16   requirements prescribed by licensor in the HomeStore manual.

17       THE COURT:  All right.

18       MR. GOLDSTEIN:  That, Your Honor, highlights for

19   Ashley and for the relationship the importance of the licensee

20   to be able to operate --

21       THE COURT:  It might if I had the HomeStore manual.

22   Do I have the HomeStore manual, counsel?

23       MR. GOLDSTEIN:  You do not, Your Honor.

24       THE COURT:  Do you have a witness here today to

25   testify with regard to the HomeStore manual?

1           MR. GOLDSTEIN:  I don't, Your Honor.

2           THE COURT:  All right, so let's go on.

3           MR. GOLDSTEIN:  Your Honor, okay, if we continue down,

4    the fifth paragraph, "Licensee in operating the licensed

5    business and warehouse will make the financial expenditures and

6    time commitments that are necessary to properly install, learn

7    to operate, upgrade and maintain at its sole expense, computer

8    hardware and software."

9           THE COURT:  Okay.

10          MR. GOLDSTEIN:  "In accordance with the requirements

11   set forth in the HomeStore manual."

12          THE COURT:  All right.  Okay, so that's a sort of a --

13          MR. GOLDSTEIN:  Same question, same answer.

14          THE COURT:  -- feasibility requirement related to

15   computers.

16          MR. GOLDSTEIN:  That's correct, Your Honor.

17          THE COURT:  All right.

18          MR. GOLDSTEIN:  Number 5, Your Honor, paragraph 5.

19          THE COURT:  Yes.

20          MR. GOLDSTEIN:  "Licensee will use its best efforts to

21   solicit sales to the Ashley products from the authorized

22   location, and in consultation with licensor to develop annual

23   sales goals and marketing objectives, reasonably designed to

24   assure maximum sales and market penetration of the Ashley

25   products in the licensed territory."

1        THE COURT:  All right.

2        MR. GOLDSTEIN:  Okay.  Again, Your Honor, we would

3   point to this as being an example of why the financial

4   structure of Ashley -- excuse me, Your Honor.  The financial

5   structure of Hartsdale in a relationship with Jennifer is an

6   important component of Hartsdale's ability to comply with

7   paragraph 5.

8        THE COURT:  Right.  But paragraph 5 doesn't say that

9   they can't borrow money, and they can't pledge their assets.

10  Is there anything in the TUA that says they can't borrow money

11  and they can't pledge their assets?

12       MR. GOLDSTEIN:  Your Honor, with respect to pledging

13  their assets there is an anti-assignment encumbered provision

14  with respect to the TUAs.  That problem, which was a problem,

15  has been remedied.  I point that out just for the record to

16  clarify since it was an issue we had raised before.  But,

17  otherwise, Your Honor, no.

18       THE COURT:  All right.  So we have a general provision

19  that they'll do their best to stay in business and to sell your

20  product.  And I assume --

21       MR. GOLDSTEIN:  That's correct.

22       THE COURT:  -- since they're in business, and since

23  they're trying to sell as much product as possible, that they

24  will do so, but we'll see.  I mean, you certainly can cross-

25  examine on that point.

1          MR. GOLDSTEIN:  Right.  The question, Your Honor, is

2     not I would argue their desire or intent with respect to

3     selling product, the question is is Hartsdale's ability to do

4     so comply and fulfill those obligations in light of the

5     encumbrances and obligations imposed upon it.

6          Admittedly, Your Honor, there is not a direct

7     prohibition with respect to that, but when we get to the issue

8     of adequate assurance of future performance, and/or

9     feasibility, as it relates to Hartsdale, I would submit, Your

10    Honor, that those are critical enquiries and are relevant to

11    our position.

12         Your Honor, the -- in the same vein as paragraph 5,

13    paragraph 6 deals with the issue of maintaining product line

14    inventory.  I'm going to skip over and come back to 7 and 8,

15    Your Honor, because they raise my sub -- my issue two, or

16    rather a subpart issue.

17         Paragraph 9 deals with the ability to protect the

18    marks and use of the marks.

19         Now, I'm going to skip forward, Your Honor.  Paragraph

20    21 and 22 deal with the obligation of providing warranty

21    service.  Very important in terms of the ability to protect

22    customers and customer's relationships to fulfill warranty

23    obligations.  Again, Hartsdale's ability to do that implicated

24    by its financial wherewithal to do so.

25         23 deals with advertising campaigns, Your Honor.

1          I'm skipping over paragraph 24, which is reports,

2     because that doesn't go to the financial issue, which I think

3     Your Honor has asked me to focus on in particular.

4          Section 24 reports really deals with a separate type

5     of issue that goes to cure and adequate assurance, it's not

6     related to this issue of the capitalization, if you would, with

7     Hartsdale.  So with the Court's indulgence, I'm going to pass

8     over that one, but reserve comment.

9          Is that acceptable, Your Honor?

10          THE COURT:  Yes.

11          MR. GOLDSTEIN:  Okay, thank you, Your Honor.

12          Those are the ones that I would -- no, no, no.   So

13     those -- those are the ones, Your Honor, that I point Your

14     Honor to that deal with what I would call the aggregate,

15     acquiring product, maintaining inventory, selling it, marketing

16     it, advertising it, providing the appropriate software,

17     hardware, essentially acting like a good licensee with respect

18     to this obligation.  Again, we're not here to suggest bad

19     intent or bad desire on the part of the licensee.  What we're

20     here is making the argument that in order to do that the

21     capitalization and financial structure has to be reviewed and

22     considered in that context.

23          If you permit me, Your Honor, I'd like to move on to

24     issue two --

25          THE COURT:  All right.

1    MR. GOLDSTEIN:  -- which deals with the second part of

2  this financial analysis.

3    THE COURT:  All right.

4    MR. GOLDSTEIN:  Thank you, Your Honor.

5    First, Your Honor, I want to point you to the

6  paragraph 7 and 8, Your Honor.  This deals with accessories.

7  In relationship with the accessory manufacturers.  Under the

8  TUAs the licensee is required to provide -- purchase

9  accessories from approved manufacturers of accessories.  And

10  they're folks who come off of a list if you will.  And then,

11  obviously, the licensee has to purchase -- buy from those

12  approved accessory providers, and pay for them.

13    Your Honor, you'll hear, and I will acknowledge, that

14  this is not a huge part of the Hartsdale business.  But it's

15  important, Your Honor, because it's related to the business and

16  it's one where Ashley is in the middle of the vendor

17  relationship.  And so the licensee's ability to, in fact, deal

18  with the accessory vendors, pay them on a timely basis, and

19  manage that relationship in appropriate fashion is an important

20  part of the overall relationship.  And this -- these two

21  provisions, Your Honor, talk specifically to that obligation.

22    THE COURT:  Do you have any -- as a part of your case,

23  or any evidence that pre-petition the Hartsdale debtor failed

24  to deal with accessories in a appropriate manner?

25    MR. GOLDSTEIN:  Your Honor, from a management

1   relationship perspective, no.  But the argument that we're

2   making here is not, again, one of a failure of intent or a

3   failure of desire.  Nor are we saying that they did something

4   bad in the past, i.e., in terms how they behaved.  And,

5   therefore, we're worried about how they're going to behave in

6   the future.  We have not made that.  This is as financial

7   argument, Your Honor.  So fair question, and that's our

8   response.  And I think we've been consistent in that respect.

9           THE COURT:  All right.

10          MR. GOLDSTEIN:  And that takes me, Your Honor, to the

11  other paragraph, and probably the most significant piece of

12  this puzzle with respect to the financial argument.  And that's

13  back to paragraph 4, Your Honor, on page 2.

14          And one, two, three, four -- if we go to the fourth

15  paragraph, Your Honor, under paragraph -- it's numbered

16  paragraph 4, so the record's clear, and then it's the fourth

17  paragraph  under that, it's on page 2.  You see that one, it

18  says "licensee in operating."

19          THE COURT:  Yes.

20          MR. GOLDSTEIN:  I guess, okay.  So "Licensee in

21  operating the licensed business and warehouse will pay, on or

22  before the date they become due all sums due licensor, owner,

23  Ashley Distribution Services Ltd."  Okay, that's us, that's my

24  client, Your Honor.  That was my first point that we said is no

25  longer a point.

1     But here's the critical piece. "And all other parties

2   with which licensee does business." "All other parties with

3   which licensee does business." This TUA requires them to pay

4   on or before the date they become due all other parties with

5   which licensor does business.

6     Your Honor, this is a license agreement, it's not a

7   lending relationship. And there is limitations to

8   licensor/licensee relationships. So there aren't financial

9   covenants and they're not EBITDA tests.

10     But there is imbedded in this document and it's in

11   other places as well, a heightened concern about the financial

12   condition of the licensee. And this provision is one of the

13   key provisions, Your Honor. This doesn't deal with monetary

14   obligations to the licensor, this deals with the monetary

15   obligations of the licensee to the licensee's vendors. So if

16   Hartsdale can't pay its vendors because all of its cash is

17   swept to its parent and its parent's assets are encumbered and

18   its parent's assets, and any excess cash flow is used to pay

19   down the plan sponsor, and the plan sponsor, who's the equity

20   holder, has no commitment to lend, there is no assurance and no

21   feasibility proof that Hartsdale can pay its vendors. And what

22   do we know, as a matter of fact from this record, is that

23   Hartsdale filed schedules, Your Honor, incomplete as they may

24   be. But, nonetheless, that showed some of their vendors, their

25   landlords, and their merchandise vendors, including Ashley.

1    Now, that schedule shows approximately, memory serves, a

2    million-six.  Of which about 900,000 or so was Ashley.  So you

3    had, roughly, another 800,000/700,000 of third party vendors.

4         Now, that list does not include, because this debtor

5    apparently doesn't do this, vendors that may have been owed for

6    advertising that the Ashley stores received.  Or vendors that

7    may have been owed for insurance.  Or vendors that may have

8    been owed for any other corporate overhead.

9         Those vendors aren't listed in those schedules, so I

10   don't really know who are the other vendors; the other parties

11   with which licensee does business should have been on the those

12   schedules and were unpaid.  But I do know that there's a fair

13   amount of them that were acknowledged.

14        And so we do have historical proof that this is a

15   problem in times of trouble, and we know that this is an

16   obligation going forward which has not been addressed.

17        In fact, Your Honor, I will submit to you that as a

18   matter of cure, under this TUA, Hartsdale creditors have to be

19   paid in cash in full, in order for my client to be cured.

20   There is no third party beneficiary provision under here.  So

21   I'm not suggesting that third party vendors could have made

22   this argument, and I'm not suggesting that I couldn't waive it.

23   So it's not anybody else's issue but mine.  But it's my issue,

24   loud and clear.

25        THE COURT:  And what is your legal support for this

1    proposition?

2         MR. GOLDSTEIN:  365, Your Honor.  This is a monetary

3    default made under the TUA, which hasn't been cured.  You want

4    to deem it not to be a monetary default because it's a third --

5    it's an obligation of a third party, then I submit, Your Honor,

6    it's a non-monetary default because it's a failure to comply

7    with this condition, and you have to cure non-monetary defaults

8    in order to cure, unless the counterparty waives.

9         Again, Your Honor, I point this out not necessarily to

10   suggest that Ashley can't deal with this issue in appropriate

11   fashion under appropriate circumstances, but you've asked me

12   Your Honor to point to specifics that bring us here today.  And

13   this is an issues that bears directly all four corners, and

14   simply, I would submit, on why adequate assurance and

15   feasibility and the structure of the Jennifer/Hartsdale

16   relationship is squarely at issue here.

17        As an aside, it's a technical matter, and I feel very

18   strongly about it, I think it's a dead-bang winner and they

19   can't get over it without my client's consent.  But, again --

20        THE COURT:  So -- and the moral of that particular

21   story is we should simply cease the hearing at this point,

22   agree that Ashley can kill this company, and do away with a

23   competitor.  And you use the word competitor already in your

24   presentation.  And there's no reason to go any further, is that

25   what I should conclude from your latest comment?

1          MR. GOLDSTEIN:  Your Honor, I think you should

2     conclude that if Ashley's words were heard by the debtors, and

3     the debtors gave recognition to this issue then, perhaps, I

4     wouldn't have had to stand here today.  Because I asked Mr.

5     Abada this question on the stand -- on his deposition.  And he

6     believed that he had no obligation to his vendors under this

7     document.  He believed that his only obligations were to

8     Ashley.  Their view is that Ashley is a licensee and they're a

9     good licensee, but there's no relationship between the license

10    and the financial play here.  I think they've fundamentally

11    misunderstood the relationship.

12         They apparently heard us a little bit, because they've

13    modified their document some.  But they haven't gotten all the

14    way.  As I said, Your --

15         THE COURT:  What is all the way as far as you're

16    concerned?

17         MR. GOLDSTEIN:  Your Honor, I believe, and I have it

18    in front of me, because I thought about this.

19         THE COURT:  Well, that's good.

20         MR. GOLDSTEIN:  I did.  I did, Your Honor.  That in

21    our conclusion to our objection we said in the alternative

22    here's what we think should be done.

23         THE COURT:  All right, let's look at that.  I remember

24    reading it.

25         MR. GOLDSTEIN:  And what I said, Your Honor, is "To

1 the extent the Court rules otherwise," which is allow

2 assumption and allow confirmation, "Ashley respectfully

3 requests that the Court, with respect to the TUAs, require

4 Hartsdale to deposit in a segregated interest account the funds

5 required to cure all monetary defaults under Section 4 of the

6 TUAs."

7        THE COURT:  I gather that's been agreed to?

8        MR. GOLDSTEIN:  Their plan says they're going to put

9 money in a reserve.  The confirmation order doesn't say that.

10        THE COURT:  Well, the confirmation order isn't entered

11 yet.

12        MR. GOLDSTEIN:  Yeah.  I --

13        THE COURT:  All right.

14        MR. GOLDSTEIN:  -- assume, Your Honor --

15        THE COURT:  All right.  So A -- we've resolved A,

16 right, Mr. Walsh -- uch, there I go again, everybody's doing

17 it.  Mr. Fox?

18        MR. FOX:  Your Honor, we have the 980,000 dollars.  We

19 painstakingly reconciled the 900 --

20        THE COURT:  Just say yes, you'll put it in escrow.

21        MR. FOX:  Yes, we do.

22        MR. GOLDSTEIN:  Your Honor, just let me be clear,

23 because we have a dispute on the 980, right.  We think it's a

24 million-two and the 980 was moved from 940 because of the -- we

25 had an attorney's fees claim.  So we think the dollar amount is

1    greater.  That's --

2           THE COURT:  What's the difference between 980 -- what

3    is that, all attorney's fees?

4           MR. FOX:  You filed a proof of claim in the

5    Hartsdale --

6           THE COURT:  No, no, don't.  You can argue -- I gather

7    that's not a critical point.

8           MR. GOLDSTEIN:  It's not a --

9           THE COURT:  But, again, counsel, you're going to have

10   to show me where in the documents you get a right to attorney's

11   fees in connection with this plan.

12          MR. GOLDSTEIN:  Okay, Your Honor.

13          THE COURT:  Okay.  Or under 365 assumption.  You

14   can --

15          MR. GOLDSTEIN:  That's fine.

16          THE COURT:  You can tell me, but that's -- perhaps,

17   that's for another day.

18          MR. GOLDSTEIN:  I think it's for another day, Your

19   Honor, because under their procedures --

20          THE COURT:  That's fine.

21          MR. GOLDSTEIN:  -- they listed their cure.  I'm not

22   sure if it was -- but our time to object to the cure amounts

23   specifically hasn't been --

24          THE COURT:  All right, we'll worry about that another

25   day.

1        MR. GOLDSTEIN:  But, Your Honor, I'm -- just so I'm

2    clear, and Your Honor's clear, that since I have -- this

3    sentence says "To the extent the Court rules otherwise" so I'm

4    assuming Your Honor is allowing assumption, notwithstanding the

5    fact that I think they have to pay the third party vendors.

6    So, therefore --

7        THE COURT:  Well, where does it say that here?  On

8    page 22 and 23, where does it say that?

9        MR. GOLDSTEIN:  It says that --

10        THE COURT:  You said you gave this some thought.

11        MR. GOLDSTEIN:  I did, Your Honor.

12        THE COURT:  And tell me where does it say that?

13        MR. GOLDSTEIN:  Your Honor, it doesn't say it here,

14    what it --

15        THE COURT:  Okay, well, let's go through this which

16    you said you gave some -- you know, I've got to start

17    somewhere.

18        MR. GOLDSTEIN:  Your Honor, I'm not trying to be

19    difficult.  All I wanted to clarify is that Section 4, the

20    TUAs, is the section that requires the payment to the third

21    party vendors --

22        THE COURT:  Yes.

23        MR. GOLDSTEIN:  -- you read that.

24        THE COURT:  Okay.

25        MR. GOLDSTEIN:  And all I want to make it clear to the

1  Court, so the Court understands, I'm not suggesting when we're

2  talking about this language right here, that they would have to

3  reserve those dollar amounts.  Because this sentence assumes

4  you've overruled that objection, that's all I'm saying.  I just

5  want to be clear.  Because, otherwise, they couldn't have

6  assumed because they're not proposing to do that.

7         THE COURT:  All right.

8         MR. GOLDSTEIN:  So we're limiting what Section 4

9  requires in this sentence, I just want to --

10        THE COURT:  Okay.

11        MR. GOLDSTEIN:  -- be clear what I'm saying so I'm not

12  being difficult, but I am reserving that issue because we've

13  assumed you denied it, that's all.

14        So you have to pay Ashley, because I've ignored

15  payment to vendors.

16        THE COURT:  All right.

17        MR. GOLDSTEIN:  B says you have to comply with the

18  other obligations which are all, Your Honor, the loose

19  obligations that we went through.  Because, again, you've

20  denied -- you've overruled adequate assurance and financial

21  performance -- and financial feasibility.  But -- so that's why

22  we say specifically comply with the reporting requirements.

23  And I go in detail, because we had a lot of colloquy about what

24  this really means, and so we said this is what we want.  And

25  we've been very clear.  And I think Mr. Abada's deposition

1    testimony says he can do all this.  They haven't done it in the

2    past, but he can do all this.

3          Y says "Comply with the confidentiality provisions by

4    restricting the plan sponsor from the receipt of any

5    confidential information."  That's been an issue we've raised

6    and here's a specific proposal to deal with that.

7          THE COURT:  All right.

8          MR. GOLDSTEIN:  They've been unwilling to do that,

9    they say it doesn't apply, or they say we will do it, but we

10   were very concerned about that.

11         And Z says "Segregated in an interest-bearing account

12   are Hartsdale customer deposits."  Our concern, Your Honor, is

13   that under -- in the Hartsdale situation customers make

14   deposits at 100 percent, that's -- we've been very concerned

15   about that.  We think that's important protection under this

16   structure.

17         THE COURT:  All right.

18         MR. GOLDSTEIN:  And then 2, where like 2 says with

19   respect to the plan let's make it clear that Jennifer remains

20   liable on its intercompany obligations to Hartsdale.

21         It's not clear to me what they're doing with the

22   intercompany.  There's pre-petition intercompany, Hartsdale has

23   a receivable, essentially, from Jennifer, because Hartsdale is

24   profitable, all the cash has been upstreamed.  Mr. Abada didn't

25   know what that dollar amount is.  In theory, it's a pre-

1    petition claim, it should be treated under the plan.  There

2    should be a payment on it, and it should go to Hartsdale, and

3    it should be accounted for.  It's not 100 percent claim, it's a

4    general unsecured claim.  Post-petition, it's 100 percent

5    claim.  The Court ordered them in the cash management motion to

6    keep track of that, I don't know if they did or not.  But they

7    say they can, so they should know what that is.  That's 100

8    percent claim.  And post-confirmation we ought to know how much

9    money is being upstreamed, what is the Hartsdale asset.

10          B, require JCI to affirm its guarantee.  They've said

11   that in their last set of pleadings.  Their plan wasn't clear

12   about that.  We pointed to that issues.  But I think their most

13   recent pleadings say, and Mr. Abada said that they're going to

14   do that, it wasn't very clear to me that that's what he meant,

15   but I think they've cleared that up, I don't think that's an

16   issue.

17          C, Your Honor, they've dealt with the tranche A, B, C,

18   and D notes.  They've stricken Hartsdale's liability for those.

19   So they've already done that.  And so we have remaining, Your

20   Honor, the structure of the E note.

21          D deals with the imposition of a lien, that goes with

22   the obligation.  They've changed the document, so the tranche

23   A, B, C and D note no longer include any encumbrances.

24   However, as I articulated at the start, the E note does, so

25   that's still an issue.

1            And that's it.

2            So, Your Honor, we think this is actually eminently

3    attainable.  We think that the confidentiality -- to put it

4    simply, the confidentiality is important to us and can be dealt

5    with.  We think, Your Honor, that the reporting, which I've

6    detailed in several lines, is something they can do, it is

7    eminently reasonable.  In fact, I didn't get to paragraph 24,

8    but that's really what paragraph 24 requires.

9            I've talked too long already on the E note structure,

10   so I won't repeat that.  They've already dealt with the

11   guarantee.  They've said they can account for the intercompany

12   claims, so they ought to be able to do that.

13           And as far as the cure amount goes, Your Honor, as

14   long as we know that there's going to be money set aside in an

15   account for the amount that we assert, and we have the

16   opportunity to litigate that in accordance with their

17   procedures, and that money will actually be somewhere and not

18   flushed or in some working capital line, and subject to some

19   other lien, then we can deal with that as well.

20           And so, Your Honor, in the alternative paragraph I'm

21   not sitting here before you and saying pay Hartsdale's other

22   vendors 100 cents on the dollar and kill this case for my

23   client's benefit.  I'm not saying that.

24           THE COURT:  All right.

25           MR. GOLDSTEIN:  But what I am saying is unless you

1    protect me going forward and make sure I don't get into this

2    situation again, you can't do this over my objection.

3            THE COURT:  Tell me if you could, can you identify the

4    other unpaid vendors who you're concerned about, or your client

5    is concerned about?

6            MR. GOLDSTEIN:  Your Honor, the -- I can only impart

7    because the Hartsdale schedule of assets and liabilities that

8    was filed in the Hartsdale case, lists only vendors who are

9    merchant vendors and landlords, as far as I understand it.  So

10   it doesn't include advertising vendors.  It doesn't include

11   insurance vendors.  It doesn't include -- I mean, to be frank,

12   Your Honor, I'm not sure what else wouldn't be included in

13   that.  But in Mr. Abada's deposition it was very clear the

14   Hartsdale cash, the Ashley cash, goes in an Ashley

15   concentration account, it pays a limited set of things.  And

16   then it gets moved to the Jennifer concentration account where

17   all the other expenses are paid.  And they didn't file

18   schedules as far as I know that says who's a vendor of whom.

19           So, again, Your Honor, I don't want to get off-track,

20   but I would say as a footnote, if you got to the class 3 issue

21   in the non-substantive consolidation, substantive

22   consolidation, and whether all the creditors in Class 3 who

23   voted or rejected, whether they're Jennifer creditors or

24   Hartsdale creditors, it's not so clear that some of the

25   creditors that Mr. Fox thinks voted against the plan who were

1  Jennifer creditors may, in fact, not be Hartsdale creditors.

2  Which I would submit, Your Honor, then puts them squarely in

3  the crosshairs of the best interest test, which we talk about

4  in our brief.

5        But, again, I'm not here to -- we're not focused on

6  that, Your Honor, I'm trying to answer the Court's direct

7  questions --

8        THE COURT:  Thank you.

9        MR. GOLDSTEIN:  -- and find solutions.  But that --

10 but I can't answer you more specifically than that.

11       THE COURT:  All right.

12       MR. GOLDSTEIN:  Your Honor, I started at the podium

13 because you asked me to address what's changed and how we dealt

14 with that.  I think I've done that in terms of their plan

15 changes.  I think I've elaborated in broad strokes the

16 adequate -- the TUA issues from a cure and adequate assurance

17 perspective.  I touched upon a little bit the interrelationship

18 between those and the plan, our brief talks to them in more

19 detail.  I'm happy to take a recess to think about it, Your

20 Honor.  Happy to sit down and deal with the direct testimony.

21       THE COURT:  Procedurally, how would you suggest we

22 proceed?

23       MR. GOLDSTEIN:  Your Honor --

24       THE COURT:  The debtors have suggested that we admit,

25 for purposes of direct testimony, certain affidavits.  You've

1    referred - you've distinguished I think among some of them.

2           MR. GOLDSTEIN:  Correct, Your Honor.

3           THE COURT:  And you then have the opportunity to

4    cross-examine.

5           MR. GOLDSTEIN:  Right.  Your Honor, we have no

6    objection to Mr. Abada's declaration in terms of it being

7    submitted as direct testimony.  We would ask the opportunity to

8    cross-examine him.

9           THE COURT:  What about Mr. Greer (sic)?

10          MR. GOLDSTEIN:  Mr. Greer (sic), Your Honor, we

11   have -- we have a serious problem with that declaration and we

12   would request that the Court strike it on the following

13   grounds.

14          As I read Mr. Greer's -- if I can have a minute, Your

15   Honor, I want to get my notes that -- I left those notes at the

16   desk?  Thank you, Your Honor.

17       (Pause)

18          MR. FOX:  Just to help this, it's Mr. Grien, not

19   Greer.

20          THE COURT:  Grien.

21          MR. GOLDSTEIN:  Thank you, Your Honor.  It's Grien,

22   G-R-I-E-N.

23          Your Honor, as we understand the declaration for Mr.

24   Grien, it's being offered as expert testimony.  And we have a

25   problem with that.  And believe that that declaration cannot be

1   qualified as expert testimony.

2          Mr. Grien is employed by TM Capital, the debtors'

3   financial advisor.  The debtors' financial advisor was employed

4   pursuant to an order of this Court, an application of this

5   Court, approving their application under 328(a).  Not 330,

6   328(a).

7          That employment application includes, Your Honor, a

8   transaction fee; 500,000 dollars "upon consummation of a

9   successful restructuring."  Your Honor, it's a classic conflict

10  of interest.  It nullifies any credibility as an expert.

11         THE COURT:  Well, I've written on this subject --

12         MR. GOLDSTEIN:  You have, Your Honor, and that was my

13  next --

14         THE COURT:  -- at least twice.

15         MR. GOLDSTEIN:  That's my next point.

16         THE COURT:  And it doesn't nullify the testimony of

17  the witness.  It must be considered in connection with the

18  testimony of the witness.  And I don't think I -- did I say

19  differently in --

20         MR. GOLDSTEIN:  Oneida --

21         THE COURT:  -- Oneida or in -- I think the other one

22  was Granite --

23         MR. GOLDSTEIN:  Your Honor, I only got this last

24  night, so I have to confess that I did not read Granite.

25         THE COURT:  I think it weighs --

1        MR. GOLDSTEIN:  I read Oneida and I --

2        THE COURT:  It weighs heavily.

3        MR. GOLDSTEIN:  It weighs heavily, Your Honor.

4        THE COURT:  But I don't think it requires the witness

5   to be excluded.  And I'll certainly hear from any expert that

6   you wish to call today.

7        So, no, I'm not going to exclude the testimony,

8   there's no jury.  You can argue.  It is, by the way, and I

9   don't know if you specialize in bankruptcy law, but it is a

10   pervasive and frequent problem --

11        MR. GOLDSTEIN:  It is, Your Honor, and --

12        THE COURT:  -- in bankruptcy cases.

13        MR. GOLDSTEIN:  It is, Your Honor.  And if I --

14        THE COURT:  And it comes up time and time again.  And

15   perhaps the solution is to exclude transaction fees altogether.

16   But no one else has jumped -- well, the lawyers in the room

17   might jump to that --

18        MR. GOLDSTEIN:  It is amazing, Your Honor --

19        THE COURT:  -- to support that proposition.

20        MR. GOLDSTEIN:  Well, I think there's a different

21   alternative, Your Honor, which I think the debtor practices

22   develop since your comments.  My notes say that case was in

23   1985, if I'm reading it correct.

24        THE COURT:  Oneida?

25        MR. GOLDSTEIN:  Oneida.

1          THE COURT:  No, it's not that long ago.

2          MR. GOLDSTEIN:  It's not that old.

3          THE COURT:  No.  I wasn't even a judge in 1985.  I was

4      still in high school in 1985.

5          MR. GOLDSTEIN:  See, I can't even read my own

6      handwriting.

7          THE COURT:  Maybe it should be 2005.

8          MR. GOLDSTEIN:  2006.

9          THE COURT:  2006.

10         MR. GOLDSTEIN:  2006, yeah, my apologies, Your Honor,

11     I was reading the wrong number.  2006.

12         THE COURT:  That's all right.

13         MR. GOLDSTEIN:  But I think the better policy, Your

14     Honor, is that you don't have your financial consultants being

15     your experts.

16         And if I had the time, Your Honor, I actually think

17     you're not alone on this, I actually think there's a lot of

18     law.  I do practice bankruptcy law, I've been doing it for -- I

19     think you made reference to history or something, and I think I

20     share some of those gray hairs.

21         I think the better practice is, Your Honor, and has

22     become the practice, to not do this.  And I think other

23     courts --

24         THE COURT:  Well, maybe that's for debtors in

25     California that have lots and lots of money to hire multiple

1    experts.

2          MR. GOLDSTEIN:  Perhaps, Your Honor.

3          THE COURT:  It certainly does happen.  So I think I'll

4    rule that you can certainly cross-examine and argue credibility

5    of the expert testimony based on the transaction fee issue.

6    But I don't think it requires that the testimony be excluded.

7    And I don't believe that in Oneida or in Granite Broadcasting,

8    I think was the other case of mine, in which it came up far

9    more seriously, actually, and I don't think I excluded the

10   testimony, but I said that it would weigh against the

11   credibility of the witness.  But there, of course, I was also

12   trying to determine a question of valuation.  And I had

13   conflicting testimony.

14         Yes, counsel.

15         MR. CARR:  Your Honor, as Your Honor may recall in

16   connection with Granite, we had five days of testimony on

17   valuation.  And both financial advisors had a success fee based

18   on valuation.  And that's when Your Honor made that

19   determination.

20         THE COURT:  Well, I'm trying to forget about it as

21   much as I can.

22         MR. GOLDSTEIN:  Your Honor, I'm not disa --

23         THE COURT:  Particularly, the five days of testimony.

24   Please go ahead.

25         MR. GOLDSTEIN:  Thank you, Your Honor.

1          And with respect to the Sperry declaration, Your

2     Honor, I'm not exactly sure what it's being offered as.  If

3     it's being offered as an expert testimony there's no support or

4     qualification with respect to that, as set forth in the

5     declaration on its face.

6          If it's being offered as a fact witness, the

7     declaration says, I believe, I believe, I believe.  There's no

8     foundation, there's nothing in the declaration that indicates

9     that that witness is testifying with respect to personal

10    knowledge about anything.  So I think on the face of it, Your

11    Honor, that declaration should be stricken because it doesn't

12    satisfy either test for being qualified as an expert or to be

13    as a fact witness.

14         THE COURT:  And was there a fourth --

15         MR. GOLDSTEIN:  No, there's not, Your Honor.

16         THE COURT:  Just the three.  Why don't we do this --

17         MR. GOLDSTEIN:  And the ballot agent, Your Honor, I

18    had no problem with it coming in.

19         THE COURT:  Thank you.  Why don't we do this.  With

20    regard to Mr. Sperry's declaration, why don't we hold on that.

21    We are going to take a lunch break at some time.  And

22    consideration can be given to the question whether or not the

23    parties wish to put him on as a live witness to supplement his

24    declaration, or whether his declaration is really, essentially,

25    cumulative, and may not be needed under the circumstances.

1    I've overruled your motion to strike the Grien

2    declaration.  But, certainly, you can enquire and cross-

3    examine.  The same for Mr. Abada.

4    We can take some of the cross now before lunch or it's

5    12:20, we can take a lunch break now, give a chance for the

6    parties to, perhaps, clarify where we are, and then proceed

7    with any necessary testimony right after lunch.

8    What is your pleasure?  Mr. Fox?

9    MR. FOX:  I would probably think it's probably an

10   appropriate time to break.  This way people can gather their

11   thoughts and come back 1 o'clock and start.  But if Mr.

12   Goldstein wants to start, I wouldn't have any objection.

13   MR. GOLDSTEIN:  I don't have any objection to a break

14   now, Your Honor.

15   THE COURT:  Well, let's take a break and come back at

16   1:15, allowing the parties a little more time for lunch.  1:15

17   usually means 1:30.  If I say 1:30 we'll start at 1:45.  If I

18   say 1:15, we'll probably start at 1:30 and the parties will

19   have a chance to get some lunch.

20   Anything else we can profitably do before lunch?

21   MR. FOX:  The only thing I'd like to do, Your Honor,

22   if you'd like, and I can do this again at the start of 1:15

23   since Mr. Goldstein commented a few things, I think that

24   there's a -- just in terms of putting forth certain

25   misunderstandings that we have on the record about the --

1        THE COURT:  All right, anything that can be clarified

2   in terms of narrowing the issues, going down the list on

3   page -- without presuming any decision at all, but at least

4   trying to narrow those issues on page 23 -- 22 and 23, that

5   would be helpful.  Anything we can do to narrow issues, it

6   seems to me is helpful.

7        No matter what my ruling is today, as I've said

8   before, if the debtor continues in business and Ashley

9   continues as a supplier, the best of business relations between

10  the parties is going to include everyone's opportunity, both

11  Ashley and the reorganized debtors.  So I think we should do

12  whatever we can today to resolve issues, if possible.  And I

13  know a lot has been done in that regard, and the remaining

14  issues I'm not suggesting are solvable by anybody except the

15  Court ruling.  However, if they can be narrowed that's always

16  beneficial to all the parties.

17        MR. FOX:  I would like that opportunity, and I think I

18  could discuss it.

19        This past weekend there was an important trade show

20  that Ashley was attending, probably had a big tremendous booth.

21  And I know for a fact, or at least I don't think it's a

22  question, that not only did Mr. Abada meet with Todd Womick

23  (ph.); the president of Ashley, as did Tom Disveri (ph.),

24  represent the plan sponsor.  So there are continuing dialogues.

25        I think what Mr. Goldstein's arguments, really, are

1   just objective financial, you know, concerns, which I think are

2   addressed in our declarations.  I'm happy to let him explore a

3   little further on cross of Mr. Abada or Mr. Grien.  That should

4   ameliorate the issues on -- you know, the 800,000 dollars of

5   other creditors.

6          I don't want to confuse people more, but I can tell

7   you there are six landlords listed in those, have all signed

8   these modification agreements, one of them is in court today,

9   represented by Ms. Pollack.

10         The other creditors in total represent less than

11  120,000 dollars.  Four of those -- when I mentioned to Your

12  Honor before that four of those Hartsdale creditors voted none

13  of them were landlords.  They were all -- I can go to them,

14  they weren't material.  But they were solicited and I'm not

15  double counting a landlord who had a lease modification.  So

16  we're not really talking about a lot.

17         Ashley will be -- there'll be sufficient money put in

18  escrow to cure whatever amount that is --

19         THE COURT:  Well, I see in your papers that you've

20  agreed to a separate Ashley bank account, 100,000 dollars.

21  They seem to want to some additional protection, vis-a-vis,

22  Ashley deposits.  I don't have to -- I'm not going to get in

23  the middle of any of these issues.

24         Let me simply say we'll resume at 1:30.  And if you

25  would like a little more time to explore and, perhaps, narrow

1  the issues, we can resume at 1:45 or 2 o'clock.

2          MR. FOX:  Well, I --

3          THE COURT:  But we don't necessarily have to.

4          MR. FOX:  Well, I'm sure -- if I may have a comment, I

5  would like to take as much time as -- maybe 1:40 -- 1:15 or

6  1:30 is probably better, because I'd like to discuss --

7          THE COURT:  Well, we'll say, certainly, we're now at

8  12:30.  We won't start again before 1:30, which probably means

9  1:45.  So the parties can get lunch, they can bring lunch in if

10  they want.  You may have to eradiate it on the way in, but I

11  can also try to ask the guards to let you have your lunch.

12          MR. GOLDSTEIN:  Your Honor, if I may, I have one

13  question of scheduling.

14          THE COURT:  Yes.

15          MR. GOLDSTEIN:  Just to have a sense of timing, if

16  discussions go or don't go, what the Court's calendar is in

17  terms of what -- how long we're going today, or we're not

18  going -- yeah, I just --

19          THE COURT:  I can go -- if we can get a reporter I can

20  go today till about 7.  Not -- quarter to 7, not much beyond

21  that.

22          MR. FOX:  There's one other thing, Mr. Goldstein.  You

23  should check the dial --

24          THE COURT:  However, if we get everything done early

25  you can get on a plane to California, you could get out of the

1    snow which is coming tomorrow.

2         MR. FOX:  Only other thing on the record that was not

3    completed is there has been a security agreement filed for the

4    exit facility.  I don't know why you didn't pick it up, or it

5    wasn't served.  I can give you a copy when this court is --

6    when we adjourn.  It's there.

7         THE COURT:  I'm sure that type of -- those issues, the

8    details of the documentation can be looked at.

9         Mr. Neiger.

10        MR. NEIGER:  Oh, I was just going to say -- make one

11   more clarification with respect to the tranche E note.

12        Hartsdale is only an obligor to the extent of the

13   value of its inventory it receives from Ashley, it's not an

14   obligor on the entire tranche E note.  So I just wanted to make

15   that clear.  Thank you.

16        THE COURT:  All right.  Well, perhaps, we'll clarify.

17        MR. CARR:  Your Honor, in connection with Mr.

18   Goldstein's arguments, I just -- I wanted clarification so that

19   I can prepare adequately to respond to those arguments.  Mr.

20   Goldstein said a lot of things in connection with his opening

21   statement going through the agreement.

22        But the one issue that I'm still not clear on, is it

23   Ashley's position that paragraph 4, specifically, the fourth

24   paragraph of paragraph 4, that the debtors are unable to assume

25   this agreement because all of the creditors in Hartsdale are

1    not getting paid in full?  I was very unclear on that.

2              THE COURT:  Well, why don't I take that up --

3              MR. CARR:  I thought he said yes initially and then

4    said no.

5              THE COURT:  -- when we resume.  If that's not

6    clarified -- I think we have a record --

7              MR. CARR:  Or is it going forward?

8              THE COURT:  -- on that.  I'm not sure entirely but it

9    is --

10             MR. GOLDSTEIN:  I'm happy to clarify --

11             THE COURT:  You were stating -- yes.

12             MR. GOLDSTEIN:  I'm happy to clarify it if the Court

13   wants me to or we can defer.

14             THE COURT:  All right, you can state your position on

15   it.

16             MR. GOLDSTEIN:  Yes.  As a technical read of the

17   document, your Honor, and application of 365, our legal

18   position and argument, Your Honor, will be that the vendors

19   have to be paid in full in order to satisfy that provision in

20   paragraph 4.  And that's a condition to cure.

21             We believe, Your Honor, that that's a benefit that

22   runs only to Ashley.  Their vendors cannot stand up and make

23   that argument as third party beneficiaries.  And Ashley can

24   clearly waive that condition.  And, therefore, Your Honor, when

25   I was going through paragraph 22, and we were talking about

1  paragraph 4, I was very clear to say in that paragraph we were

2  not saying you have to pay vendors, because I assume that the

3  Court had rejected that argument.

4       So I wanted to make it very clear, Your Honor, that

5  we're not sitting here trying to hold up this case if we can

6  otherwise resolve issues on that issue.

7       But as a legal technical matter, yes, Mr. Carr, we

8  believe that in order to assume those TUAs over our objection

9  those vendors have to be paid.

10      THE COURT:  But you can't tell me, as you stand here

11  today, what you're talking about with any specificity.

12      MR. GOLDSTEIN:  Well, I can tell you, Your Honor, that

13  the vendors on schedule of assets and liabilities, that's a

14  million-six, that's a start.  And I think what I heard Mr. Fox

15  say is well, there's some landlords on that list and there all

16  being taken care of.  And if they are then that's not an issue.

17  But there are also other vendors on that list who are not being

18  paid in full.  He suggests that that amount is a non-material

19  amount.  I think he said maybe a couple of 100,000 dollars.

20      If it is maybe it's not as big an issue as perhaps we

21  thought it was.

22      THE COURT:  All right.  I think we've gone as far as

23  we can --

24      MR. GOLDSTEIN:  But that's I think as far as I can,

25  Your Honor.

 1          THE COURT:  -- for now.

 2          MR. CARR:  He clarified it for my purposes, Your

 3    Honor.  Thank you.

 4          THE COURT:  All right, thank you.

 5          All right, we'll take a break.

 6          You have a question?

 7          MR. NEIGER:  May I, Your Honor, just to say one more

 8    clarification on the record.

 9          The Hartsdale inventory does not serve as collateral

10    on the LC portion of the exit facility.  And that's a very

11    important point to make.

12          MR. GOLDSTEIN:  I'm sorry, could you please repeat

13    that, counsel?

14          MR. NEIGER:  Yes.  The Hartsdale inventory --

15          MR. GOLDSTEIN:  Yes.

16          MR. NEIGER:  -- is not collateral on the LC portion of

17    the exit facility.

18          Your Honor, we've done everything we can to try to

19    remove the risks that they raise with respect to

20    collateralization amount and obligations.

21          THE COURT:  All right.  I'll hear testimony on that

22    point, if necessary.

23          MR. GOLDSTEIN:  Yeah.  And I'm happy to look at those

24    documents and be clarified, if that's the case.

25          MR. FOX:  Judge, can we leave our papers here?

1          THE COURT:  Leave all the papers just where they are.

2     We'll lock the door.

3          The first person back, if the door is locked come to

4     chambers, which is on the fifth floor, and we'll open the door

5     for you.

6          MR. FOX:  Thank you, Your Honor.

7          THE COURT:  Thank you.

8     (Recess from 12:32 p.m. until 1:51 p.m.)

9          THE COURT:  All right.  Please be seated.  We're back

10    on the record in Jennifer Convertibles.  Where are we?

11         MR. FOX:  Well, Your Honor, I think we're at the --

12    unfortunately, the same place where we are where we left off

13    and there are just -- we would just wish to point out is we

14    have had some discussions.  I think we're in agreement to agree

15    that the -- on the who's an obligor and who's not and what

16    security is or isn't going to be given on the A, B, C, D, E,

17    and exit facility.  Mr. Goldsmith (sic) -- recently we were

18    pointing out that it's clear that on the A, B, C and D that

19    Hartsdale will not be a grantor or an obligor, on the E note it

20    will be an obligor -- and I'm going to get it wrong so --

21         MS. NADRITCH:  Let me just clarify, Your Honor.  With

22    respect to the exit facility, there's two parts.  There's an E

23    note and there's a LoC facility.  The LoC facility is a letter

24    of credit facility in the amount between three to five million

25    that will act as a backstop to credit card processors upon

1  emergence of bankruptcy.  On that LoC facility, Hartsdale

2  Convertibles is an obligor but none of its assets are being

3  encumbered or pledged, you know, as collateral to any -- to, I

4  guess, the credit card processors -- or to Mengnu rather, under

5  that facility.

6          The second part of the exit agreement is the tranche E

7  Note.  Under the tranche E note, the only assets of Hartsdale

8  that are being encumbered is inventory to be purchased from

9  Ashley.  As you know, Hart -- E facility, Your Honor, is a

10  working capital facility, a large portion of which is to fund

11  the COD payments of inventory from Ashley.

12          THE COURT:  And Ashley is being paid cash on delivery,

13  right?

14          MS. NADRITCH:  Correct, Your Honor.  So under that

15  facility, the only assets of Hartsdale being encumbered is the

16  inventory to be purchased from Ashley which is the money being

17  used to fund that.

18          MR. FOX:  Thank you to Ms. Nadritch.  And then the

19  final point of where we just don't have any clarity, is on

20  paragraph 4, Your Honor, where we're not sure that it had --

21  Ashley had taken a position almost like it's an ipso facto

22  clause that we have to pay all obligations on pre-petition

23  claims regardless of a plan that may find that contrary.  I

24  think that's a legal argument that we'll reserve for later.  If

25  it's just on prospective basis then it's a feasibility issue

1    and certainly the testimony of the affidavit -- the

2    declarations that we have in address that and we would turn

3    over that -- Mr. Abada's the first witness -- for Ashley to

4    cross.

5             THE COURT:  All right.

6             MR. GOLDSTEIN:  Your Honor, we're ready to start with

7    cross-examination so --

8             THE COURT:  All right.

9             MR. GOLDSTEIN:  We'd ask Mr. Abada to take the stand.

10            THE COURT:  All right.  Mr. Abada?

11            THE CLERK:  Please state your name for the record.

12            THE WITNESS:  Rami Abada.

13        (Witness sworn)

14            THE CLERK:  Please take a seat.

15            THE COURT:  All right.  We will accept then Mr.

16   Abada's declaration as his direct testimony and any party who

17   wishes may cross-examine and then if we need any redirect,

18   we'll have an opportunity to redirect.

19            MR. FLEMING:  Your Honor, we'd also like to move in

20   the exhibits to Mr. Abada's declaration into evidence.

21            THE COURT:  Any objection?

22            MR. GOLDSTEIN:  Your Honor, could I reserve on that

23   until the conclusion?

24            THE COURT:  Well --

25            MR. GOLDSTEIN:  I'd like to have the opportunity to

1    review those again and they came in late and I read this

2    declaration several times but I don't think I'm going to have

3    an objection to the exhibits but I'd like to have the

4    opportunity to look at them.

5          THE COURT:  Well, we'll look at them again then.

6          MR. GOLDSTEIN:  Thank you, Your Honor.  Your Honor, as

7    a housekeeping matter, if I may procedurally -- in preparation

8    and connection with their examination, we have binders of

9    documents that we may be referring to and a set for the witness

10   and a set for Your Honor, if we may approach?

11         THE COURT:  You can give the witness a set, if you

12   wish.

13         MR. GOLDSTEIN:  We have given sets to counsel as well,

14   Your Honor.  Since I'll be referring to them, can we approach

15   and give Your Honor a set as well?

16         THE COURT:  All right.

17         MR. GOLDSTEIN:  Thank you, Your Honor.

18         THE COURT:  I'm not sure where you should put them

19   either.

20         MR. GOLDSTEIN:  If I may proceed, Your Honor?

21         THE COURT:  Go ahead.

22   CROSS-EXAMINATION

23   BY MR. GOLDSTEIN:

24   Q.   Good afternoon, Mr. Abada.

25   A.   Good afternoon.

1  Q.   Just to remind you, my name is Michael Goldstein.  I'm

2  with Greenberg Traurig.  I represent Ashley HomeStores and

3  Ashley Furniture.  Before I begin examination, just a few terms

4  I'd just like to get straight on the record so when I ask

5  questions, you understand the terms I'm referring to and when

6  you respond to my questions, hopefully you'll keep those in

7  mind, okay?

8  A.   Sure.

9  Q.   These terms should be familiar to you since we talked

10 about them in the deposition.

11          THE COURT:  Why don't you get on with the examination?

12          MR. GOLDSTEIN:  Yes, Your Honor.

13          THE COURT:  If you want to ask him terms, if you want

14 to set out terms, go ahead but get on with it.

15 Q.   Mr. Abada, did Hartsdale have cash on hand on the petition

16 date?

17 A.   Yes.

18 Q.   That -- how much cash did Hartsdale have on the petition

19 date?

20 A.   I don't recall the amount.

21 Q.   That amount was not reflected on Hartsdale's schedules,

22 was it?

23 A.   Correct.

24 Q.   Does an amount of appropriately 780,000 dollars sound

25 about right to you; the amount that Hartsdale had in cash on

1  the petition date?

2  A.  It's conceivable.  I don't recall the number but it's

3  conceivable.

4  Q.  If I showed you the monthly corporate operating report

5  that the debtor filed in this case and it showed the amount in

6  the Ashley concentration account 780,000 dollars, would that

7  refresh your recollection?

8  A.  Yes.

9        MR. GOLDSTEIN:  Your Honor, the corporate monthly

10  operating report for the period July 18th 2010 to August 31,

11  2010, dated September 24, 2010 is docket number 29 in this

12  case.  I would ask that the Court have the record reflect that

13  that document was filed by the debtor and it shows, for the

14  Ashley concentration account, an amount on July 18th, 2010,

15  approximately 780,000 dollars.

16        THE COURT:  All right.  We'll take that subject to

17  check.  I can take judicial notice of that document.

18        MR. GOLDSTEIN:  That document, Your Honor --

19        THE COURT:  Go on.

20        MR. GOLDSTEIN:  -- for purposes is binder -- is number

21  14 in the binders -- the trial exhibits.

22  Q.  Mr. Abada, all receipts from the Ashley segment are

23  deposited to the Ashley concentration account, correct?

24  A.  Yes.

25  Q.  And money in the Ashley concentration account is used to

1   pay certain expenses of the Ashley segment but not all of them,

2   correct?

3   A.   That's correct.

4   Q.   The Ashley segment expenses paid from the Ashley

5   concentration account include payments to Ashley for

6   merchandise, correct?

7   A.   That's correct.

8   Q.   And the Ashley segment expenses paid from the Ashley

9   concentration account includes payments to customers for

10  refunds, correct?

11  A.   Correct.

12  Q.   And the Ashley segment expenses paid from the Ashley

13  concentration account include payments to landlords, correct?

14  A.   Not correct.

15  Q.   No landlords are paid from the Ashley concentration

16  account?

17  A.   They're not paid from the concentration account, no.

18  Q.   The Ashley segment expenses paid from the Ashley

19  concentration account includes payments to credit card

20  companies, correct?

21  A.   Fees.  The fees to the credit card companies.

22  Q.   Credit card fees?

23  A.   Yes.

24  Q.   The Ashley segment expenses paid from the Ashley

25  concentration account do not include payments for rent then,

1  correct?

2  A.   Correct.

3  Q.   And the Ashley segment expenses paid from the Ashley

4  concentration account do not include payments for utilities,

5  correct?

6  A.   Correct.

7  Q.   And Ashley segment expenses paid from the -- that are not

8  paid from the Ashley concentration account would include

9  expenses for insurance, correct?

10  A.   Correct.

11  Q.   Okay.  And the Ashley expenses that are not paid from the

12  Ashley concentration account would include payments for

13  employees, correct, at the corporate senior executive

14  management level, correct?

15  A.   Correct.

16  Q.   Can from the Ashley concentration account, after payment

17  of the Ashley segment expenses from that account is transferred

18  to the Jennifer concentration account, correct?

19  A.   Correct.

20  Q.   And from the Jennifer concentration account, expenses of

21  the Ashley segment are paid, right?

22  A.   Correct.

23  Q.   And the Ashley segment expenses paid from the Jennifer

24  concentration account include rent, is that correct?

25  A.   Yes.

1   Q.   And Ashley segment expenses paid from the Jennifer

2   concentration account include utilities?

3   A.   Correct.

4   Q.   And Ashley segment expenses paid from the Jennifer

5   concentration account includes advertising, correct?

6   A.   Yes.

7   Q.   And Ashley expenses paid from the Jennifer concentration

8   account include insurance, correct?

9   A.   Correct.

10   Q.   And Ashley segment expenses paid from the Jennifer

11   concentration account include employees?

12   A.   Correct.

13   Q.   As a result, Mr. Abada, of the transfers of cash from the

14   Ashley concentration account to the Jennifer concentration

15   account, that creates an account receivable from Jennifer in

16   favor of Hartsdale, doesn't it?

17   A.   Correct.

18   Q.   And, Mr. Abada, if you thought about the --

19   A.   I'm sorry; can you repeat that question again?

20   Q.   Okay.

21   A.   The one I just answered.  Say it again.

22   Q.   Absolutely.

23   A.   I'm sorry.

24   Q.   The transfers from the Hartsdale -- excuse me.  the

25   transfers from the Ashley concentration account to the Jennifer

1  concentration account results in an account receivable from

2  Jennifer in favor of Hartsdale, correct?

3  A.   Correct, yes.

4  Q.   And if one was to do an accounting of the total transfers

5  from the Ashley concentration account to the Jennifer

6  concentration account, that would result in the net receivable

7  in favor of Hartsdale from Jennifer, correct?

8  A.   Correct.

9  Q.   And when I asked you in your deposition what that dollar

10  amount was, you don't know -- you answered you don't know, is

11  that correct?

12  A.   The dollar amount?  No, I didn't know.

13  Q.   All right.  And as you sit here today, you still don't

14  know what that dollar amount is, correct?

15  A.   We could look it up but I don't know off the top of my

16  head, no.

17  Q.   And you say you look it up, is there actually a schedule

18  that you would look to that has been prepared that actually

19  calculates the total receivable from Jennifer in favor of

20  Hartsdale?

21  A.   We have a balance sheet that has a due to and due from.

22  Q.   And it's on that balance sheet?

23  A.   Yes.

24  Q.   And when was that balance sheet dated?

25  A.   The most recent one, I believe, was first quarter or

1    fiscal 2011.

2    Q.    And that balance sheet of first quarter of 2011 was not --

3    has not been provided to Ashley, has it?  Yes or no?

4    A.    No.

5    Q.    Mr. Abada, it's the debtors' custom and practice to

6    maintain a balance in the Ashley concentration account, isn't

7    it?

8    A.    Yes.

9    Q.    And historically or --

10            MR. GOLDSTEIN:  Strike that, Your Honor.

11   Q.    In July -- the period of July to August 2010, that average

12   balance was in the neighborhood of 500,000 dollars, wasn't it?

13   A.    July to August 2010, I wouldn't know -- I wouldn't recall

14   exactly.

15   Q.    Does that sound about right what that average balance is?

16   Do you have a recollection of that?

17   A.    No.

18   Q.    Mr. Abada, do you know what the average balance in the

19   Ashley concentration account would have been back in June -- in

20   the period June 18th to August 18th, 2010?

21   A.    No.

22            MR. GOLDSTEIN:  Your Honor, for the record, I would

23   just note, again, that the debtors' corporate monthly operating

24   for the period July 18th, 2010 to August 31, 2010, which is

25   docket number 29, Exhibit 14 in our trial book, shows for the

1    Ashley concentration account a ledger balance with a low of

2    767,000 dollars and a high of a million-five.

3    Q.   Mr. Abada, those numbers are substantially higher than

4    100,000 dollars, aren't they?

5         MR. FLEMING:  I'm sorry; I couldn't get the last

6    question.

7    Q.   Mr. Abada, those numbers I just stated are substantially

8    higher than 100,000 --

9    A.   Yes.

10   Q.   -- dollars, aren't they?  And the answer was?

11   A.   Yes.  Yes.

12   Q.   Yes.  Mr. Abada, I assume it's correct that you wouldn't

13   know what the average balance in the Ashley concentration

14   account would be for the period October 30, 2010 through

15   November 26, 2010.

16   A.   Don't recall.

17        MR. GOLDSTEIN:  And Your Honor, just again, for the

18   record -- I'm trying to be efficient here -- the corporate

19   monthly operating report dated January 6, 2011, docket number

20   421, trial Exhibit number 15, shows for the Ashley

21   concentration account daily ledger balances that range from a

22   low of 410,000 dollars to a high of 1,170,000 dollars.

23        MR. FLEMING:  Your Honor, to the extent Mr. Goldstein

24   wants to put in these financial things, he doesn't need to

25   cross-examine Mr. Abada.  These are, you know, records of

1    court.

2            THE COURT:  It's all right.  Let him do it his own

3    way.  What month though?  Just tell me again.  Now was that

4    November-December -- the month of November?

5            MR. GOLDSTEIN:  That was October 30th, 2010 to

6    November 26th, 2010, Your Honor.

7            THE COURT:  Appropriately November, 2010.

8            MR. GOLDSTEIN:  Yes, Your Honor.  And that was the

9    last corporate monthly operating report filed.

10           THE COURT:  All right.

11   BY MR. GOLDSTEIN:

12   Q.   Mr. Abada, the schedule of assets and liabilities filed

13   for Hartsdale in this case does not show an account receivable

14   from Jennifer to Hartsdale, does it?

15   A.   Correct.

16           MR. GOLDSTEIN:  Can I just have a moment, Your Honor?

17   I have to get a document.

18           THE COURT:  Certainly.

19       (Pause)

20           MR. GOLDSTEIN:  Your Honor, I just have a few

21   questions I want to ask the witness about paragraph -- well,

22   it's the conclusion, page 22 in our objection.  A copy of

23   that's not in the binder but I have a copy here if I may

24   approach?

25           THE COURT:  If you think it would be helpful to give

1    him a copy of that -- if there's any objection I can hear it.

2          MR. FLEMING:  No objection, Your Honor.

3          THE COURT:  All right.

4          MR. GOLDSTEIN:  Thank you.  Your Honor, I have an

5    extra copy but I -- if you -- I assume you probably have one

6    there.

7          THE COURT:  No, I have one.

8    Q.   Mr. Abada, if you would, I've handed you a copy of

9    objection of Ashley HomeStores Ltd. and Ashley Furniture

10   Industries, Inc., to confirmation of debtors' amended joint

11   plan -- joint Chapter 11 plan of reorganization for Jennifer

12   Convertibles, Inc. and its affiliated debtors.  If you would,

13   turn to page 22 of that document, please.

14   A.   Okay.

15   Q.   In particular, Mr. Abada, turn your attention to the

16   seventh line where it starts -- towards the end of the line

17   where it says (x) and the language after that says comply with

18   the reporting, do you see that?

19   A.   Yes.

20   Q.   Okay.  If you would just take a moment and just read

21   subpart x if you will?  And let me know when you're finished.

22          (Pause)

23   A.   Okay.

24   Q.   Mr. Abada, with that clause (x) in mind, on a go forward

25   basis, can Hartsdale provide Ashley with historical, current

1    and ongoing annual and quarterly income statements, balance

2    sheets and cash flow statements in accordance with generally

3    accepted accounting principles?

4    A.    Yes.

5    Q.    And Mr. Abada, I want to make sure that you understand

6    that that would include the accounting of intercompany

7    transactions and allocations, you understand that?

8    A.    Yes.

9    Q.    And Hartsdale can do that on a go forward basis?

10   A.    Yes.

11   Q.    And it's Hartsdale's intention to do that on a go forward

12   basis if it has the ability to assume the TUAs?

13   A.    It's our intention to comply with the TUA.

14   Q.    And you understand the TUA's reference to the trademark

15   usage agreements --

16   A.    Yes.

17   Q.    -- that's the subject of the debtors' assumption motion?

18   A.    Yes.

19   Q.    Thank you.  Mr. Abada, id the debtors -- can the debtors

20   on a go forward basis provide historical, current and on going

21   annual and quarterly store level four-wall income statements,

22   balance sheets and cash flow statements for the Ashley stores?

23   A.    Yes.

24   Q.    And is it the debtors' intention, if it can assume the

25   TUAs to provide historical, current on ongoing annual and

1   quarterly store level four-wall income statements, balance

2   sheets and cash flow statements?

3   A.   Yes.

4   Q.   Mr. Abada, historically, the debtors have not prepared for

5   Hartsdale income statements, balance sheets or cash flow

6   statements that included a full accounting of intercompany

7   transactions, isn't that correct?

8   A.   To the best of my knowledge, we were requested to provide

9   fiscal year-end numbers for Hartsdale, Inc. for the first time

10   in last 2009 and that's when we provided Ashley, your client,

11   with 2008 and 2009's financial information.

12         MR. GOLDSTEIN:  Okay.  Your Honor, I would ask that --

13   it was non-responsive.  The testimony doesn't have to be

14   stricken, it can stand, but I have to ask the question again.

15   Q.   Mr. Abada, I didn't ask you what Ashley requested.  I

16   asked you about Ashley's historical activities.  My question to

17   you has -- excuse me; Hartsdale historical activities.  My

18   question is had Hartsdale historically prepared income

19   statements, balance sheets and financial statements --

20         MR. GOLDSTEIN:  Strike that, Your Honor.

21   Q.   Mr. Abada, isn't it true that historically, Hartsdale has

22   not prepared income statements, balance sheets and cash flow

23   statements that included a full accounting of all intercompany

24   allocations?  Is that correct?

25   A.   That's correct.

1       (Pause)

2           MR. GOLDSTEIN:  Your Honor, if we may approach the

3   witness, I want to put in front of the witness a copy of one of

4   the TUAs.

5           THE COURT:  Go ahead.

6           MR. GOLDSTEIN:  Thank you, Your Honor.

7           THE COURT:  Thank you.

8   Q.   Mr. Abada, you're familiar with the TUAs.

9   A.   Yes.

10  Q.   Right.  And you've -- you've reviewed them in the past,

11  correct?

12  A.   Correct.

13  Q.   Okay.  We've handed you a copy of one of the TUAs.  If you

14  would turn to page 24, please -- I'm sorry; paragraph 24.  It's

15  the report section.  It's on page 7 of the TUA itself.

16          MR. FLEMING:  Could you just identify which of the

17  date the TUA is and who that parties are?  I mean, the locale?

18          MR. GOLDSTEIN:  It's -- the TUA that we're looking at

19  is the one for Carle Place, 168 Glen Cove Road, Carle Place.

20  It's the same one that we looked at earlier.

21          MR. FLEMING:  Okay.  Thank you.

22          MR. GOLDSTEIN:  Absolutely.  Thanks for the

23  clarification.

24  Q.   Mr. Abada, you have, in front of you, page 7 of that TUA,

25  paragraph 24?

1    A.   Yes, I do.

2    Q.   Mr. Abada, I want to turn your attention to the first

3    sentence of paragraph 24.  Nowhere in that first sentence on

4    paragraph 24 on page 7 is there the word request, is there?

5    A.   That's correct.

6    Q.   In fact, that first sentence says that licensor will

7    submit to licensor quarterly financial reports, correct?

8    A.   That's correct.

9    Q.   And I want to turn your attention to the second sentence

10   in that paragraph.  Do you have that in front of you?

11   A.   Yes.  Yes.

12   Q.   And in that second sentence, nowhere will you find the

13   word request, will you?

14   A.   No.

15   Q.   No.  In fact, that sentence requires the licensee to

16   provide annual financial statements, doesn't it?

17   A.   Correct.

18   Q.   And those statements are supposed to be in accordance with

19   generally accepted accounting principles, correct?

20   A.   Correct.

21   Q.   And it's true -- it is the case --

22        MR. GOLDSTEIN:  Strike that.

23   Q.   Is it a fact, Mr. Abada, that generally accepted

24   accounting principles would require a full accounting of

25   intercompany transactions and overhead allocations?

1      MR. FLEMING:  Objection, Your Honor; I'm not sure this

2   witness is qualified to be an expert on what general accounting

3   principles require.

4      MR. GOLDSTEIN:  Your Honor, this witness comes before

5   you with his declaration that says he is the president, the

6   CFO, the CEO.

7      THE COURT:  If the witness can answer the question, he

8   can answer it; if he doesn't know, he can say he doesn't know.

9      MR. GOLDSTEIN:  Thank you, Your Honor.

10  A.   Can you ask the question again, please?

11  Q.   Mr. Abada, isn't it correct that financial statement

12  prepared in accordance with generally accepted accounting

13  principles would require and accounting of intercompany

14  transactions and an allocation of corporate overhead?

15  A.   I believe yes.

16  Q.   Mr. Abada, you, in your testimony previously, referred to

17  financial statements that were prepared -- dated as of August

18  '09 and were provided to Ashley.  Do you recall that testimony?

19  A.   Yes.

20  Q.   Do you have those financial statements generally in mind

21  or would it be helpful to refresh your recollection; I can show

22  you a copy of them.

23  A.   It would be helpful to see a copy of it.

24  Q.   Mr. Abada, in front of you we've provided some trial

25  binders.  If you could turn to Tab 22, please.

1    A.   Okay.

2    Q.   You got hat in front of you, Mr. Abada?

3    A.   Yes.

4    Q.   Okay, if you would specifically direct your attention to

5    the document marked AH-001 through AH-005.  That's part of Tab

6    22 in the Ashley trial exhibits.

7    A.   Okay.

8    Q.   Mr. Abada, were these the financial statements that you

9    had in mind when you testified earlier that financial

10    statements were provided to Ashley on or about -- with respect

11    to August 2009?

12    A.   Yes.

13    Q.   Mr. Abada, were these statements prepared by an outside

14    accountant?

15    A.   No.

16    Q.   Were they reviewed by an outside accountant?

17    A.   Yes.  I believe yes.

18    Q.   Is there any indication on those documents that they were

19    reviewed and signed off by an outside accountant?

20    A.   No.

21    Q.   Were these documents prepared in accordance with generally

22    accepted accounting principles?

23    A.   Yes.

24    Q.   Mr. Abada, similar financial statements were not provided

25    to Ashley for the fiscal year end August 2010, were they?

1    A.    They were not pr -- no.

2    Q.    Mr. Abada, you're -- continuing looking at the documents

3    behind Tab 22, specifically AH-001, under August 29, '09

4    column, there's an amount 1,151,827 dollars, do you see that?

5    A.    Yes.

6    Q.    And that amount it shows "due from company," is that

7    correct?

8    A.    Yes.

9    Q.    And that's receivable from Jennifer Convertibles, correct?

10    A.    Yes.

11    Q.    For the period from the petition date until today or the

12    end of the December 2010 monthly period, do you know what the

13    due from Jennifer Convertibles is to Hartsdale?

14    A.    No, I don't.

15    Q.    No, you don't.

16    A.    No, I would need to see --

17    Q.    Has that amount been specifically put on a schedule that

18    you've seen?

19    A.    As I said earlier, we have a first quarter P&L -- internal

20    P&L.

21    Q.    Is that first quarter P&L break out pre-petition and post-

22    petition transactions?

23    A.    It's an up-to-date balance sheet.

24    Q.    So the answer is no.  Or you don't know?

25    A.    It's up to -- I don't know.  It's an up-to-date balance

1   sheet.

2   Q.   Mr. Abada, if you would turn to the document that's marked

3   Tab 17 in the binders.  It's the debtors amended disclosure

4   statement.  Document number 398 for the record.

5   A.   I have it.

6   Q.   Do you have that document in front of you?

7   A.   Yes.

8   Q.   If you would turn to page 48 of that document.  Do you

9   have that in front of you?

10  A.   Yes.

11  Q.   Page 48?  Okay.  Specifically, draw your attention to

12  subparagraph (b).  It says the basis for substantive

13  consolidation in the Chapter 11 cases.  Do you see that

14  section?

15  A.   Yes, I do.

16  Q.   Okay.  And specifically I want to refer your attention to

17  the next to last sentence.  It's about five sentences up from

18  the bottom.  It says separate entity plans.  Do you see that

19  sentence?

20  A.   Yes.

21  Q.   Okay.  If you would just take a moment and read that

22  sentence to yourself.

23  A.   Okay.

24       (Pause)

25  Q.   Have you had a chance to read that one sentence, Mr.

1   Abada?

2   A.   Yes.

3   Q.   Mr. Abada, isn't it correct that when you -- let me step

4   back.  Mr. Abada, you signed this disclosure statement,

5   correct?

6   A.   Yes.

7   Q.   And you reviewed this disclosure statement before it was

8   filed, correct?

9   A.   Several times, yes.

10  Q.   And you believe the statements set forth in this

11  disclosure statement are true and correct?

12  A.   Yes.

13  Q.   Yes.  Thank you.  Mr. Abada, when you -- turning back --

14  turning your attention to page 48, subpa -- paragraph (b) that

15  we looked at, when you used the word impossible in that

16  sentence, you meant that you couldn't calculate to the penny,

17  correct?

18  A.   That's correct.

19  Q.   That you couldn't get it perfect, correct?

20  A.   Correct.

21  Q.   That assumptions would have to be made, correct?

22  A.   That's correct.

23  Q.   And when you used the word difficult, that mean time and

24  resources had to be undertaken to do the calculations, correct?

25  A.   Yes.

1    Q.   In fact, in August of 2009, that undertaking was done,

2    wasn't it?

3    A.   Yes.  Slightly different.  We only had two stores at that

4    time versus the six now.

5    Q.   But it was done, nonetheless?

6    A.   Yes.

7    Q.   And in fact, on a go forward basis, the allocations

8    referred to in that sentence can be done, correct?

9    A.   Allocations could be done.

10        (Pause)

11   Q.   But Mr. Abada, does -- when you prepared the schedule on

12   assets and liabilities for Hartsdale, those allocations were

13   not done, correct?

14   A.   When we prepared -- you're talking about the SOFA filing?

15   Q.   Yes, correct.

16   A.   That's correct.

17   Q.   And that's why -- and so, for example, the SOFA filing for

18   Hartsdale don't show a receivable from Jennifer to Hartsdale,,

19   right?

20   A.   Let me correct myself.  We did not put all the assets on

21   the SOFA filing for Hartsdale Convertible, Inc. --

22   Q.   Thank you.

23   A.   -- under the -- well,

24   Q.   Go ahead.  I'm sorry.  I apologize.  I didn't mean to cut

25   you off.

1    A.   Discussing it with our advisor and our counsel, it was

2    much more -- it was deemed as a much more efficient way of

3    making the filing was to put -- consolidate.

4    Q.   So for efficiency purposes, you provided incomplete

5    information, is that your testimony?

6    A.   My testimony would be that I followed the direction of a

7    counsel in putting the filings together.

8    Q.   So you're blaming counsel for providing incomplete

9    information?

10   A.   I don't --

11        MR. FLEMING:  Objection, Your Honor.

12        MR. GOLDSTEIN:  Withdrawn.

13        THE COURT:  Sustained.

14        MR. GOLDSTEIN:  Withdrawn.

15   Q.   The debtors' disclosure statement includes a liquidation

16   analysis, is that correct?

17   A.   Yes.

18   Q.   And that liquidation analysis is done on a consolidated

19   basis, correct?

20   A.   Yes.

21   Q.   The debtor has not provided, in its disclosure statement,

22   a liquidation analysis for each individual debtor, has it?

23   A.   That's correct.

24   Q.   In fact, there is no liquidation for each individual

25   debtor that has yet been filed in these cases, is that correct?

1  A.  Not that I'm aware of.

2  Q.  Have you done a liquidation analysis for Hartsdale?

3  A.  Me, personally?  No.

4  Q.  Has anybody for the debtors prepared a liquidation

5  analysis for Hartsdale?

6  A.  No.

7  Q.  Isn't it correct that Hartsdale did not file bankruptcy

8  because it has any business or liquidity issues?

9  A.  Hartsdale is part of JCI company --

10  Q.  Mr. Abada, during your deposition I asked you if there was

11  a business reason for Hartsdale filing Chapter 11.  Do you

12  recall what your testimony is?

13  A.  I don't recall.

14  Q.  You don't recall your testimony was that there was no

15  business reason for filing Hartsdale and you filed it on advice

16  of counsel?

17  A.  I don't recall, no.

18      (Pause)

19  Q.  If you would turn to page 20 of -- I'm sorry; Tab 20 of

20  the binders, it's the deposition transcript for the deposition

21  of Mr. Abada.

22  A.  Okay.

23  Q.  If you would turn to page 25 of that transcript.  Mr.

24  Abada, if you would, turn your attention to line 3 on page 25.

25  See if this helps refresh your memory.

1  "Q.  Did HCI have a particular liquidity problem, at the time,

2  it needed to solve by filing for Chapter 11?

3  "A.  Difficult to answer because the -- just viewed -- just

4  view it as part of the entire company.

5  "Q.  I want to focus on HCI specifically.

6       "MR. FLEMING:  He's asking you specifically if you

7  recall any of the specific issues at HCI so answer the best you

8  can.

9  "A.  At HCI, I wouldn't recall specifically any issue."

10      Does that help refresh you recollection, Mr. Abada?

11  A.  Sure.  I see it here now.

12  Q.  So, in fact, HCI did not have a specific business reason

13  for filing Chapter 11, did it?  Yes or no?

14  A.  I'm not so --

15      MR. FLEMING:  Objection, Your Honor; the witness

16  should be allowed to answer the question.

17      THE COURT:  Sustained.  It's not a yes or no question,

18  necessarily.

19      MR. GOLDSTEIN:  I apologize, Your Honor.

20      THE COURT:  One can talk for three or four hours on

21  the subject.

22      MR. GOLDSTEIN:  One can talk and sometimes we like

23  them to.  I will refrain --

24      THE COURT:  All right.

25      MR. GOLDSTEIN:  -- in the future.

1          THE COURT:  The witness can give you his best answer

2     to the question.

3     A.    My answer is simply that there was a, you know, a

4     confluence of events that took place during that period of time

5     that put the company in the position that it, unfortunately,

6     was at and as a result, we were left no choice but to file for

7     bankruptcy.

8     Q.    And when you refer to the company in that answer, you're

9     referring to the entire company, correct?

10    A.    That's correct.

11    Q.    Because, in fact, the Ashley segment is a profitable

12    segment for the debtors, correct?

13    A.    Yes.

14    Q.    In fact, for calendar year 2010, the Ashley segment is the

15    only profitable segment, correct?

16    A.    Calendar year 2010?

17    Q.    Calendar year 2010.

18    A.    We haven't produced those numbers yet but I would believe

19    that to be correct.

20    Q.    Mr. Abada, you say you haven't produced numbers for

21    calendar year 2010.  Are you including in that testimony, you

22    haven't prepared projections for calendar year 2010?

23    A.    We don't work on a calendar year.

24    Q.    I want to make sure we're clear about this Mr. Abada, the

25    projections that are in the disclosure statement, they're

1  calendar year projections, correct?

2  A.   That's correct.

3  Q.   And they start at calendar year 2011, correct?

4  A.   That's correct.

5  Q.   So there's no calendar year 2010 numbers upon which the

6  calendar year 2011 projections were based?

7  A.   We worked on projections for the go forward company based

8  on projected expenses, projected stores to be open, projected

9  volumes.  So we put together a calendar year projections under

10  the assumption that we were going to be out, you know, and make

11  projections based on a calendar year.  But for historical

12  purposes, for reporting purposes, we have a fiscal yearend of

13  the last Saturday in August.

14  Q.   So there's no calendar year 2010 projection or financial

15  statement or combined actual and projected statement, is that

16  correct?

17  A.   Working closely with our financial advisors, we'd had many

18  different projections throughout this period.  We had rolling

19  twenty-six month projections, thirteen week projections, weekly

20  projections.  We did not have a calendar year 2010 projections.

21       (Pause)

22  Q.   Mr. Abada, if you would, I want you to just to turn to --

23  back to the disclosure statement.  It's Tab 17, page 91.

24  A.   Okay.  I'm there.

25  Q.   Page 91.  You're on that page?

1   A.   Yes.

2   Q.   So footnote 8 on page 91 says that all the projections are

3   set forth in the disclosure statement based on calendar year,

4   not the debtors' fiscal year, correct?

5   A.   Yes.

6   Q.   Okay.  And footnote 17 says that the 2010 estimated EBITDA

7   is not meaningful; meaningful defined as greater than zero,

8   correct?

9   A.   Footnote 17?

10   Q.   I'm sorry; footnote 7.

11   A.   Yes, that's what it says.

12   Q.   So does that help refresh your recollection that for

13   calendar year 2010, the debtors had no EBITDA?

14   A.   I'd just like to reread that for a second.

15       (Pause)

16   A.   I'm not sure what you're asking.  Please ask me again.

17   Q.   Based on footnote 7, which is language in your disclosure

18   stmt hat you signed, is it not the case that that says that for

19   calendar year 2010, estimated EBITDA is not meaningful, i.e.

20   zero, isn't that what it says?

21   A.   This is really unclear.  It says 2010 EBITDA.  It doesn't

22   say for calendar or fiscal.

23   Q.   Footnote 8 says that all the numbers are for calendar year

24   not fiscal year, correct?

25   A.   On a go forward basis, it's all on a calendar year.

1    You're asking me historically, correct?

2    Q.   So this is -- so looking at page 91, footnote 7 and 8,

3    that doesn't help refresh your recollection that for calendar

4    year 2010 the debtors projections, indicated on an aggregate

5    basis, that there would be not meaningful i.e. zero EBITDA?

6    A.   I don't recall doing a 2010 calendar year projection.

7    Q.   So then, as you sit here today, you don't know if, for

8    calendar year 2010, whether the Jennifer segment was profitable

9    or operated as a loss?

10   A.   I know for the different periods that encompass 2010,

11   except for December.  That I know.

12   Q.   Okay.  So for what period of calendar year 2010 do you

13   know what the Jennifer segments either profit or loss would be?

14   A.   Well, I would have to look it up but we have financial

15   reporting done through fiscal 2010, which is through August,

16   and we also have published first quarter numbers which is

17   September, October, November of 2010.

18   Q.   So as the president, CFO and CEO of this company, you

19   don't know, sitting here today, whether for calendar year 2010,

20   the Jennifer segment operated at a profit or a loss?

21   A.   I could make certain assumptions but we haven't put

22   together any kind of numbers that go exactly from January

23   through December of 2010.

24   Q.   And if you made certain assumptions, what would your

25   answer be?

1    A.   That the -- specifically related to the Jennifer segment?

2    Q.   Correct.

3    A.   That it is not making money currently.

4    Q.   Not making money.

5    A.   That it didn't make money for that period.

6    Q.   Yeah.  So when I ask you that for calendar 2010, the only

7    segment of the debtors' business making money is the Ashley

8    segment, isn't that correct.

9    A.   That would be correct.

10   Q.   While we're on the subject of EBITDA, what -- if you

11   would, in the -- we're still in the disclosure statement, Tab

12   17.  If you would turn to Exhibit C.  It's towards the very end

13   of the document, Mr. Abada and Your Honor.  The pages are not

14   sequentially numbered so I can't give you a page number but if

15   you count backwards from the document --

16        THE COURT:  Tab 17.

17        MR. GOLDSTEIN:  It's the -- four or five pages back

18   from --

19        THE WITNESS:  From the end?

20        MR. GOLDSTEIN:  Counting from the back.  It's exhibit

21   C.

22        THE COURT:  Discounted cash flow analysis.

23        MR. GOLDSTEIN:  That's correct.

24        THE COURT:  All right.

25   Q.   Let me know when you have that page, Mr. Abada?

1    A.    I have it.

2    Q.    Mr. Abada, for calendar year 2018, isn't it correct that

3    the debtors project the EBITDA for the Jennifer segment being

4    815,441 dollars?

5    A.    That's correct.

6    Q.    And that 815,441 dollar projected EBITDA in 2018 is a

7    component of the total projected EBITDA of 6,859,250 dollars,

8    correct?

9    A.    Yes.

10   Q.    Now, I don't know if you need a calculator but that would

11   suggest that the EBITDA percentage of the Jennifer segment of

12   the total company is roughly twelve percent, does that sound

13   about right to you?

14   A.    Okay.  Yes.

15   Q.    So, do you need to -- that amount sounds about right?

16   A.    I'll go with it, yeah.

17   Q.    When we look at this kind of cash flow analysis, the

18   projected EBITDA for 2011 is 4,105,978 dollars, correct?

19   A.    Projected EBITDA for 2011?

20   Q.    Calendar year 2011.  It's 4,105,978 dollars, correct?

21   A.    One moment.

22   Q.    You look under -- let me see if I can help you out here

23   not to be difficult.  By 2011, you see that column?

24   A.    Yes.  I see the column, yes.

25   Q.    And you see EBITDA is the first line?

1    A.   Yes.  Okay.

2    Q.   It's 4,105,900 --

3    A.   Yes.

4    Q.   Mr. Abada, you understand with the word "EBITDA" means,

5    correct?

6    A.   I think so, yeah.

7    Q.   You think so or --

8    A.   I understand it.

9    Q.   Oh, okay. Thank you.

10        Mr. Abada, if we do some rough math, 12 percent of

11   4,480,000 dollars sound about right?

12   A.   Twelve percent of 4.1 million?

13   Q.   Twelve percent of four million it's roughly, 408,000

14   dollars, correct?

15   A.   Yep.

16   Q.   So, just to use round numbers to make it easy is it fair

17   to say that for calendar year 2011 the debtors projected the

18   Jennifer segment would do about 500,000 dollars in EBITDA?

19   A.   Yes.

20   Q.   Yes?

21   A.   Yes.

22   Q.   So, that, then, would suggest that the calendar year 2011

23   EBITDA for the Ashley segment would be about 3.5 million

24   dollars in round numbers?

25   A.   Yes.

1          (Pause)

2      Q.   Mr. Abada, if you would turn in the same binder tab 15?

3      This is the debtors' corporate monthly operating report for the

4      period of 11/1 to 11/30, 2010.

5      A.   Okay.

6      Q.   You have that in front of you?

7      A.   Yes.

8      Q.   Okay.  If you would turn to the fifth page, this page --

9      it's the one that's marked on top "Statement of operations."

10     You have that in front of you?

11     A.   Yes, I do.

12     Q.   Mr. Abada, is this correct that for the post-petition

13     period from July 19, 2010 to November 27, 2010 the debtors had

14     a loss from continuing operations of roughly five million

15     dollars?

16     A.   Yes.

17     Q.   And it's fair to say that the loss from discontinued

18     operations relates to the loss arising from the closed stores

19     where you rejected leases?  Is that correct?

20     A.   Yes.

21     Q.   And of that five million dollar loss that's shown there,

22     approximately 850,000 dollars is related to restructuring cost,

23     correct?

24     A.   Yes.

25     Q.   And restructuring costs include counsel and financial

1  advisors, committee and the other costs associated with this

2  bankruptcy.

3  A.   That's correct.

4  Q.   Says it would be nonoperating type costs?

5  A.   Correct.

6  Q.   You would hope that you wouldn't incur those costs post-

7  confirmation, correct?

8  A.   That's correct.

9  Q.   So, if we back out those costs from the income from -- or

10  loss from continued operations that would suggest in round

11  numbers a four million dollar loss before continuing operations

12  for the period from July 19th through November 27th, is that

13  correct?

14  A.   Yes.

15  Q.   Now, during that period, the Ashley segment is actually

16  profitable, correct?

17  A.   Yes.

18  Q.   Because it's a profitable segment?

19  A.   It is.

20  Q.   And so, in calendar year 2010 we looked before and that

21  suggested -- excuse me -- for calendar year 2011, that

22  suggested the Ashley segment was -- had an EBITDA of

23  approximately 3.5 million dollars, correct?

24  A.   Okay.  Yes.

25  Q.   Roughly.  That would be rough numbers 300,000 dollars a

1   month on average?

2   A.   Doesn't work that way but it comes out to three and a half

3   million dollars.

4   Q.   Is that a close approximation for the mon --

5   A.   Well, the seasonality with deliveries utility schedules,

6   but it comes out to three and a half million for the year.

7   Q.   So, what would the swing given --

8   A.   I don't know.

9   Q.   You don't know the seasonality swings for the Ashley --

10  A.   I do but I can't break it out because --

11  Q.   You can't give me -- I mean is it 500,000?  Is it 200 --

12  A.   There's a range.  I can't give you that.

13  Q.   Okay.  So, of the four million dollar loss for the period

14  of July 19th through November 27th, how much of that loss was

15  offset by actual income that was gained on the Ashley segment

16  for that period, roughly?

17  A.   I'm uncertain.

18  Q.   It's five months; you don't have that range of

19  profitability for the Ashley segment for five months?

20  A.   No.

21  Q.   Could be -- is it --

22  A.   I don't have a range.  I don't know.

23  Q.   Okay.  Well, six months would be half a year, correct?

24  A.   That's correct.

25  Q.   And half of three and a half is about a million seven

1  fifty, correct?

2  A.   Yes.  It depends on shipping cycles and things of that

3  nature as well.

4  Q.   Would a range of a million to two million dollars be about

5  right?  Is that a fair range for that five month period?  It's

6  a pretty big range.  Is that fair?  Just trying to break this

7  down.

8  A.   I'm not certain.

9  Q.   Let's estimate that the range -- that the high range of

10  two million dollars.  Is that at least -- would you agree

11  that's a high range for a five month period for the

12  profitability of the Ashley segment for this five month period?

13  A.   That two million is a high range --

14  Q.   Yes.

15  A.   -- for that five month period?  Possibly.

16  Q.   Possibly.

17  A.   Yeah.

18  Q.   Okay.  Would a million dollars possibly be a low range?

19  A.   For that five month period?

20  Q.   Yes.

21  A.   As I said before, it really depends on shipping schedules.

22  Q.   So, that four million dollar loss for that five month

23  period, would you agree that the loss of the Jennifer segment

24  was greater than four million dollars?

25  A.   Yes.

1    Q.   You don't know how much greater it would be because we

2    don't know the offsetting income from the Ashley segment,

3    correct?

4    A.   We don't know how -- for that reason and we also don't

5    know because we don't allocate corporate overhead at this

6    point.  So, they're not allocating proper corporate overhead

7    for the Ashley segment.

8    Q.   We have -- but the corporate overhead numbers are in --

9    A.   They're in the --

10   Q.   -- total order --

11   A.   -- absolutely, yes.

12   Q.   -- are in those number in the aggregate, right?

13   A.   They're in the aggregate but as you know we don't allocate

14   it for the Ashley segment because --

15   Q.   Because you had allocated the corporate overhead that

16   would mean that the profitability associated with the Ashley

17   segment would be lower than if you don't allocate the corporate

18   overhead.  Is that correct?

19   A.   No greater example than the 2018 model you asked me to

20   take a look at a little while back that shows 6.8 million with

21   Ashley, 800,000 without Ashley.  The difficulty is that if we

22   didn't take the time to allocate the corporate overhead.

23   Q.   So, let's assume we allocated the corporate overhead and

24   the profitability we actually send for this five month period

25   was in the low range a million dollars.  That would be suggest

1  that loss that Jennifer sent for this five month period was

2  five million dollars, right?

3  A.   It would have -- if we allocated properly or if we took

4  the time to allocate it it would have an effect on the profit

5  of loss of both segments, most certainly, a month.

6  Q.   So, would you -- could you agree that the loss is the

7  actually -- that the Jennifer segment for this five month

8  period is around four million dollars?

9  A.   Yes.

10  Q.   And to be complete, when we say around four million

11  dollars, it could be a million dollars lower or a million

12  dollars higher.  Is that correct?

13  A.   I'm not certain but it -- you know, again, I don't know

14  because we didn't take the time to do all the allocations.

15  Q.   And so, you're generally familiar with your company's cost

16  structure having been involved in this company for over -- at

17  least over a decade if not more, correct?

18  A.   I used to be a lot more familiar than I am, have been the

19  last four, five months because of all the issues associated

20  with the bankruptcy.  So, it's a little bit more difficult

21  right now.

22  Q.   Let me see if I can put it this way.  Would you agree with

23  me that it's fair to say that for the five month period we were

24  just looking at that the loss of the Jennifer segment is in the

25  range of two to four million dollars?

1   A.   Yes.

2   Q.   And in calendar year -- in the entire calendar year 2011,

3   the Jennifer segment will earn approximately 500,000 dollars in

4   EBITDA, correct?

5   A.   Whatever specifically we put in projections are what I

6   believe should happen.

7   Q.   Mr. Abada, you agree that the U.S. economy has not fully

8   recovered from the recession, wouldn't you?

9   A.   I would agree with that.

10  Q.   You would also agree that the housing market remains

11  stalled, correct?

12          MR. FLEMING:  Objection, Your Honor.  I don't know if

13  this witness is an expert on housing or the U.S. economy

14  generally.

15          MR. GOLDSTEIN:  Your Honor --

16          THE COURT:  Overruled.

17          MR. GOLDSTEIN:  Thank you, Your Honor.

18  Q.   You can answer the question.

19  A.   Please repeat the question again.

20  Q.   I said, you agree that the housing market remains stalled?

21  A.   From what I see it seems to be a recovery.

22  Q.   See a recovery.

23       But you agree that the home furnishing market hasn't

24  recovered, correct?

25  A.   I wouldn't say that it's -- these are boom times but there

1    appears to be some evidence that things are improving.

2    Q.    It hasn't fully recovered, right?

3    A.    It's not fully recovered, that's correct.

4    Q.    Similarly, you would agree that consumer lending hasn't

5    fully recovered from the height before the financial crises,

6    correct?

7    A.    Yes, that's correct.

8    Q.    In fact, credit scores for consumers remain historically

9    low, correct?

10   A.    From what I read and hear, yes.

11   Q.    Mr. Abada, for calendar year 2011 actually sales were

12   projected to increase 56.9 percent in calendar year 2010,

13   correct?

14   A.    Yes.

15   Q.    And for calendar year 2011, Jennifer sales were projected

16   to increase 8.6 percent from calendar year 2010, correct?

17   A.    Correct.

18   Q.    In calendar year 2011 versus 2010, the same-store sales

19   were actually projected to increase five percent, correct?

20   A.    Calendar year -- say that again.

21   Q.    Calendar year 2011 versus calendar year 2010, the same-

22   store sales for the Ashley segment projected to increase five

23   percent, correct?

24   A.    The Ashley segment?

25   Q.    The Ashley segment.

1   A.   I don't have the projections in front of me but if that's

2   what they say, yes.  Somebody have them to confirm that?  The

3   Jennifer segment, I believe, is five percent; comp stores.

4   Q.   If you would take a look, tab 17 is the disclosure

5   statement, Exhibit B is the projections.  You have to look from

6   the back.  Okay.  And look at the sum sheets, Mr. Abada, I

7   think you are correct.  So, the Jennifer same-store sales

8   growth is approximately five percent?

9   A.   I believe you asked me if it was Ashley was --

10  Q.   I said it was Ashley and you thought it was Jennifer and

11  you were correct. My mistake.

12       So for 2011 versus 2010, same-store sales for Jennifer

13  projected to increase five percent.

14  A.   Yes.  What -- just what page -- that's correct but what

15  page you looking on?

16  Q.   Well, if you look at the projections for Exhibit B

17  following the three schedules there are your revenue

18  assumptions.  So, you have to work your way from the back of

19  the document.

20  A.   It says --

21  Q.   Six pages --

22  A.   -- tab 17?

23  Q.   -- tab 17.

24       MR. GOLDSTEIN:  I didn't mean to turn to you.  I had

25  my notes, Your Honor, I apologize.

1    Q.    Do you have that page?

2    A.    Yes.

3    Q.    Okay.  Great.  So, to be clear, so for calendar year 2011

4    versus calendar 2010, same-store sales for Jennifer segment

5    projected increase five percent, correct?

6    A.    Yes.

7    Q.    And for calendar year 2011 versus 2010, same-store sales

8    for Ashley are projected to increase five percent, correct?

9    A.    For Ashley, no, it says eight percent.

10   Q.    Ashley's eight percent.

11   A.    Yeah.  That's wasn't a trick, right?

12   Q.    That was a trick -- thank you.  We're covered and we'll

13   try and get through this quickly.

14         And thereafter, same-store sales for both segments of

15   projected growth four percent a year, correct?

16   A.    Yes.

17   Q.    Okay.  The 2011 growth in Ashley 56.9 percent projected

18   increase, part of that comes from maturing stores in the Ashley

19   segment, correct?

20   A.    Not part, a huge chunk of it.

21   Q.    A huge part of it.

22   A.    Yes.

23   Q.    Okay.  So, four stores will generate approximately 15.75

24   million in revenue.  That's what you said, correct?

25   A.    Yes.

1    Q.   Okay.  And the total stores in the Ashley segment are six

2    stores, correct?

3    A.   That's what it will be for 2011.

4    Q.   Right.  And the two other stores in the Ashley segment

5    that are not part of your four returning stores, those are

6    already matured stores?

7    A.   Well, I wouldn't call them mature necessarily, but we've

8    had one for three and a half years and one for, I guess, close

9    to two seasons; two years.

10   Q.   Now, the four stores you say will have approximately 5.75

11   million of revenue.  Is it fair to say that that would

12   suggest --

13   A.   5.75?

14   Q.   Fifteen; I'm sorry.

15   A.   Okay.

16   Q.   Approximately 15.75 million in revenue for the four

17   stores.

18   A.   Yes.

19   Q.   So, rounding that suggests about four million per store in

20   revenue.  Does that sound about right for the Ashley segment?

21   A.   Well, it's correct but it's low in comparison to the

22   original two stores but that's correct.  That's what it comes

23   out to.

24   Q.   Okay.  What are the other two stores that are not in the

25   six stores, what is their revenue, roughly?

1    A.    I would say about twelve million; actually a little more

2    than that but --

3    Q.    So, for 2011 the Ashley segment has roughly twenty million

4    dollars in revenue; calendar year 2011, is that about right?

5    A.    I believe, actually, it's a little more than that.

6    Q.    How much more?

7    A.    I don't have the document in front of me but I believe you

8    add up all the revenue components it probably it's getting

9    close to about thirty million.

10   Q.    Thirty million?

11   A.    Yes.

12   Q.    Okay.  If you turn to the first page in the exhibit the

13   projections, calendar year 2011 has total projected net revenue

14   or net sales of eight-eight million, correct?

15   A.    I just need to find it.  I do know what that sales are but

16   I need to find it first.

17   Q.    Oh, sure.

18   A.    Okay.  I got the page.

19   Q.    Right?

20   A.    Yes.

21   Q.    Okay.  So, is it fair to say then about eighty-eight

22   million dollars approximately thirty million represents Ashley

23   segment sales and fifty-eight million represents Jennifer

24   segment sales?

25   A.    Yes.

1  Q.   And, sir, just so I understand the context here, so that

2  thirty-eight million in Ashley segment sales --

3  A.   I didn't say thirty-eight million.

4  Q.   I'm sorry; thirty million.

5  A.   Yes.

6  Q.   Thank you.  That thirty million in Ashley segment sales

7  generates roughly or we estimate at three and a half million

8  dollars of EBITDA, right?

9  A.   Yes.

10  Q.   So, about a twelve percent EBITDA margin.  Does that sound

11  about right?

12  A.   I'm going to say yes but again I want to remind you that

13  that isn't with proper corporate overhead allocations.

14  Q.   Okay.  So, if you go into Exhibit C.

15  A.   Okay.

16  Q.   You look into 2018 EBITDA breakdown.

17  A.   Yes.

18  Q.   You're saying that EBITDA breakdown does not include

19  corporate overhead allocations?

20  A.   It does -- it does when you -- it does when you look at

21  the Jennifer segment by itself.  That has all the corporate

22  overhead in it when we have the 815,000.  We have not allocated

23  corporate overhead to the Ashley segment for a variety of

24  reasons.  Most importantly, again, till fiscal 2010, we only

25  had two stores.  So, it was not a significant -- it wasn't a

1    significant reason to do that.  And as you can imagine, we

2    became distracted with a few other things as soon as fiscal

3    2010 came about or while we were in the middle fiscal 2010.

4    Q.   Okay.  Let's -- I want to turn your attention to corporate

5    overhead for a moment.  Today were talking about terms that has

6    to be allocated.  Corporate overhead that has to be allocated

7    include senior management, correct?

8    A.   Yep.  A part of it which we discussed in great detail in

9    the deposition on Wednesday.

10   Q.   So, that's roughly salaries of eight senior management,

11   correct?

12   A.   We have senior executives, yes.  Yes.  But that wouldn't

13   be the only corporate allocation.

14   Q.   What else would be the corporate allocation?

15   A.   There's a whole garden variety of issues.  Is there

16   anything specifically you wanted me to address?

17   Q.   I'm just focusing on senior executives at this point in

18   time.

19   A.    If it's senior executives and you're correct those eight

20   or --

21   Q.   Eight.

22   A.   Yes.  But that doesn't address, right --

23   Q.   I don't -- I didn't mean to interrupt you, I just focus --

24   I know that there's other components I'm going to ask you

25   about.

1    The other components of corporate overhead that have to be

2    allocated, for example, are employees who work in the

3    warehouse, correct?

4    A.    The whole warehouse distribution operation would need an

5    allocation.

6    Q.    One warehouse that services both segments, correct?

7    A.    We have two warehouses but only one services the Ashley

8    operation.

9    Q.    Right.  So, only that one would have to be allocated,

10   correct?

11   A.    That's correct.

12   Q.    And you would have to also allocate employees who provide

13   accounting functions, their services, correct?

14   A.    Accounting functions, customer service functions.

15   Q.    Right.  And you have to also allocate employees who

16   provide advertising -- who work in advertising for the company,

17   correct?

18   A.    For specifically the purchasing of advertising time, yes.

19   There are several others, I don't know if you care to go

20   through them.

21   Q.    Sure.  What are the other ones?

22   A.    Well, you haven't allocated the -- our ordering fees would

23   be an example of an allocation.

24   Q.    Okay.

25   A.    Legal fees.

1  Q.   Lease revenue would be pretty easy to allocate, wouldn't

2  it?

3  A.   Yes.

4  Q.   All right.  So, I take it, Mr. Abada, that we looked at

5  the thirty million net sales for calendar year 2011.  The

6  EBITDA percentage -- the EBITDA --

7          MR. GOLDSTEIN:  Strike that, Your Honor.

8  Q.   Of the thirty million in sales in calendar year 2011 that

9  you attribute to the Ashley segment, you believe that the

10  EBITDA percentage on that is greater than three -- is greater

11  than twelve percent?

12  A.   I would need to sit down with my -- with proper

13  allocations --

14  Q.   Yes.

15  A.   Is the question proper allocations?  I would need to sit

16  down with my team and take the time to go through it and answer

17  that question.

18  Q.   But after that proper allocation the Ashley segment would

19  be profitable in calendar year 2011, correct?

20  A.   It would be profitable.

21  Q.   The Jennifer segment, however, would still be operating a

22  loss or would it be profitable in calendar year 2011?

23  A.   Hopefully profitable.

24  Q.   But you don't know.

25  A.   Again, I have to go same as the question before.  I have

1    to go through the proper allocations.

2    Q.   Mr. Abada, the growth and projections from calendar year

3    2010 to 2011 is attributable in part to coming out of

4    bankruptcy; correct?

5    A.   That's one of the elements.

6    Q.   And the growth from calendar year 2010 to 2011 is

7    attributable in part to the company hopefully having a private

8    label credit card in place; correct?

9    A.   Yes.

10   Q.   And, in fact, you testified at your deposition that you

11   believe that a private label credit card will be in place soon

12   after the plan's confirmed; correct?

13   A.   That's correct.

14   Q.   And that would be a good thing for the company; correct?

15   A.   I think it's going to be a very, very good thing for the

16   company, not a good thing.

17   Q.   And part of the growth from calendar year 2010 to 2011 is

18   attributable in part to having stable inventory supply;

19   correct?

20   A.   Yes.

21   Q.   And part of the growth from calendar year 2010 to 2011 is

22   attributable to management not being distracted from the

23   bankruptcy; correct?

24   A.   That's definitely; yes.

25   Q.   And part of the growth from calendar year 2010 to 2011 is

1  attributable to the maturing stores in the Ashley segment you

2  talked about earlier; correct?

3  A.   That's correct.

4  Q.   Mr. Abada, the growth from calendar year 2011 to 2012 is

5  attributable in part to those same factors; correct?

6  A.   Yes.

7  Q.   In fact, I think you would agree that by 2012, you think

8  you'll be hitting your stride or words to that effect?

9  A.   We'll certainly be hitting our stride better than 2011.

10  Q.   And from 2012 to 2013, is that growth also attributable to

11  continuing to hit your stride?

12  A.   A combination of factors; that would be one of them.

13  Q.   What are the other factors?

14  A.   Just a more seasoned management, in terms of having fully

15  figured out how to work with a smaller company with a smaller

16  footprint.  Instead of being in twenty states, we'll be in

17  significantly less; I think it's four or five states.  That

18  will be a big factor.  There's a lot of elements that given the

19  next eighteen to twenty-four months, we will figure out how to

20  really take advantage of being a much more streamlined

21  organization.

22  Q.   So by the end of calendar year 2013, three full calendar

23  years you think you'll finally be hitting your stride and

24  management will have that figured out?

25  A.   Well hopefully we're continuing to improve every year and

1    getting more and more intelligent in how you operate the

2    business.  But I think once you get into 2013, there are other

3    factors, as well --

4    Q.   You're getting --

5    A.   -- besides hitting our stride.

6    Q.   One of those factors will be inflation; is that correct?

7    A.   That could be a factor; sure.

8    Q.   Yes.  And I think also in your deposition, you said one of

9    those factors would be support from your plan sponsor; is that

10   correct?

11   A.   Uh-huh.

12   Q.   Any other factors besides those two that are going to help

13   the company in 2013?

14   A.   Well I am not a clairvoyant but I would expect and

15   hopefully -- I would think a lot of people expect that the

16   economy should certainly be better in 2013 than it is right

17   now.

18   Q.   Or it could be worse.

19   A.   It could be.

20   Q.   In fact, your projections from 2011 through 2018 are a

21   constant, ever-rising slope; aren't they?

22   A.   Yes.

23          MR. GOLDSTEIN:  I am trying to go through this very

24   quickly, Your Honor, and I'm -- actually have just two or three

25   sections left.  I didn't know if Your Honor or the witness or

1    anybody wanted to take a break.  I actually tend to get

2    absorbed in this and I tend to lose track of time.  But I think

3    we've probably been at this an hour --

4         THE COURT:  An hour, an hour and a quarter.

5         MR. GOLDSTEIN:  An hour and a quarter and I just

6    wanted to be sensitive to the parties and the witness.  I'm

7    happy to --

8         THE COURT:  Do you want to take a five --

9         MR. GOLDSTEIN:  I'm happy to plod through another

10   hour plus or minus, but if people want to take a five minute

11   break, I just wanted to raise the issue as a matter of

12   courtesy.

13        THE COURT:  Well if it's going to be another hour or

14   more, maybe we'll take a five minute break.  Please don't

15   discuss your testimony with anyone during the break.  We'll

16   take a five minute break which usually means ten minutes.

17        THE WITNESS:  Okay.

18        THE COURT:  But let's be back in ten minutes.

19        MR. GOLDSTEIN:  Thank you, Your Honor.

20     (Recess from 3:08 p.m. until 3:37 p.m.)

21        THE COURT:  Please be seated.  Mr. Abada, please

22   resume the stand.  You're still under oath.  Continued cross-

23   examination.

24        MR. GOLDSTEIN:  Thank you, Your Honor.

25   Q.   Mr. Abada, would you turn to Exhibit 9 in the trial

1    binders please?  Exhibit 9 is a letter from my colleague, Mr.

2    Schultz to Mr. Fox.  Mr. Abada, you've seen this letter before;

3    haven't you?

4    A.   I believe I saw this on -- last Wednesday.

5    Q.   And before last Wednesday, you saw it around the time it

6    was dated; correct?

7    A.   I don't recall.

8    Q.   On your deposition, you testified you were familiar with

9    the information requested in the letter; correct?

10   A.   Let me take a look at it then.

11   Q.   Absolutely.

12   A.   I haven't read the whole document but I -- okay.

13   Q.   You've familiarized yourself with the letter now; is that

14   correct?

15   A.   Yes.

16   Q.   And you were generally -- you were aware of this letter on

17   around the date it bears October 7 -- August 17, 2010; is that

18   correct?

19   A.   I really don't recall.

20   Q.   You were generally aware of this letter before last

21   Wednesday though; isn't that correct?

22   A.   I think so.

23          MR. FLEMING:  Your Honor, I'd like to assert an

24   objection.  This is a letter between counsel talking about a

25   cooperative effort and request materials and engage in informal

1    discovery.  I don't know what relevance it has to this witness

2    or any testimony we're hearing today.  If somebody wanted

3    discovery, they could have served a formal request.  They

4    didn't.

5              THE COURT:  Well, we'll find out --

6              MR. FLEMING:  Okay.

7              THE COURT:  -- perhaps in due course.

8              MR. GOLDSTEIN:  Thank you, Your Honor.

9    Q.   Mr. Abada, you were aware, weren't you, before last

10   Wednesday, that Ashley had requested information from the

11   debtors regarding financial information?

12   A.   Yes.

13   Q.   And you also know, isn't it true, that the debtors did not

14   find the financial information that was requested in this

15   letter; is that correct?

16             MR. FLEMING:  Objection, Your Honor.

17             MR. GOLDSTEIN:  Your Honor?

18             THE COURT:  Overruled.

19             MR. GOLDSTEIN:  Thank you.

20   A.   Looking at it now, I could say yes.

21   Q.   Yes, you are aware that the debtors did not provide this

22   information; correct?

23   A.   That we have not provided the information that's on here;

24   not all of it.

25   Q.   Mr. Abada, you're familiar with the TUAs; correct?

1    A.    Yes.

2    Q.    And you have one of the TUAs at the witness stand?

3    A.    Yes.

4    Q.    The one that deals with --

5    A.    That's the November 6, 2006.

6    Q.    The Cove Road, Carlisle Place TUA; correct?

7    A.    That's correct.

8    Q.    Okay.

9    A.    November 6, 2006.

10   Q.    Okay.  Mr. Abada, the debtors intend to comply with

11   Ashley's rules and policies regarding customer service;

12   correct?

13   A.    Most certainly.

14   Q.    And the debtors intend or Hartsdale intends to comply with

15   the requirements to operate and maintain, upgrade its hardware

16   and software system; correct?

17   A.    Yes.

18   Q.    And Hartsdale intends to comply with its obligations to

19   buy product to maintain sufficient product to generate customer

20   sales; correct?

21   A.    Yes.

22   Q.    Hartsdale intends to use its best efforts to promote the

23   sales of Ashley's products and consult with Ashley regarding

24   sales goals and marketing objectives; correct?

25   A.    Yes.

1    Q.   And it would be Ashley's intention to attempt to achieve

2    those sales goals and marketing objectives; correct?

3    A.   It would be Ashley, your client?

4    Q.   I'm sorry, thank you.  It is Hartsdale's goal and

5    objective to meet those sales goals and marketing objectives;

6    correct?

7    A.   Of ours?

8    Q.   Yes.

9    A.   We have certain objectives and projections and most

10   certainly that's our goal to hit them or to exceed them.

11   Q.   And it would be Hartsdale's intention to maintain product

12   inventory of accessories as required on the TUA; correct?

13   A.   Yes.

14   Q.   And it would be Hartsdale's intention to purchase

15   accessories in accordance with the accessories list as set

16   forth in TUAs; correct?

17   A.   That's correct.

18   Q.   Similarly, it will be Hartsdale's intention to comply with

19   governing law; right?

20   A.   Yes.

21   Q.   And it would be --

22   A.   Not because of the TUA, just in general.

23   Q.   In general.  And it would be Hartsdale's intention to

24   comply with warranty requirements under the TUAs with respect

25   to customers; correct?

1   A.   Above and beyond, naturally.

2   Q.   Okay.  Mr. Abada, to do all the things you just described

3   will require Hartsdale to spend money; won't it?

4   A.   Some of the items; yes.

5   Q.   Yes.  And to the extent Hartsdale doesn't have money in

6   the Ashley concentration account to pay for those items, it's

7   going to have to get that money from Jennifer; correct?

8   A.   Yes.  It depends on the item, let me correct myself.  If

9   it's merchandise, it comes out of the Hartsdale account,

10  accessories and things of that nature.

11  Q.   Okay.  But to the extent it's not -- okay.  So some items

12  Hartsdale would pay for directly out of the Ashley

13  concentration account; right?

14  A.   That's correct; yes.

15  Q.   If the balance in the Hartsdale Ashley concentration

16  account is managed to one hundred thousand dollars, and to the

17  extent Hartsdale needed more than one hundred thousand dollars,

18  it would need to get that money from Jennifer; correct?

19  A.   The commitment was to have a minimum of a hundred thousand

20  dollars in the account.  So I --

21  Q.   So it --

22  A.   It depends on -- it would depend on a point in time.

23  Q.   Right.  So to the extent that there was not more than a

24  hundred thousand dollars in the account --

25  A.   If there was no more than a hundred thousand dollars in

1  the account and --

2  Q.   And Hartsdale had to pay expenses --

3  A.   It depends on the expenses.  Some of the accessory

4  vendors, it could be a two thousand dollar invoice.  It'd be

5  fine.

6  Q.   And if the invoice or the aggregate expenses were greater

7  than a hundred thousand dollars, and there was only a hundred

8  thousand dollars in the Hartsdale Ashley concentration account,

9  then Hartsdale would need to get that money from Jennifer;

10  correct?

11  A.   That's correct.

12  Q.   Yeah, okay.  Mr. Abada, I turn your attention, it's still

13  in the TUA at paragraph 4, the fourth paragraph under paragraph

14  4.  The one that starts --

15  A.   What page?

16  Q.   Page -- it's page 2 of the TUA.

17  A.   Okay.

18  Q.   It's paragraph 4.

19  A.   Okay.

20  Q.   It's the one  --

21  A.   Should I read it?

22  Q.   It is the fourth paragraph.  It starts "Licensee and

23  operating a licensed business."  Do you see that paragraph?

24  A.   "Licensee will operate the licensed business."  Is that

25  the paragraph?

1    Q.   Uh-huh.

2    A.   Okay.  Let me read it.

3    Q.   Yup.

4    A.   Okay.

5    Q.   Okay.  Mr. Abada, there are parties other than Ashley with

6    whom Hartsdale does business; correct?

7    A.   Yes.

8    Q.   And certain of those parties that Hartsdale does business

9    were owed money as of the petition date; correct?

10   A.   That's correct.

11   Q.   And under the debtors' proposed Chapter 11 Bankruptcy

12   plan, certain of those parties who were owed money as of the

13   petition date by Hartsdale will not be paid in full; will they?

14   A.   Correct; no.  I want to -- can I go back to that for one

15   moment?

16        MR. GOLDSTEIN:  Your Honor, I'm fine with that.

17   A.   Okay.  Some of the landlords of -- we've negotiated new

18   lease agreements with.  Now there were -- there were a few

19   other vendors I guess that are not getting -- not being made

20   whole, okay; yes.

21   Q.   Mr. Abada, you don't know dollar amount what those parties

22   who did business with Hartsdale who were owed money as of the

23   petition date who won't be paid in full under the plan would

24   aggregate to; do you?

25   A.   Beyond what we've disclosed in our statements; no.

1    Q.   But we know it's not Ashley because Ashley's going to get

2    cured if the assumption's approved; correct?

3    A.   Ashley?

4    Q.   Ashley would not be one of those parties who is not being

5    paid if the TUAs are assumed and Ashley --

6    A.   The 980 thousand that we reconciled.

7    Q.   Right.  They're not in that list.

8    A.   That's correct.

9    Q.   And the landlord who you -- whose current leases the

10   debtors' assuming in the arrearages are cured or there's

11   modifications, they're being taken care of; correct?

12   A.   We've worked out new arrangements with them; correct.

13   Q.   So I am just -- in terms of the universe of people we're

14   talking about, we're talking about merchandise vendors other

15   than Ashley, correct, would be one group?

16   A.   Yes.

17   Q.   And it would be vendors of other expenses to the stores

18   that otherwise aren't being paid; correct?

19   A.   It could be some others.

20   Q.   So advertising, for example, could be one.

21   A.   Could be.

22   Q.   Insurance could be one.

23   A.   Unlikely but maybe.

24   Q.   But it's a fairly well-defined universe of parties who've

25   fallen into this category, wouldn't you agree, of parties who

1    claimed as of the petition date against Hartsdale are not going

2    to get paid in full under the plan; isn't that right?

3    A.    Again, whatever we put in our disclosure statements.

4              THE COURT:  Well, while we're on this subject, let me

5    ask a question.  You're paying Ashley a cure amount which has

6    been, I think, represented to be in the range of not quite a

7    million dollars.  Ashley may want a little bit more but that

8    issue is being I think held open.  I think the amount that was

9    stated earlier today was eight hundred.

10             THE WITNESS:  Nine-eighty.

11             THE COURT:  Nine-eighty.  Oh, just almost -- and then

12   I was right, almost a million dollars.  Is that 980 thousand

13   dollars coming from a separate Ashley cash account that exists

14   today?

15             THE WITNESS:  We've been paying Ashley out of the

16   Ashley concentration account.  I'm not certain if at the time

17   of exit if that would be coming out of that account or if it

18   would be coming out of exit financing.

19             THE COURT:  The exit financing.

20             THE WITNESS:  Yeah.

21             THE COURT:  So it may be that in order to get the

22   exit financing to pay Ashley almost a million dollars, you have

23   to access exit financing or go to Jennifer and Jennifer's

24   credit and or the credit of the entire enterprise in order to

25   pay Ashley the cure amount; is that correct?

1      THE WITNESS:  Yeah.  I'm fairly certain it wouldn't

2  be coming out of the Ashley concentration account.

3      THE COURT:  If it did, it would probably use up that

4  entire account and there would be nothing left in order to keep

5  the company --

6      THE WITNESS:  Yes.

7      THE COURT:  -- in business.  It would have to be

8  replenished.

9      THE WITNESS:  Yes.

10      THE COURT:  All right.  Now there's been much talk

11  about the Ashley intercompany claim against Jennifer as of the

12  petition date.  Do you recall that questioning?

13      THE WITNESS:  Yes.

14      THE COURT:  Do you have any idea as you sit here

15  today what that intercompany claim would be worth in terms of

16  an actual ability of Ashley to recover on a claim against

17  Jennifer?

18      THE WITNESS:  I'm not certain as to what the number

19  is.  The primary reason that it would -- we've always run the

20  company as -- from a cash management point of view, it's one

21  entity and didn't really -- where the money was coming from to

22  pay different vendors was not the -- not a critical issue for

23  us to focus on.

24      THE COURT:  But are Jennifer creditors being paid in

25  full under the plan?

1          THE WITNESS:  Not all Jennifer creditors.

2          THE COURT:  No, general unsecured creditors, they're

3     not being paid in full.

4          THE WITNESS:  That's correct.

5          THE COURT:  About what percentage does the disclosure

6     statement project as a payment to the Jennifer creditors?

7          THE WITNESS:  I believe when you include the equity,

8     it's somewhere in the area of twenty-two percent.

9          THE COURT:  Twenty-two percent.

10          THE WITNESS:  I believe.

11          THE COURT:  So if Ashley had an intercompany claim

12     against Jennifer, could I presume that that claim might be

13     worth over time twenty-two percent?

14          THE WITNESS:  Uhm.

15          THE COURT:  Well, I guess it would be diluted because

16     if that claim were paid, everybody would get less.

17          THE WITNESS:  I would think so, but I would go by

18     what you say.

19          THE COURT:  No, I am asking questions.  I'm not

20     making any statements.

21          THE WITNESS:  Yes, I would say -- yes, I would --

22          THE COURT:  All right.

23          THE WITNESS:  It would stand to reason that more

24     people in the pot would dilute the pot from the existing

25     potholders.

1          THE COURT:  All right.  Thank you.  Obviously anyone

2     can ask questions based on my questions and they can always

3     object if they don't like the question.

4          MR. FOX:  Not if they're smart.

5          THE COURT:  Go ahead, counsel.

6          MR. GOLDSTEIN:  Thank you, Your Honor.  I would note

7     for the record in tab 15, the corporate monthly operating

8     report for the period November 1 to November 30, 2010, shows

9     for the Ashley concentration account, a cash balance of 2.1

10    million dollars.

11         MR. FLEMING:  Okay.  What page are you on?  I didn't

12    get that.

13         MR. GOLDSTEIN:  It is tab 15.

14         MR. FLEMING:  Right.

15         MR. GOLDSTEIN:  It's the corporate monthly operating

16    report for the period 11/1 to 11/30.

17    Q.   The second page of that document starts -- there's a

18    spreadsheet of that document that has all the cash accounts set

19    forth and if the -- the Ashley concentration account shows a

20    balance of 2.1 million dollars.

21    A.   We talked before about seasonality.  That came right after

22    Black Friday where we have significant volume for that weekend.

23    So it's conceivable that that played a role in the buildup of

24    the cash at that point in time.

25    Q.   So you think maybe the two million dollars when taken out

1    of the Ashley concentration account is now sitting in the hands

2    of Jennifer?

3    A.   I don't know.

4    Q.   You don't know.

5    A.   No.

6    Q.   Okay.  That's it.  Mr. Abada, you're familiar with the

7    secured exit financing that's being provided by the plan

8    sponsor under the plan?

9    A.   Yes.

10   Q.   And you're familiar that that facility has two components,

11   a letter of credit facility and a cash facility?

12   A.   Yes, yeah.

13   Q.   What's your understanding of the cash facility?

14   A.   Cash facility, the tranche E note should be approximately

15   in the area of 2.6, 2.7 million dollars.

16   Q.   And that dollar amount is to refinance the protected

17   balance on the DIP loan from the plan sponsor; is that correct?

18   A.   And to just generally help in the exiting of bankruptcy

19   and making sure the company hits all its commitments.

20   Q.   And that 2.7 million dollar balance is projected -- is

21   that the projected balance as a result of the company's

22   operating in the ordinary course of business or does that

23   include projected payments as of the effective date of the

24   plan?

25   A.   The 2.6, 2.7 million dollars is based on what's projected

1  in the CIA account with the payments that have gone to Mengnu

2  during the bankruptcy.

3  Q.   So it doesn't include the payments that will be required

4  to be made on the effective date of the plan; right?

5  A.   We're going to use that money to pay things that are due

6  on the effective date.  In fact, a significant amount of that

7  is -- was probably going to be earmarked for curing the Ashley

8  980 thousand dollars.

9  Q.   So that CIA account is actually cash that's sitting in

10  that account?

11  A.   Yes.

12  Q.   And what account is that?

13  A.   I don't know the account.

14  Q.   Is that a Jennifer concentration account?

15  A.   No, no, that's an account that the trustee has in his

16  account.  We don't have access to it.

17  Q.   And you project that the full amount of that 2.6 million

18  dollars in that account will be used to fund payments that are

19  due on the effective date?

20  A.   Not necessarily the full amount but a significant portion

21  of it.

22  Q.   Do you know how much?

23  A.   I don't know.

24  Q.   Your declaration in support of confirmation didn't attach

25  the sources and use of cash as of the effective date; did it?

1  A.   I'm not certain.

2  Q.   Have you -- if the balance in that CIA account that you

3  just discussed is fully used, will that be the end of the

4  credit available under the cash facility?

5  A.   As you said before, there are several components.  One is

6  the CIA account or the cash account.  We also have the -- which

7  is the tranche E note and then we also have the LOC when we

8  exit up to five million dollars.

9  Q.   And the letter of credit is to backstop credit card

10  reserves; correct?

11  A.   That's primarily what it's for.

12  Q.   It's not to pay to fund general operating expenses of the

13  debtors; is it?

14  A.   It's available to also help to put together a private

15  label card program.  We're going to need to backstop that with

16  an LLC.

17  Q.   So to backstop credit card reserves again; correct?

18  A.   Yeah -- well it's not a credit card reserve but it's to

19  allow us to get into the private label card business.

20  Q.   Okay.  But the letter of credit is not something that the

21  reorganized company will be able to draw upon to pay expenses

22  in the ordinary course of business; is it?

23  A.   It would depend on Mengnu.  We would make a request for

24  the LLC to go as high as five million dollars and it could be

25  used to go towards American Express.

1  Q.   So you would have to make the request to Mengnu.  It's not

2  provided for in the documents presently; correct?

3  A.   To go up to five million; correct.

4  Q.   So in addition to the letter of credit and the cash in the

5  account, the 2.6, 2.7 million dollars, is there any other

6  working capital being provided under the exit credit facility

7  to your understanding?

8  A.   Well, we received a half a million dollars of working

9  capital out of that CIA account, as part of DIP financing, not

10  too long ago.  And another key component would be that we will

11  be going to ninety days receipt of good on all Mengnu shipments

12  as soon as we exit.  And what's critical to note on that is

13  that it's ninety days receipt of goods in the warehouse which

14  really translates into 120, 125 days if you include the time on

15  the water.

16  Q.   That's credit financing for purchasing supplies from

17  Mengnu; correct?

18  A.   Well, to me it's money because we don't have to pay on any

19  goods received for the first ninety days that we come out of

20  bankruptcy.

21  Q.   With respect to other accesses to cash, is there any other

22  working capital facility or financial commitments being

23  provided to the debtor that the debtors can rely on post-

24  confirmation that you're aware of?

25  A.   No.

1    Q.    No.  Mr. Abada, you have in front of you still the copy of

2    the TUA that we were looking at earlier --

3    A.    Yes.

4    Q.    -- for the Carle Place.  If you would turn to paragraph

5    37.

6    A.    The page at the bottom?

7    Q.    Page 11.

8    A.    Okay.

9    Q.    To date, Hartsdale's been operating the Ashley stores

10   under the TUAs without representatives of Mengnu being part of

11   management; correct?

12   A.    That's correct.

13        MR. GOLDSTEIN:  Your Honor, if I could have just a

14   few minutes to gather my thoughts, I think I may actually be

15   done or very close to done.

16        THE COURT:  All right.

17        MR. GOLDSTEIN:  I don't think we need to take a break

18   but if I could just pause for a minute at counsel table, I'd

19   appreciate it.

20        THE COURT:  That's perfectly fine.

21        MR. GOLDSTEIN:  Thank you, Your Honor.

22        (Pause)

23        MR. GOLDSTEIN:  Your Honor, I don't have any further

24   questions at this time.  If plaintiffs intend or if the debtors

25   intend to do any redirect, I reserve the right to do recross.

1        THE COURT:  Surely.  All right.  Any redirect or --

2        MR. FLEMING:  Just thirty -- I won't say thirty

3   seconds because it won't be thirty seconds but probably three

4   minutes if I could, Your Honor.

5        THE COURT:  All right.

6        MR. FLEMING:  And the first thing I wanted to do was

7   to offer into evidence the --

8        THE COURT:  The first thing you should do is state

9   your name for the record.

10       MR. FLEMING:  Oh, sorry, Your Honor.  Thomas Fleming,

11  counsel for the debtors.

12       THE COURT:  All right.

13       MR. FLEMING:  From Olshan Grundman.

14       THE COURT:  All right.

15       MR. FLEMING:  I just want to move into evidence the

16  exhibits to Mr. Abada's declaration.

17       THE COURT:  All right.  Now I read Mr. Abada's

18  declaration but tell me where it appears in your three volumes,

19  so I have it, unless I have taken it out.

20       MR. FLEMING:  I have it --

21       THE COURT:  What tab -- what volume is it in?

22       MR. FLEMING:  I have this one which --

23       THE COURT:  I think you should consult with the

24  person --

25       MR. FLEMING:  Yes, do you know which of these binders

1    it's in?

2            THE COURT:  What binder is it in?  It's in the index

3    but --

4            MS. NADRITCH:   No, no, no, it's in the original.

5    It's in binder number -- no, no, no.  It's in binder number 2,

6    Your Honor.

7            THE COURT:  Binder number 2.  All right.

8            MS. NADRITCH:  Exhibit --

9            THE COURT:  Now hold on.  Hold on.  Hold on.

10           MS. NADRITCH:  Sure.

11           THE COURT:  Binder number 2.

12           MS. NADRITCH:  That we provided to Your Honor in

13   connection with today's hearing, not from Ashley.

14           THE COURT:  All right.  And what tab?

15           MS. NADRITCH:  Tab -- I'm sorry?  Tab 4-E.

16           THE COURT:  4-E.

17           MS. NADRITCH:  I apologize, Your Honor.  I was just

18   corrected.  It's binder 1.  I have an index here that says

19   binder 2 but it's binder 1 and it's tab 4-E.

20           THE COURT:  All right.

21           MS. NADRITCH:  I apologize.

22           THE COURT:  Just hold on.  Hold on.  Slow down.  All

23   right.  Binder 1 and what tab?

24           MS. NADRITCH:  It begins, Your Honor, on tab 4-E, I

25   believe.

1        THE COURT:  All right.  Don't give me a number, just

2    give me a letter.  Tab E?

3        MS. NADRITCH:  Well, 4 -- no, it's tab 4.

4        THE COURT:  Tab --

5        MS. NADRITCH:  And then letter E within tab 4.

6        THE COURT:  All right.  Hold on.  All right.  There

7    it is.  Okay.  All right.  Now, that's the Abada declaration.

8    And now you're moving into evidence the exhibits.

9        MR. FLEMING:  Right, Your Honor.

10        THE COURT:  All right.  Does counsel for Ashley have

11    the -- the first exhibit is documents in the file with New York

12    State; right?

13        MR. FLEMING:  Yes, Your Honor.  That's the first

14    exhibit.

15        THE COURT:  All right.  That's pretty obvious stuff.

16    Any objection?

17        MR. GOLDSTEIN:  No objection, Your Honor.

18        THE COURT:  All right.

19    (Certificate of good standing was received into evidence as

20    Debtors' Exhibit A as of this date.)

21        THE COURT:  All right.  Let's go to Exhibit B.

22        MR. FLEMING:  It's the certificate of incorporation

23    from the Secretary of State.

24        THE COURT:  Exhibit B?

25        MR. FLEMING:  That's correct, Your Honor.

1    THE COURT:  Any objection?  I don't know that there

2    could be.

3    MR. FLEMING:  Exhibit C --

4    THE COURT:  Hold on.  Any objection?

5    MR. GOLDSTEIN:  Your Honor, I would just --

6    THE COURT:  I'm looking for --

7    MR. GOLDSTEIN:  I was looking for it.  I have A and I

8    have C.

9    THE COURT:  B.

10   MR. GOLDSTEIN:  But I don't have B.

11   MS. NADRITCH:  It's here.  B is only one page.

12   THE COURT:  B is one page and it's a --

13   MR. GOLDSTEIN:  Oh, it's one page.

14   THE COURT:  Got it.

15   MR. FLEMING:  A is the certificate of good standing

16   and B is the actual certificate of incorporation.

17   THE COURT:  There is the -- all right.  B is the

18   certification of incorporation.  Any objection?

19   MR. GOLDSTEIN:  No objection, Your Honor.

20   THE COURT:  All right.

21   (Certification of Incorporation was received into evidence as

22   Debtors' Exhibit B as of this date.)

23   THE COURT:  Exhibit C is the TUA that we've been

24   talking about all day.

25   MR. FLEMING:  Correct.

1          THE COURT:  Any objection?

2          MR. GOLDSTEIN:  No, no objection, Your Honor.

3          THE COURT:  It's the Carle Place one; right?

4  (Carle Place TUA was received into evidence as Debtors' Exhibit

5  C as of this date.)

6          MR. FLEMING:  And Exhibits D through I are all the

7  other TUAs for the other locations.

8          THE COURT:  Any objections?

9          MR. GOLDSTEIN:  No objection, Your Honor.

10          THE COURT:  All right.

11  (TUAs were received into evidence as Debtors' Exhibit D, E, F,

12  G, H, and I as of this date.)

13          MR. FLEMING:  And Exhibit J is the financial

14  statement that was marked on cross, that Hartsdale provided to

15  Ashley in December 2009.

16          THE COURT:  Any objection?

17          MR. GOLDSTEIN:  No objection, Your Honor.

18          THE COURT:  All right.  That will be admitted and I

19  assume the document that you -- well it's in now as Exhibit --

20  as part of these exhibits.

21  (Financial statement Hartsdale provided to Ashley in December

22  2009 was received into evidence as Debtors' Exhibit J as of

23  this date.)

24          MR. GOLDSTEIN:  I assume I'll have the opportunity,

25  Your Honor, we would mark the exhibits I referred to in

1  cross --

2           THE COURT:  Well, we could go through them --

3           MR. GOLDSTEIN:  We'll get to them, yeah.

4           THE COURT:  -- one by one at some point.  We don't

5  have to do that right now.  All right.  Mr. Fleming, you've got

6  your exhibits in.  Next question?

7  REDIRECT EXAMINATION

8  BY MR. FLEMING:

9  Q.   Mr. Abada --

10          THE COURT:  You've also gotten your three minutes

11  but --

12          MR. FLEMING:  I wasn't counting that as my three

13  minutes, Your Honor.

14  Q.   Mr. Abada, you recall earlier this afternoon you were

15  asked some questions about the cash management system that

16  Jennifer and Hartsdale employs?

17  A.   Yes.

18  Q.   The cash management system that you described, was that

19  the same as the one that was in place in 2007?

20  A.   2007, yes, correct.

21  Q.   Right.  Was it also in place in 2008?

22  A.   Yes.

23  Q.   And was that the one that was in place on each occasion

24  when a TUA was signed with Ashley?

25  A.   Yes.

1  Q.  Is there anything in the TUA that addresses Hartsdale's

2  cash management that you're aware of?

3  A.  No.

4  Q.  Did anyone from Ashley ever make any inquiries about

5  Hartsdale's cash management or Jennifer's cash management?

6  A.  No.

7  Q.  The TUA, do you have the one in front of you that you were

8  shown?

9  A.  Yes.

10 Q.  Paragraph 24, can you take a look at that?  It's the

11 financial reporting paragraph.

12 A.  Okay.

13 Q.  And the first sentence addresses providing quarterly

14 financial reports and it says, "In the form and content

15 required by licensor."  Did anyone from Ashley ever provide

16 Hartsdale with forms to use for issuing quarterly reports?

17 A.  No.

18 Q.  Did anyone from Ashley ever ask for quarterly reports?

19 A.  Not -- quarterly reports?  No.

20 Q.  No.  And when was the first time you got a request for any

21 financial information from Hartsdale?

22 A.  It was at the time we prepared the 2009 -- fiscal 2009

23 numbers for Ashley.

24 Q.  Now did Jennifer in its public filings report information

25 about its Ashley segment?

1    A.    Yes, we --

2    Q.    And what information was reported there?

3    A.    For our filings a public company, we provide segment

4    reporting on the Jennifer segment, the Ashley segment and then

5    corporate overhead.

6              MR. FLEMING:  Those were all the questions I have,

7    Your Honor.

8              THE COURT:  Any other party?

9              MR. CARR:  Yes, Your Honor.

10   REDIRECT EXAMINATION

11   BY MR. CARR:

12   Q.    Good afternoon, Mr. Abada.  My name is Jim Carr from the

13   law firm of Kelley Drye & Warren and I represent the creditors

14   committee in this case.

15   A.    Good afternoon.

16   Q.    Mr. Abada, I have a few questions in connection with the

17   TUA.  If you can please, turn to page 2, paragraph 4.

18   A.    yes.

19   Q.    Specifically, I want to refer to the fourth paragraph in

20   paragraph 4.  Have you read that paragraph?

21   A.    I read it before.  I'll take a quick read again.

22   Q.    Okay.

23   A.    Okay.

24   Q.    Does anywhere in that paragraph say that licensee is

25   obligated to pay in full all parties' obligations for which the

1  licensee does business with?

2        MR. GOLDSTEIN:  Objection.  He's asking for a legal

3  conclusion and he's asking his understanding of what it says.

4        MR. CARR:  I'm just asking if it has the word in

5  full.

6        THE COURT:  I can read the document.

7        MR. CARR:  Okay.

8        THE COURT:  I don't see the words in full in that

9  paragraph.

10       MR. CARR:  Okay.

11       THE COURT:  The record will so show.

12  Q.   The next question --

13       THE COURT:  For whatever that's worth.

14  Q.   Next question; in connection with this document, to the

15  best of your knowledge is the words or the terms "all sum due"

16  defined anywhere?

17  A.   No.

18  Q.   As a corporate officer of the debtors, is one of your

19  obligations to interpret what this document means to you?

20  A.   To some extent; yes.

21  Q.   Okay.  If a party for which the debtors conduct business

22  is owed ten dollars, let's say, and for whatever reason that

23  party wants to get paid eight dollars and you agree to pay that

24  party eight dollars, are you now violating this agreement?

25  A.   No.

1          THE COURT:  Sustained.

2          MR. GOLDSTEIN:  Thank you, Your Honor.

3    Q.   I want to turn your attention to paragraph 27 on page 8,

4    the default provisions.

5    A.   Paragraph 27; okay.

6    Q.   Specifically I want to turn your attention to 27(a) for

7    the first part of 27(a) --

8    A.   Just give me a moment.

9    Q.   -- where it says, "Licensee.  It's an event of default if

10   licensee becomes insolvent or generally does not pay its debts

11   as they mature."

12        The term "generally does not pay its debts as they mature"

13   in connection with your interpretation, is that inconsistent

14   with paragraph 4?

15   A.   I would say yes.

16   Q.   Okay.  I want to turn your attention to paragraph 27(h).

17   A.   Okay.

18   Q.   Another event of default.  It says, "Licensee fails to pay

19   when due any amounts due to any third party, with which

20   licensee does business."  Is (h) inconsistent with paragraph

21   27(a)?

22          MR. GOLDSTEIN:  Is it inconsistent with his

23   understanding?

24          MR. CARR:  Inconsistent with his understanding.

25          THE COURT:  Do you have an objection?

1          MR. GOLDSTEIN:  Objection, Your Honor.

2          THE COURT:  Sustained.

3          MR. CARR:  I have no further questions.

4          THE COURT:  Anyone else?

5          MR. NEIGER:  Yes, Your Honor.  Edward Neiger on

6    behalf of Mengnu.  May I introduced the secured credit exit

7    facility into evidence?

8          THE COURT:  Surely.  Why don't we mark it.  Is it in

9    any of the books because we should use that -- we can use that

10   document perhaps more readily.

11         MR. GOLDSTEIN:  I just need to know which one we --

12         THE COURT:  Yes.

13         MR. GOLDSTEIN:  There's so many floating around.  It

14   would be nice to have a couple of extra copies, so we're all

15   looking at the same document.

16         THE COURT:  All right.  That's a good idea.

17         MR. GOLDSTEIN:  Thank you, Your Honor.

18         THE COURT:  Let's see.  Where is it in the books?

19         MS. NADRITCH:  Your Honor, I believe it's in the

20   first binder in tab 5, letter W.

21         THE COURT:  W.

22         MR. GOLDSTEIN:  Does counsel have a book for me?

23         MS. NADRITCH:  I don't know --

24         THE COURT:  You don't have one of these books?

25         MR. GOLDSTEIN:  I do not, Your Honor.

1      THE COURT:  Well I think you may be very fortunate.

2      MR. GOLDSTEIN:  I think you -- I actually do have --

3      THE COURT:  But you have a right to it.

4      MR. GOLDSTEIN:  I just, for these purposes, would

5  like a copy of the document we're referring to.

6      THE COURT:  W.

7      MS. NADRITCH:  Actually, it might be --

8      THE COURT:  Amended Exhibit B is amended terms of

9  tranche A, B, C, D and E notes.

10      MS. NADRITCH:  One second.  I apologize, Your Honor.

11  It's Exhibit V then, one prior to that.

12      THE COURT:  V?

13      MS. NADRITCH:  V.

14      THE COURT:  Amended exit loan agreement?

15      MS. NADRITCH:  Correct, Your Honor.

16      THE COURT:  All right.  Exhibit V.  Okay. Why don't

17  you make sure counsel has a copy.

18      MR. GOLDSTEIN:  Yes, Your Honor.  I'm sorry.  I'm

19  confused because I have a document that has the date on the

20  bottom, 118503-1, which I understood to be the most up-to-date

21  current final version.  Counsel for Mengnu handed me a document

22  that on the bottom says 1138372-2.  So I am --

23      THE COURT:  That's what I have in the book.

24      MR. GOLDSTEIN:  1138372-2?

25      THE COURT:  Yup.

1          MR. GOLDSTEIN:  Okay.

2          MS. NADRITCH:  Your Honor?

3          MR. GOLDSTEIN:  That's not the one they've given me

4     that says it's the final version.  So I am confused.

5          THE COURT:  This may be before, I don't know.  What

6     is it, Mr. Neiger?

7          MR. NEIGER:  I just gave him the final version.

8          MR. GOLDSTEIN:  Well let's have the Judge --

9          MS. NADRITCH:  Do you know what, Your Honor, I can

10    correct the record if they don't mind.  It's in the second

11    binder, it's tab AA is the one that counsel for Ashley is

12    looking at, I believe.  It has the bottom page as 1185008 as

13    the first page.  That's the cover page.

14         THE COURT:  And is that the most recent?

15         MS. NADRITCH:  That is the most recent.  That's the

16    one I believe --

17         THE COURT:  So Mr. Neiger doesn't have the most

18    recent because he has 1138372-2.

19         MS. NADRITCH:  Well this is what Mr. Neiger provided

20    to us.  So I don't --

21         MR. NEIGER:  It's probably the same one.  Our

22    computer just put on different number.

23         THE COURT:  Well, somebody ought to take a look.

24         MS. NADRITCH:  I can hand Mr. Neiger the correct

25    version.

1        THE COURT:  Now what binder?  You were talking about

2    document AA?

3        MS. NADRITCH:  Yes, Your Honor.

4        THE COURT:  In binder what?

5        MS. NADRITCH:  Binder number 2.

6        THE COURT:  Binder 2.  I don't have anything marked

7    AA.

8        MS. NADRITCH:  Then binder -- mine are incorrect

9    then, Your Honor.  Maybe I -- I apologize.  Binder 3?

10       THE COURT:  Well, that's the other possibility.

11   Binder 3, AA.  Okay.  I'm in binder 3, second amended secured

12   exit credit agreement.  The other one was -- V was secured exit

13   credit agreement marked draft.  This is second amended secured

14   exit credit agreement, also marked draft, 1185035-1.  That's

15   the most recent, Mr. Neiger?

16       MR. NEIGER:  I believe so.

17       THE COURT:  Well it is or it isn't.

18       MS. NADRITCH:  It's the most recent, Your Honor.  The

19   one we most recently filed on the docket, that all the parties

20   have.

21       THE COURT:  All right.

22       MR. NEIGER:  The provision that I am going to be

23   addressing, I believe are in all the versions that everyone

24   has.

25       THE COURT:  All right.  Well, we'll see.  We'll find

1    out.

2            MR. NEIGER:  And I'm also going to be brief, not more

3    than three minutes, Your Honor.

4            THE COURT:  Well we've held you up now for more than

5    three minutes.  Please go ahead.  What's your first question?

6            MR. NEIGER:  Thank you, Your Honor.  May I give a

7    copy to the witness?

8            THE COURT:  Yes.

9            MR. NEIGER:  Thank you.

10           THE COURT:  This is document 1185035-1.

11   REDIRECT EXAMINATION

12   BY MR. NEIGER:

13   Q.   Mr. Abada, in the last "Whereas" before Article 1 --

14   A.   Uh-huh.

15   Q.   -- may I point your attention to 2(i) that describes the

16   cash facility?  And would you mind taking a minute to review

17   that?

18   A.   Okay.

19   Q.   And specifically 2(b) of that.

20   A.   Additional -- okay.

21   Q.   Is it your understanding after reading that now that

22   Mengnu will not only be providing the CIA or the relending of

23   the DIP money or monies owed under the DIP but also new cash?

24   A.   The new cash, I was referring to was the receipt of goods

25   dating for new merchandise coming in.  That's what I referred

1    to before.

2    Q.   May I ask that you take a look at Article 5 of the credit

3    facility, lease of proceed.

4    A.   Yup.  Okay.

5    Q.   Is it your understanding now that the proceeds of the exit

6    facility will be to provide working capital to Jennifer?

7    A.   Yes, as well as repay obligations.

8           MR. NEIGER:  No more questions.  Thank you, Your

9    Honor.

10          THE COURT:  Anyone else?

11       (No response)

12          THE COURT:  All right.  Any recross?

13   RECROSS-EXAMINATION

14   BY MR. GOLDSTEIN:

15   Q.   Mr. Abada, if you could turn to document number 9, tab 9

16   in the Ashley binders?  That's the --

17   A.   Yup, I have it.

18   Q.   -- August 17 letter we talked about previously.  Do you

19   have that in front of you?

20          THE COURT:  In binder 2 -- binder 1 of Your Honor.

21          MR. GOLDSTEIN:  Binder 1.

22   A.    I have it.

23          MR. GOLDSTEIN:  Tab 9.

24          THE COURT:  Tab 9 is the letter of August 17, 2010.

25          MR. GOLDSTEIN:  Right.

1    Q.    Mr. Abada, when you just testified that Ashley had not

2    requested any information regarding their cash management

3    system, and you said no, you were not including the August 17

4    letter in your mind when you said that; is that correct?

5    A.    The question I was answering a few moments ago?

6    Q.    Yes.

7    A.    I answered the question that the first recollection we

8    have -- when I say we, myself and my accountants, for Ashley

9    client making a request for any financial documentation related

10   to HCI was towards the end of calendar year 2009.  And at that

11   time, we provided them with fiscal year-end 2009 and 2008.

12   Q.    And that request at that time included cash management

13   information?

14   A.    I don't believe so. I think they just needed P&Ls, balance

15   sheets.

16   Q.    So was there ever a time that Ashley requested the

17   information regarding the cash management system?

18   A.    Well, apparently on August 17.

19   Q.    Okay, thank you.  They made that request?

20   A.    Yes.

21   Q.    I didn't mean to interrupt you.

22   A.    Yes.

23   Q.    If the debtors confirm their plan, they won't be a public

24   company, will they?

25   A.    If the plan gets confirmed, we most certainly will be a

1   public company.

2   Q.   You'll be a public company?

3   A.   Yeah.  Yes.

4   Q.   And you'll be reporting as a public company?

5   A.   Yes.

6   Q.   And you'll be making SEC filings?

7   A.   Yes.

8   Q.   Quarterly and annually.

9   A.   Yes.

10  Q.   For Jennifer Convertibles, Inc.?

11  A.   That's correct.

12  Q.   That's your understanding.

13  A.   Jennifer Convertibles, Inc. and within those filings we do

14  segment reporting.

15  Q.   No, no, no.  But post-confirmation?

16  A.   We would continue to do segment reporting.

17  Q.   Are you going to be filing documents with the Securities

18  and Exchange Commission?

19  A.   For JCI.

20  Q.   For JCI?

21  A.   Yes, absolutely.

22  Q.   10-Qs and 10-Ks?

23  A.   10-Qs, 10-Ks and sometimes 8-Ks and things like that.

24  Q.   The counsel for Mengnu handed you the document, the exit

25  facility document, that you looked at earlier, do you have that

1    in front of you.

2    A.   Yes.

3    Q.   And you were looking at the fifth "Whereas" clause

4    previously.  Do you have that in front of you?

5    A.   I'm looking at the document.

6    Q.   Yes.

7    A.   The exit financing.

8    Q.   Okay.  You're looking at the document.  If you would turn

9    to the recitals.

10   A.   What page?

11   Q.   Page 1.

12   A.   Page 1.  Okay.

13   Q.   The recitals.  Page 1's not marked.

14   A.   Okay.

15   Q.   Page 2 is.

16   A.   Yup.

17   Q.   The fifth "Whereas" clause.  Do you see -- that's the one

18   you were looking at earlier, do you see that?

19   A.   Yes.

20   Q.   Focusing your attention on subpart 2(a) where a reference

21   is made to the cash facility, isn't it correct that Mengnu's

22   obligation to provide funds under the cash facility is at its

23   discretion?

24   A.   Certain components of it.

25              MR. GOLDSTEIN:  I don't have any further questions,

1   Your Honor.

2          THE COURT:  Anything further from anyone else?

3          MR. FLEMING:  No questions, Your Honor.

4          THE COURT:  All right.  Thank you, Mr. Abada.  You

5   may step down.

6      (Witness excused)

7          THE COURT:  We have a proffered declaration of Mr.

8   Grien and if there's no objection, we'll admit that as his

9   direct testimony subject to questioning by counsel as to his

10  qualifications if counsel wishes to do so or any disqualifying

11  history and then cross-examination.

12         Mr. Grien, would you come forward and take the stand

13  please?  Please state your name for the record.

14         MR. GRIEN:  Robert Grien.

15         THE COURT:  And spell your name.

16         MR. GRIEN:  G-r-i-e-n.

17     (Witness sworn)

18         THE COURT:  If you wish to put these documents

19  together and aside, you may.  We're going to use some of them.

20  You can put them there, so they're not in the way.

21  CROSS-EXAMINATION

22  BY MR. GOLDSTEIN:

23  Q.   Mr. Grien, good afternoon.  My name is Michael Goldstein.

24  I'm with Greenberg Traurig.  We represent Ashley HomeStores and

25  Ashley Furniture.

1    Did I get the pronunciation of your name correct?

2  A.   It's Grien like the color.

3  Q.   Grien.  Okay.  Thank you.

4    Mr. Grien, you don't have twenty years experience in

5  restructuring advisory industry; do you?

6  A.   Not per se.

7  Q.   Thank you.

8    Mr. Grien, your testimony set forth in the declaration is

9  dependent upon information provided to you by the debtors;

10  correct?

11  A.   Yes.

12  Q.   And your testimony set forth here in the declaration is

13  also based in part upon your review of business records of the

14  debtors; correct?

15  A.   Well, yeah, business information.

16  Q.   You didn't independently verify any of that information;

17  did you?

18  A.   No.

19  Q.   You didn't independently audit any of that information;

20  did you?

21  A.   Well that's what I meant when I said I didn't

22  independently verify.  I mean I due diligenced it, but I didn't

23  audit it.

24  Q.   By due diligence, you meant you -- you mean you reviewed

25  the information; correct?

1    A.   Yes.

2    Q.   You didn't test the information through any processes or

3    procedures to determine if the information was accurate; did

4    you?

5    A.   Well, I mean the information that we received from the

6    company, we reviewed it with them.  We queried them about it.

7    We tried to develop an understanding of it.  We may have

8    challenged certain information.  We did typical diligence of

9    that sort.

10   Q.   So you didn't go back and look at original invoices; did

11   you?

12   A.   No.

13   Q.   You didn't go back and test the company's accounting

14   systems to see if they're reliable; did you?

15   A.   No.

16   Q.   You didn't test the company's software system to see if it

17   was accurate; did you?

18   A.   No.

19   Q.   You didn't review any of the company's underlying

20   contracts to see if transactions in the company's financial

21   systems were recorded in accordance with those contracts; did

22   you?

23   A.   No.

24   Q.   In fact, Mr. Grien, what you did and I quote is you quote,

25   "Assumed and relied on the accuracy and completeness of all

1    financial and other information furnished by the debtors."

2    Isn't that correct?

3    A.   Yes, but I think that was in the context of the

4    projections.

5    Q.   So in the context of the projections, you assumed and

6    relied on the accuracy and completeness of all financial and

7    other information furnished to you by the debtors; correct?

8    A.   Well, as I said, we did due diligence on the information.

9    Q.   And by due diligence, you mean reviewing information

10   provided to you by the debtors; correct?

11   A.   Correct.

12   Q.   And by due diligence, you mean asking the debtors

13   questions; correct?

14   A.   Sanity-checking, what investment bankers typically do.

15   Q.   Just so I am clear, the investment bankers you're

16   referring to, they're the same ones that issued subprime debt

17   and caused the 2007 financial crisis?

18          MR. FLEMING:  Objection, Your Honor.

19          MR. GOLDSTEIN:  I strike that, Your Honor.

20          THE COURT:  Sustained.

21   Q.   Mr. Grien, you were involved in the Spectrum Jungle Labs

22   Corporation bankruptcy case; correct?

23   A.   Correct.

24   Q.   And before your -- and that case took place in 2009;

25   correct?

1   A.   Correct.

2   Q.   And before that case you never read a plan of

3   reorganization; isn't that correct?

4   A.   No, that's not correct.

5   Q.   You didn't testify to that in a deposition in that case,

6   that you --

7   A.   I'm sure that I testified --

8   Q.   -- that was the first plan of reorganization --

9   A.   I'm sure that I testified for, you know, six or seven

10  hours in a deposition.  I'm sure that I testified for many

11  hours on the stand.  And I'm sure that I established that I had

12  spent twenty years as a lender and had been involved with a lot

13  of companies in a lot of various stages of workout.

14  Q.   And that --

15  A.   So I am not sure what the context of that was.

16  Q.   And you did not, in your deposition testimony in that case

17  say that the first reorganization plan you had ever read was in

18  connection with that case?

19  A.   I don't recall that.

20  Q.   So you don't know if that's true or not?

21  A.   I don't recall that and I don't know the context of it,

22  even if I said it.

23  Q.   in that Spectrum bankruptcy case, you were qualified as an

24  expert on the subject of industry practice in connection with

25  credit agreements; correct?

1    A.    Correct.

2    Q.    And before your employment with TM Capital, you had spent

3    your professional career in connection with lending

4    transactions; is that correct?

5    A.    Say that again.

6    Q.    Okay.  Prior to 2009 when you joined TM Capital, you had

7    spent your career primarily involved in connection with lending

8    transactions; correct?

9    A.    Yes, as a lender in leveraged transactions.

10   Q.    TM Capital's financial advisor to the debtor; is that

11   correct?

12   A.    Correct.

13   Q.    And you have been very involved in TM Capital's providing

14   financial advisory services to the debtor in connection with

15   these cases; correct?

16   A.    Yes, from about March of April of last year.

17   Q.    It's been pretty time-intensive during parts of that time

18   period?

19   A.    Yes.

20   Q.    You spent a lot of time with management; haven't you?

21   A.    Yes.

22   Q.    You've advised and assisted the debtors in putting

23   together the plan of reorganization; haven't you?

24   A.    Yes.

25   Q.    You've advised and assisted the debtors in negotiating

1  parts of the plan of reorganization with creditors; haven't

2  you?

3  A.    Yes.

4  Q.    Is it fair to say you advised and assisted the debtors in

5  connection with its operations in planning for its ongoing

6  operations?

7  A.    I'm not sure what you mean.

8  Q.    Okay.  That's fine.  I withdraw that.

9        Is it fair to say you've developed a very good working

10  relationship with the debtors' management?

11  A.    Yes, some members.

12  Q.    Some members?

13  A.    Of the management --

14  Q.    Some members of the managements.

15  A.    I think Rami mentioned there's eight managers. I would say

16  there's a few that I have developed closed relationships with.

17  Q.    Is it fair to say that you'd be disappointed if the plan

18  of reorganization wasn't confirmed?

19  A.    That -- I'm just trying to do the best job I can as a

20  fiduciary for the various parties involved here.

21  Q.    You're also trying to get paid, too; right?

22  A.    Obviously, I'd like to get paid but I have an engagement

23  letter that's specific as to what happens in certain

24  circumstances.

25  Q.    And that engagement letter provides for a transaction fee

1  upon the successful confirmation of reorganization plan; does

2  it not?

3  A.   Well not specifically.  It does have a success fee but

4  it's not tied to a successful confirmation of the plan.  I

5  think what it really is is a success fee that says that I don't

6  receive anything if the company ends up doing a Chapter 7

7  liquidation.

8  Q.   Mr. Grien, the engagement letter filed with this court

9  attached the application of the debtors pursuant to Sections

10  105, 327(a) and 328(a) of the Bankruptcy Code and the

11  authorization to employ and retain TM Capital Corp. as

12  financial advisors to the debtors states, "In the event that

13  the company completes financing or strategic transaction

14  including romanette iv the sale of the business assets or

15  equity securities the company or a substantial portion thereof

16  or other similar transaction or a combination thereof, the

17  company agrees to pay in cash at closing a fee, the transaction

18  fee of 500 thousand dollars."

19          MR. FLEMING:  Your Honor, I would ask that the

20  witness be allowed to look at the documents instead of having

21  portions read.  When I hear romanette iv, it tells me that

22  there's romanette i, ii and iii.

23          THE COURT:  If we ever get a question, the witness

24  will have a chance to look at the document.

25          MR. FLEMING:  Okay, thank you.

1  Q.   Mr. Grien, isn't it true that your engagement letter

2  states that the company TM Capital will get a transaction fee

3  of 500 thousand dollars upon the confirmation of a plan of

4  reorganization?

5  A.   As I said --

6  Q.   Does it --

7  A.   As I said, our engagement letter specifically carves out a

8  Chapter 7.  That's my recollection.  I don't have the

9  engagement letter with me but there was conversation with the

10  Board about that and that's my recollection of what was carved

11  out of our success fee.

12  Q.   So your view is that your engagement letter carves out the

13  transaction fee, the Chapter 7 liquidation?

14  A.   Yes.

15  Q.   So if there's a Chapter 7 liquidation, you don't get a

16  success fee; is that correct?

17  A.   Correct.  But if there was a Chapter 11 liquidation or any

18  other variety of transactions that could occur within the

19  context, of the bankruptcy we would get paid, not specifically

20  of this plan.

21  Q.   So the confirmation of a plan of reorganization would

22  include -- would result in the payment of a success fee;

23  correct?

24  A.   That's correct.

25  Q.   So then confirmation of the plan is before the Court would

1    result in TM Capital being entitled to a 500 thousand dollar

2    success fee under its engagement letter; correct?

3    A.    That's correct.

4    Q.    Mr. Grien, in connection with the debtors' disclosure

5    statement, you assisted the debtors in preparing a liquidation

6    analysis; correct?

7    A.    That's correct.

8    Q.    And that liquidation analysis was prepared on a

9    consolidated basis for all the debtors; correct?

10   A.    That's correct.

11   Q.    That liquidation analysis doesn't set forth the

12   liquidation analysis of any of the individual debtors; is that

13   correct?

14   A.    That's correct.

15         (Pause)

16   Q.    Mr. Grien, you should have a witness stand -- actually

17   trial binders.  If you go to binder 1, tab 17, it's the amended

18   disclosure statement.  When you get to that tab, just let me

19   know.

20   A.    I'm there.

21   Q.    You're there?  Tab 17.  If you go to the back of the

22   document and work your way forward, Exhibit B is the debtors'

23   projections.

24   A.    Yup.

25   Q.    Are you there?

1    A.    Yup.

2    Q.    These projections for the years stated are prepared on a

3    calendar year basis; correct?

4    A.    That's correct.

5    Q.    So calendar year 2011 starts January 1, 2011; correct?

6    A.    That's correct.

7    Q.    So these projections for calendar year 2011 assume that

8    the effective date occurs before or after calendar year 2011.

9    A.    These projections assume that the effective date is

10   effectively January 1, I guess.  I mean it assumes that the

11   projection period starts immediately upon the effectiveness of

12   the plan, and therefore all of the transactions that would

13   occur upon effectiveness of the plan are not specifically

14   expressed in the cash flow statements but the opening balance

15   sheet would reflect them in terms of cash, et cetera.

16   Q.    So the opening balance sheet -- well -- for calendar year

17   2011 assumes that the effective date already occurred?

18   A.    That's correct.  So the payment, for example, to -- on the

19   503(b)((9) claims that would occur upon the effective date is

20   already taken out of the cash that we were projecting out of

21   thirteen week cash flow statements.

22   Q.    Is there a sources and uses of cash and the effective date

23   in Exhibit B?

24   A.    No, not that I am aware of.

25   Q.    Mr. Grien, do you know what the projected opening amount

1    of the tranche E note will be under the plan?

2    A.    I believe it's roughly 2.6 million.

3    Q.    So does that mean that as of the effective --

4    A.    I should strike -- I should clarify.  That's the maximum

5    availability.  we'll just have to see what the closing numbers

6    are that it would fully be drawn but that's the maximum

7    availability.

8    Q.    So you don't know what the actual amount will be on the

9    effective date.

10    A.    No, I don't know the exact number because it's a working

11    capital line that will be determined by the needs at that

12    moment.

13    Q.    How do you know that you're going to have enough

14    availability if you don't know what the number is?

15    A.    Well, we have been since the beginning of this case doing

16    rolling thirteen week cash forecasts which is typical in these

17    types of situations.  We update those projections from time-to-

18    time on a go forward basis.  We update the historical weeks for

19    the actuals and we have a rolling projection on what our cash

20    balance will be in any given time.  I think a form of that was

21    filed as the DIP budget in this case.  And so we use that to

22    calculate what the cash balance will be on the effective date.

23    Q.    So according to that rolling thirteen week cash flow

24    forecast that you're familiar with, what does it suggest will

25    be the amount of the tranche E note on the effective date?

1    A.    I don't recall the exact tranche E number but I believe

2    our current estimate of cash on the balance sheet pro forma for

3    all the exit transactions is roughly a million-four.

4    Q.    So the principal amount of the tranche E note, the

5    effective date will a million-four; is that --

6    A.    No, it will be higher.  It will be, you know, whatever the

7    number is.  There's -- it's a pretty complicated formula on how

8    that works but there's availability right now, I believe of 2.6

9    million under the note.  I don't recall if it's all drawn but

10   there's 2.6 of availability.

11   Q.    So you just don't know how much of it will be drawn.

12   A.    I mean I could go back and check my notes but I don't have

13   it in the top of my head.

14   Q.    So as you -- Mr. Grien, you're familiar with the secured

15   exit financing that's being provided by the plan sponsor, I

16   assume.

17   A.    Yes.

18   Q.    So however much of the 2.6 million dollars is not drawn on

19   the effective date, that balance will be available to the

20   debtors post-confirmation; correct?

21   A.    I believe so.  It could be.

22   Q.    When you say could be, why are you hesitating?

23   A.    I believe it could be available.

24   Q.    Okay.

25   A.    Yes.

1  Q.   And that the secured exit financing also provides for a

2  letter of credit facility; correct?

3  A.   Yes.

4  Q.   And it also provides for additional funding if Mengnu

5  decides to make that funding available; correct?

6  A.   You're talking about the LOC?

7  Q.   No, the secured exit credit agreement, the additional cash

8  portion.

9  A.   Yes.

10  Q.   Yes, that additional cash will be made available to the

11  plan sponsor if they so choose; correct?

12  A.   I'm not sure I understand the question.  That's pretty

13  convoluted.

14  Q.   So let me go back.  The secured exit financing credit

15  agreement that the plan sponsor's providing has three

16  components; correct?  Has an LOC component; yes?

17  A.   Correct.

18  Q.   It has a tranche E note component; correct?

19  A.   Correct.

20  Q.   And it has an additional cash component; correct?

21  A.   I'm not sure what you mean by the cash component.

22  Q.   I'm trying to say that it has a cash facility component;

23  correct?

24  A.   I'm not sure what you're talking about.

25  Q.   Okay.  Let me strike --

1   A.    There's a letter of credit and there's a tranche E

2   facility.

3   Q.    So there's only two facilities.

4   A.    And yes, then there's cash coming back to the company with

5   respect to money that's in the escrow.  That might be --

6   Q.    Okay.

7   A.    That's what I think.  When I think of the cash, there's

8   money in escrow that's been effectively paid for goods that

9   have been delivered that's sitting in escrow.  That money will

10  be remitted back to the company.

11        The remaining or -- I'm sorry, on goods that haven't been

12  delivered yet.  That money will be remitted back to the company

13  and then when those goods come in, the company has ninety days

14  to pay for them.

15  Q.    And that money that's in escrow can be used by the company

16  to pay for expenses on the effective date.

17  A.    Correct.

18  Q.    And that's money in that escrow Mr. Abada testified was

19  about 2.6, 2.7 million; correct?

20  A.    I believe that is the escrow number today.  That's not

21  necessarily the availability number.  It's a complicated

22  formula.

23  Q.    Well, Mr. Grien, you're the financial advisor and I'm just

24  the lawyer and I would like to understand what the formula is

25  that tells us how much availability there is to the debtor --

1    A.    It's a --

2    Q.    -- on confirmation --

3    A.    It is a number that is --

4    Q.    -- and post-confirmation.

5    A.    It's a number that's calculated at a date and time.  As I

6    said, our -- I don't have those specific numbers committed to

7    memory, but what I can tell you is that based on our

8    projections of deliveries, et cetera, the excess cash on the

9    balance sheet at the time of exit pro forma for all the

10   payments due at exit will be approximately 1.3 million dollars.

11   Q.    Let's take a look at tab 7 in the binder.  Are you

12   familiar with the document that's behind tab 7?  It's the DIP

13   budget dated --

14   A.    Yes.

15   Q.    -- 11/24/10.  Is this an example of one of those rolling

16   cash flow statements you referred to earlier?

17   A.    Yes.

18   Q.    Perhaps you can help me understand your testimony by

19   looking at this document.  I realize the numbers are small but,

20   it's not my --

21   A.    Yeah, I was going to say the numbers are a little small

22   for me to read.

23   Q.    It's not my document but if you look at the very last

24   column, is that column reflecting estimated payments as of the

25   effective date?

1    A.    Yeah, that's the settlement column.  That's the column I

2    said we used in creating an initial balance sheet for our

3    projections.

4    Q.    All right.  So we look at this spreadsheet and hopefully

5    it refreshes your recollection.  Can you tell me as of the

6    effective date after making all the projected payments, what

7    will be the availability under the -- not the letter of credit

8    portion of the secured exit facility but the working capital

9    portion of that facility?

10   A.    I can't read it.  If you want to point to a line, I'll --

11   I can't read it.

12   Q.    Do you see the ending operating cash number in the

13   settlement column is 1.7 --

14   A.    That's a million -- it looks like a 1.71 million.

15   Q.    A million-seven?

16   A.    Yes.

17   Q.    So is that cash from the balance sheet?

18   A.    That would be --

19   Q.    Is that --

20   A.    That would be ending cash on the balance sheet.  And that

21   was our projection as of the date we filed the DIP budget which

22   I believe was in November.

23   Q.    Right.  And so the -- if you go to the top of that

24   settlement column where it has cash inflows, it looks like you

25   had a million-seven that you were projecting that was in the

1    escrow account?

2    A.   Yeah, that's coming from the CIA escrow account.

3    Q.   Right, which now is closer to 2.6 million?

4    A.   Yes.

5    Q.   Okay.

6    A.   What's in the account.

7    Q.   So I am just trying to understand.  So are you going to --

8    does this mean you end up with under this projection 1.7

9    million dollars of cash on the effective date --

10   A.   Yes.

11   Q.   -- after making all the effective date payments?

12   A.   Yes.

13   Q.   Okay.  And that would be then the amount that's due under

14   the security tranche note; is that correct?

15   A.   The ending cash balance is not the number that is due

16   under the note.

17   Q.   Okay.

18   A.   What is due under the note is the amount of money that's

19   borrowed under the note which is the amount of the current DIP

20   facility plus any monies taken out of the escrow account which

21   is based on a formula at the date and time which we believe

22   right now is 2.6 million of availability.

23   Q.   The DIP --

24   A.   But it --

25   Q.   The DIP balance right now is how much?

1    A.    Half a million.

2    Q.    Half a million dollars; okay.  And so that's going to be

3    rolled into the tranche E note, a half a million dollars.

4    A.    Yes.

5    Q.    Okay.  And you have -- and the monies that you use out of

6    the escrow account for effective date payments --

7    A.    Correct.

8    Q.    -- that will be rolled into the tranche E note, as well;

9    correct?

10   A.    Correct.

11   Q.    Under this document that we're looking at, tab 17 as of

12   the settlement date, you would effectively about 1.7 million

13   dollars was being taken out of the escrow account, being used

14   to make expenses and you end up with an opening cash balance.

15   So that would then suggest, am I correct, that a million-seven

16   would have been taken out of the account and rolled into the

17   tranche E note?

18   A.    Yes.  Yes, that's what it looks like on this page.

19   Q.    All right.  So, looking at these numbers then, you would

20   have a tranche E note of a half a million dollars, a tranche E

21   note of a million-seven that came out of the escrow account,

22   rolled into the tranche E note and you have nothing left in the

23   escrow account; correct?  That would be the mechanics?

24   A.    Right.  The escrow goes away on effectiveness.

25   Q.    Right.  Okay.  Now if there was 2.6 million dollars in the

1    escrow account and on these numbers you only needed to use a

2    million-seven, you would have round numbers -- a million

3    dollars left in the escrow account for the company to use post-

4    confirmation; correct?

5    A.   No, I don't believe it works that way.

6    Q.   No?

7    A.   I don't think you fully understand the escrow way it

8    works.  The escrow is for money that the company has paid on a

9    CIA account for goods from Mengnu.  And some of that money is

10   for goods that haven't been shipped and some of -- and when the

11   goods have been shipped, the money was left in that account.

12        The money at -- it's not like one number.  There's a

13   certain amount of money that is representing goods that have

14   already been shipped that can be lent back under the DIP

15   facility.  There's money for goods that haven't been shipped

16   that is going to be released back to the company as cash on the

17   effective date.

18   Q.   Right.

19   A.   So if there's 2.6 million dollars in the escrow account

20   today, it's not to say that 2.6 million dollars will be the

21   balance of the E note.  Some of that money will be released

22   back to the company as cash.

23   Q.   Right.

24   A.   Some of it may be -- is eligible to be borrowed and I

25   think -- I said, I think the availability is 2.6.  So I think

1   it's the 2.1 of cash plus the half a million that's already

2   borrowed under the DIP facility.

3   Q.   Okay.  So we have -- then is it fair to say under the exit

4   facility provided by the plan sponsor, there's a letter of

5   credit facility and a working capital facility that has

6   availability of 2.6 million dollars?

7   A.   Well the letter of credit is a separate issue.  The E note

8   is 2.6.

9   Q.   Right.

10   A.   And the letter of credit is I think up to five.

11   Q.   Okay.

12         MR. GOLDSTEIN:  I just have a few more questions,

13   Your Honor.

14   Q.   The -- under the E note terms, if the 2.6 million dollars

15   of availability is exhausted, then unless we knew -- agrees

16   otherwise, there will be no more working capital availability

17   under the E note; correct?  Is that your understanding?

18   A.   Well, the 2.6 is the maximum availability.

19   Q.   Okay.

20   A.   So, yes, like any lender if you require more cash than you

21   have on your facility, you have to either get an increase or

22   whatever.

23   Q.   The E note -- the tranche E note has an excess cash flow

24   provision; correct?

25   A.   A cash sweep; yes.

1    Q.   Yeah.  And that's based upon consolidated cash flow;

2    correct?

3    A.   Yes.

4          MR. GOLDSTEIN:  Your Honor, I don't have any further

5    questions at this time.

6          THE COURT:  Thank you.  Any redirect?

7          MR. FLEMING:  No, Your Honor, no redirect.

8          THE COURT:  Anyone else?  Mr. Neiger?

9          MR. NEIGER:  No, Your Honor.  Thank you.

10         THE COURT:  Nothing from the creditors committee.

11   Anyone else?

12       (No response)

13         THE COURT:  All right.  I think that allows you to

14   stand down, Mr. Grien.  Thank you.

15       (Witness excused)

16         THE COURT:  Do we have any other testimony on behalf

17   of the debtors or plan proponent?

18         MR. FLEMING:  Your Honor, could we just break?  We

19   want to discuss whether or not we want to call Mr. Sperry.

20         THE COURT:  All right.  That's fine.

21         MR. FLEMING:  That's was the issue you left on the

22   table for us.

23         THE COURT:  We'll take a five or ten minute break.  I

24   think we can go today until 6:30.  Is that all right?  All

25   right.  But however, no one will be penalized for not going

1   that long.  We'll take a five minute break.

2            MR. FLEMING:  Thank you.

3        (Recess from 5:01 p.m. until 5:23 p.m.)

4            THE COURT:  Please be seated.  All right, Mr.

5   Fleming, where are we?

6            MR. FLEMING:  Your Honor, we are not offering Mr.

7   Sperry's declaration.  We would like to call Mr. Sperry to the

8   stand for a brief examination on the tranche E note and I think

9   Mr. Neiger's going to ask him the question since he proffered

10  the affidavit, if that's acceptable.

11           THE COURT:  All right.

12           MR. NEIGER:  Thank you, Your Honor.

13           MR. FLEMING:  Mr. Sperry?

14           THE COURT:  Please state your name for the record.

15           MR. SPERRY:  L. Thomas Sperry or Tom Sperry.

16       (Witness sworn)

17           THE COURT:  Please be seated.

18  DIRECT EXAMINATION

19  BY MR. NEIGER:

20  Q.   Good afternoon, Mr. Sperry.  Who do you work for?

21  A.   I work for my own firm, Sperry Restructuring Advisors.

22  Q.   What is Sperry Restructuring Advisors role in this

23  bankruptcy?

24  A.   We are the financial advisor to Mengnu Group -- Haining

25  Mengnu Group Co., Ltd., the plan sponsor.

1   Q.   Are you familiar with the exit facility?

2   A.   Yes, I'm quite familiar with the exit facility.

3   Q.   What made you become so familiar with the exit facility?

4   A.   I guess as much as anybody, I largely structured the

5   facility and to the extent there were negotiations over any of

6   its particular terms, I was involved with that.

7   Q.   Thank you.  Can you please explain the structure of the

8   exit facility?

9   A.   The exit facility is compromised of two components; the

10   LOC or letter of credit component and the cash side.  On the

11   letter of credit side, it provides for a letter of credit

12   funding to the debtors post-bankruptcy of three to five million

13   dollars.  Three million of that is currently in place.  500

14   thousand dollars additional has begun to be worked on to come

15   into place soon after the effective date of the plan.  And the

16   remaining million and a half dollars is available for

17   additional funding in the form of letters of credit.

18       The use of proceeds of the entire exit facility is both

19   for letter of credit financing to back the credit card

20   processors and private label card programs going forward and

21   for general working capital purposes.

22       The cash portion of the exit facility is really synonymous

23   with the tranche E note and that's a term note.

24   Q.   Thank you.  Can you please describe the structure of the

25   tranche E note?

1    A.    Yes.   The tranche E note which will be issued on the

2    effective date will be a term note with a two-year maturity.

3    It will be repayable in advance of the maturity date based on

4    an excess cash flow sweep formula.   That formula provides that

5    there needs to be a minimum cash balance in the company left

6    after a quarterly sweep of three million dollars plus an amount

7    over and above three million dollars needed to repay any other

8    principal amount of debt due in that quarter.

9         So while it's an excess cash flow sweep of -- off of the

10   cash earnings of the company, it's subject -- it only gets paid

11   in terms of really amortization if there is a minimum cash

12   balance in the company at the time.   I think that's based on a

13   rolling prior thirty-day average, not just a one day cash

14   balance.

15        The tranche E note, it will be funded by (one) rollover of

16   any cash portion of the DIP facility that's outstanding just

17   prior to the effective date and (two) additional cash

18   borrowings -- sorry, cash loans from a new borrowing by

19   Jennifer of cash.

20        Currently there's 500 thousand dollars outstanding under

21   the cash portion of the DIP facility and it's anticipated that

22   there would be an additional approximately 2.1 to 2.2 million

23   dollars of new cash money coming into Jennifer on the effective

24   date such that the total face amount of the tranche E note is

25   expected to be approximately 2.6 to 2.7 million dollars as of

1   the effective date.  And thereafter it's not a revolving

2   facility.  It's a term note.

3   Q.   Thank you.  Why is the tranche -- why is the cash facility

4   in respect of the tranche E note discretionary?

5   A.   Well it's discretionary in the sense that the amount --

6   the final amount hasn't been fixed at this time.  The tranche E

7   note is being funded as I said, 500 thousand dollars out of a

8   rollover of the DIP cash facility or a greater amount if there

9   is more borrowing under the DIP cash facility prior to the

10  exit.

11       The remaining portion of the facility is new cash from

12  Mengnu.  However, Mengnu expects to take cash that is currently

13  sitting in the escrow account that's been referred to and use

14  that cash that belongs to Mengnu in respect of goods that have

15  been received by Jennifer for which advance payments were made

16  and then money's been allowed to sit in escrow.

17       So and that money is -- there is continuing to be money

18  put into the escrow account as more goods arrive from shipments

19  arriving in the US.  So that sourcing amount isn't fixed until

20  the last moment.  And also, there will be a quick look at the

21  working capital needs of the company at that point in time,

22  including all of the exit payments that are due.

23  Q.   You mentioned the escrow account.  Can you please

24  elaborate a little bit on the structure of it?

25  A.   Yes, the escrow account was established and I believe

1    there was actually a court order for the -- a comfort order for

2    the original establishment of the escrow account.  And the

3    escrow account receives money -- the escrow trustee receives

4    money from Jennifer for deposit money for new orders being

5    placed with Mengnu by Jennifer.  Additional monies are being

6    paid in advance as shipments leave the port in Shanghai bound

7    for Jennifer's warehouses in the U.S.  And that's how that

8    account gets funded by Jennifer.

9        When the goods arrive in the U.S., Mengnu can ask the

10   trustee to release the money to Mengnu.  At that point, it

11   becomes Mengnu's property, the cash in the account.  So it all

12   points in time, there's an amount of money in the account.  I

13   think currently it's around 2.8 million dollars.  Some of that

14   is money that Mengnu could if it so chose, withdraw

15   immediately.  It's Mengnu's entitlement but it has chosen to

16   leave it there in anticipation of funding the exit facility.

17       The other portion of money that's in the account at any

18   given point in time is money in respect of goods which have not

19   been received. And as of the effective date under the plan

20   terms, Mengnu and Jennifer have agreed that money will revert

21   back to Jennifer and Jennifer will pay for the goods in the new

22   ordinary course of ninety-day trade terms as they are received

23   going forward.

24       So again, those amounts are not -- they're estimated but

25   they're not precisely known at this time.

1  Q.   And what happens to the escrow account on the effective

2  date?

3  A.   On the effective date, Mengnu will -- Mengnu's intent is

4  to use all of the money that is in the escrow account that it

5  is entitled to receive in respect of goods previously received

6  and use that to fund the tranche E note, along with the DIP

7  rollover into the tranche E note and the remaining money will

8  go  back to Jennifer and the escrow account will be closed.

9  Q.   Thank you.  And one last question, Will Mengnu provide the

10  exit financing if Jennifer cannot assume the TUAs?

11  A.   No.

12          MR. NEIGER:  No further questions, Your Honor.  Thank

13  you.

14          THE WITNESS:  May I step down?

15          THE COURT:  No, you have to be available to --

16          THE WITNESS:  Oh, right.

17          THE COURT:  -- through cross or further examination.

18          THE WITNESS:  Yes, sir.

19          THE COURT:  Any other examination by those who seek

20  confirmation of the plan and/or assumption of the TUAs?

21          MR. FLEMING:  None for debtor, Your Honor.

22          MR. CARR:  None from the committee, Your Honor.

23          THE COURT:  Anyone else?  All right.  Cross?

24          MR. GOLDSTEIN:  I rise again, Your Honor.  Thank you.

25  CROSS-EXAMINATION

1    BY MR. GOLDSTEIN:

2    Q.   Mr. Sperry, Michael Goldstein, Greenberg Traurig.  I

3    represent Ashley Home Store, Ashley Furniture.

4         Mr. Sperry, the letter of credit facility you mention in

5    your testimony, you said three million dollars of that is in

6    place; correct?

7    A.   Yes.

8    Q.   Who is the beneficiary of that letter of credit?

9    A.   Merrick Bank.

10   Q.   And you also said there's a 500 thousand dollar letter of

11   credit in place.  Who is the beneficiary under that letter of

12   credit?  Or I am sorry, I think you said there's 500 thousand

13   dollars that's in place or that's going -- it's in the works,

14   if you will.

15   A.   It's --

16   Q.   Who will be the beneficiary under that letter of credit?

17   A.   JP Morgan Chase will be the intermediate beneficiary in

18   all likelihood.  And then there will be a further beneficiary.

19   Q.   I'm sorry, I --

20   A.   Then there will be a further beneficiary beyond that.

21   Q.   And who will that be?

22   A.   It hasn't been disclosed at this point.

23   Q.   It's a third-party.  It's not the debtor; correct?

24   A.   It's a third-party.

25   Q.   Thank you.

1  A.   It's a third-party who will be a private label credit card

2  provider.

3  Q.   That's -- thank you.

4       You indicate in your testimony that with the three million

5  dollars LOC in place and assuming the 500 thousand dollars in

6  place, that would make -- leave 1.5 million of LOC facility

7  still available; correct?

8  A.   Yes.

9  Q.   And so as I understand it correctly, that would be the

10 issuance of letters of credit in favor of third parties; is

11 that correct?  Or would the letter of credit be issued in favor

12 of the debtors?

13 A.   Well, the letter of credit would be issued in favor of

14 third-parties.  However, the exit credit facility including the

15 letter of credit portion can be used to support in the first

16 instance on the one hand, credit card processors or private

17 label programs like that and working capital, general working

18 capital uses.

19      So it's conceivable that there could be an LOC in place at

20 some point that would be in favor of a bank and Jennifer would

21 get cash from the bank against it.

22 Q.   But the letter of credit facility, the 1.5 million would e

23 issued in the five instance to a third-party; is that correct?

24 Not to the debtors.

25 A.   It's unlikely that it would -- there's no current plan or

1    structure envisioned that would be directly in favor of the

2    debtors.

3    Q.    Does the letter of credit facility limit the scope at all

4    as to potential beneficiaries of the letter of credit?

5    A.    You mean like an intermediate or do you mean with respect

6    to third-parties?

7    Q.    With respect to third-parties.  Well, let me rephrase the

8    question.  Is there any limitation on -- for whose benefit the

9    debtors could issue the letters of credit under that facility?

10   A.    Well, the debtors won't issue the letter of credit.

11   Q.    Let me rephrase the question.  Is there any limitation on

12   the letter of credit facility that would limit the debtors'

13   ability to have issued letters of credit under that facility

14   for third-parties?

15   A.    No, because Mengnu -- well, Mengnu's not a bank, so that

16   Mengnu has retained in its sole discretion, the ability to

17   approve the future issuances.  Again, because it's not a bank,

18   it doesn't issue letters of credit itself.  So it needs to

19   retain that discretion because it cannot commit its own bank in

20   advance of issuing the LC.  It will go to its bank and have an

21   LC issued, depending on what the specific need is at the time

22   for Jennifer for either support of a credit card program or for

23   working capital purposes.

24   Q.    Okay.  When you say working capital purposes in that

25   regard, that's what I am trying to get a sense of.  What do you

1    mean by working capital purposes in terms of who would be --

2    what would be the use of that working capital with respect to

3    the issuance of the letter of credit?

4    A.   Well, for example, supposing the Ashley HomeStores

5    operated by Hartsdale or by Jennifer -- but owned by Hartsdale,

6    were to experience a significant increase in volume and needed

7    to buy inventory, the tranche E note facility as I said is a

8    fixed term facility, fixed amount.  There might be a need to

9    buy more goods from your client, Ashley, for the Hartsdale

10    store.  That could be one use.

11    Q.   In your example, Ashley would have to agree to ship on the

12    basis of the beneficiary of the letter of credit.

13    A.   Not at all.  They're going to be shipped COD.  Why do they

14    have to be involved?

15    Q.   So then in that instance, the letter of credit would be

16    issued to the debtor?

17    A.   The letter of credit as I mentioned earlier, I believe,

18    might be issued to a bank in the United States, let's say JP

19    Morgan Chase where the debtor, I believe has some accounts and

20    it might be in favor then of the debtor itself who might draw

21    against it.

22    Q.   Okay.  And just so I am clear on the tranche E note side,

23    that is a term facility, not a revolver facility.

24    A.   Correct.

25    Q.   And that amount will get fixed as of the effective date of

1    the plan; correct?

2    A.    Correct.

3    Q.    With respect to the escrow account, some of the money in

4    the escrow account is going to be returned to Mengnu; correct?

5    A.    The money that's in the account is advance payments for

6    orders and shipments that have not been received, will be

7    returned to Jennifer.

8    Q.    So some of the monies go to Mengnu in the escrow account

9    and some of the money in the escrow account will be returned to

10   Jennifer; correct?

11   A.    In respect of goods not received, the money goes to

12   Jennifer and in respect of goods received, Mengnu is entitled

13   to receive that money in its intention is to use that money to

14   fund the tranche E note.

15   Q.    Right.  But in the first instance, the money goes to

16   Mengnu and then Mengnu advances it under the tranche E note,

17   essentially.

18   A.    That would be a transactional chain that would be --

19   Q.    Right.

20   A.    -- technically what would happen; yes.

21   Q.    Okay.  So do you have an estimate of how much of the money

22   in the escrow account will actually be released to Jennifer on

23   the effective date, kind of rough ballpark?

24   A.    Yes, the estimate -- the current estimate is about 1.2

25   million.  That would be the Jennifer -- money going back to

1    Jennifer in respect of goods not yet received.

2    Q.   And is it anticipated that part of that 1.2 million

3    dollars would be used by Jennifer to pay -- make any of the

4    payments due on the effective date or would that be cash that

5    would reside on Jennifer's balance sheet on the effective date?

6    A.   Well, money's fungible.  So there will be that 1.2

7    million.  There'll be the -- there'll be approximately 2.1 to

8    2.2 million of new cash under the tranche E note.  The other

9    500 thousand being already funded under the DIP that gets

10   rolled into it.  That's assuming no intermediate additional

11   borrowings under the DIP.  So that -- there's a 2.1 there to

12   2.2 on top of the 1.2.  And there's whatever cash Jennifer

13   already had -- will have had on its balance sheet as of the

14   effective date.  You could add all that up.  It has significant

15   exit payments to make such as 980 thousand dollars roughly to

16   Ashley in respect to the Hartsdale claim, et cetera.

17   Q.   So do you know what the net cash will be on the balance on

18   the effective date after making all those payments?

19   A.   The last estimate I looked at was 1.8 million dollars.

20   Q.   So net net 1.8 million dollars to the Jennifer balance

21   sheet after accounting for the tranche E note, the escrow funds

22   and then making the effective date payments.

23   A.   If you were to -- right.  If you were to do full sources

24   and uses, there'd be a -- I think -- again, the last estimate I

25   looked at which may not be the most recent estimate, the model

1    gets updated periodically --

2    Q.   Right.

3    A.    -- but it was about 1.8 million of day one opening cash

4    balance.

5    Q.   And that estimate included -- I'm done, Your Honor.

6            THE COURT:  Well I was going to say that --

7            MR. GOLDSTEIN:  I'm done.

8            THE COURT:   -- if this hearing goes on for many more

9    days --

10           MR. GOLDSTEIN:  No, I'm --

11           THE COURT:   -- that 1.8 is going to be less but --

12           MR. GOLDSTEIN:  No, I'm done.  I can finish on that

13   note.

14           THE COURT:  Thank you.  Anyone else?

15           MR. GOLDSTEIN:  Not from the debtors, Your Honor.

16           THE COURT:  All right.  Mr. Sperry, you may step

17   down.

18           THE WITNESS:  Thank you, Your Honor.

19       (Witness excused)

20           MR. GOLDSTEIN:  Your Honor, if I may?

21           THE COURT:  Yes.

22           MR. GOLDSTEIN:  I have the procedural issue of our

23   exhibits.

24           THE COURT:  Yes, but let's see whether the debtors

25   have any further evidence that they wish to educe in support

1    of -- we're dealing with confirmation of the plan and

2    assumption of the Ashley executory contracts.

3          MR. FLEMING:  No more evidence, Your Honor.

4          THE COURT:  All right.  Anything from the committee?

5          MR. CARR:  No, Your Honor.

6          THE COURT:  From Mengnu?

7          MR. NEIGER:  No, Your Honor.

8          THE COURT:  All right.  The floor is all yours, Mr.

9    Goldstein.

10         MR. GOLDSTEIN:  Thank you, Your Honor.  I would just

11   direct folks' attention to the index in our binders and I refer

12   to the tab numbers.  These will be -- we'll refer to the tab

13   number of the documents that are used in the course of the

14   cross-examination.  So it would be tab 4 which is the Hartsdale

15   scheduled assets and liabilities.

16         THE COURT:  That's a pleading in the bankruptcy case.

17         MR. GOLDSTEIN:  Correct, Your Honor.

18         THE COURT:  Which I can take judicial notice of but

19   we'll admit it as, shall we say, Ashley Exhibit 4?

20         MR. GOLDSTEIN:  Yes, Your Honor.  I think it would be

21   easier if we keep the number associated with the tabs.

22         THE COURT:  All right.

23   (Hartsdale scheduled assets and liabilities pleading was

24   received into evidence as Ashley's Exhibit 4 as of this date.)

25         MR. GOLDSTEIN:  The next one, Your Honor, is the

1    amended DIP budget, tab 7, which is the one that Mr. Grien and

2    I discussed.

3              THE COURT:  Any objection?  Ashley Exhibit 7, the

4    amended DIP budget and that's a pleading, too in the

5    bankruptcy.

6              MR. FLEMING:  I have no objection, Your Honor.  I

7    would just note that it's not the most current one.  That's

8    what I am told but I have no objection to --

9              THE COURT:  It is -- let's see what the date is.

10             MR. FOX:  11/24.

11             THE COURT:  If we can read that -- what was the date,

12   November 24?

13             MR. FLEMING:  November 24, 2010.

14             THE COURT:  November 24 DIP budget.  All right.

15   Admitted.

16   (Amended DIP budget dated 11/24/10 was received into evidence

17   as Ashley's Exhibit 7 as of this date.)

18             MR. GOLDSTEIN:  The next one, Your Honor, is tab 9

19   which is the August 17 letter from Mr. Schultz to Mr. Fox.

20             MR. FLEMING:  Your Honor, I have an objection to that

21   letter.  I just don't think it's -- have been authenticated by

22   anybody, first of all and I don't think it's particularly

23   relevant what one lawyer wrote to another about documents.

24             THE COURT:  Well --

25             MR. FLEMING:  They were smart to serve a document --

1          THE COURT:  -- do the debtors deny that -- again, Mr.

2   Fox was a recipient.  Did you -- we don't want to put Mr. Fox

3   on the stand.  I assume you received Exhibit 9 shortly after

4   the date it bears.

5          MR. FLEMING:  Right.  We acknowledge receipt of the

6   letter, Your Honor.

7          THE COURT:  All right.  I'll admit it.

8   (August 17 letter from Mr. Schultz to Mr. Fox was received into

9   evidence as Ashley's Exhibit 9 as of this date.)

10         THE COURT:  Okay.

11         MR. GOLDSTEIN:  Thank you, Your Honor.  Your Honor,

12  the next three documents 14, 15 and 17, those are also

13  documents as part of the file.

14         THE COURT:  They're monthly operating -- well, 14 is

15  a monthly --

16         MR. GOLDSTEIN:  Two monthly -- there's a monthly

17  operating reports and the disclosure statement.

18         MR. FLEMING:  No objection, Your Honor.

19         THE COURT:  All right.  Admitted.

20         MR. GOLDSTEIN:  14, 15 and 17.

21  (Monthly operating report and disclosure statement were

22  received into evidence as Ashley's Exhibits 14, 15 and 17 as of

23  this date.)

24         MR. GOLDSTEIN:  Your Honor, at tab 22 these were the

25  balance sheets, pages AH-001, AH-005 only. Those were the only

1  pages we referred to.  I think these overlap to some extent

2  with the plaintiff's exhibit but just to keep the record clear,

3  I'd like to make sure that the documents we referred to as tab

4  22 are part of the record.

5       MR. FLEMING:  No objection.

6       THE COURT:  All right.  Hold on.  Let me just make

7  sure I at least can follow along.  Okay.  Tab 22.  That's the

8  balance sheet from 2009.

9       MR. FLEMING:  Correct, Your Honor.

10       THE COURT:  All right.

11       MR. GOLDSTEIN:  And just pages AH-001 to AH-005.

12       THE COURT:  That's okay.

13  (2009 balance sheet pages AH-001 to AH-005 were received into

14  evidence as Ashley's Exhibits 22 as of this date.)

15       THE COURT:  All right.

16       MR. GOLDSTEIN:  Your Honor, we also marked two

17  exhibits that weren't in the binder.  Well, we referred to

18  them, we didn't mark them.  One was the TUA with respect to the

19  Carle Place.

20       THE COURT:  I think that's in the record.  That's in

21  evidence already.

22       MR. GOLDSTEIN:  It is, Your Honor.  I just -- I might

23  since --

24       THE COURT:  Do you want it in as --

25       MR. GOLDSTEIN:  If we could keep it as tab 29 and

1    just make it a clear part of the record, since that's the one

2    that I referred to so many times.  I think it would just be

3    easier if there was ever a need to look at the transcript.

4              MR. FLEMING:  I have no objection, Your Honor.  It's

5    in --

6              THE COURT:  All I'd ask you to do then is mark it.

7              MR. GOLDSTEIN:  I have a copy.

8              THE COURT:  And hand it up.

9              MR. GOLDSTEIN:  I could submit it when I finish.

10             THE COURT:  Mark it as Exhibit -- as Ashley Exhibit

11   29.

12   (TUA with respect to Carle Place was received into evidence as

13   Ashley's Exhibits 29 as of this date.)

14             MR. GOLDSTEIN:  Right.  And then, Your Honor, the

15   last one is actually the second amended secured exit credit

16   agreement that Mr. -- I'm sorry.

17             MR. FLEMING:  Grien.

18             MR. GOLDSTEIN:  -- Mr. Grien was cross-examined by

19   Mr. Neiger and then I did some examination, as well.

20             THE COURT:  All right.  That is --

21             MR. GOLDSTEIN:  I would like to mark that as Ashley

22   tab number 30.  That was the document, Your Honor, 1185035-1.

23   I would offer --

24             THE COURT:  Give me that number again.

25             MR. GOLDSTEIN:  It's the secured credit agreement.

1          THE COURT:  Yes, amended --

2          MR. GOLDSTEIN:  It's second amended secured exit

3   credit agreement.  That's what it says on the first page.  And

4   then the document itself, the secured exit credit agreement

5   document for the --

6          THE COURT:  Yes, the stamp --

7          MS. NADRITCH:  Your Honor, it's --

8          THE COURT:  The computer number on the bottom.

9          MR. GOLDSTEIN:  1185035-1.

10          THE COURT:  035-1.  Now that is your Exhibit --

11          MS. NADRITCH:  5 double --

12          THE COURT:  B?

13          MS. NADRITCH:  No, it's actually -- it's in your

14   third binder, Your Honor and it's tab 5-AA.

15          THE COURT:  Okay.

16          MR. GOLDSTEIN:  If we could just mark --

17          THE COURT:  But if you would mark another version

18   then as Exhibit 30 --

19          MR. GOLDSTEIN:  Tab 30.

20          THE COURT:  -- for Ashley, we can try to keep the

21   record straight.

22          MR. GOLDSTEIN:  Thank you, Your Honor.

23   (Second amended secured exit credit agreement 1185035-1 as

24   received into evidence as Ashley's Exhibit 30 as of this date.)

25          MR. GOLDSTEIN:  I have those marked, Your Honor, if I

1    may approach.

2              THE COURT:  You can hand those up, sure.

3              MR. GOLDSTEIN:  Thank you.

4              THE COURT:  All right.  Any other evidence for

5    Ashley?

6              MR. GOLDSTEIN:  That's it, Your Honor.

7              THE COURT:  All right.  Then anything else from any

8    other party or I will deem the record closed on both the

9    debtors' motion to confirm the plan of reorganization and the

10   debtors' motion to assume the Ashley contracts.

11             Now with regard to the motion to assume the

12   contracts, I understand the record stands.  The arguments

13   stand.  I have Ashley's memorandum of law.  I gather that there

14   is no dispute that if the contracts are to be assumed, there is

15   a minimum cure due on the effective date of just under a

16   million dollars, 980 thousand --

17             MR. FOX:  And some-odd change.

18             THE COURT:  And some change.  There may be further

19   amounts due and those can be established at a subsequent

20   hearing if the parties don't agree.  I don't know exactly what

21   those amounts entail.  They may entail attorney's fees.  They

22   may entail other items and perhaps it's a moving amount,

23   depending upon the business arrangements between the parties.

24             If there is a request for attorneys fees, I think it

25   should be made relatively promptly or a request for other cure

1    amounts and if there's a request for attorneys fees, it should

2    be supported with the claim of right, whether as a matter of

3    cure under Section 365 of the Bankruptcy Code or as a matter of

4    right under the contract itself.

5         Other than that, I gather that unless the parties

6    wish to have further argument and I can certainly take that

7    now, we have a little bit of time, and we have more time if the

8    parties want it.  I'm not trying to rush anyone, either

9    argument or further explication of any of the issues.  Anything

10   further from the debtors?

11        MR. FOX:  I would just -- Michael Fox for Jennifer.

12   I would just like to make a brief summation, perhaps clarify a

13   few things.  We have filed a notice of proposed confirmation.

14   We have filed a memorandum of law.  I think there's been

15   testimony that's been made today, both in the form of the

16   direct affidavits of Mr. -- the declarations of Mr. Abada and

17   Mr. Grien subject to the cross.  So everything that was heard

18   today is not necessarily what's before Your Honor because those

19   exhibits have been read and have been filed.

20        I think what is obvious is that the company, I think

21   Your Honor stated this early on, things change.  The company in

22   2009 or 2008 when it opened up the first Ashley store was one

23   or two.  The dynamics changed to where it's now six stores.

24   Six stores, the way you try to integrate that operation is

25   probably a lot different than it was when it was two because at

1  the same time, Jennifer's segment was almost three hundred

2  stores.  It's now been reinvented and restructured.

3          THE COURT:  How many stores are left?

4          MR. FOX:  Right now, I think seventy-three.

5          THE COURT:  Okay.  The TUAs, and I could ask Mr.

6  Goldstein this question, what is the term of those agreements

7  since there are a whole bunch of different ones?

8          MR. FOX:  Okay.  They all have different expirations,

9  from the earliest part their initial term is five years and

10  then since they're in the record, there's another section that

11  talks about a renewal for another sixty months.  So they

12  basically can go out to -- you know, if the first one was 2008,

13  it will expire in 2013, and then at 2018.  I think that's

14  pretty much why the EBITDA went out to that level because at

15  that point, they were assuming that there may not be renewed

16  beyond the five-year period and the initial period.

17          THE COURT:  Okay.

18          MR. FOX:  But they all have different rolling basis,

19  depending on when they started.  So I can't -- I have a chart

20  somewhere.

21          THE COURT:  No, that's okay.  That gives me a good

22  enough feel there.  There were some dates in here.  I recall

23  something like those dates.  I just wanted to clarify it.

24          MR. FOX:  I think that's why, in fact, Your Honor, we

25  only carried out the projection to 2018 because you had to make

1    a decision at that point and we hope we make it that far with

2    Ashley as our partner, that the company will in fact not be six

3    stores -- of Ashley stores but perhaps it will be eight, ten,

4    twelve and the relationship will be smooth and running.  But

5    the projections that are before Your Honor assumed no new

6    stores that were being opened.  That doesn't mean that there's

7    not a constant dialogue.  There has been.  There are sites that

8    we have that we -- that the company could be excited about

9    going into and again, once we hope -- and the expectation if we

10   can get out of Dodge, as I have been so-saying to my client,

11   they can get away from having to deal with the bankruptcy life,

12   they could start to figure out really how to retool their

13   business and focus more on not the bankruptcy but the business

14   which really, you know, as any business does, it needs a lot of

15   TLC.

16           What it has today is it has some financing and it has

17   the ability to get out but what it really needs is to just try

18   to put this in its distant path.  I think that there was a lot

19   of questions or confusion.  Maybe Mr. Abada didn't know why

20   Hartsdale filed.  Let me just tell you this, Your Honor.  It

21   would be disingenuous if the Ashley counsel disagreed, if

22   Jennifer were to file and not have filed Hartsdale, that would

23   have triggered a default under the TUA.  And then we wouldn't

24   be able to have the protection of the stay that we have.

25           So there's no deep dark secret of why an entity files

1    its entities but there was actually a very good reason because

2    if Jennifer filed TUA -- it would be a default if Jennifer's a

3    guarantor under the TUAs.  So that's the simplest answer.

4          The more complicated answer is that some of the

5    finances were in a cash management system and the money was

6    technically in a JCI concentration account/Ashley, but the real

7    reason is we just needed to be smart about gathering what was

8    important to protecting what we deemed to be -- and it's not

9    disputed.  It's a valuable asset.  We want to preserve it.  We

10   want to nurture it.  We want to grow it.

11         We can have a legal argument on whether paid all sums

12   means that Ashley has this requirement to require that we pay

13   all those Hartsdale creditors.  That's contrary.  They're not

14   the committee for the Hartsdale entities.  They're an

15   unimpaired creditor or they will in that estate.

16         Mr. Carr's more than capable.  Deloitte was

17   representing the financial advisors.  They looked through a lot

18   of things that were important.  This case, Your Honor, is on --

19   it has -- and I consider it to be a fast track case.  It has

20   done a lot in a very short period of time but to sit here today

21   and think that the case would collapse because there's an

22   argument on a paid in full or paid all sums due is almost an

23   insult to the integrity of the plan, to the disclosure

24   statement that has been approved and actually solicited by all

25   the vendors that are out there.

1        So I have, I believe, satisfied the burden, to

2    establish the evidence, Your Honor, before you would be

3    sufficient and I've had my COO who was also the CFO and the

4    President who is familiar with the supply chain, testify about

5    his industry experience, testify why the case was filed,

6    testify about the projections being reasonable, disclosing all

7    the things that are required as my memorandum of law says that

8    would require us under 1129 to get this case confirmed.

9        And I can go on and I can go on; I prefer not to.  I

10    think the record is pretty clear.  There are jobs at stake.

11    There are obligations that could be met.  There's nobody --

12    nobody took that stand, neither Mr. Sperry, neither Mr. Abada,

13    or neither Mr. Grien and guaranteed success. What they all

14    would testify to is that there's a reasonable likelihood that

15    the plan obligations could be met, give them a chance to

16    reorganize and to affirm all the obligations that are owing

17    under the plan and under the TUA.

18        Once we assume the TUA, all those obligations are

19    being reaffirmed.  Mr. Abada wasn't perfect about the

20    reporting.  Nothing in life is perfect, Your Honor, but it will

21    be and they will exercise all their best efforts to comply with

22    those.  And if they're not, communication which is a very

23    important skill to have that I believe Mr. Abada will have with

24    his management team, speak to the people in the management at

25    Ashley and just get beyond this, so that this case can move

1  forward, whether it's 980, a million-one; the plan does give a

2  process for that.  I'm just surprised that the number is not

3  what they put in their motion but there will be a process for

4  that like everything else.  There will be sufficient money.

5  There's -- I don't think that's been a dispute.

6       So I really would move this -- for Your Honor to do

7  two things; grant the motion to allow us to assume the TUAs and

8  to allow us to confirm our case under 1129.  We worked very

9  hard to get here, Your Honor and we hope never to see you again

10  before in this case, other than for some cleanup and some fee

11  applications and post-effective reports, but Jennifer hopes not

12  to ever become a Chapter 22, so that we can move beyond.

13       THE COURT:  I think I can take judicial notice of

14  every debtors' desire to --

15       MR. FOX:  Well I think that --

16       THE COURT:  -- stay out of bankruptcy court.

17       MR. FOX:  And I think that we've at least established

18  that we have some of the tools within which to meet our

19  obligations under the plan and to successfully emerge and stay

20  away.  And to continue to operate, so that they can grow.  Mr.

21  Abada's not rooting for the economy not to improve and not for

22  consumer spending to be up.  He just wants to be there at the

23  right time, the right place, so that his business could take

24  advantage of that and unlike any business in America, including

25  law firms and financial accounting firms.

1     So we thank Your Honor very much for the time you've

2    taken today.  Don't need to go I think in anything further than

3    just to say that I hope that we have established sufficient

4    information before you, Your Honor, that this case can confirm

5    and the TUAs can be assumed.  Thank you.

6          THE COURT:  Thank you.  Anyone else who wishes to

7    speak in support of plan confirmation and/or assumption of the

8    TUAs?

9          MR. CARR:  Thank you, Your Honor.  Jim Carr of Kelley

10   Drye & Warren on behalf of the committee.  Your Honor, I'd like

11   to focus my comments on two points; 1129(a)(11), feasibility

12   and 365(b) which is the cure and assumption provisions of the

13   Code.  But before getting into those two provisions of the

14   Code, I would like to just give some general comments.

15         Your Honor, this case filed in mid-July and as Your

16   Honor recalls, when we came -- when the committee was first

17   formed and I appeared before Your Honor at one of the first

18   hearings, there was significant concern on my behalf and the

19   committee's behalf that we would be here; that we would get to

20   today.

21         There was a belief that I had and the committee

22   members had that we thought this case was going to liquidate.

23   And it was only through the very strong efforts of debtors'

24   counsel, Mengnu's counsel and committee, that we were able to

25   get here today.  And as a result of that, Your Honor, four

1    hundred employees will continue to have a job, eighty stores

2    will continue to go forward selling Jennifer or Ashley -- and

3    Ashley goods.

4                And that, Your Honor, cannot be underestimated

5    because it was a lot of give and take in this process and a lot

6    of professionals got together, so that we could get to a

7    confirmed plan of reorganization.  We had a nine member

8    committee and not all the members saw things identically or the

9    same.

10               THE COURT:  I would hope not.  Was Ashley a member?

11               MR. CARR:  Ashley was not a member of the committee,

12   Your Honor.  And when it got to the voting -- what's

13   interesting, when it got to the voting, out of all the

14   creditors eligible to vote, you had ninety-three percent of the

15   creditors voting in support of the plan, four of whom were at

16   the Hartsdale entity.

17               And by the way, Your Honor, Brent Associates, who is

18   one committee member, is also at the Hartsdale -- is a creditor

19   of the Hartsdale entity.  And Brent Associates also voted to --

20   voted in favor of the plan.

21               Your Honor, feasibility -- I think there's obviously

22   enough evidence presented in the record in connection with

23   feasibility.  And the documents that were filed, the legal

24   documents that were filed, there's one decision, Your Honor, I

25   would like to bring to your attention by a learned judge in the

1    Journal Register decision and the judge in that case said,

2    feasibility standard requires and I quote, "reasonable

3    assurance of success.   Success need not be guaranteed."

4           THE COURT:  I don't think I made up that language.  I

5    was quoting somebody else.

6           MR. CARR:  You were quoting someone else but I

7    thought that decision was the best to bring to Your Honor's

8    attention.  The test is whether things that are to be done

9    after confirmation in a plan, if there's a reasonable

10   likelihood that they will be done, that's feasibility.  Nothing

11   more.  Nothing less.

12          Your Honor, turning to 365(b), I have to give Mr.

13   Goldstein credit.  His arguments in connection with the TUC,

14   specifically paragraph 4 was I think very creative.

15   Specifically, the language about paying all sums due, other

16   parties with which the licensee, i.e., the debtors conduct

17   business.  Now if you look at that provision, Your Honor, I can

18   come up with a number of legal arguments.  I can create

19   legalese.  The words, "all sums due" what does that modify?

20   Does that modify other licensed -- other parties or does that

21   modify just the owner and Ashley?

22          I can also come up with further legal arguments,

23   legalese -- what I'll call legalese-type arguments.  What does

24   due mean?  Does due mean what the creditors are getting under

25   the plan?  Does it mean paid in full?  These are all issues

1    that certainly Your Honor can consider.

2          But I am going to give a pragmatic answer to this

3    provision, Your Honor.  If Your Honor accepts this provision as

4    the way Mr. Goldstein suggests then we might as well take 365

5    and take it out of the Bankruptcy Code because what will happen

6    is every executory contract will have this provision that will

7    say you cannot -- debtor, forget -- I'm not talking now about

8    assignment, I'm not talking about 365(e) or 365(f) dealing with

9    assignments and ipso facto clauses.  But if you have a

10   provision in a contract that says counterparty debtor cannot

11   assume this agreement unless all of its other creditors are

12   paid in full.  There will never be another assumption on a

13   going forward basis.  That's the only point I want to make with

14   respect to that provision, Your Honor.  Thank you.

15         THE COURT:  Anyone else wish to speak in support of

16   confirmation?  All right.

17         MR. NEIGER:  Your Honor, if I may?

18         THE COURT:  Yes, you will not lose any ground if you

19   do not make any statement but you certainly may.

20         MR. NEIGER:  My client has been the one who has been

21   pushing timing all along.  So I certainly am not going to delay

22   it any further than absolutely necessary.  So I incorporate by

23   reference the comments of Mr. Fox and Mr. Carr and I agree with

24   everything they said.

25         If I may, I would just like to read one portion of

1  the TUA that I think will shed some further light on the spirit

2  of the TUAs and the spirit of the case going forward.  And that

3  is paragraph 17 and it says:

4       "Licensee acknowledges and agrees that licensor's

5  acceptance of the authorized location shall not be deemed as

6  constituting a guarantee, recommendation, warranty,

7  representation or assurance by licensor that the authorized

8  location is capable of supporting a successful retail furniture

9  store."

10      A similar paragraph is in the acknowledgement and

11  addendum to the Ashley HomeStores where again it states, and

12  this is paragraph 3 to the beginning of that, "The undersigned

13  acknowledged that licensee understands that there exists no

14  guarantee against possible loss or failure in this or any other

15  business.  And that the most important factors in the success

16  of the licensed business are the licensee's personal business,

17  marketing, sales, management, judgment and other skills."

18      There can never, ever be a guarantee of future

19  performance but what we have demonstrated today is that there

20  is a very strong likelihood of success.  The debtors have made

21  painstaking concessions in closing stores, in negotiating

22  leases, in obtaining financing and this company has a very

23  bright future.  Thank you, Your Honor.

24      THE COURT:  Anyone else?

25  (No response)

1      THE COURT:  All right.  In opposition?

2      MR. GOLDSTEIN:  Thank you, Your Honor.  The Ashley

3  segment has a very bright future and has had a very successful

4  past.  The evidence was clear.  Contrast, the Jennifer segment

5  is operating at a loss, a substantial loss and its

6  profitability in 2018 should it get there, would be a mere 800

7  thousand dollars.  This is a restructuring, Your Honor, built

8  on the back and the foundation and the cash flow of the Ashley

9  segment, beginning and end of the story.

10      The TUAs have a five-year time frame.  Whether there

11  is a renewal provision, whether they get renewed or not, we

12  don't know and that's not before you and we haven't made an

13  issue but since Your Honor asked, it's really -- they have a

14  five-year life.  And the question is what happens after that?

15      I make that point only so the record is clear that

16  I'm not agreeing with Mr. Fox that there's some kind of

17  automatic renewal.  There's a specific procedure but we haven't

18  made that an issue, so I am not raising it in closing for

19  purposes of that, suggesting there's some uncertainty with

20  respect to that, just for reservation of rights.

21      But my point, Your Honor, is that the issue of this

22  company's ongoing business is clear that it's being

23  restructured on the back of the Ashley segment.  What does that

24  mean?

25      THE COURT:  Well what does that mean?

1          MR. GOLDSTEIN:  What --

2          THE COURT:  I understand your argument but as a

3    matter of good bankruptcy policy, what does that mean?  Does

4    that mean that if there's a strong part of a business and a

5    weak part, that we should destroy the business all together by

6    liquidating it?  No.  You're shaking your head no.

7          MR. GOLDSTEIN:  No, no, Your Honor.  That is not

8    our --

9          THE COURT:  No.  If there's a strong part and a weak

10   part, does that mean that we should divorce the two and say we

11   should close all the weaker stores and go forward only with the

12   strong part of the business?  Is that -- that's not what

13   Ashley's arguing, is it?

14         MR. GOLDSTEIN:  That's not what we're arguing, Your

15   Honor.

16         THE COURT:  Okay. As a matter of sound bankruptcy

17   policy, what should we do?

18         MR. GOLDSTEIN:  One, Your Honor, we had a real

19   problem with disclosure because the evidence educed today is

20   not the evidence in the disclosure statement.  Hartsdale

21   creditors never heard about its cash or its accounts

22   receivable.  Hartsdale creditors never saw a liquidation

23   analysis.  And Hartsdale creditors never saw or had an

24   opportunity to understand the extent to which there was this

25   ongoing support.  So there's a disclosure issue, Your Honor;

1    fundamental.  And it runs -- it's a pervasive problem, frankly.

2         THE COURT:  So what do I do?  Do I deny confirmation

3    all together or do I have the few Hartsdale creditors, other

4    than Ashley, resolicit it?

5         MR. GOLDSTEIN:  You could resolicit them, Your Honor,

6    but you still have the issue --

7         THE COURT:  Or simply say the debtors can confirm the

8    plan but we have to deem them unimpaired.

9         MR. GOLDSTEIN:  The latter, Your Honor, is I was just

10   going to say, you could clearly solicit -- I'm not suggesting

11   that.  I think the argument we've made and I appreciate Mr.

12   Carr's comments, although I am not going to repay them by

13   suggesting his comment reply was as creative because I think

14   it's wrong, but -- that's a little tongue-in-cheek, Mr. Carr.

15   We've known each other for a while.

16        But, Your Honor, the legal bankruptcy issue next

17   after disclosure is 365 and it is the issue of cure.  And as I

18   said in my opening arguments, the issue under a license where

19   you have a licensor who has accessorily list vendors and whose

20   name is attached to that business, and whose trademarks and

21   goodwill and reputation and brand are part of that business,

22   they have a direct and important interest those vendors being

23   taken care of.

24        And I can't worry, Your Honor, and I don't think it's

25   appropriate for this court to consider what the implications

1   are or are not with respect to a particular bankruptcy issue.

2          In this district in the Enron case, people said at

3   one point that the secondary markets would fall apart if you

4   didn't -- if you had buyers of debtor be subject to fraudulent

5   conveyance risks and we had the whole issue in the Enron case.

6   I mean we hear that argument time and time again.

7          People -- bankruptcy judges make decisions and

8   financial markets respond.  What we have to deal with today,

9   Your Honor, and what Your Honor has to deal with is these TUAs,

10  these facts and circumstances and what's appropriate under the

11  law, under these circumstances.  And what these TUA say is that

12  this debtor had an obligation to pay all sums due.  And when we

13  look at --

14         THE COURT:  All sums due?

15         MR. GOLDSTEIN:  To the third-parties who do business

16  with the licensee.  And it also says further in 27(h) -- it

17  doesn't -- it says, "and if any amounts are not paid," so it

18  actually goes even further, "it's a default."

19         So while I appreciate Mr. Carr's attempt to parse the

20  ordinary English language as to what all sums due means, I

21  think 27(h) makes it pretty clear that if any amount is not

22  paid, it's a default.

23         And again, Your Honor, it's a default vis-a-vie

24  Ashley.  It's not a default that the vendor can take advantage

25  of.  It's not a vendor issue.  They have their own contractual

1    rights.  They're not third-party beneficiaries.  But so, Your

2    Honor, I do believe that --

3            THE COURT:  And explain to me Ashley's interest in

4    payment to the third-parties.

5            MR. GOLDSTEIN:  Ashley's interest in paying vendors

6    with respect to the Ashley segment is its name, its marks, its

7    brand, and its goodwill that's on the door.

8            THE COURT:  And tell me who, identify some of these

9    unpaid parties in this case that Ashley's concerned about.

10           MR. GOLDSTEIN:  Your Honor, if we -- the schedule of

11   assets and liabilities which was one of the documents we looked

12   at has 1.6 million of vendors; one of them is Ashley.

13           THE COURT:  How much is that of Ashley?  Well the

14   record will show.

15           MR. GOLDSTEIN:  The record shows, Your Honor.  I

16   think it's roughly 800 or 900 thousand dollars.

17           THE COURT:  All right.

18           MR. GOLDSTEIN:  And then there's a bunch of

19   landlords, I believe.

20           THE COURT:  Yes.

21           MR. GOLDSTEIN:  And then there's a bunch, a number --

22   the rest of them are vendors, merchants.  Now I don't think

23   that's a complete list.  Your Honor has asked me that before.

24   I can only deal with what I have in terms of the debtors'

25   disclosures.

1          THE COURT:  I have a record.  That's all I have.

2          MR. GOLDSTEIN:  But there are other creditors there

3     and there's a number of vendors, merchandise vendors, who are

4     on that list.  And they didn't have Hartsdale liquidation

5     analysis.  They didn't have Hartsdale information.  In fact,

6     they had on their schedule, a schedule that says no cash and no

7     accounts receivable.

8          So if we try to make a determination, well what's

9     fair to them, well they didn't really have all the information

10    to make a decision but again, it's not their issue.  It's my

11    issue.  And my issue is can you cure?  And I'm saying, Your

12    Honor, you can cure.  It just costs you some money and it may

13    not be that much of a dollar amount if somebody did their

14    homework and I'm -- and it may not, in fact, curtail or derail

15    this reorganization because, in fact, apparently there is some

16    money as of the effective date; 1.8 million.  I don't know.  It

17    wasn't clear to me just how much really was available but if we

18    assume that, then there is money to pay them.

19         So it's not a question of stopping the railroad

20    train, Your Honor.  It's a question of making sure that the

21    track and the railroad are running on the straight and narrow

22    path and we're doing things the right way.  That's the nice

23    thing about these -- of having the opportunity to come before

24    Your Honor that we get to stop and say if we missed something,

25    if we made a wrong assumption, if we haven't done something,

1    somebody else gets to decide if we can't rely upon it.

2         As I said, we're not trying to stop the

3    reorganization.  We're trying to resolve this.  But there is a

4    fundamental difference.  Some people didn't think they had to

5    deal with this.  We do and it's an important issue to us.  So

6    that's the 365 issue with respect to cure.

7         The other cure issue, Your Honor, is the non-monetary

8    default with respect to the provision of information.  I would

9    simply note that the first two sentences of paragraph 24 don't

10   require a request.  The information Mr. Abada testified was not

11   provided.  The information was provided in '09 but not in '10.

12   And that's a default.

13        I think the more important 365 issue or the other two

14   365 issues are (1), the assignment issue and then the adequate

15   assurance.  The assignment issue, Your Honor, I am not going to

16   belabor.  You've heard it before from my colleague, Mr. Schultz

17   and I just need to point it out for purposes of the record.  I

18   think it's actually a very strong argument here, not only --

19        THE COURT:  What was that issue?

20        MR. GOLDSTEIN:  Whether or not the assumption is

21   really a de facto assignment.

22        THE COURT:  Mr. Schultz specifically stated that he

23   was not relying on that issue.  He said so on the record.

24        MR. GOLDSTEIN:  Right.

25        THE COURT:  And I assume you're not countervailing

1    anything he said.

2              MR. GOLDSTEIN:  Not countervailing there.  We just

3    want to preserve it for the record, Your Honor, but we're not

4    arguing it.

5              THE COURT:  There's nothing to preserve.

6              MR. GOLDSTEIN:  Okay.

7              THE COURT:  He said he wasn't making the argument.

8              MR. GOLDSTEIN:  Okay.  Then Your Honor --

9              THE COURT:  If you're making the catapult argument

10   here --

11             MR. GOLDSTEIN:  I'm not -- no, no, no.

12             THE COURT:  -- for appeal --

13             MR. GOLDSTEIN:  No.

14             THE COURT:  -- I would like to know that.

15             MR. GOLDSTEIN:  No, no.  I'm sorry, Your Honor.  No.

16   I'm not making the catapult argument.

17             THE COURT:  All right.

18             MR. GOLDSTEIN:  No, no, Your Honor, we're not.

19             THE COURT:  All right.

20             MR. GOLDSTEIN:  That's --

21             THE COURT:  Next issue?

22             MR. GOLDSTEIN:  I apologize.  I didn't mean to

23   confuse or make that ambiguous.

24             The issue that I think in terms of the assignments,

25   not the catapult issue, Your Honor but to the adequate

1    assurance issue, so let me turn to that one.

2            THE COURT:  All right.

3            MR. GOLDSTEIN:  Okay?  The adequate assurance issue

4    has two components; one is the ability to comply with the

5    ongoing TUA obligations.  We went through them in ad nauseum.

6    I am not going to repeat what Mr. Abada said.  We expect full

7    reporting.  We do think that from the confidentiality

8    perspective under that provision, the debtor should confirm

9    that confidential information won't be provided to the plan

10   sponsor.  The debtors' been able to operate long before the

11   plan sponsor's involvement in this case without doing that.

12   And we think that it's as a matter of adequate assurance, they

13   shouldn't receive that information.

14           The adequate assurance issue that I want to focus you

15   on, Your Honor, is the issue of the structural relationship

16   between Hartsdale and Jennifer.  It's a variant on the

17   feasibility issue, Your Honor.  It's what I was thinking when I

18   said assignment but not in terms of the catapult.  It's the

19   fact that we see this process of assumption and the structure

20   of this debtor being one where, in fact, the obligation to

21   perform, the financial obligations to perform and we went

22   through a number of those obligations, other than ones which

23   require payment to Ashley, payment to the vendors on an going

24   basis, performing all of the obligations that require the

25   expenditure of funds, protecting the brand, et cetera, is it --

1    requires under the debtors' proposed restructure, complete and

2    utter dependence on cash flow coming back from Jennifer since

3    it's all cash swept out of Hartsdale.

4        Their suggestion wherein Hartsdale maintained

5    hundreds if not millions of dollars of cash balances will now

6    be 100 thousand dollars is illusory. And while yes, the debtor

7    will have cash on the balance sheet of around two million

8    dollars, there is no more term E note availability. I think

9    that testimony was very clear. And at best, there's a million-

10   five of a letter of credit which it's not clear from the

11   testimony whether that can or cannot be issued back to the

12   benefit of the debtor but will give them the benefit of the

13   doubt.

14       Your Honor, on a business of eighty million dollars

15   of net sales, that's not a tremendous amount of flexibility and

16   what you're doing by allowing all of the funds to go out of

17   Hartsdale is you're making Hartsdale now dependent --

18   Hartsdale's creditors including Ashley, who we're really

19   speaking for, in terms of adequate assurance, dependent upon

20   the good fortunes of Jennifer, a business that has been and is

21   today failing, a business that doesn't account for any

22   significant portion of the calendar year 2011 EBITDA according

23   to the testimony in their own projections. So when we just

24   look at where this snapshot is on confirmation, I don't believe

25   they've met their burden of proving adequate assurance or

1  future performance.

2          With respect to the plan, Your Honor, I've touched on

3  the disclosure issue, so I am not going to repeat that.  We've

4  raised that in the brief.  I think the failure to do a

5  liquidation analysis is a really, really difficult one to

6  overcome.

7          THE COURT:  For Hartsdale.

8          MR. GOLDSTEIN:  For Hartsdale; yeah.

9          THE COURT:  All right.

10          MR. GOLDSTEIN:  But I think Your Honor, the

11  disclosure issue as I said, is really the difficult one because

12  they presumed an answer in this case day one which is that you

13  could do substantive consolidation on an affirmative basis,

14  really directly in violation with what Owens-Corning and the

15  progeny have talked about in terms of substantive

16  consolidation.

17          The notion that you can do procedural substantive

18  consolidation and waive away the debtors, create one class and

19  not allow class voting, and not even give people the

20  opportunity to understand what those classes are entitled to,

21  and on the other hand say actually well it's difficulty, which

22  it really wasn't, or it's impossible, which meant according to

23  Mr. Abada, you had to get it down to the penny which is I don't

24  think it's a standard that anybody thought when you read

25  impossible, is very difficult to overcome.

1          And what I think it does, Your Honor, from my

2     perspective is it affects more this issue of how you think

3     about cure of those vendors.

4          THE COURT:  All right.  Well, let me see if I

5     understand your theory --

6          MR. GOLDSTEIN:  Well, could I just -- okay.

7          THE COURT:  -- your argument.

8          MR. GOLDSTEIN:  All right.  One more point but --

9          THE COURT:  Go ahead.  Finish.

10          MR. GOLDSTEIN:  No.

11          THE COURT:  And then I'll ask you the question.

12          MR. GOLDSTEIN:  Yeah, just one more point.  I will

13     make it very quick, Your Honor, because I know everyone wants

14     to get out of here and I appreciate the Court's --

15          THE COURT:  No, we have all the time --

16          MR. GOLDSTEIN:  No, I know.

17          THE COURT:  -- in the world.

18          MR. GOLDSTEIN:  I am not feeling pressured.  I am not

19     suggesting that my time is being limited in its -- believe me,

20     we've spent a lot of time.

21          And I think on the feasibility issue, Your Honor,

22     nobody's saying it's a guarantee.  Nobody's saying that you

23     have to do exactly a hundred percent when your projections say

24     -- but what the case law does say is you have to have a

25     reasoned basis for what you project.  It can't be based upon

1  your belief.  It can't be based upon your hopes and desires.

2  It can't be speculative.  There has to be some there there,

3  other than a cheerleading squad that says boy, this is great.

4  Our alternative is terrible.  This is great.  Now they're

5  not -- the sixteen million dollar supplier in this case who

6  wants to own this company is willing to fund it and boy, that's

7  great.  Let him have it because we have a chance for success.

8      I get the cheerleading.  I don't get the substance.

9  Because the substance you have in Exhibit C to the disclosure

10  statement and the declarations are a bunch of numbers on a

11  page.  Nobody's told you how they got there, why they got

12  there, why they're reasonable, why five percent isn't three

13  percent or five percent maybe isn't six percent.

14      THE COURT:  Well, I'll make that decision based on

15  the record.  The record as a whole shows no countervailing

16  testimony whatsoever.  You have made arguments against the

17  projections in the record.  You certainly cross-examined Mr.

18  Grien, but you have had an opportunity to put in your own

19  record and there's nothing.  So I'll make that decision on the

20  record.

21      But let me ask you the question I had and that is

22  what do you want me to do?  There are two things I can do today

23  because you've made two different arguments, if I'm -- I can.

24  I'm not saying today.  But there are two things I can do; one

25  is, I can say TUAs are assumed, the plan is confirmed but the

1  debtors either have to resolicit the few creditors of

2  Hartsdale, of the Ashley company and we'll see where they

3  stand.  I'm not saying I am going to do that.  That's one thing

4  I could do.

5          Or I could deny confirmation of the plan.  We could

6  liquidate these companies.  Ashley gets the TUAs back, which

7  may be or may not be what it wants but we'll put that question

8  aside and everybody gets liquidated because you say there are

9  some issues relating to feasibility which is a question

10 obviously I have to decide on the record I have.  But which of

11 those two scenarios do you argue or do you argue for them both?

12 We'll take the second.  We'd rather, no assumption, no

13 confirmation, but if we don't get that, then going to page 18

14 or 22 of your memo of law, well then we have an alternative.

15          MR. GOLDSTEIN:  Your Honor, let me respond by saying

16 I can give you the alternative arguments.  I can't give you a

17 definitive position because I don't have authority to tell you

18 definitively.  However, if Your Honor concludes that the TUAs

19 can't be assumed, whether liquidation will follow or whether

20 there will be some other alternative, I don't know but clearly

21 one of the things we have said is that you can't assume the

22 TUAs without providing us the relief set forth in paragraph 22.

23          The element of the paragraph 22 relief that I believe

24 navigates the waters, Your Honor, and doesn't necessarily

25 require resolicitation is that you agree that assumption

1    requires under paragraph 4, payment of the Hartsdale vendors

2    because if they're paid, any issues with respect to disclosure,

3    any issues with respect to liquidation analysis, any issues

4    with respect to the process are really mooted.

5        I think Your Honor if you reach the result that these

6    can be assumed but you agree with me that the vendors have to

7    be paid, the debtor complies with its reporting requirements,

8    the debtor complies with the confidentiality requirements, you

9    can get there.  Now --

10       THE COURT:  Going forward, I don't think there is any

11   dispute that the TUAs will be in effect as written and the

12   debtor will be obligated to comply with it.  And fortunately or

13   unfortunately, if there is a subsequent dispute in a year or

14   two, I don't believe I will be the party required to resolve

15   that dispute.  Hopefully there won't be a dispute.

16       It appears that the company -- the two companies got

17   along very well for many years without much of a glitch and

18   indeed, both parties seem to have benefitted enormously from

19   the relationship.  You've impressed on me time and time again

20   that this has been a very beneficial contract, group of

21   contracts for these debtors and I have to assume that Ashley

22   has gotten paid and paid in full.  I don't believe that Ashley

23   was behind.  The debtors were not behind on Ashley on the day

24   of the filing or not far behind, at least I have been told

25   that.  And presumably, you made this point over and over

1    again, the Ashley relationship is a valuable one and one that

2    these debtors should give up no matter what they do.

3            Another alternative of course would be for me to say

4    kill the Jennifer side of the business and continue with

5    Ashley.  That seems to be sometimes what you're arguing for.

6            MR. GOLDSTEIN:  No, I am not arguing that, Your

7    Honor.  We're arguing that the Ashley side is subsidizing the

8    Jennifer side and that you have to take that in account when

9    you think about adequate assurance, which I think -- and I

10   think Your Honor appreciates that.

11           THE COURT:  All right.

12           MR. GOLDSTEIN:  But, Your Honor, I am not -- I want

13   to be clear because I am trying to be cognizant of the Court's

14   comments.  Because it is an important business and we're not

15   saying it's not important business, what's part of that

16   important business is the vendors and getting back to the

17   brand, the goodwill, the trademark.  It's a very perhaps

18   nuanced comment but it's one that I think we tried to make and

19   make convincingly, I think under the documents but as well as

20   try and bring them into the fold.

21           That is a significant piece, we think, of cure.  And

22   if you reach that decision on cure, then they have to make some

23   additional payments.  They'll comply with the obligation.  And

24   we'll see what happens, Your Honor.  If you don't reach that

25   conclusion, then I think you have -- the issues of disclosure

1    become more paramount in terms of how you think about how those

2    creditors were treated in this process and the issues of de

3    facto substantive consolidation and the liquidation and

4    disclosure and what not.

5         THE COURT:  All right.  I think I understand what

6    your position is.

7         MR. GOLDSTEIN:  I hope I --

8         THE COURT:  At least you've given me as much as you

9    are authorized to state today.  Thank you.

10        MR. GOLDSTEIN:  Thank you very much, Your Honor.

11        MR. FOX:  I just have one further point of

12   clarification because Ashley is a fiduciary to Ashley.  I

13   understand that.  We negotiated with a committee that was

14   composed of not just Jennifer Convertible creditors but Ashley

15   creditors -- Hartsdale creditors.

16        There's no evidence before Your Honor that any one of

17   these Ashley paragraph 4 creditors are all unhappy; quite to

18   the contrary during the time I sat there.  Aside from the

19   landlords, who will argue that they're going to get future rent

20   but one of them is represented here, those are the top

21   creditors.  Every one of our leased locations with Ashley has

22   entered into a lease modification agreement.  There's also a

23   rather -- there was a large creditor debt owed to GMM which is

24   -- I mean is now based on the settlement, is additional rent.

25   So that's another one.

1    But the three creditors that did vote -- I stand

2    corrected, I thought it was four, so maybe my math -- I can

3    recognize all the corporate names, Your Honor.  I am only going

4    by the claims -- the ballot and the sofas but the three largest

5    ones that were on there, aside from landlords, Valspar voted

6    for the plan.

7        Now why he -- why Mr. Goldstein reads that they voted

8    for a different plan, I don't know.  If they really were

9    unsure, maybe they wouldn't have voted.  They voted. Sealy

10   voted for the plan.  Left Bank voted for the plan. And let me

11   tell you, Judge, when I was down to Left Bank, they wrote a

12   thousand dollars.  So now when you go through these sofas and

13   you're asking us to resolicit if that would be something that

14   would go to find out whether those creditors, other than those,

15   need to -- didn't understand it, I just think they weren't owed

16   a lot of money.  You know, basically they are -- it's all

17   relative in life but they're owed -- most of those creditors

18   are owed four or five thousand dollars.  They probably didn't

19   know what to do when they got a disclosure statement of the

20   plan.

21       THE COURT:  We're speculating.

22       MR. FOX:  Okay.

23       THE COURT:  I have a record.

24       MR. FOX:  Okay.

25       THE COURT:  And does anybody else wish to be heard?

1          MR. CARR:  Yes, Your Honor, just two quick points.

2          THE COURT:  Excuse me.

3          MR. CARR:  I suspect I'm one of the cheerleaders that

4   Mr. Goldstein was referring to.  In any event, Mr. Goldstein

5   today makes a real big issue about Ashley's name, Ashley's

6   marks, Ashley's reputation.  It talks about the record that was

7   made at today's hearing, the need to protect those intellectual

8   property rights.

9          But what's also part of the record, Your Honor, is

10  not -- is one thing that was not done in this case and that is

11  Your Honor has never once filed a motion to vacate the

12  automatic stay to allow it to protect its rights because of

13  various defaults that the debtors had in connection with the

14  TUA.  Specifically, not paying -- for example, not paying its

15  other customers or vendors in the ordinary course of business.

16         So if those marks were of paramount importance to

17  Ashley, I submit Your Honor would have seen a motion to vacate

18  the automatic stay to allow Ashley to terminate those

19  agreements.

20         THE COURT:  Well --

21         MR. CARR:  It didn't happen.

22         THE COURT:  We're speculating.

23         MR. CARR:  You know, I just think what we're hearing

24  today is a little bit different than reality.

25         The second point is, again I'm going to go back to

1    paragraph 4 of the TUA.  An interpretation of that paragraph

2    consistent with what Mr. Goldstein wants turns everything

3    upside down.  There are landlords of the Hartsdale entity that

4    agreed, for example, to waive claims and to give rent

5    reduction.  In fact, Your Honor approved those agreements

6    earlier today.

7         The absurdity of the argument is that the debtor

8    can't accept those.  The debtor has to go back to the landlords

9    and say to the landlords, no, we're compelled to pay you in

10   full and we don't need any rent relief because we're not

11   allowed to because we're going to be in violation of paragraph

12   4 of the TUA.  That's just another -- just think of that from a

13   logical perspective.  Thank you.

14        THE COURT:  All right.  I will think of it from a

15   perspective of interpreting a contract and making sense of all

16   the terms of a contract but that's what judges do all the time.

17   Anyone else?

18        MR. FOX:  Your Honor, I just misstated.  When I

19   discussed three creditors, it was three non-landlord creditors

20   because there were lots of creditor landlords that did vote for

21   the plan.

22        THE COURT:  Yes.

23        MR. FOX:  So I'd have to stand corrected.  I was

24   giving you -- I didn't even think of the argument Mr. Carr

25   made.  I was giving you three more vanilla creditors.

1      THE COURT:  I was assuming that.

2      MR. FOX:  Okay.

3      THE COURT:  You have separate deals, you've told me

4  with the landlords, of Hartsdale, as well as with most of the

5  other landlords, at least those where you're assuming.

6      MR. FOX:  Right.

7      THE COURT:  Or most of them.  Anyone else?

8    (No response)

9      THE COURT:  All right.  I will not attempt to issue a

10  decision tonight.  I will issue a decision as soon as I can,

11  either in writing or if it's oral, I will have a telephonic

12  conference and you'll read my decision into the record.

13      At that time, if the decision is to confirm the plan

14  and to assume the contracts, I may or may not have some

15  colloquy over the form of the confirmation order.  Frankly, I

16  think the form of the order is generally far better than many

17  I've seen recently.  And one of the main questions though is

18  the -- some of the release language, not all of it but perhaps

19  a little of the language that the debtors have inserted.  But

20  we can look at it and when I'm speaking of release, I'm not

21  speaking of the debtors' release, I'm speaking of the third-

22  party release.  But that's for -- perhaps that's -- I'm getting

23  ahead of myself.

24      I appreciate very much the efforts of all parties and

25  the professional presentations today.  And I will try to get

1   out a decision as soon as I possibly can.  I realize this case

2   has been on a fast track and I'm assuming that you want to

3   confirm -- you want to go effective if you can as soon as you

4   can.  And that's everyone's desire, at least to know where you

5   stand.  It may not be everyone's desire to confirm but that

6   certainly everyone would want to know where they stand, as soon

7   as possible.

8              MR. FOX:  In particular, a lot of the landlords are

9   probably are expecting to get their cure payments that we

10  haven't made and certain other perspective payments that we've

11  made.

12             THE COURT:  Well, you're making the cure payments on

13  the effective date.

14             MR. FOX:  Yes.

15             THE COURT:  And when would you -- I don't know that

16  you've ever stated when you would -- if I confirm the plan

17  today, when you would hope to go effective.

18             MR. FOX:  February 8.

19             THE COURT:  February 1?

20             MR. FOX:  8th.

21             THE COURT:  February 8.

22             MR. FOX:  Well, no, later than February 8.  It

23  depends on whether Mengnu was going to want to wait the

24  fourteen days.  We're ready to -- I think that everybody's

25  ready to go effective sooner than that but I wouldn't want to

1    put, I think it was --

2            MR. NEIGER:  February 8, Your Honor.

3            THE COURT:  February 8.  Well it may -- there

4    obviously is going to be some delay in terms of entry of a

5    confirmation order because we're not going to enter a

6    confirmation order tonight.  That I can assure the parties.

7            I do want to look at the arguments.  There are a few

8    issues that I think I should look at more closely before I

9    issue a decision.

10           Anything else tonight?

11           MS. NADRITCH:   Just one housekeeping matter, Your

12   Honor.

13           THE COURT:  Yes.

14           MS. NADRITCH:  Earlier this morning, you approved

15   three motions; if I may submit those orders.

16           THE COURT:  Yes, please do.

17           MS. NADRITCH:  Thank you very much.

18           THE COURT:  Please do.

19           MS. NADRITCH:  Thank you.

20           THE COURT:  And again, I thank the parties for very

21   professional presentations.

22           IN UNISON:  Thank you, Your Honor.

23        (Whereupon these proceedings were concluded at 6:40 p.m.)

24

25

1

2                    I N D E X

3

4              T E S T I M O N Y

5   WITNESS               ATTORNEY              PAGE

6   Rami Abada            Mr. Goldstein         76, 159

7   Rami Abada            Mr. Fleming           149

8   Rami Abada            Mr. Carr              151

9   Rami Abada            Mr. Neiger            158

10

11  Robert Grien          Mr. Goldstein         163

12

13  L. Thomas Sperry      Mr. Neiger            185

14  L. Thomas Sperry      Mr. Goldstein         190

15

16              E X H I B I T S

17  DEBTORS'                                    EVID

18  A - Certificate of good standing            146

19  B - Certification of Incorporation          147

20  C - Carle Place TUA                         148

21  D, E, F, G, H, I                            148

22  J - Financial statement Hartsdale           148

23  provided to Ashley in December 2009

24

25

I N D E X

(continued)

E X H I B I T S

ASHLEY'S                                              EVID

4 - Hartsdale scheduled assets                        198

and liabilities pleading

7 - Amended DIP budget dated 11/24/10                 199

9 - August 17 letter from Mr. Schultz                 200

to Mr. Fox

14, 15, 17 - Monthly operating report                 200

and disclosure statement

22 - 2009 balance sheet pages AH-001 to AH-005    201

29 - TUA with respect to Carle Place                  201

30 - Second amended secured exit credit               203

agreement 1185035-1

R U L I N G S

DESCRIPTION                                      PAGE LINES

Settlement approved subject to the additional    13    21-24

notice

Claims expunged and adjusted as requested        15    8-10

subject to a clarification with regard

to the claim of 376 Boylston Street Realty.

I N D E X

(continued)

R U L I N G S

| DESCRIPTION | PAGE | LINES |
|---|---|---|
| Motion for approval to assume leases approved | 20 | 15 |
| Motion to strike Grien declaration overruled | 65 | 1-2 |

1

2                    C E R T I F I C A T I O N

3

4    I, Esther Accardi, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8       Esther        Digitally signed by Esther
                      Accardi
9       Accardi       DN: cn=Esther Accardi, o, ou,
                      email=digital1@veritext.com,
                      c=US
10   _____ Date: 2011.01.27 15:42:29 -05'00'_____

11   Esther Accardi (CET**D-485)

12   AAERT Certified Electronic Transcriber

13

14   Also transcribed by:     Zipporah Geralnik (CET**D-489)

15                            Ellen Kolman (CET**D-568)

16

17   Veritext

18   200 Old Country Road

19   Suite 580

20   Mineola, New York 11501

21

22   Date:  January 27, 2011

23

24

25